**No. 23-15234**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

PAUL A. ISAACSON, M.D., ET AL.,
*Plaintiffs-Appellants,*

v.

KRISTIN K. MAYES, ATTORNEY GENERAL OF ARIZONA, IN HER
OFFICIAL CAPACITY, ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Arizona
No. 2:21-cv-01417-DLR

_____

**PLAINTIFFS-APPELLANTS' BRIEF**

_____

Jessica Sklarsky
Gail Deady
Catherine Coquillette
Center For Reproductive Rights
199 Water Street
New York, NY 10038
Telephone: (917) 637-3600
jsklarsky@reprorights.org
gdeady@reprorights.org
ccoquillette@reprorights.org

*Counsel for Paul A. Isaacson, M.D.,
National Council of Jewish Women
(Arizona Section), Inc., and Arizona
National Organization for Women*

Jared G. Keenan
American Civil Liberties Union
Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
jkeenan@acluaz.org

*Counsel for Plaintiffs-
Appellants*

[Additional Counsel Below]

Jen Samantha D. Rasay
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC 20006
Telephone: (202) 628-0286
jrasay@reprorights.org

Beth Wilkinson
Anastasia Pastan
Anthony Ferrara
Elizabeth Keys
Wilkinson Stekloff LLP
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
aferrara@wilkinsonstekloff.com
ekeys@wilkinsonstekloff.com

Ralia Polechronis
Justin Mungai
Wilkinson Stekloff LLP
130 West 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-9410
rpolechronis@wilkinsonstekloff.com
jmungai@wilkinsonstekloff.com

*Counsel for Paul A. Isaacson, M.D.,
National Council of Jewish Women
(Arizona Section), Inc., and Arizona
National Organization for Women*

Alexa Kolbi-Molinas
Rebecca Chan
Ryan Mendías
Lindsey Kaley
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
akolbi-molinas@aclu.org
rebeccac@aclu.org
rmendias@aclu.org
lkaley@aclu.org

*Counsel for Eric M. Reuss, M.D.,
M.P.H., and Arizona Medical
Association*

# DISCLOSURE STATEMENT

Plaintiffs-Appellants Paul A. Isaacson, M.D., National Council of Jewish Women (Arizona Section), Inc., Arizona National Organization for Women, Eric M. Reuss, M.D., M.P.H., and Arizona Medical Association do not have parent corporations. No publicly held corporation owns ten percent or more of Plaintiffs-Appellants' stock.

Date: April 20, 2023

*/s/ Jessica Sklarsky*
Jessica Sklarsky

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ...................................................................... i

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION .................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 4

ISSUES PRESENTED ............................................................................. 4

STATUTORY AUTHORITY .................................................................... 4

STATEMENT OF THE CASE ................................................................... 5

    I.      FACTUAL BACKGROUND ......................................................... 5

          A.    Plaintiff-Physicians .......................................................... 5

          B.    Fetal Screening and Diagnosis in Arizona Before the Reason Scheme ............................................................. 6

               1.    Fetal Screening and Diagnosis Standards ........................ 6

               2.    Plaintiff-Physicians' Practices Before the Reason Scheme .................................................................. 9

          C.    The Reason Scheme .......................................................... 11

          D.    Impact of the Reason Scheme on Plaintiff-Physicians' Practices ............................................................. 14

               1.    The Scheme's Incomprehensible Vagueness ................ 14

               2.    Plaintiff-Physicians' Practices Under the Reason Scheme .................................................................. 19

    II.      PROCEEDINGS BELOW ............................................................ 21

SUMMARY OF THE ARGUMENT ....................................................26

STANDARD OF REVIEW .................................................................28

ARGUMENT ......................................................................................29

    I.     THE DISTRICT COURT ERRED IN FINDING NO ARTICLE III INJURY-IN-FACT......................................................................29

          A.    Plaintiff-Physicians Are Experiencing "Actual," Ongoing Injuries Under the Reason Scheme...........................................30

          B.    Plaintiff-Physicians Demonstrate an "Imminent" Future Injury. ......................................................................................36

                   1.    Plaintiff-Physicians Demonstrate an "Intent[] to Engage in a Course of Conduct Arguably Affected with a Constitutional Interest."..................................................37

                   2.    Plaintiff-Physicians Demonstrate an "Intent[] to Engage in a Course of Conduct Arguably . . . Proscribed" By the Reason Scheme. ......................................................40

                   3.    Plaintiff-Physicians Demonstrate a "Credible Threat of Prosecution" Under the Reason Scheme. .......................44

                   4.    The District Court's Failure to Find an "Imminent" Future Injury Rests on Its Misinterpretation of "Arguably Affected with a Constitutional Interest."......54

CONCLUSION ...................................................................................61

STATEMENT OF RELATED CASES ...............................................64

CERTIFICATE OF COMPLIANCE..................................................65

CERTIFICATE OF SERVICE ..........................................................66

ADDENDUM .....................................................................................67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Farm Bureau Fed'n v. EPA*,
792 F.3d 281 (3d Cir. 2015) ...........................................................30

*Animal Legal Def. Fund v. Vaught*,
8 F.4th 714 (8th Cir. 2021) ............................................................38

*Ariz. Right to Life Pol. Action Comm. v. Bayless*,
320 F.3d 1002 (9th Cir. 2003) ................................................ 47, 53

*Arizona v. Yellen*,
34 F.4th 841 (9th Cir. 2022) ................................................ *passim*

*Ass'n of Am. Railroads v. Dep't of Transp.*,
38 F.3d 582 (D.C. Cir. 1994)..........................................................31

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979)............................................................... *passim*

*Baggett v. Bullitt*,
377 U.S. 360 (1964).............................................................. *passim*

*Bankshot Billiards, Inc. v. City of Ocala*,
634 F.3d 1340 (11th Cir. 2011) ........................................... *passim*

*Box v. Planned Parenthood of Ind. & Ky., Inc.*,
142 S. Ct. 2893 (2022).....................................................................23

*Brnovich v. Isaacson*,
142 S. Ct. 2893 (2022)............................................................ 22, 23

*Cal. Pro-Life Council, Inc. v. Getman*,
328 F.3d 1088 (9th Cir. 2003) .......................................................41

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017)................................................................ 31, 33

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022)......................................................................1

*Does 1-5 v. Chandler*,
83 F.3d 1150 (9th Cir. 1996) .........................................................28

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)......................................................................35

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
988 F.3d 114 (2d Cir. 2021) ........................................................31

*Green v. U.S. Dep't of Just.*,
392 F. Supp. 3d 68 (D.D.C. 2019).................................................38

*Huff v. TeleCheck Servs., Inc.*,
923 F.3d 458 (6th Cir. 2019) .......................................................29

*Kashem v. Barr*,
941 F.3d 358 (9th Cir. 2019) .......................................................59

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ........................................................31

*Knife Rts., Inc. v. Vance*,
802 F.3d 377 (2d Cir. 2015) ........................................... 38, 39, 56

*Kolender v. Lawson*,
461 U.S. 352 (1983)......................................................................59

*Lake Carriers' Ass'n v. MacMullan*,
406 U.S. 498 (1972)................................................... 2, 26, 30, 31

*LSO, Ltd. v. Stroh*,
205 F.3d 1146 (9th Cir. 2000) ............................................. 48, 52

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)................................................... 2, 30, 31, 50

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016) .......................................................51

*Meachum v. Fano*,
427 U.S. 215 (1976)......................................................................39

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)................................................... 38, 47, 53, 61

*Mishler v. Nev. State Bd. of Med. Exam'rs*,
896 F.2d 408 (9th Cir. 1990) .......................................................39

*Nat'l Audubon Soc'y v. Davis*,
307 F.3d 835 (9th Cir. 2002) .......................................................31

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) ................................................................. 37

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925) .............................................................................. 30

*Poe v. Ullman*,
    367 U.S. 497 (1961) .............................................................................. 52

*Rutledge v. Little Rock Fam. Plan. Servs.*,
    142 S. Ct. 2894 (2022) .......................................................................... 23

*San Diego Cnty. Gun Rts. Comm. v. Reno*,
    98 F.3d 1121 (9th Cir. 1996) ......................................................... 28, 51

*Santa Monica Food Not Bombs v. City of Santa Monica*,
    450 F.3d 1022 (9th Cir. 2006) .............................................................. 53

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) .................................................................. 38, 56

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .............................................................................. 34

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ....................................................................... *passim*

*Thomas v. Anchorage Equal Rts. Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ....................................................... 36, 45

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ......................................................... *passim*

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ......................................... 40, 44, 47, 56

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ....................................................................... 57, 58

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988) .............................................................................. 50

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................... 3, 29, 35, 56

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010) ................................................. 48, 52, 53

*Woodhull Freedom Found. v. United States*,
  948 F.3d 363 (D.C. Cir. 2020)................................................................38

**Statutes**

28 U.S.C. § 1292 ....................................................................................4

28 U.S.C. § 1331 ....................................................................................4

28 U.S.C. § 1343 ....................................................................................4

A.R.S. § 11-532....................................................................................49

A.R.S. § 13-107....................................................................................49

A.R.S. § 13-301....................................................................................14

A.R.S. § 13-303....................................................................................14

A.R.S. § 13-3603.02 ...................................................................... *passim*

A.R.S. § 13-702....................................................................................12

A.R.S. § 32-1401....................................................................................13

A.R.S. § 32-1403....................................................................................13

A.R.S. § 32-1403.01................................................................................13

A.R.S. § 32-1451....................................................................................13

A.R.S. § 36-2157........................................................................... *passim*

A.R.S. § 36-2158........................................................................... *passim*

A.R.S. § 36-2161.................................................................. 1, 12, 13, 51

A.R.S. § 36-449.02................................................................................51

Senate Bill 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) ............................ 4, 11, 50

**Other Authorities**

Appl. for Partial Stay of Inj. Pending Appeal, *Brnovich v. Isaacson et al.*,
  No. 21A222 (U.S. Dec. 10, 2021) ...................................................22

Emergency Mot. Under Circuit Rule 27-3 for a Partial Stay Pending Appeal,
  *Isaacson et al. v. Brnovich et al.*, No. 21-16645 (9th Cir. Oct.
  22, 2021) .................................................................................22

Mot. to Intervene and Join Pet. for Review of Intervenor/Appellee Dennis McGrane, Yavapai County Att'y, *Planned Parenthood Ariz., Inc. v. Mayes*, No. CV-23-005-PR (Ariz. Mar. 2, 2023)..........................................49

Order, *Isaacson et al. v. Brnovich et al.*, No. 21-16645 (9th Cir. June 30, 2022) ...................................................................................................23

**Rules**

9th Cir. R. 28-2.7 .........................................................................................4

Fed. R. App. P. 4 ..........................................................................................4

Fed. R. Civ. P. 12 .......................................................................................60

**Constitutional Provisions**

Ariz. Const. art. V, § 1 ...............................................................................49

U.S. Const. art. III, § 2 ...............................................................................35

# INTRODUCTION[1]

After being enjoined for nearly a year, Arizona's Reason Scheme ("Reason Scheme" or "Scheme," A.R.S. §§ 13-3603.02(A)(2), (B)(2), (D), (E), 36-2157(A)(1), 36-2158(A)(2)(d), 36-2161(A)(25)) became enforceable on June 30, 2022. Shortly thereafter, plaintiffs, who are individual physicians and the largest physicians' association in Arizona ("Plaintiff-Physicians"), and two organizations that educate Arizonans about their constitutional rights (together, "Plaintiffs") once again sought to preliminarily enjoin the Scheme due to its unconstitutional vagueness. The Scheme criminalizes the provision of abortion if the provider has *some uncertain level* of knowledge that a patient's decision is to *some uncertain degree* motivated by an *unclearly defined* set of "genetic abnormalities."[2]

On January 19, 2023, the district court denied Plaintiffs' Renewed Motion for Preliminary Injunction, erroneously concluding that Plaintiffs could no longer demonstrate "a sufficiently concrete and imminent injury" to support federal jurisdiction under Article III after the loss of the substantive due process right to abortion in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).

---

[1] Unless otherwise indicated, for all citations herein: all emphases are added, all internal citations and quotations omitted.

[2] Where not directly quoting the language of the Scheme, Plaintiffs herein refer to the term "genetic abnormalities" as "fetal conditions" or "fetal diagnoses."

1-ER-7, 10. Given the undisputed facts of this case, the district court's conclusion is legally flawed for at least two reasons. *First*, given the Scheme's vague, inconsistent, and imprecise terms, Plaintiff-Physicians cannot determine what care the Scheme prohibits and fear arbitrary prosecution with severe criminal, civil, and licensure penalties under countless scenarios. As a result, since the Scheme became enforceable, Plaintiff-Physicians have been forced to over-comply with the law—severely curtailing the care they previously offered to patients with suspected or known fetal conditions (including care that may still be legal under the Reason Scheme)—to avoid as best they can the threat of prosecution. The district court's analysis disregards the costs and harms associated with Plaintiff-Physicians' coerced over-compliance with the now-enforceable Scheme, which constitute quintessential "actual" and ongoing Article III injuries. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 508 (1972).

*Second*, if Plaintiff-Physicians were to cease over-compliance and attempt to decipher the Scheme and offer as much care as is legally permissible under it, which would be their preference, the threat of prosecution would be severe. The district court cast aside these "imminent" future injuries Plaintiff-Physicians suffer due to the threat of prosecution, based on a clear misreading of the Supreme Court's "general standard" for pre-enforcement challenges set out in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). *Tingley v. Ferguson*, 47 F.4th 1055, 1067

2

(9th Cir. 2022), *petition for cert. filed*, Mar. 27, 2023 (No. 22-942) (raising unrelated questions of law). According to the district court, the *Driehaus* standard—which requires the challenger to demonstrate an "intention to engage in a course of conduct arguably affected with a constitutional interest," 573 U.S. at 159—is only met in pre-enforcement vagueness challenges when the law's vagueness chills the exercise of a *separate* constitutional right. 1-ER-7–13. Such a rule has no grounding in the Article III injury requirement, which merely seeks to "ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Driehaus*, 573 U.S. at 158 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). This rule also ignores the due process violations produced by vague laws that—like the Reason Scheme—threaten life, liberty, or property interests, regardless of whether an enforcement action has been initiated or the regulated conduct is constitutionally protected.

Plaintiff-Physicians unquestionably possess the requisite "personal stake" in the outcome of this case to satisfy Article III. *Warth*, 422 U.S. at 498. The district court incorrectly held the opposite, causing it to abandon its "duty . . . to decide" a "federal constitutional question" within its jurisdiction. *Baggett v. Bullitt*, 377 U.S. 360, 375 n.11 (1964); *see also Driehaus*, 573 U.S. at 167. Plaintiffs ask this Court to vacate the district court's Order and remand to the district court for consideration on the merits of Plaintiffs' Renewed Motion for Preliminary Injunction.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Pursuant to 28 U.S.C. § 1292(a)(1), this Court has jurisdiction over the appeal of a preliminary injunction. The district court denied preliminary injunctive relief on January 19, 2023. 1-ER–3–14. Plaintiffs timely appealed on February 21, 2023. 3-ER-304. *See* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

I.    Did the district court legally err by failing to find an "actual" Article III injury-in-fact given Plaintiff-Physicians' ongoing coerced over-compliance with the Reason Scheme?

II.   Did the district court legally err by failing to find that the threat of prosecution to Plaintiff-Physicians under the Reason Scheme is an "imminent" future Article III injury-in-fact under the *Driehaus* standard?

## STATUTORY AUTHORITY

Pursuant to 9th Cir. R. 28-2.7, the final version of Senate Bill 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) appears in the Addendum to this brief. *See infra* page A-1.

## STATEMENT OF THE CASE

### I.   FACTUAL BACKGROUND

### A. Plaintiff-Physicians

Plaintiff Dr. Paul A. Isaacson, M.D., is a licensed, board-certified obstetrician-gynecologist. 2-ER-250. Dr. Isaacson has been providing abortion care in Arizona for more than 20 years. *Id*. He is the co-owner of and one of two physicians at Family Planning Associates Medical Group, an independent abortion clinic located in Phoenix. 2-ER-250–51.

Plaintiff Dr. Eric M. Reuss, M.D., M.P.H., is a licensed, board-certified obstetrician-gynecologist. 2-ER-220. Since 2001, he has operated a private, solo obstetrics and gynecology ("OB/GYN") practice, Scottsdale Obstetrics & Gynecology, P.C., where he provides his patients with the full range of general OB/GYN care, including well-woman care; prenatal care; labor and delivery care; and abortion care. 2-ER-220, 222. He cares for hundreds of prenatal patients each year, and offers genetic testing and non-directive counseling to those patients, often in consultation with other medical specialists. 2-ER-222. He provides medication and procedural abortions to his patients. *Id*.

Plaintiff Arizona Medical Association ("ArMA") is a professional membership organization with nearly 4,000 physician members, including at least 75 members who are obstetrician-gynecologists. 2-ER-295, 297. Among ArMA's

5

membership are physicians who care for pregnant patients in myriad ways, including by providing fetal genetic testing and counseling for pregnant patients. 2-ER-297–98. One such member is Dr. Katherine B. Glaser, M.D., M.P.H., a board-certified obstetrician-gynecologist licensed to practice in Arizona. 2-ER-242. Dr. Glaser provides a wide range of OB/GYN care to patients in Arizona, including pregnant patients. 2-ER-242–43. Dr. Glaser's services include pregnancy care up to and including delivery, and she offers and counsels her pregnant patients about genetic and other routine testing, such as ultrasound results, provides them with non-directive information about options for their pregnancy and other care, and discusses any concerns or questions they may have during the pregnancy. 2-ER-243. In addition to providing ongoing prenatal care for her patients, she has performed about one or two procedural abortions per year and has provided medication abortion care. 2-ER-244.

### B. Fetal Screening and Diagnosis in Arizona Before the Reason Scheme

#### 1. Fetal Screening and Diagnosis Standards

The American College of Obstetricians and Gynecologists ("ACOG") and the Society for Maternal-Fetal Medicine ("SMFM") jointly recommend all prenatal patients routinely be offered fetal genetic testing options. 2-ER-224–25. This provides patients with additional information for possible prenatal treatment, for optimal delivery staff and location, and to inform consideration of abortion, if that

6

is an option the patient is considering. 2-ER-227–28. For patients with positive indications of a fetal diagnosis, it also helps with preparation for care after birth, if they decide to continue the pregnancy. 2-ER-227. As the ACOG and SMFM guidelines emphasize, testing should occur with complete, non-directive counseling both pre- and post-test. *Id.* Such counseling provides the patient with detailed facts about the test(s), fetal condition(s) at issue, range of possible outcomes, and community resources, among other topics, while answering questions to facilitate the patient's own decision-making. 2-ER-224; 2-ER-227–31.

There are a variety of tests and exams during pregnancy that screen for or may diagnose a fetal genetic condition. *See* 2-ER-167; 2-ER-224–26, 228–30; 2-ER-243–44. Those tests include ultrasounds, which are a routine part of prenatal care, as well as genetic testing options that examine fetal cells in maternal blood or the DNA of fetal cells sampled through chorionic villus sampling or amniocentesis. 2-ER-224–26, 228–29, 243. Many of these screening and diagnostic tests occur between 10-13 weeks of pregnancy. 2-ER-224, 228–29.

There are inherent uncertainties in fetal testing and diagnosis. 2-ER-225–26, 229; 2-ER-167. Fetal screening tests provide information about the likelihood or risk that a fetal condition may be present. 2-ER-225. While some fetal screening tests are quite sensitive and specific, they can produce false-positives, false-negatives, and uninterpretable results. 2-ER-229. Diagnostic tests—if available and pursued—aim

to determine whether a specific genetic condition is present in the fetus. 2-ER-225. However, diagnostic testing—like fetal screening—has limits and uncertainties. *Id.* Even when a diagnosis is made in utero, that cannot tell the patient and their physicians specifically how a condition will manifest over a child's lifetime or exactly how long a particular child might live. *See* 2-ER-167–68; 2-ER-228; 2-ER-259–60. The prognosis for fetal conditions that are or may be present is extremely varied, both among different conditions and, in almost all instances, within any one diagnosis. 2-ER-228; 2-ER-259.

The possible or diagnosed presence of a fetal condition adds another complex layer to decision-making related to pregnancy. 2-ER-224. Pregnant patients face a wide range of complex personal considerations—including, *e.g.*, their own health problems, worries about family stability, economic concerns, and existing care-giving responsibilities—in deciding whether to continue a pregnancy. 2-ER-231–33; 2-ER-252–53, 263; *see also* 2-ER-246. Physicians, genetic counselors, and/or other health care professionals offer confidential, non-directive counseling, answer questions, and provide facts, and patients may consult other trusted advisors, 2-ER-227–31; 2-ER-243–46, but it is the patient that must evaluate their situation and make the decision. 2-ER-232–33; 2-ER-252–53, 263; *see also* 2-ER-233–34; 2-ER-266.

### 2. Plaintiff-Physicians' Practices Before the Reason Scheme

Prior to the Reason Scheme, in accordance with ACOG and SMFM guidelines, Plaintiff-Physicians routinely provided patients with full-spectrum and non-directive counseling related to fetal testing, diagnosis, and care options. 2-ER-224, 227–31; 2-ER-243, 245–46; *see also* 2-ER-167.

For example, Dr. Reuss offered fetal screening and testing options for all his prenatal patients, as did Dr. Glaser. *Id*. And, Plaintiff ArMA's members, including obstetricians and gynecologists, maternal-fetal medicine specialists ("MFMs"), perinatologists, reproductive endocrinologists, and others who care for pregnant patients, regularly provided information and counseling about genetic testing and fetal conditions to their patients as part of their practices. 2-ER-297. Through this pre-test counseling, Plaintiff-Physicians provided patients with information about the limits and uncertainties of fetal screening and diagnostic testing. 2-ER-224, 227–31; 2-ER-243, 246.

In addition, Plaintiff-Physicians provided post-test counseling, during which they discussed and counseled patients on all available care options, including abortion care, if their results revealed a likelihood or confirmed diagnosis of a fetal condition. 2-ER-227–31; 2-ER-243–44. Plaintiff-Physicians answered patient questions, provided facts, and ensured that "patients realize there is a broad range of clinical presentations, or phenotypes, for many genetic disorders and that the results

of genetic testing cannot predict all outcomes." 2-ER-227–28 (quoting ACOG & SMFM, Diagnostic Bulletin). These processes were intended to prevent patients from exaggerating the significance or likely consequences of a given condition or confusing it with other genetic and/or structural manifestations. *Id*.

Plaintiff-Physicians also worked with medical professionals throughout Arizona to provide their patients with comprehensive and compassionate medical care, and balanced information about their pregnancy options. 2-ER-261. For example, when a patient required more specialized testing, diagnosis, counseling, or treatment, Drs. Reuss and Glaser regularly referred patients to, *e.g.*, perinatologists, MFMs, genetic counselors, and reproductive endocrinologists. 2-ER-222, 229–30; 2-ER-243–44. When Dr. Reuss' patients experienced both a high-risk pregnancy and a fetal diagnosis or potential fetal condition, 2-ER-233, he referred those patients to an MFM for care, while continuing to provide prenatal care and ongoing consultation for the patients as their primary obstetrician-gynecologist, 2-ER-229–30. Further, when patients who had received a positive screening and/or diagnostic test results for a fetal condition decided to seek abortion care for any reason, Dr. Glaser provided them with information about and referrals to abortion providers. 2-ER-244. Dr. Isaacson was often on the receiving end of such referrals from numerous providers. 2-ER-251–52. For these patients, the referring physician typically contacted Dr. Isaacson's clinic directly to speak with Dr. Isaacson or another clinic

physician about the patient, and usually forwarded the patient's medical records. 2-ER-253–54.

Additionally, Plaintiffs Drs. Reuss and Isaacson provided abortion care for patients with likely or confirmed fetal conditions. When a patient of Dr. Reuss' ultimately decided upon abortion after receiving positive fetal screening and/or diagnostic test results, he provided that care. 2-ER-231. And Dr. Isaacson's clinic was the foremost medical practice in Arizona providing abortion care to patients referred by MFMs and genetic counselors, including following fetal screening that revealed the likelihood of, or testing that led to a diagnosis of, a fetal condition. 2-ER-251. And, indeed, like virtually all physicians in private practice, Drs. Reuss and Isaacson accepted money for providing abortion services. 2-ER-251; 2-ER-223.

### C. The Reason Scheme

The Reason Scheme was enacted on April 27, 2021, as part of Senate Bill 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) ("S.B. 1457"). The Scheme consists of several interdependent and internally inconsistent provisions that collectively prohibit the provision of abortion if a provider has some *uncertain level* of knowledge that the patient is to some *uncertain degree* motivated by an *unclearly defined* set of "genetic abnormalities" in the fetus or embryo.

The Scheme creates a class 3 felony punishable by two to 8.75 years' imprisonment for any person who "knowingly . . . [s]olicits or accepts monies to

finance . . . an abortion *because of* a genetic abnormality" of the fetus or embryo. A.R.S. § 13-3603.02(B)(2) (the "Solicitation Provision"); A.R.S. § 13-702(D). The Scheme also creates a class 6 felony punishable by four months' to two years' imprisonment for any person who "[p]erforms an abortion knowing that the abortion is sought *solely because of* a genetic abnormality" of the fetus or embryo. A.R.S. § 13-3603.02(A)(2) (the "Performance Provision"); A.R.S. § 13-702(D).

The Scheme also prohibits abortion care unless the provider first executes an affidavit swearing "no knowledge that the" pregnancy is being terminated "*because of* . . . a genetic abnormality" of the fetus or embryo. A.R.S. § 36-2157 (the "Affidavit Requirement"). It further prohibits abortion care unless the provider first tells any patient "diagnosed with a nonlethal fetal condition" that Arizona law "prohibits abortion . . . *because of* a genetic abnormality." A.R.S. § 36-2158(A)(2)(d) (the "Notification Requirement"). Finally, the Scheme requires providers to report to the Arizona Department of Health Services "[w]hether any genetic abnormality . . . was detected at or before the time of the abortion by genetic testing, such as maternal serum tests, or by ultrasound, such as nuchal translucency screening, or by other forms of testing." A.R.S. § 36-2161(A)(25). This is in addition to the pre-existing requirement that providers ask every patient's "reason for the abortion," including whether the "abortion is due to fetal health considerations," and report any such reason provided. *Id.* § 36-2161(A)(12) (collectively, with A.R.S.

§ 36-2161(A)(25), the "Reporting Requirements"). Those who violate these or any other provision of the Reason Scheme risk suspension or revocation of a medical license, public censure, and civil penalties of at least $1,000 and up to $10,000 for each violation found. A.R.S. §§ 32-1401(27); 32-1403(A)(2), (A)(5); 32-1403.01(A); 32-1451(A), (D)-(E), (I), and (K).

The Scheme defines "genetic abnormality" as the "presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression." A.R.S. § 13-3603.02(G)(2)(a). It does not provide any guidance about the level of certainty required for a fetal condition to be deemed "presen[t] or presumed presen[t]." *Id.* Additionally, under the Scheme, "lethal fetal conditions"—those "diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth"—are excluded. A.R.S. § 13-3603.02(G)(2)(b), incorporating A.R.S. § 36-2158(G)(1).

Further, the Scheme broadly imposes liability on any "physician, physician's assistant, nurse, counselor or other medical or mental health professional who *knowingly* does not report *known* violations [of the Scheme] to appropriate law enforcement authorities." A.R.S. § 13-3603.02(E) (the "Informer Requirement"). And, after fetal testing or diagnosis, referring patients for or providing information about abortion care could potentially give rise to liability for aiding or facilitating

13

another person in obtaining a prohibited abortion. *See* A.R.S. §§ 13-301, 13-303. For example, medical providers who provide prenatal genetic screening and testing typically provide non-directive, full-spectrum pregnancy options counseling and referrals. *See* 2-ER-148; 2-ER-245. Those services could put such providers at risk of prosecution for aiding or facilitating a violation under the Scheme should they refer for an abortion and the physician providing that care ultimately ends up being arbitrarily prosecuted for doing so. *See* A.R.S. §§ 13-301, 13-303. Referring physicians would similarly risk prosecution under the Informer Requirement, A.R.S. § 13-3603.02(E).

Finally, the Reason Scheme imposes broad civil liability, allowing a pregnant person's spouse to bring a civil action "to obtain appropriate relief with respect to a violation of" the Solicitation or Performance Provisions, including "monetary damages for all injuries, whether psychological, physical or financial, including loss of companionship and support," and attorney's fees and costs. A.R.S. § 13-3603.02(D). If the pregnant person is under 18, one or both of their parents may bring such action. *Id.*

### D. Impact of the Reason Scheme on Plaintiff-Physicians' Practices

#### 1. The Scheme's Incomprehensible Vagueness

The Scheme's operative language and interplay with existing Arizona law are so confusing and inconsistent that Plaintiff-Physicians cannot decipher what care it

14

prohibits and fear arbitrary prosecution under countless scenarios. 2-ER-144; 2-ER-148; 2-ER-152; 2-ER-236; 2-ER-256–57; *see also* 2-ER-179 (citing 2-ER-236; 2-ER-258, 260). The Scheme fails to make clear (1) what fetal conditions are included within its definition of "genetic abnormality"; (2) what role a fetal condition must play in a patient's decision-making to implicate the Scheme; (3) how physicians are to assess a patient's subjective motivations for seeking abortion care; (4) what level of knowledge a physician must possess about a patient's prohibited motivation to trigger the Scheme; and, (5) what circumstantial evidence could ultimately be used to prove the physician possessed this unclear level of knowledge.

*First*, due to inherent uncertainties in fetal condition screening and diagnosis, Plaintiff-Physicians do not understand *which* fetal conditions constitute "genetic abnormalities" under the Scheme. 2-ER-167 (citing 2-ER-225; 2-ER-257). Nor do they understand when such conditions will be deemed "presen[t] or presumed presen[t]" or what it means to "detect" them. 2-ER-257–58; 2-ER-225, 229, 236; 2-ER-167. For example, the Scheme defines "genetic abnormality" to include "morphological malformation[s]" resulting from "abnormal gene expression." A.R.S. § 13-3603.02(G)(2)(a). However, "morphological malformations" may result from multiple genes, infectious diseases, environmental factors, or other factors; the cause is not always clear, and reasonable physicians may disagree. 2-ER-226, 237; 2-ER-257; *see* 2-ER-167.

15

The Scheme's definition of "genetic abnormality" also excludes "lethal fetal condition[s]," A.R.S. § 13-3603.02(G)(2)(b), that are "diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth," A.R.S. § 36-2158(G)(1). But even when a diagnosis is made in utero, a physician cannot determine with specificity how a condition will manifest over a child's lifetime or exactly how long a particular child might live. 2-ER-167–68; 2-ER-225, 228, 236–37; 2-ER-258–60. Yet the Scheme provides no further information or elaboration about which fetal conditions qualify as "lethal"; how one would determine with "reasonable certainty" that a condition will result in death within three months after birth; who must make this determination; nor whether or how external factors, such as potential medical interventions, should be considered.

*Second*, Plaintiff-Physicians do not understand what role a "genetic abnormality" must play in a patient's decision-making to trigger the Scheme's prohibitions because, throughout the Reason Scheme, different standards are used. 2-ER-236; 2-ER-256–57, 260–61, 263. Must the patient seek abortion care "solely because of" a "genetic abnormality," as the Performance Provision suggests? A.R.S. § 13-3603.02(A)(2). Or does it suffice if it is merely "because of" a "genetic abnormality," as the Solicitation Provision and Notification Requirement suggest? A.R.S. §§ 13-3603.02(B)(2); 36-2158(A)(2)(d). Or is it sufficient that there is

merely the possibility that a "genetic abnormality" factored into the patient's decision, as the Affidavit Requirement suggests? A.R.S. § 36-2157(A)(1).

*Third*, it is often difficult—if not impossible—for Plaintiff-Physicians to delineate how any one reason contributed to a patient's decision-making. 2-ER-169 (citing 2-ER-232–33; 2-ER-263); 2-ER-252–53. Ultimately, each patient's decision about whether to terminate a pregnancy is deeply personal, "complex," and "often . . . motivated by a variety of considerations, some of which are inextricably intertwined with the detection of a fetal genetic abnormality." *Id.*; *see also* 2-ER-232–33. As the district court recognized, assessing how any one factor contributed to another person's complex decision-making is an inherently subjective determination. 2-ER-168–69. Plaintiff-Physicians do not understand how they are supposed to make this unbelievably challenging subjective assessment, and the Reason Scheme provides no guidance. 2-ER-236; 2-ER-256–57; 2-ER-263.

*Fourth*, Plaintiff-Physicians do not understand what level of knowledge they must possess regarding their patients' motivations to trigger the Scheme's prohibitions. 2-ER-237; 2-ER-245; 2-ER-265. Do they need actual knowledge that the patient's decision is motivated by a fetal condition, as the Solicitation and Performance Provisions indicate? 2-ER-237; 2-ER-245; 2-ER-265; A.R.S. § 13-3603.02(A)(2), (B)(2). Or is any suggestion that a fetal condition played a role in the

patient's decision-making sufficient, as the Affidavit Provision suggests? 2-ER-260–63; A.R.S. § 36-2157.

*Fifth*, Plaintiff-Physicians cannot predict *when* they could be deemed to have this unknown level of knowledge that a covered fetal condition exists or that such a condition played an impermissible role in the patient's decision-making. This lack of clarity puts Plaintiff-Physicians at risk of arbitrary prosecution because there are "myriad ways in which [physicians] can and often do infer a patient's motive for terminating a pregnancy." 2-ER-168 (citing 2-ER-231, 237; 2-ER-253, 261–62).

While some patients disclose fetal test results and their motivations for seeking care, others do not. But, as the district court previously concluded, there are "many realistic scenarios in which surrounding circumstances could provide evidence of a provider's 'knowledge' that a patient sought an abortion because of a fetal genetic abnormality—likely sufficient to establish a *prima facie* case for criminal or civil liability—even though a patient did not explicitly state that was her motive." 2-ER-170. For example, before the Reason Scheme went into effect, many of Dr. Isaacson's patients were referred to his clinic by an MFM or other high-risk pregnancy specialist or genetic counselor. 2-ER-251. Some patients who make an appointment with Dr. Isaacson's clinic for themselves may nevertheless check off "fetal health considerations" on the state-mandated reporting form as one of the

reasons for their abortion. 2-ER-260–61. They may also include their preliminary fetal screening results in the medical history form. *Id.*

Even if the patient's medical records or forms do not indicate that a fetal condition has factored into the patient's decision-making, patients may discuss their pregnancy in a way that indicates the patient may have continued the pregnancy had they not received a fetal diagnosis. 2-ER-262, 267. For example, a patient may ask how soon after an abortion they can become pregnant again, or how likely it is for certain diagnoses to recur over multiple pregnancies. *Id.* Given the Scheme's multiple layers of vagueness, Plaintiff-Physicians are left guessing whether—in any of these myriad scenarios—the Reason Scheme applies or could threaten their liberty and livelihoods due to an arbitrary prosecution.

### 2. Plaintiff-Physicians' Practices Under the Reason Scheme

Because Plaintiff-Physicians do not understand what care the Reason Scheme currently prohibits, and they fear arbitrary prosecution in innumerable scenarios, they have been forced to make changes to their medical practices ever since the Reason Scheme went into effect. They have done so to ensure that they have the best chance of avoiding prosecution under this unconstitutionally vague law.

Plaintiff Dr. Reuss no longer provides full-spectrum, non-directive options counseling to all his patients, as recommended by ACOG and SMFM, because he "must now deprive some patients of a medical option [abortion] for their

19

pregnancies." 2-ER-144. And he no longer offers or provides abortion to patients whenever a fetal condition "at a minimum . . . factors into their decision" to terminate. *Id.* "[G]iven the confusing and inconsistent language in the law," this is the only way for Dr. Reuss to avoid "even a circumstantial indication that [he] may be violating the Reason Scheme" and to "avoid criminal consequences." *Id.*

Similarly, Plaintiff Dr. Isaacson has ceased providing abortion care to patients with likely or confirmed fetal conditions. 2-ER-152–53. Dr. Isaacson no longer takes referrals from MFMs or genetic counselors because he fears that a referral could be interpreted to mean that he had the requisite "knowledge" to trigger the Reason Scheme's prohibitions. *Id.* And, even if a patient is not directly referred by an MFM or genetic counselor, Dr. Isaacson remains concerned that other circumstances surrounding a patient's care could be seen as evidence of his "knowledge" that a patient sought an abortion with a prohibited motive. 2-ER-153. This forces him to err on the side of caution and deny care to patients with suspected or known fetal diagnoses—even if that care could arguably fall outside of the Reason Scheme's grasp—lest he risk severe criminal, civil, and professional penalties. 2-ER-152.

Dr. Glaser also worries that she may get "caught up in a criminal prosecution" for simply providing non-directive options counseling and referrals. 2-ER-148. Other members of ArMA who do not provide abortion are similarly concerned about how open and honest they can be with their patients when discussing pregnancy

20

options, fearing that they may be risking arrest and prosecution for providing full-spectrum options counseling and referrals to abortion providers. *Id.*

Since the Reason Scheme has been in effect, Plaintiff-Physicians have significantly curtailed their medical practices to avoid the grasp of the Reason Scheme's prohibitions. Doing so is the only way for Plaintiff-Physicians to continue their medical practices and care for as many patients as possible without risking criminal consequences, civil penalties, and loss of their medical licenses. 2-ER-144; 2-ER-148; 2-ER-152–53.

## II.   PROCEEDINGS BELOW

Nearly two years ago, Plaintiffs challenged the Reason Scheme and sought to have it preliminarily enjoined. 2-ER-186–216. On September 28, 2021, before the Scheme took effect, the district court granted Plaintiffs' request for a preliminary injunction, concluding that Plaintiffs satisfied each preliminary injunction factor, including that Plaintiffs were likely to succeed on the merits of both their claim that the Reason Scheme violates patients' then-applicable substantive due process right to abortion and their claim that the Reason Scheme is unconstitutionally vague. 2-ER-171, 180, 183–84.

As relevant here, the district court found the Reason Scheme likely violated Plaintiff Physicians' due process rights because the Scheme's "squishy" terms and reliance on physicians' "knowledge" of "the subjective motivations of another

individual" fail to adequately notify Plaintiff-Physicians of what activity is proscribed and expose them to arbitrary criminal prosecutions. 2-ER-169–71. The district court also found a likelihood that, given the risk of prosecution, Plaintiff-Physicians and "many other providers in Arizona will be chilled from performing abortions whenever they have information from which they might infer that a fetal genetic abnormality is a reason why a patient is seeking to terminate a pregnancy." 2-ER-179. Likewise, the district court determined that "these same uncertainties" would "fall upon the host of Arizonans who, while not directly performing abortions, nonetheless help patients access such care" through both the Reason Scheme's requirement to report "known violations" of the law and Arizona's "accomplice and facilitation" statutes. 2-ER-171.

Defendants appealed the district court's preliminary injunction order and sought emergency stays from this Court, Emergency Mot. Under Circuit Rule 27-3 for a Partial Stay Pending Appeal, *Isaacson et al. v. Brnovich et al.*, No. 21-16645 (9th Cir. Oct. 22, 2021), and the Supreme Court, Appl. for Partial Stay of Inj. Pending Appeal, *Brnovich v. Isaacson et al.*, No. 21A222 (U.S. Dec. 10, 2021). However, the entire Scheme remained enjoined until June 30, 2022, when the Supreme Court summarily disposed of all three cases pending before it that involved reason-based abortion restrictions. *See Brnovich v. Isaacson*, 142 S. Ct. 2893 (2022);

*Box v. Planned Parenthood of Ind. & Ky., Inc.*, 142 S. Ct. 2893 (2022); *Rutledge v. Little Rock Fam. Plan. Servs.*, 142 S. Ct. 2894 (2022).

Although Arizona had not petitioned for certiorari, the Supreme Court treated Arizona's limited stay application identically to the petitions for certiorari pending before it in *Box* and *Rutledge*, converting it to a petition for certiorari before judgment and granting the petition; vacating the entirety of the district court's September 28, 2021, Preliminary Injunction Order (even those portions pertaining to Plaintiffs' challenge to a different set of laws, which were not the subject of the State's application to the Supreme Court); and remanding the case to this Court with instructions to remand the case to the district court for further consideration in light of *Dobbs. See Brnovich*, 142 S. Ct. at 2893. Pursuant to that order, this case was remanded to the district court on the same day. Order, *Isaacson et al. v. Brnovich et al.*, No. 21-16645 (9th Cir. June 30, 2022).

In early September 2022, with the Reason Scheme in effect, Plaintiffs once again moved to have the Reason Scheme preliminarily enjoined on vagueness grounds since *Dobbs* did not undermine this claim in *any* way.[3] 2-ER-114–39. In support of Plaintiffs' Renewed Motion for Preliminary Injunction, Plaintiffs relied

_____

[3] Although the Reason Scheme went into effect on June 30, 2022, Plaintiff-Physicians were not providing abortion care at that time due to uncertainty regarding the legality of abortion care in the state. Plaintiff-Physicians filed their Renewed Motion for Preliminary Injunction shortly after the legality of abortion care was clarified and they had resumed providing care. 2-ER-121–22.

upon the six affidavits previously submitted in support of their initial request for a preliminary injunction and an additional three supplemental affidavits, from Dr. Reuss, Dr. Isaacson, and Dr. Glaser, attesting to how they and other members of ArMA altered their medical practices once the Reason Scheme went into effect. 2-ER-114–55; *see also* 2-ER-219–99. Arizona did not submit any additional evidence and did not dispute any of Plaintiffs' evidence.

The district court held oral argument on Plaintiffs' Renewed Motion for Preliminary Injunction on October 25, 2022. 2-ER-28–113. On December 7, 2022, the district court ordered the parties to file a round of supplemental briefing, requesting that the parties address several questions, including how Plaintiffs satisfy the following "three-part jurisdictional test" for ripeness: "(1) whether [Plaintiffs] have articulated a concrete plan to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." 2-ER-25. The district court did not ask the parties to address injury-in-fact more broadly, nor did it indicate that any other aspect of Plaintiffs' injury-in-fact was in dispute.

On January 19, 2023, the district court denied Plaintiffs' motion. According to the district court, without a substantive due process right to abortion, Plaintiff-Physicians could no longer demonstrate "a sufficiently concrete and imminent

injury" to support federal jurisdiction under Article III. 1-ER-7. And, because the Article III injury-in-fact inquiry "coincides squarely" with the constitutional component of the ripeness inquiry, the district court concluded that Plaintiffs' pre-enforcement vagueness claim was no longer ripe. *Id.* (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000)).

In finding no Article III injury-in-fact, the district court did not consider the costs and harms associated with Plaintiff-Physicians' over-compliance with the Scheme, and only assessed whether Plaintiff-Physicians demonstrated an "imminent" future injury based on threat of prosecution under the *Driehaus* standard. 1-ER-7–13. Relying on an isolated 2011 decision from the Eleventh Circuit, *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340 (11th Cir. 2011), the district court concluded that Plaintiff-Physicians failed the *Driehaus* standard because their intended conduct was not "arguably affected with a constitutional interest." 1-ER-7–13. In the district court's view, this element of the *Driehaus* test is only met in the pre-enforcement vagueness context when the challenged law's *unconstitutional* vagueness chills the exercise of a *separate* constitutionally protected right. *See id.* The district court then concluded that the Reason Scheme did not chill any constitutionally protected conduct in the wake of *Dobbs*, 1-ER-12, and refused to "render[]" any further "judgment on the Reason [Scheme's] legality." 1-ER-13. Plaintiffs timely appealed. 3-ER-304.

## SUMMARY OF THE ARGUMENT

The district court legally erred in concluding that—after the loss of the substantive due process right to abortion—Plaintiffs can no longer demonstrate "a sufficiently concrete and imminent injury" to support federal jurisdiction under Article III.[4] 1-ER-7. Quite the contrary, now that the Reason Scheme is in effect and enforceable, Plaintiff-Physicians' injuries are even more plain.

Now, due to the Scheme's "uncertain meanings," Plaintiff-Physicians have been forced "to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," *Baggett*, 377 U.S. at 372, and have severely curtailed the care they previously offered to patients with suspected or known fetal conditions (even care that may still be legal under the Scheme) to avoid as best they can the threat of arbitrary enforcement and attendant loss of liberty and livelihood. The burdens and costs associated with such coerced over-compliance constitute "actual" ongoing injuries that satisfy Article III, *MacMullan*, 406 U.S. at 508, and

---

[4] Although the district court conducted its injury analysis within the framework of the ripeness doctrine, the district court's decision was confined to considering only the constitutional component of the doctrine, which, as noted *supra* Statement of the Case Section II, "coincides squarely with" the Article III "injury in fact prong." Accordingly, Plaintiffs focus this brief on the district court's errors in failing to find an Article III injury-in-fact, which resolves any dispute regarding the ripeness of Plaintiffs' claim.

the district court's refusal to credit them, seemingly because there is no longer a substantive due process right to receive or provide abortion care, was legal error.

Moreover, the threat of prosecution under the Scheme—if Plaintiff-Physicians were to cease their over-compliance and attempt to decipher and offer as much care as is legally permissible under the Scheme, which would be their preference—constitutes an "imminent" future injury that satisfies Article III under *Driehaus*, 573 U.S. at 158–59. The Scheme's vagueness raises due process concerns because the law threatens Plaintiff-Physicians' liberty and property interests; Plaintiff-Physicians face far more than a "speculative" or "imaginary" chance of prosecution should they provide care to patients with suspected or known fetal conditions, even if Plaintiff-Physicians believe the care is legal under the Scheme; and, Plaintiff-Physicians face more than a credible threat of prosecution, particularly since the Scheme targets them for regulation and imposes numerous enforcement mechanisms.

The district court's failure to find "imminent" future injuries from threat of prosecution derives from a clear misunderstanding of what it means for conduct to be "arguably affected with a constitutional interest" under the *Driehaus* "general standard." *Tingley*, 47 F.4th at 1067. From this confusion, the district court wrongly concluded that Plaintiffs must show that the Scheme chills the exercise of a *separate* constitutional right to make out an Article III injury in this context. 1-ER-7–13. But,

27

such a rule has no grounding in Article III, which merely seeks "to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Driehaus*, 573 U.S. at 158 (quoting *Warth*, 422 U.S. at 498). Furthermore, this rule disregards the due process violations produced by vague laws that threaten life, liberty, or property interests, even in the absence of an enforcement action and regardless of whether the underlying conduct the law governs is constitutionally protected.

Because Plaintiff-Physicians clearly establish an Article III injury-in-fact, the district court improperly abdicated its "virtually unflagging" "obligation to hear and decide cases within its jurisdiction." *Driehaus*, 573 U.S. at 167. Accordingly, Plaintiff-Physicians ask the Court to vacate the district court's Order and remand with instruction to consider the merits of Plaintiffs' Renewed Motion for Preliminary Injunction.

## STANDARD OF REVIEW

Where the district court is alleged to have relied on erroneous legal premises, issues of law underlying the decision to grant or deny a preliminary injunction are reviewed de novo. *Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996). Article III injury-in-fact is a "question[] of law" that the Court reviews de novo, while the "factual determinations underlying the district court's decision" on this issue are reviewed "for clear error." *San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1124 (9th Cir. 1996).

28

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN FINDING NO ARTICLE III INJURY-IN-FACT.

Article III's "injury-in-fact" requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Driehaus*, 573 U.S. at 158 (quoting *Warth*, 422 U.S. at 498). Thus, Article III requires an injury that is "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (quoting *Lujan*, 504 U.S. at 560). Whether an injury satisfies Article III, however, "in no way depends on the merits" of the plaintiff's claim. *Warth*, 422 U.S. at 500; *see also Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022). Further, adequately stating a legal claim and demonstrating an Article III injury "are not one and the same," although "there can be overlap between the two." *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019).

Plaintiff-Physicians demonstrate "actual" injuries (those associated with over-compliance now that the vague Reason Scheme is in effect and enforceable) and "imminent" future injuries (those associated with the threat of prosecution under the Reason Scheme were they to attempt to decipher and offer as much care as is legally permissible under the Scheme, which is their goal). Either Plaintiff-Physicians' "actual" or "imminent" future injuries are sufficient to support federal jurisdiction.

### A. Plaintiff-Physicians Are Experiencing "Actual," Ongoing Injuries Under the Reason Scheme.

Plaintiff-Physicians' efforts to ensure compliance with the Reason Scheme constitute an "actual," ongoing injury that satisfies Article III because the resulting over-compliance has been effectively coerced by the Reason Scheme's vagueness and accompanying threat of arbitrary prosecution. Costs resulting from compliance coerced through "the threat of enforcement" constitute an "immediate and real," *i.e.*, *actual* present injury. *MacMullan*, 406 U.S. at 508 (holding that compliance that is "coerced by threat of enforcement" creates a controversy that "is both immediate and real"); *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925) (finding an interest that is "clear and immediate" where the challengers sought "protection against arbitrary, unreasonable, and unlawful interference with their patrons and the consequent destruction of their business and property").

Indeed, as Circuit Courts around the country have regularly held, "[a] regulated entity may plead an 'injury in fact' by plausibly alleging compliance costs associated with an increased regulatory burden."[5] *See Grand River Enters. Six*

---

[5] Any compliance costs associated with an allegedly illegal law—coerced or otherwise—satisfy the Article III injury-in-fact requirement. *See, e.g.*, *Lujan*, 504 U.S. at 561–62; *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 293 (3d Cir. 2015) ("compliance costs" are "a classic injury-in-fact"). That said, without coercion, the plaintiff may not be able to make out the other *standing* elements, which require the injury to be "fairly traceable" to the challenged law and redressable by the court. *Lujan*, 504 U.S. at 560–61. Given that Plaintiff-Physicians' over-compliance with

*Nations, Ltd. v. Boughton*, 988 F.3d 114, 121 (2d Cir. 2021) (collecting cases), *cert. denied*, 142 S. Ct. 755 (2022); *see also Lujan*, 504 U.S. at 561–62 (holding that "there is ordinarily little question that the [government's] action or inaction has caused [the challenger] injury" where the challenger is an "object of the action (or foregone action) at issue"); *Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 855–56 (9th Cir. 2002) (finding litigants satisfied Article III where they "suffered actual, discrete, and direct injury in fact in the form of financial losses incurred from the prohibition"); *Ass'n of Am. Railroads v. Dep't of Transp.*, 38 F.3d 582, 585–86 (D.C. Cir. 1994) (holding that compliance burden stemming from allegedly unlawful rule constitutes a "sufficient injury-in-fact"); *Kentucky v. Yellen*, 54 F.4th 325, 342 (6th Cir. 2022) ("[C]ompliance costs are a recognized harm for purposes of Article III."). Moreover, compliance that results in "a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017).

Here, Plaintiff-Physicians' uncontroverted evidence demonstrates tangible and intangible costs associated with their coerced over-compliance with the Reason Scheme that satisfy Article III. *MacMullan*, 406 U.S. at 508.

As Plaintiff-Physicians' uncontested declarations establish, before the Reason Scheme went into effect, Plaintiff-Physicians regularly provided abortion care to

---

the Scheme has been coerced by the threat of prosecution, *see infra* Argument Section I.A, they satisfy all standing elements.

patients with diagnosed or suspected fetal conditions. 2-ER-251; 2-ER-233. Dr. Isaacson's clinic was the foremost medical practice in Arizona providing abortion care to patients referred by MFMs and genetic counselors, including following fetal screening that revealed the likelihood of or testing that led to a diagnosis of a fetal condition. 2-ER-251. Plaintiffs Dr. Isaacson and Dr. Reuss regularly offered such patients confidential, non-directive counseling and provided abortion care to those who ultimately chose this option—regardless of their reason. 2-ER-231, 233; 2-ER-252–55. And, indeed, like virtually all physicians in private practice, Drs. Reuss and Isaacson accepted money for providing these services. 2-ER-251; 2-ER-223. Likewise, members of Plaintiff ArMA, including Dr. Glaser, regularly provided patients with confidential, non-directive counseling and referred those who chose to terminate a pregnancy for abortion care—regardless of their reason. *See* 2-ER-243–44.

Plaintiff-Physicians would continue to offer as much of this care as is legally permissible under the Scheme, but given the Reason Scheme's vagueness, cannot decipher what remains legal under the law and fear that providing any of this care could expose them to a threat of arbitrary prosecution. *See supra* Statement of the Case Section I.D. Plaintiff-Physicians have thus been forced to "steer far wider of the unlawful zone," *Baggett*, 377 U.S. at 372—severely curtailing the care they

32

provide to patients with suspected or known fetal conditions—even though some of this care may very well be legal under the Reason Scheme.

Specifically, Dr. Isaacson no longer offers abortion care whenever there is even the slightest indication of a fetal condition, even though this was a significant part of his practice previously. 2-ER-152. As a result, Dr. Isaacson now denies patients care in the "myriad," "realistic" circumstances—previously credited by the district court, 2-ER-168, 170—from which he could infer that a fetal condition may have factored into a patient's decision. *See* 2-ER-152–53. Likewise, Dr. Isaacson no longer accepts referrals from MFMs and genetic counselors, as the referral alone could be an indication that a fetal condition played an impermissible role in a patient's decision. 2-ER-152. Given that Dr. Isaacson does not provide his services for free, turning these patients away generates tangible financial costs associated with his over-compliance. *Czyzewski*, 580 U.S. at 464.

And, as a corollary harm, Dr. Isaacson no longer collaborates with such clinicians to provide his patients with the most compassionate care possible. 2-ER-152–53. Similarly, some Plaintiff-Physicians, including members of ArMA, have curtailed their confidential non-directive counseling, 2-ER-144, and fear prosecution based on their communications with their patients, including patients with a suspected or known fetal condition, 2-ER-148.

Such an ongoing *over*-compliance burden—coerced by the Reason Scheme through its vagueness and severe penalties—presents a quintessential actual and ongoing injury that satisfies Article III.[6]

While focusing on *Dobbs*, the district court's Order fails to appreciate what is perhaps the biggest difference between Plaintiffs' first and second request for a preliminary injunction: the fact that the Reason Scheme is now in effect and enforceable. Failing to fully reflect the significance of this development, the district court's analysis entirely overlooks Plaintiff-Physicians' "actual" ongoing over-compliance injuries and, instead, exclusively assesses whether the threat of prosecution under the Reason Scheme is a sufficiently "imminent" *future* injury to satisfy Article III.

The district court ostensibly disregards these over-compliance costs because (1) "Plaintiffs do not have a constitutional right to perform [] abortions and their patients no longer have a constitutional right to receive them," and (2) any chilled patient-physician speech resulting from the Reason Scheme does not constitute the independent Article III injury of "self-censorship." 1-ER-12. In addition to overlooking Plaintiff-Physicians' "actual" over-compliance injuries, this reasoning

---

[6] Although some of Plaintiff-Physicians' coerced changed practices may not be associated with economic loss, they are the type of "intangible harm" that can "nevertheless be concrete." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).

is misguided and erroneous because it suggests that the federal judiciary exists only to adjudicate "cases or controversies" that implicate fundamental constitutional rights. *See* U.S. Const. art. III, § 2 (judicial power extends not only to cases "arising under this Constitution," but myriad other categories).

As noted *supra*, a court's only task when considering the Article III injury-in-fact requirement is to determine whether a plaintiff has "alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Warth*, 422 U.S. at 498 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). While a "federal court's jurisdiction . . . can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action [constitutional or otherwise],'" *id.* at 499 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)), *any* injury to a plaintiff that is "concrete and particularized and actual or imminent, not conjectural or hypothetical" satisfies Article III's injury-in-fact requirement. *Driehaus*, 573 U.S. at 158 (quoting *Lujan*, 504 U.S. at 560); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Neither the injury nor the claim need be constitutional—as is evident from the innumerable cases adjudicated by the federal courts in which no one asserts the violation or chilling of a constitutional right.

Consistent with this jurisprudence, the district court erred in failing to consider and credit Plaintiff-Physicians' coerced over-compliance with the Reason Scheme as an "actual" and ongoing Article III injury-in-fact.

### B. Plaintiff-Physicians Demonstrate an "Imminent" Future Injury.

Having shown "actual" over-compliance costs now that the Reason Scheme is in effect and enforceable, Plaintiff-Physicians need not establish that the threat of prosecution under the Reason Scheme is a sufficiently "imminent" future injury to satisfy Article III. Nevertheless, if Plaintiff-Physicians were to cease over-complying with the Reason Scheme and attempt to decipher and offer as much care as is legally permissible under the Reason Scheme—as they would like to do—the threat of prosecution is a sufficiently "imminent" future injury that satisfies Article III.

Under longstanding Supreme Court precedent, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur." *Driehaus*, 573 U.S. at 158. At base, the question is "whether the plaintiffs face 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement,' or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." *Thomas*, 220 F.3d at 1139 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Accordingly, the "threatened enforcement of a law creates an Article III injury" if

36

the "circumstances . . . render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 158–59.

In setting the "general standard" for "pre-enforcement" challenges, *Tingley*, 47 F.4th at 1067, the Supreme Court has held that a threat of enforcement is "sufficiently imminent" where a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). Plaintiff-Physicians' uncontested declarations satisfy this standard, and the district court's conclusion to the contrary rests on a misunderstanding of what it means for intended conduct to be "arguably affected with a constitutional interest." *Id*.

### 1. Plaintiff-Physicians Demonstrate an "Intent[] to Engage in a Course of Conduct Arguably Affected with a Constitutional Interest."

Although this "factor to a degree resembles an invitation to reach the merits of [the plaintiff's] constitutional claims," the Supreme Court has made clear that this inquiry "in no way depends on the merits" of the plaintiff's claim. *Yellen*, 34 F.4th at 849; *see also Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007). Rather, at most, it requires a court to satisfy itself that the plaintiff has alleged the

law violates its constitutional rights.[7] *See Green v. U.S. Dep't of Just.*, 392 F. Supp. 3d 68, 84 (D.D.C. 2019) ("'[A]rguably affected with a constitutional interest' simply means that a plaintiff has challenged a law on constitutional grounds.").[8]

This standard is satisfied whenever a plaintiff claims a law that threatens life, liberty, or property interests is unconstitutionally vague. This is because the vagueness doctrine stems from "[t]he Fifth and Fourteenth Amendments['] guarantee that 'life, liberty, or property' may not be taken 'without due process of law.'" *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring). *Any* law that threatens such interests, therefore, raises constitutional due process

---

[7] Indeed, given that the Supreme Court has not limited pre-enforcement review to those asserting violations of constitutional rights, it is unclear if alleging a constitutional violation is even necessary—or if this requirement merely obliges a plaintiff to allege that the legal right it is asserting (constitutional or otherwise) is being violated. *Cf. MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 122–25, 128–31 (2007) (recognizing standing to challenge patent validity based on clear threat of action for breach of license or infringement); *see also Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 n.4 (2d Cir. 2015).

[8] For example, in the First Amendment context, courts typically dispense with this requirement with simple reference to the fact that the intended conduct involves speech that is potentially protected under the First Amendment. *See, e.g.*, *Driehaus*, 573 U.S. at 162 ("Because petitioners' intended future conduct concerns political speech, it is certainly 'affected with a constitutional interest.'"); *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718 (8th Cir. 2021) ("This conduct is arguably affected with a constitutional interest, because the creation and dissemination of information are speech within the meaning of the First Amendment."); *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 372 (D.C. Cir. 2020) ("Her alleged conduct is 'arguably affected with a constitutional interest,' because Andrews' intended future conduct involves speech.").

concerns if it is vague. Criminal laws—through the threat of incarceration—necessarily implicate liberty interests. *See, e.g.*, *Meachum v. Fano*, 427 U.S. 215, 224 (1976). Laws that threaten professional licensure—and the pursuit of one's livelihood—necessarily implicate property interests. *See Mishler v. Nev. State Bd. of Med. Exam'rs*, 896 F.2d 408, 409–10 (9th Cir. 1990) (citing *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 238–39 (1957)). Thus, conduct governed by allegedly vague laws that threaten such liberty and property interests are necessarily "affected with a constitutional [due process] interest." *Driehaus*, 573 U.S. at 159; *see also Knife Rts.*, 802 F.3d at 384 n.4 (noting that the "arguably affected with a constitutional interest" requirement is satisfied based on "the due process interest in avoiding vague criminal prohibitions").[9]

Plaintiff-Physicians' allegations and the Reason Scheme's statutory punishments satisfy this standard. As noted *supra* Statement of the Case Section I.C, the Scheme imposes felony penalties, punishable by up to 8.75 years' imprisonment; licensure penalties, up to and including revocation; and significant civil fines. Given Plaintiff-Physicians' claim that the Reason Scheme is vague on its face, along with

---

[9] Further, although "many pre-enforcement challenges have implicated the First Amendment right of free expression, many of these same cases have also presented the due process interest in avoiding vague criminal prohibitions." *Knife Rts.*, 802 F.3d at 384 n.4. And the Supreme Court "has drawn no distinction between these constitutional interests in pronouncing a credible threat of prosecution sufficient to establish standing." *Id*.

the law's severe penalties to Plaintiff-Physicians' liberty and property interests, Plaintiff-Physicians' conduct is "arguably affected with a constitutional [due process] interest." *Driehaus*, 573 U.S. at 159. Indeed, this Court previously satisfied itself that this first *Driehaus* factor was met where a plaintiff "challenge[d]" a criminal law threatening imprisonment and fines "on constitutional [vagueness] grounds." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) (employing language from *Babbitt* adopted in *Driehaus* as the standard). This case is no different.

### 2. Plaintiff-Physicians Demonstrate an "Intent[] to Engage in a Course of Conduct Arguably . . . Proscribed" By the Reason Scheme.

A plaintiff's intended course of conduct is "arguably . . . proscribed by the statute" where engaging in it exposes the plaintiff to a threat of prosecution that is "not imaginary or wholly speculative." *Babbitt*, 442 U.S. at 302. Allegations suffice where they "demonstrate a reasonable likelihood that [the challenged law] could be enforced against [the plaintiff]" for engaging in its intended activities. *Valle del Sol*, 732 F.3d at 1015; *see also Yellen*, 34 F.4th at 849 ("In evaluating the second *Driehaus* factor, we must . . . evaluate whether [the] desired course of conduct falls under the provision's sweep.").

This element does not require a plaintiff to allege that they are currently engaging in the conduct that would expose them to a "reasonable likelihood" of

enforcement. Only a "plan or desire" to engage in this conduct is necessary, *Tingley*, 47 F.4th at 1067, particularly where a plaintiff has "curtail[ed]," *Babbitt*, 442 U.S. at 301, or altered its prior activities due to the threat of prosecution under the challenged law. *See Driehaus*, 573 U.S. at 166–67 (finding Article III injury based on past activities despite refraining from those activities to avoid administrative proceedings); *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094–95 (9th Cir. 2003) (finding a cognizable injury-in-fact where plaintiff forwent intended speech due to fear it would be penalized for failing to comply with regulatory scheme).

Similarly, this element does not "require[] a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate the law." *Driehaus*, 573 U.S. at 163; *see also Babbitt*, 442 U.S. at 301–02. For example, in *Babbitt*, the Supreme Court considered an Arizona statute that "on its face proscribe[d] dishonest, untruthful, and deceptive publicity." 442 U.S. at 302. The plaintiff alleged that it had previously actively engaged in publicity campaigns and intended to engage in these activities in the future. Although the plaintiff did not "plan to propagate untruths," the fact that "erroneous statement is inevitable in free debate" was enough to render the threat of prosecution there "not imaginary or wholly speculative." *Id.* at 301–02 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964)).

41

Plaintiff-Physicians satisfy this standard because they demonstrate a desire to continue to offer as much care to patients with suspected or known fetal conditions as is legally permissible under the Reason Scheme, yet face a "not imaginary or wholly speculative" fear that they will be prosecuted because the Scheme's confusing and inconsistent provisions fail to provide adequate notice about what is proscribed and beget arbitrary enforcement. *Babbitt*, 442 U.S. at 302.

Given the multiple layers of vagueness in the Reason Scheme, *see supra* Statement of the Case Section I.D, Plaintiff-Physicians fear that providing care to patients with suspected or known fetal conditions exposes them to a real, non-hypothetical threat of prosecution—regardless of how hard they try to comply with the Scheme. For instance, Drs. Isaacson and Reuss fear that any circumstantial evidence surrounding a patient with a fetal diagnosis—including the mere existence of the fetal diagnosis—could lead to prosecution under the Reason Scheme. 2-ER-261, 263, 267; 2-ER-236. Similarly, genetic counselors and MFMs, including members of ArMA, fear that providing full-spectrum options counseling to their patients could violate the Reason Scheme through Arizona's aiding and abetting provisions, particularly should they refer to an abortion provider who could be subject to an arbitrary prosecution, even due to the referral itself. 2-ER-245. Such genetic counselors and MFMs likewise fear prosecution should a patient with a

suspected or known fetal condition seek abortion care if they do not report a violation. *Id.*

Indeed, as the district court previously concluded, "[g]iven Arizona's broad definition of knowledge and the vagueness of the Reason [Scheme's] criminal and civil liability provisions," many abortion providers will refuse care "whenever they have information from which they might infer that a fetal genetic abnormality is a reason why a patient is seeking to terminate a pregnancy." 2-ER-179. Likewise, the district court previously determined that "these same uncertainties" would "fall upon the host of Arizonans who, while not directly performing abortions, nonetheless help patients access such care" through both the Reason Scheme's requirement to report "known violations" of the law and Arizona's "accomplice and facilitation" statutes. 2-ER-171. The district court credited the fears of abortion providers, like Drs. Isaacson and Reuss, and of non-abortion providers, like ArMA's members, as not only reasonable, but dictated by "[t]he evidence, along with common sense." 2-ER-179.

Moreover, even the district court's recent order implicitly acknowledges that, should physicians attempt to provide care to patients with suspected or known fetal conditions consistent with the Reason Scheme, this would likely place them in severe jeopardy. As the district court stated, "[d]octors likely will err on the side of caution" and not provide care in circumstances Plaintiffs' declarations show

regularly occur, 2-ER-235–38; 2-ER-260–67—where "a patient's motive might be ambiguous or where circumstantial evidence might cause some outside observers to believe the doctor knew the patient had a prohibited motive, even if not expressed." 1-ER-10.[10]

Accordingly, Plaintiff-Physicians' uncontested declarations demonstrate an "intent to engage in a course of conduct arguably . . . proscribed by the statute" because they wish to offer as much care to patients with suspected or known fetal conditions as is legally permissible under the Reason Scheme, but doing so would expose them to a "reasonable" threat of prosecution, *Valle del Sol*, 732 F.3d at 1015, that is "not imaginary or wholly speculative," *Babbitt*, 442 U.S. at 302.

### 3. Plaintiff-Physicians Demonstrate a "Credible Threat of Prosecution" Under the Reason Scheme.

Applying the "general standard" articulated in *Driehaus*, the Ninth Circuit has "developed a framework to evaluate whether a claimed threat of enforcement is genuine enough to confer standing." *Yellen*, 34 F.4th at 850. Under this framework, courts in the Ninth Circuit consider: "(1) whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, (2) whether the prosecuting authorities

---

[10] Although the district court now suggests doctors will only be put in this position in "edge cases," 1-ER-10, whether the Scheme is vague in limited "edge cases" or practically always is a question that goes to the merits of Plaintiffs' facial vagueness challenge and is not relevant to the injury analysis. *Yellen*, 34 F.4th at 849.

have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." *Id.*; *see also Tingley*, 47 F.4th at 1067. Using this framework, Plaintiff-Physicians demonstrate a "credible threat of prosecution" under the Reason Scheme.

### a. Plaintiff-Physicians Articulate A "Concrete Plan" to Violate the Reason Scheme.

While a "general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan," *Thomas*, 220 F.3d at 1139, allegations of past activity that would violate the challenged law along with a "plan or desire" to continue those same activities satisfy this prong. *Tingley*, 47 F.4th at 1067; *see also Babbitt*, 442 U.S. at 301, 303 (crediting relevant conduct before the challenged enactment).

As noted above, this is particularly true where the plaintiff has "curtail[ed]," *Babbitt*, 442 U.S. at 301, or altered its prior activities due to the threat of prosecution under the challenged law. *See supra* Argument Section I.B.2. Moreover, in such cases, this Court "do[es] not require plaintiffs to specify 'when, to whom, where, or under what circumstances' they plan to violate the law" because "they have already violated the law in the past." *Tingley*, 47 F.4th at 1068.

Here, Plaintiff-Physicians demonstrate a sufficiently "concrete plan" to violate the law based on their prior acts that they have curtailed due to the Reason Scheme.

As articulated *supra* Statement of the Case Section I.B.2, Plaintiff-Physicians' uncontested declarations demonstrate that, before the Reason Scheme went into effect, they regularly treated patients with suspected or diagnosed fetal conditions—regardless of their reason for seeking care. 2-ER-251; 2-ER-233; 2-ER-243. Again, as the district court itself acknowledged, the care that Plaintiff-Physicians "historically could [and did] perform" is "arguably unlawful" under the Reason Scheme. 1-ER-12.

Plaintiff-Physicians' declarations further demonstrate a desire to continue to offer as much of this care as is legally permissible under the Reason Scheme. *See* 2-ER-144; 2-ER-152–54.[11] Yet, Plaintiff-Physicians have severely curtailed the care they provide to patients with suspected or known fetal conditions due to reasonable fears that providing *any* of this care could subject them to prosecution, *see supra* Statement of the Case Section I.D.2. *See also* 2-ER-144; 2-ER-152–53; 2-ER-245.

---

[11] It is irrelevant that Plaintiff-Physicians have not identified specific patients with suspected or diagnosed fetal conditions to whom they wish to provide care. Their declarations demonstrate that they regularly provided care to these patients in the past and they "cannot control when clients" with suspected or diagnosed fetal conditions "will come" to them. *Tingley*, 47 F.4th at 1068; *see* 2-ER-153.

Because Plaintiff-Physicians' past and intended acts fall within the ambit of the Reason Scheme, and they have curtailed those activities to avoid—to the best of their ability—threat of prosecution, they have articulated a sufficiently "concrete plan."

### b. The Reason Scheme Imposes a "Specific Threat of Enforcement" to Plaintiff-Physicians.

"One does not have to await the consummation of threatened injury to obtain preventive relief." *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003); *see also Valle del Sol*, 732 F.3d at 1015 n.5 ("[W]e have never held that a specific threat is necessary to demonstrate standing"). That law enforcement has not specifically threatened Plaintiffs yet is therefore irrelevant.

The Reason Scheme only became enforceable on June 30, 2022, and since then, Plaintiff-Physicians have "steer[ed] far wider of the unlawful zone," *Baggett*, 377 U.S. at 372, due to the law's vagueness, to try to avoid even the possibility of a prosecution, civil penalty, or professional discipline. While Plaintiff-Physicians' preventative actions may "eliminate[] the imminent threat of prosecution," they "nonetheless do[] not eliminate Article III jurisdiction." *MedImmune*, 549 U.S. at 129.

Moreover, were Plaintiff-Physicians to resume providing care to patients with suspected or known fetal conditions, Plaintiffs would have "a *plausible* and

47

*reasonable* fear of prosecution," despite their best efforts to comply with the Scheme. *Wolfson v. Brammer*, 616 F.3d 1045, 1062 (9th Cir. 2010) (emphases in original); *cf. Babbitt*, 442 U.S. at 302 (threat of prosecution must be more than "imaginary or wholly speculative" for pre-enforcement review); *see supra* Argument Section I.B.2. Four key considerations substantiate Plaintiff-Physicians' fear.

*First*, Defendants have never disavowed enforcement. Courts have "considered the Government's failure to disavow application of the challenged provision as a factor in favor of a finding of [injury]." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (collecting cases). Throughout this litigation, Defendants have vigorously defended the Reason Scheme and have repeatedly sought emergency relief in order to enforce it, including from the U.S. Supreme Court. The Arizona Department of Health Services and Arizona Medical Board have recently and explicitly declined to disavow enforcement in their responses to a motion to intervene, stating that they "comply with the laws that are in effect." *See* 2-ER-18; 2-ER-22. The Ninth Circuit has recently reaffirmed that where the State has "confirmed that it will enforce" a challenged law "as it enforces other restrictions," this refusal to disavow enforcement indicates a credible threat of enforcement. *Tingley*, 47 F.4th at 1068; *Yellen*, 34 F.4th at 850 (that the "government has not

disavowed enforcement of the [challenged law] is evidence of an intent to enforce it").

Even if the current Arizona Attorney General has disavowed enforcement, *see* 2-ER-21, that does not undermine Plaintiff-Physicians' reasonable fear. As noted, that position does not necessarily reflect the views of the other Defendants charged with enforcing the Scheme, including the Arizona Department of Health Services, Arizona Medical Board, and County Attorneys. Indeed, that the Yavapai County Attorney has recently sought to intervene in *Planned Parenthood of Arizona, Inc. v. Mayes*, in favor of enforcing a near-total ban on abortion in the state, only underscores the breadth and vigilance of enforcers of Arizona's abortion laws. *See* Mot. to Intervene and Join Pet. for Review of Intervenor/Appellee Dennis McGrane, Yavapai County Att'y, *Planned Parenthood Ariz., Inc. v. Mayes*, No. CV-23-005-PR (Ariz. Mar. 2, 2023). Here, too, any of the County Attorneys could seek to enforce the Reason Scheme. A.R.S. § 11-532. Further, while the Attorney General serves a four-year term, *see* Ariz. Const. art. V, § 1(A), the statute of limitations for felony penalties under the Reason Scheme is seven years, A.R.S. § 13-107(B)(1). Accordingly, even disavowal by one Attorney General does not eliminate the threat of prosecution by that office. Finally, any change in the Attorney General's position would be relevant only to a mootness inquiry, as injury for purposes of standing and ripeness is assessed at the time of filing. *See Lujan*, 504

U.S. at 569 n.4. As such, the current Attorney General's position alone is not dispositive.

*Second*, the Reason Scheme specifically targets Plaintiff-Physicians and other healthcare providers who offer abortion and abortion-related care. The Supreme Court held in *Virginia v. American Booksellers Association* that plaintiffs demonstrate an injury-in-fact where "the law is aimed directly at plaintiffs who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." 484 U.S. 383, 392 (1988). Plaintiff-Physicians' situation is arguably more severe because they are unable to discern whether their interpretation of the statute is indeed correct, given the law's vagueness, and so have over-complied to reduce their risk.

Nevertheless, the Reason Scheme *directly* targets Plaintiff-Physicians: it is providers who are threatened with felony penalties under the Performance and Solicitation Provisions, and who are required to swear "no knowledge" that a pregnancy is being terminated "because of a genetic abnormality" under the Affidavit Requirement. In passing the Reason Scheme, the Legislature stated its interest in "protect[ing] the integrity and ethics of the medical profession by preventing doctors" from providing abortion care under the prohibited circumstances. S.B. 1457 § 15. And the imposition of aiding and abetting liability implicates MFMs, genetic counselors, and other healthcare providers whose

communications might give rise to an indication of a fetal condition that could trigger the Reason Scheme's prohibitions. Unlike cases in which plaintiffs' "allegations of threatened prosecution and increased prices" were "no more than a 'generalized grievance' shared in substantially equal measure by . . . a large class of citizens," *Reno*, 98 F.3d at 1131, here, it is a narrow, defined universe of physicians and other healthcare providers who offer abortion-related care in Arizona who are directly regulated and targeted by the statute.

*Third*, the Reason Scheme itself, along with other abortion laws, subjects providers like Plaintiff-Physicians to significant oversight in the interest of enforcement. *See, e.g.*, *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016) (finding "an attribute of the challenged statute that makes enforcement easier or more likely" weighs in favor of injury-in-fact); *cf. Driehaus*, 573 U.S. at 164. These requirements create a web of burdensome and, at times, conflicting obligations that allow for a great deal of State intrusion into the operation of Plaintiff-Physicians' medical practices. These obligations include the Affidavit, Reporting, and Informer Requirements along with regular state inspections as a condition of licensure. A.R.S. §§ 36-2157; 36-2161; 13-3603.02(E); 36-449.02(E).

The State utilizes these multiple overlapping mechanisms to ensure that any potential violation of the Reason Scheme is detected and prosecuted. Accordingly, healthcare providers engaging in abortion-related care have more than a reasonable

fear of prosecution under the law, even as they remain unclear about what activity, precisely, the law prohibits.

*Fourth*, even apart from State enforcement, the Reason Scheme confers a private right of action on certain individuals. *See* A.R.S. § 13-3603.02(D); *see also* A.R.S. § 36-2158. "Because the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of [frivolous] complaints," *Driehaus*, 573 U.S. at 164, which, in turn, could lead to civil penalty or professional discipline, including loss of license.

For each of these reasons, Plaintiff-Physicians have asserted far more than a reasonable fear of enforcement under the Reason Scheme.

### c. History of Enforcement Carries Little Weight Here.

History of enforcement carries little weight in the context of new laws. *Wolfson*, 616 F.3d at 1060; *see also LSO, Ltd.*, 205 F.3d at 1155 ("[E]nforcement history alone is not dispositive. Courts have found standing where no one had ever been prosecuted under the challenged provision."); *cf. Poe v. Ullman*, 367 U.S. 497, 502–08 (1961) (finding lack of enforcement history relevant where there were "common[] and notorious[]" violations of the law and the statute had "gone uniformly and without exception unenforced" for nearly a century). Plaintiffs filed this pre-enforcement challenge prior to the Reason Scheme going into effect, and the Scheme was enjoined from September 28, 2021, to June 30, 2022. Thus,

litigation has remained active for the less than one year that the Scheme has been in effect. The lack of enforcement during this limited period does not undermine the justiciability of Plaintiffs' claims.

Moreover, as discussed above, Plaintiff-Physicians have severely curtailed their activities in an attempt to *avoid* prosecution or penalty since the Reason Scheme took effect. *See supra* Statement of the Case Section I.D.2. Plaintiff-Physicians' decision to "eliminate[] the imminent threat of harm by simply not doing what [Plaintiff-Physicians] claim[] the right to do" does not "preclude subject-matter jurisdiction because the threat-eliminating behavior [is] effectively coerced." *MedImmune*, 549 U.S. at 129; *see also Wolfson*, 616 F.3d at 1060–61; *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1034 (9th Cir. 2006); *Bayless*, 320 F.3d at 1006.

Accordingly, Plaintiff-Physicians suffer a "genuine threat of imminent enforcement" under the Reason Scheme: Plaintiff-Physicians have demonstrated "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). Plaintiff-Physicians have, therefore, asserted an "imminent" future injury that satisfies Article III.

### 4. The District Court's Failure to Find an "Imminent" Future Injury Rests on Its Misinterpretation of "Arguably Affected with a Constitutional Interest."

Although Plaintiff-Physicians clearly establish all that is required under the *Driehaus* "general standard," the district court concluded otherwise due to its misinterpretation of what it means for a plaintiff's intended conduct to be "arguably affected with a constitutional interest." *Tingley*, 47 F.4th at 1067; *see also* 1-ER-13. As explained *supra* Argument Section I.B.1, this *at most* requires a court to assure itself that the litigant claims the law violates its constitutional rights. Or, specifically in the vagueness context, that the law challenged as unconstitutionally vague threatens a life, liberty, or property interest. It does not, as the district court concluded, require a plaintiff to allege that the vagueness in the challenged law causes a "*separate* injury" where "the litigant is chilled from engaging in constitutionally protected activity." *See* 1-ER-8 (quoting *Bankshot*, 634 F.3d at 1350).

The district court's erroneous "separate injury" requirement originates from an isolated Eleventh Circuit case—*Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340 (11th Cir. 2011). In *Bankshot*, the Eleventh Circuit panel indicated that a "separate injury" is necessary in the pre-enforcement context because courts "review statutes for vagueness concerns only when a litigant alleges a constitutional harm." 634 F.3d at 1349–50. The panel noted that, in the post-enforcement context, the

relevant "constitutional harm" is the "deprivation of liberty—incarceration—without due process because the criminal defendant was not on notice that his conduct was criminal." *Id.* In the pre-enforcement context, however, the panel reasoned that, "because the State has not yet enforced the vague law; we do not know if the litigant will ever be deprived of his liberty without due process of law." *Id.* at 1350. Thus, according to the panel, pre-enforcement vagueness claims are only heard where the allegedly vague "law causes a separate injury: the litigant is chilled from engaging in constitutionally protected activity." *Id.*

As a preliminary matter, no other Circuit, including this Court, has ever cited *Bankshot*, let alone applied it. Perhaps more significantly, *Bankshot* was decided before *Driehaus*, which set forth the test—first articulated in *Babbitt*—that is the "general standard," *Tingley*, 47 F.4th at 1067, and that courts use to assess whether a threat of prosecution is sufficiently "imminent" to satisfy Article III. *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). *Bankshot* makes no reference to this key language from *Babbitt*, calling into question whether *Bankshot* captured the law as it existed then, much less its continued vitality—even in the Eleventh Circuit—since *Driehaus* was decided in 2014.

By applying the *Bankshot* "separate injury" requirement here, the district court committed clear legal error given its several fatal flaws. *First*, as explained *supra*, the Supreme Court has made clear that the purpose of the injury-in-fact

requirement under Article III is to ensure that a litigant bringing a claim has an adequate personal stake in the outcome of the case. *See Warth*, 422 U.S. at 498. The Supreme Court's jurisprudence has never required the allegation of a "constitutional harm," *contra Bankshot*, 634 F.3d at 1349, to satisfy Article III's injury-in-fact requirement. Moreover, consistent with this jurisprudence, other Circuits considering pre-enforcement vagueness challenges—including this one—have not required such a "separate injury" to satisfy Article III. *See, e.g.*, *Valle del Sol*, 732 F.3d at 1015; *Knife Rts.*, 802 F.3d at 384 n.4.

*Second*, the district court's "separate injury" requirement fails to account for the *constitutional* due process violations that vague laws inflict, even in the absence of an enforcement action, and regardless of whether they govern constitutionally protected conduct. As the Supreme Court has held, the vagueness doctrine is not only concerned with fair notice, but also with—arguably its "more important aspect"—"the requirement that a legislature establish minimal guidelines to govern law enforcement and keep the separate branches within their proper spheres." *Dimaya*, 138 S. Ct. at 1228 (Gorsuch, J., concurring). Where laws are so standardless that they fail to provide adequate notice and beget arbitrary enforcement, those they govern are forced to either "forswear doing all that is literally or arguably within the purview of the vague terms," *Baggett*, 377 U.S. at 378, or engage in conduct with

the constant threat of arbitrary prosecution and potentially severe penalty looming over them. *See also id.* at 372.

Coercing individuals into this choice—through threat to any life, liberty, or property interest—is a *constitutional* due process violation *in and of itself*. *See id.* at 374. While criminal defendants charged under vague statutes may be able to prevent incarceration, that does not remedy the very real due process harm of being hauled into court, threatened with severe penalty, and forced to undergo the expense and uncertainty of defending against an arbitrary prosecution. *See id.* at 373 (holding that, while "a prosecutor's sense of fairness and the Constitution" may "prevent a successful . . . prosecution for some of the activities seemingly embraced within" the statute, "[t]he hazard of being prosecuted for knowing but guiltless behavior nevertheless remains").[12]

Furthermore, due process violations accrue from vague laws, even if the underlying conduct they govern is not constitutionally protected. *See Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982) ("A law

---

[12] Moreover, even if it were correct that vague laws only implicated due process concerns in the context of an enforcement action, *Bankshot*, 634 F.3d at 1349–50, the purpose of the *Driehaus* test is to determine whether a *future* harm—here a prosecution—is sufficiently "imminent" such that it amounts to an Article III injury. Therefore, to preclude federal court review simply because the constitutional due process violation that would result from such a prosecution has yet to occur defies the purpose of the test.

that does not reach constitutionally protected conduct . . . may nevertheless be challenged on its face as unduly vague, in violation of due process."). While the vagueness doctrine demands more clarity of laws that implicate the exercise of constitutional rights, the doctrine *still applies* to laws that have no effect on the exercise of other constitutional rights—including those that regulate "normal business activity," such as medical care. *See id.* at 498 ("The *degree* of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."); *see also Baggett*, 377 U.S. at 379–80. That is, even if the vagueness standard is less stringent, such a law must nevertheless be scrutinized under the vagueness doctrine. Vague laws "cannot possibly be . . . excuse[d]" simply because it is within "the power of a State" to regulate the conduct. *Baggett*, 377 U.S. at 379–80. Such laws are "forbidden by the Constitution" just the same. *Id.* at 380.

The Eleventh Circuit in *Bankshot* (as well as the district court) appears to have conflated the stringency of review applied to allegedly vague laws (a merits question) with the inquiry of whether a cognizable injury-in-fact has been alleged (a justiciability question). *See Bankshot*, 634 F.3d at 1350 (citing *Kolender v. Lawson*, 461 U.S. 352 (1983), for the proposition that "courts are more tolerant of a vague statute that simply regulates business behavior" to support the conclusion that chilled business activity is insufficient to establish an Article III injury-in-fact); *see also* 1-

ER-7–13.[13] But, in short, while relevant to the merits question whether a vague law implicates the exercise of constitutional rights, it is not dispositive of whether there is an Article III injury.

*Third*, any concern that—without the "separate injury" requirement— potential litigants could "comb the statute books for poorly drafted laws" and challenge them on vagueness grounds is unfounded. *See Bankshot*, 634 F.3d at 1349. Unlike in the First Amendment overbreadth context, to state a claim for vagueness a plaintiff must allege that it does not understand how the vague law applies to its own activities. *See, e.g.*, *Kashem v. Barr*, 941 F.3d 358, 375 n.9 (9th Cir. 2019) (articulating this requirement for vagueness challenges in comparison to those brought under First Amendment overbreadth doctrine where "litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973))). A plaintiff must also allege that the challenged law threatens a life, liberty,

---

[13] To elaborate, *Kolender* is not a case about Article III injury; rather, the Court was engaged in analyzing the merits of the claim, *i.e.*, whether the statute in question was unconstitutionally vague. 461 U.S. at 357–61. In so doing, the Court considered the constitutional interests impacted by the vague law—Lawson's constitutional right to freedom of movement as well as the "potential for arbitrarily suppressing First Amendment liberties." *See id.* at 358, 361.

or property interest. *See supra* Argument Section I.B.4. Accordingly, any plaintiff who fails to allege that it does not understand how the purportedly vague law governs its activities, or how the law threatens a life, liberty, or property interest, cannot proceed. Not because they lack an Article III injury necessarily, but because they will be unable to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).

Furthermore, the other *Driehaus* factors, which require the plaintiff's intended conduct to be "proscribed by [the] statute," and for there to be a "credible threat of prosecution thereunder" likewise create a sufficient safeguard against the specter of unwarranted and unlimited litigation. *Tingley*, 47 F.4th at 1067; *see also supra* Argument Section I.B. As this Court has made clear, "[n]either the mere existence of a proscriptive statute nor a generalized threat of prosecution" is sufficient to articulate an Article III injury. *Tingley*, 47 F.4th at 1067 (quoting *Thomas*, 220 F.3d at 1139). Rejecting the district court's "separate injury" requirement does nothing to undermine these guardrails.

*     *     *

Given that Plaintiff-Physicians demonstrate both "actual" and "imminent" Article III injuries, the district court's conclusion that Plaintiffs should be forced either to refrain from providing care that is arguably not covered by the Reason Scheme, or to provide care at the risk of prosecution with severe criminal, civil, and

licensure penalties in order to raise their vagueness claim, *see* 1-ER-11–12, is untenable. As the Supreme Court has clearly held, plaintiffs are "not require[d], as a prerequisite to testing [a law's] validity . . . [to] bet the farm, so to speak, by taking the violative action." *MedImmune, Inc.*, 549 U.S. at 129; *see also Babbitt*, 442 U.S. at 302 (holding that Plaintiffs "need not first expose [themselves] to actual arrest or prosecution to be entitled to challenge the statute"). If the Reason Scheme is "truly vague, [Plaintiffs] should not be expected to pursue their collective activities at their peril." *Babbitt*, 442 U.S. at 303.

## CONCLUSION

For the reasons set forth above, this Court should vacate the district court's order finding no Article III injury and denying Plaintiffs preliminary injunctive relief against the Reason Scheme, and remand for further consideration on the merits of Plaintiffs' Renewed Motion for Preliminary Injunction.

Date: April 20, 2023

Respectfully submitted,

*/s/ Jessica Sklarsky*

Jared G. Keenan
American Civil Liberties Union
Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
jkeenan@acluaz.org

*Counsel for Plaintiffs-Appellants*

Alexa Kolbi-Molinas
Rebecca Chan
Ryan Mendías
Lindsey Kaley
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
akolbi-molinas@aclu.org
rebeccac@aclu.org
rmendias@aclu.org
lkaley@aclu.org

*Counsel for Eric M. Reuss, M.D., M.P.H., and Arizona Medical Association*

Jessica Sklarsky
Gail Deady
Catherine Coquillette
Center For Reproductive Rights
199 Water Street
New York, NY 10038
Telephone: (917) 637-3600
jsklarsky@reprorights.org
gdeady@reprorights.org
ccoquillette@reprorights.org

Jen Samantha D. Rasay
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC 20006
Telephone: (202) 628-0286
jrasay@reprorights.org

Ralia Polechronis
Justin Mungai
Wilkinson Stekloff LLP
130 West 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-9410
rpolechronis@wilkinsonstekloff.com
jmungai@wilkinsonstekloff.com

*Counsel for Paul A. Isaacson, M.D., National Council of Jewish Women (Arizona Section), Inc., and Arizona National Organization for Women*

ADDITIONAL COUNSEL ON NEXT PAGE

Beth Wilkinson
Anastasia Pastan
Anthony Ferrara
Elizabeth Keys
Wilkinson Stekloff LLP
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
aferrara@wilkinsonstekloff.com
ekeys@wilkinsonstekloff.com

*Counsel for Paul A. Isaacson, M.D., National Council of Jewish Women (Arizona Section), Inc., and Arizona National Organization for Women*

**STATEMENT OF RELATED CASES**

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs-Appellants state that they know of no related case pending in this Court beyond the cross-appeal stemming from the district court's first preliminary injunction order, Nos. 21-16645 and 21-16711.

*/s/ Jessica Sklarsky*
Jessica Sklarsky

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** ____23-15234_____

I am the attorney or self-represented party.

**This brief contains __13,799__ words,** excluding the items exempted by Fed.

R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** _/s/ Jessica Sklarsky_____ **Date** __*April 20, 2023*___

65

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the appellate CM/ECF system. I further certify that counsel for all parties are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/ Jessica Sklarsky*
Jessica Sklarsky

# ADDENDUM

## Table of Contents

**Page**

S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) ................................................ A-1

**Conference Engrossed**

**abortion; unborn child; genetic abnormality**

**State of Arizona**
**Senate**
**Fifty-fifth Legislature**
**First Regular Session**
**2021**

## CHAPTER 286

# SENATE BILL 1457

### AN ACT

**AMENDING TITLE 1, CHAPTER 2, ARTICLE 2, ARIZONA REVISED STATUTES, BY ADDING SECTION 1-219; AMENDING SECTION 13-3603.02, ARIZONA REVISED STATUTES; REPEALING SECTION 13-3604, ARIZONA REVISED STATUTES; AMENDING TITLE 15, CHAPTER 1, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 15-115.01; AMENDING SECTIONS 35-196.04, 36-449.01, 36-449.03, 36-2151, 36-2153, 36-2157 AND 36-2158, ARIZONA REVISED STATUTES; AMENDING TITLE 36, CHAPTER 20, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING SECTION 36-2160; AMENDING SECTION 36-2161, ARIZONA REVISED STATUTES; RELATING TO ABORTION.**

**(TEXT OF BILL BEGINS ON NEXT PAGE)**

**Be it enacted by the Legislature of the State of Arizona:**

Section 1. Title 1, chapter 2, article 2, Arizona Revised Statutes, is amended by adding section 1-219, to read:

**1-219. Interpretation of laws; unborn child; definition**

A. THE LAWS OF THIS STATE SHALL BE INTERPRETED AND CONSTRUED TO ACKNOWLEDGE, ON BEHALF OF AN UNBORN CHILD AT EVERY STAGE OF DEVELOPMENT, ALL RIGHTS, PRIVILEGES AND IMMUNITIES AVAILABLE TO OTHER PERSONS, CITIZENS AND RESIDENTS OF THIS STATE, SUBJECT ONLY TO THE CONSTITUTION OF THE UNITED STATES AND DECISIONAL INTERPRETATIONS THEREOF BY THE UNITED STATES SUPREME COURT.

B. THIS SECTION DOES NOT CREATE A CAUSE OF ACTION AGAINST:

1. A PERSON WHO PERFORMS IN VITRO FERTILIZATION PROCEDURES AS AUTHORIZED UNDER THE LAWS OF THIS STATE.

2. A WOMAN FOR INDIRECTLY HARMING HER UNBORN CHILD BY FAILING TO PROPERLY CARE FOR HERSELF OR BY FAILING TO FOLLOW ANY PARTICULAR PROGRAM OF PRENATAL CARE.

C. FOR THE PURPOSES OF THIS SECTION, "UNBORN CHILD" HAS THE SAME MEANING PRESCRIBED IN SECTION 36-2151.

Sec. 2. Section 13-3603.02, Arizona Revised Statutes, is amended to read:

**13-3603.02. Abortion; sex and race selection; genetic abnormality; injunctive and civil relief; failure to report; definitions**

A. EXCEPT IN A MEDICAL EMERGENCY, a person who knowingly does any of the following is guilty of a class 3 6 felony:

1. Performs an abortion knowing that the abortion is sought based on the sex or race of the child or the race of a parent of that child.

2. PERFORMS AN ABORTION KNOWING THAT THE ABORTION IS SOUGHT SOLELY BECAUSE OF A GENETIC ABNORMALITY OF THE CHILD.

B. A PERSON WHO KNOWINGLY DOES EITHER OF THE FOLLOWING IS GUILTY OF A CLASS 3 FELONY:

2. 1. Uses force or the threat of force to intentionally injure or intimidate any person for the purpose of coercing a sex-selection or race-selection abortion OR AN ABORTION BECAUSE OF A GENETIC ABNORMALITY OF THE CHILD.

3. 2. Solicits or accepts monies to finance a sex-selection or race-selection abortion OR AN ABORTION BECAUSE OF A GENETIC ABNORMALITY OF THE CHILD.

B. C. The attorney general or the county attorney may bring an action in superior court to enjoin the activity described in subsection A OR B of this section.

C. D. The father of the unborn child who is married to the mother at the time she receives a sex-selection or race-selection abortion OR AN ABORTION BECAUSE OF A GENETIC ABNORMALITY OF THE CHILD, or, if the mother has not attained eighteen years of age at the time of the abortion, the A maternal grandparents GRANDPARENT of the unborn child, may bring a civil action on behalf of the unborn child to obtain appropriate relief with respect to a violation of subsection A OR B of this section.� The court may award reasonable attorney fees as part of the costs in an action brought pursuant to this subsection. For the purposes of this subsection, "appropriate relief" includes monetary damages for all injuries, whether psychological, physical or financial, including loss of companionship and support, resulting from the violation of subsection A OR B of this section.

D. E. A physician, physician's assistant, nurse, counselor or other medical or mental health professional who knowingly does not report known violations of this section to appropriate law enforcement authorities shall be subject to a civil fine of not more than ten thousand dollars $10,000.

E. F. A woman on whom a sex-selection or race-selection abortion OR AN ABORTION BECAUSE OF A CHILD'S GENETIC ABNORMALITY is performed is not subject to criminal prosecution or civil liability for any violation of this section or for a conspiracy to violate this section.

F. G. For the purposes of this section: ,

1. "Abortion" has the same meaning prescribed in section 36-2151.

2. "GENETIC ABNORMALITY":

(a) MEANS THE PRESENCE OR PRESUMED PRESENCE OF AN ABNORMAL GENE EXPRESSION IN AN UNBORN CHILD, INCLUDING A CHROMOSOMAL DISORDER OR MORPHOLOGICAL MALFORMATION OCCURRING AS THE RESULT OF ABNORMAL GENE EXPRESSION.

(b) DOES NOT INCLUDE A LETHAL FETAL CONDITION. FOR THE PURPOSES OF THIS SUBDIVISION, "LETHAL FETAL CONDITION" HAS THE SAME MEANING PRESCRIBED IN SECTION 36-2158.

3. "MEDICAL EMERGENCY" HAS THE SAME MEANING PRESCRIBED IN SECTION 36-2151.

Sec. 3. Repeal

Section 13-3604, Arizona Revised Statutes, is repealed.

Sec. 4. Title 15, chapter 1, article 1, Arizona Revised Statutes, is amended by adding section 15-115.01, to read:

15-115.01. Public educational institution facility; prohibition; definitions

A. A FACILITY THAT IS RUN BY OR THAT OPERATES ON THE PROPERTY OF A PUBLIC EDUCATIONAL INSTITUTION MAY NOT PERFORM OR PROVIDE AN ABORTION, UNLESS THE ABORTION IS NECESSARY TO SAVE THE LIFE OF THE WOMAN HAVING THE ABORTION.

B. FOR THE PURPOSES OF THIS SECTION:

1. "ABORTION" HAS THE SAME MEANING PRESCRIBED IN SECTION 36-2151.

2. "MEDICAL EMERGENCY" HAS THE SAME MEANING PRESCRIBED IN SECTION 36-2151.

3. "PUBLIC EDUCATIONAL INSTITUTION" MEANS ANY OF THE FOLLOWING:

(a) A COMMUNITY COLLEGE AS DEFINED IN SECTION 15-1401.

(b) A UNIVERSITY UNDER THE JURISDICTION OF THE ARIZONA BOARD OF REGENTS.

(c) A SCHOOL DISTRICT, INCLUDING ITS SCHOOLS.

(d) A CHARTER SCHOOL.

(e) AN ACCOMMODATION SCHOOL.

(f) THE ARIZONA STATE SCHOOLS FOR THE DEAF AND THE BLIND.

Sec. 5. Section 35-196.04, Arizona Revised Statutes, is amended to read:

35-196.04. Use of public monies prohibited; human cloning research involving fetal remains from abortion; other prohibited research; definition

A. Notwithstanding any other law, tax monies of this state or any political subdivision of this state, federal monies passing through the state treasury or the treasury of any political subdivision of this state or any other public monies shall not be used by any person or entity, including any state funded institution or facility, for human somatic cell nuclear transfer, commonly known as human cloning.

B. NOTWITHSTANDING ANY OTHER LAW, PUBLIC MONIES OR TAX MONIES OF THIS STATE OR ANY POLITICAL SUBDIVISION OF THIS STATE, ANY FEDERAL MONIES PASSING THROUGH THE STATE TREASURY OR THE TREASURY OF ANY POLITICAL SUBDIVISION OF THIS STATE OR MONIES PAID BY STUDENTS AS PART OF TUITION OR FEES TO A STATE UNIVERSITY OR A COMMUNITY COLLEGE SHALL NOT BE EXPENDED OR ALLOCATED FOR OR GRANTED TO OR ON BEHALF OF AN EXISTING OR PROPOSED RESEARCH PROJECT THAT INVOLVES FETAL REMAINS FROM AN ABORTION OR HUMAN SOMATIC CELL NUCLEAR TRANSFER OR ANY RESEARCH THAT IS PROHIBITED BY TITLE 36, CHAPTER 23.

B. C. This section does not restrict areas of scientific research that are not specifically prohibited by this section, including research in the use of nuclear transfer or other cloning techniques to produce molecules, deoxyribonucleic acid, cells other than human embryos, tissues, organs, plants or animals other than humans.

C. D. For the purposes of this section, "human somatic cell nuclear transfer" means human asexual reproduction that is accomplished by introducing the genetic material from one or more human somatic cells into a fertilized or unfertilized oocyte whose nuclear material has been removed or inactivated so as to produce an organism, at any stage of development, that is genetically virtually identical to an existing or previously existing human organism.

Sec. 6. Section 36-449.01, Arizona Revised Statutes, is amended to read:

**36-449.01.** Definitions

In this article, unless the context otherwise requires:

1. "Abortion" means the use of any means with the intent to terminate a woman's pregnancy for reasons other than to increase the probability of a live birth, to preserve the life or health of the child after a live birth, to terminate an ectopic pregnancy or to remove a dead fetus. Abortion does not include birth control devices or oral contraceptives.

2. "Abortion clinic" means a facility, other than a hospital, in which five or more first trimester abortions in any month or any second or third trimester abortions are performed.

3. "BODILY REMAINS" HAS THE SAME MEANING PRESCRIBED IN SECTION 36-2151.

3. 4. "Director" means the director of the department of health services.

5. "FINAL DISPOSITION" HAS THE SAME MEANING PRESCRIBED IN SECTION 36-301.

4. 6. "Medication abortion" means the use of any medication, drug or other substance that is intended to cause or induce an abortion.

5. 7. "Perform" includes the initial administration of any medication, drug or other substance intended to cause or induce an abortion.

6. 8. "Surgical abortion" has the same meaning prescribed in section 36-2151.

7. 9. "Viable fetus" has the same meaning prescribed in section 36-2301.01.

Sec. 7. Section 36-449.03, Arizona Revised Statutes, is amended to read:

**36-449.03.** Abortion clinics; rules; civil penalties

A. The director shall adopt rules for an abortion clinic's physical facilities. At a minimum these rules shall prescribe standards for:

1. Adequate private space that is specifically designated for interviewing, counseling and medical evaluations.

2. Dressing rooms for staff and patients.

3. Appropriate lavatory areas.

4. Areas for preprocedure hand washing.

5. Private procedure rooms.

6. Adequate lighting and ventilation for abortion procedures.

7. Surgical or gynecologic examination tables and other fixed equipment.

8. Postprocedure recovery rooms that are supervised, staffed and equipped to meet the patients' needs.

9. Emergency exits to accommodate a stretcher or gurney.

10. Areas for cleaning and sterilizing instruments.

11. Adequate areas for the secure storage of TO SECURELY STORE medical records and necessary equipment and supplies.

12. The display in the abortion clinic, in a place that is conspicuous to all patients, of the clinic's current license issued by the department.

B. The director shall adopt rules to prescribe abortion clinic supplies and equipment standards, including supplies and equipment that are required to be immediately available for use or in an emergency. At a minimum these rules shall:

1. Prescribe required equipment and supplies, including medications, required for the TO conduct, in an appropriate fashion, of any abortion procedure that the medical staff of the clinic anticipates performing and for monitoring TO MONITOR the progress of each patient throughout the procedure and recovery period.

2. Require that the number or amount of equipment and supplies at the clinic is adequate at all times to assure ENSURE sufficient quantities of clean and sterilized durable equipment and supplies to meet the needs of each patient.

3. Prescribe required equipment, supplies and medications that shall be available and ready for immediate use in an emergency and requirements for written protocols and procedures to be followed by staff in an emergency, such as the loss of electrical power.

4. Prescribe required equipment and supplies for required laboratory tests and requirements for protocols to calibrate and maintain laboratory equipment at the abortion clinic or operated by clinic staff.

5. Require ultrasound equipment.

6. Require that all equipment is safe for the patient and the staff, meets applicable federal standards and is checked annually to ensure safety and appropriate calibration.

C. The director shall adopt rules relating to abortion clinic personnel.� At a minimum these rules shall require that:

1. The abortion clinic designate a medical director of the abortion clinic who is licensed pursuant to title 32, chapter 13, 17 or 29.

2. Physicians performing abortions are licensed pursuant to title 32, chapter 13 or 17, demonstrate competence in the procedure involved and are acceptable to the medical director of the abortion clinic.

3. A physician is available:

(a) For a surgical abortion who has admitting privileges at a health care institution that is classified by the director as a hospital pursuant to section 36-405, subsection B and that is within thirty miles of the abortion clinic.

(b) For a medication abortion who has admitting privileges at a health care institution that is classified by the director as a hospital pursuant to section 36-405, subsection B.

4. If a physician is not present, a registered nurse, nurse practitioner, licensed practical nurse or physician assistant is present and remains at the clinic when abortions are performed to provide postoperative monitoring and care, or monitoring and care after inducing a medication abortion, until each patient who had an abortion that day is discharged.

5. Surgical assistants receive training in counseling, patient advocacy and the specific responsibilities of the services the surgical assistants provide.

6. Volunteers receive training in the specific responsibilities of the services the volunteers provide, including counseling and patient advocacy as provided in the rules adopted by the director for different types of volunteers based on their responsibilities.

D. The director shall adopt rules relating to the medical screening and evaluation of each abortion clinic patient. At a minimum these rules shall require:

1. A medical history, including the following:

(a) Reported allergies to medications, antiseptic solutions or latex.

(b) Obstetric and gynecologic history.

(c) Past surgeries.

2. A physical examination, including a bimanual examination estimating uterine size and palpation of the adnexa.

3. The appropriate laboratory tests, including:

(a) Urine or blood tests for pregnancy performed before the abortion procedure.

(b) A test for anemia.

(c) Rh typing, unless reliable written documentation of blood type is available.

(d) Other tests as indicated from the physical examination.

4. An ultrasound evaluation for all patients. The rules shall require that if a person who is not a physician performs an ultrasound examination, that person shall have documented evidence that the person completed a course in ~~the operation of~~ OPERATING ultrasound equipment as prescribed in rule. The physician or other health care professional shall review, at the request of the patient, the ultrasound evaluation results with the patient before the abortion procedure is performed, including the probable gestational age of the fetus.

5. That the physician is responsible for estimating the gestational age of the fetus based on the ultrasound examination and obstetric standards in keeping with established standards of care regarding the estimation of fetal age as defined in rule and shall write the estimate in the patient's medical history. The physician shall keep original prints of each ultrasound examination of a patient in the patient's medical history file.

E. The director shall adopt rules relating to the abortion procedure. At a minimum these rules shall require:

1. That medical personnel is available to all patients throughout the abortion procedure.

2. Standards for the safe conduct of abortion procedures that conform to obstetric standards in keeping with established standards of care regarding the estimation of fetal age as defined in rule.

3. Appropriate use of local anesthesia, analgesia and sedation if ordered by the physician.

4. The use of appropriate precautions, such as ~~the establishment of~~ ESTABLISHING intravenous access at least for patients undergoing second or third trimester abortions.

5. The use of appropriate monitoring of the vital signs and other defined signs and markers of the patient's status throughout the abortion procedure and during the recovery period until the patient's condition is deemed to be stable in the recovery room.

6. For abortion clinics performing or inducing an abortion for a woman whose unborn child is the gestational age of twenty weeks or more, minimum equipment standards to assist the physician in complying with section 36-2301. For the purposes of this paragraph, "abortion" and "gestational age" have the same meanings prescribed in section 36-2151.

F. THE DIRECTOR SHALL ADOPT RULES RELATING TO THE FINAL DISPOSITION OF BODILY REMAINS.� AT A MINIMUM THESE RULES SHALL REQUIRE THAT:

1. THE FINAL DISPOSITION OF BODILY REMAINS FROM A SURGICAL ABORTION BE BY CREMATION OR INTERMENT.

2. FOR A SURGICAL ABORTION, THE WOMAN ON WHOM THE ABORTION IS PERFORMED HAS THE RIGHT TO DETERMINE THE METHOD AND LOCATION FOR FINAL DISPOSITION OF BODILY REMAINS.

F. G. The director shall adopt rules that prescribe minimum recovery room standards. At a minimum these rules shall require that:

1. For a surgical abortion, immediate postprocedure care, or care provided after inducing a medication abortion, consists of observation in a supervised recovery room for as long as the patient's condition warrants.

2. The clinic arrange hospitalization if any complication beyond the management capability of the staff occurs or is suspected.

3. A licensed health professional who is trained in the management of MANAGING the recovery area and WHO is capable of providing basic cardiopulmonary resuscitation and related emergency procedures remains on the premises of the abortion clinic until all patients are discharged.

4. For a surgical abortion, a physician with admitting privileges at a health care institution that is classified by the director as a hospital pursuant to section 36-405, subsection B and that is within thirty miles of the abortion clinic remains on the premises of the abortion clinic until all patients are stable and are ready to leave the recovery room and to facilitate the transfer of emergency cases if hospitalization of the patient or viable fetus is necessary. A physician shall sign the discharge order and be readily accessible and available until the last patient is discharged.

5. A physician discusses RhO(d) immune globulin with each patient for whom it is indicated and assures ENSURES THAT it is offered to the patient in the immediate postoperative period or that it will be available to her within seventy-two hours after completion of the abortion procedure.� If the patient refuses, a refusal form approved by the department shall be signed by the patient and a witness and included in the medical record.

6. Written instructions with regard to postabortion coitus, signs of possible problems and general aftercare are given to each patient.� Each patient shall have specific instructions regarding access to medical care for complications, including a telephone number to call for medical emergencies.

7. There is a specified minimum length of time that a patient remains in the recovery room by type of abortion procedure and duration of gestation.

8. The physician assures ENSURES that a licensed health professional from the abortion clinic makes a good faith effort to contact the patient by telephone, with the patient's consent, within twenty-four hours after a surgical abortion to assess the patient's recovery.

9. Equipment and services are located in the recovery room to provide appropriate emergency resuscitative and life support procedures pending the transfer of the patient or viable fetus to the hospital.

G. H. The director shall adopt rules that prescribe standards for follow-up visits. At a minimum these rules shall require that:

1. For a surgical abortion, a postabortion medical visit is offered and, if requested, scheduled for three weeks after the abortion, including a medical examination and a review of the results of all laboratory tests.� For a medication abortion, the rules shall require that a postabortion medical visit is scheduled between one week and three weeks after the initial dose for a medication abortion to confirm the pregnancy is completely terminated and to assess the degree of bleeding.

2. A urine pregnancy test is obtained at the time of the follow-up visit to rule out continuing pregnancy. If a continuing pregnancy is suspected, the patient shall be evaluated and a physician who

performs abortions shall be consulted.

H. I. The director shall adopt rules to prescribe minimum abortion clinic incident reporting. At a minimum these rules shall require that:

1. The abortion clinic records each incident resulting in a patient's or viable fetus' serious injury occurring at an abortion clinic and shall report them in writing to the department within ten days after the incident. For the purposes of this paragraph, "serious injury" means an injury that occurs at an abortion clinic and that creates a serious risk of substantial impairment of a major body organ and includes any injury or condition that requires ambulance transportation of the patient.

2. If a patient's death occurs, other than a fetal death properly reported pursuant to law, the abortion clinic reports it to the department not later than the next department work day.

3. Incident reports are filed with the department and appropriate professional regulatory boards.

I. J. The director shall adopt rules relating to enforcement of this article.� At a minimum, these rules shall require that:

1. For an abortion clinic that is not in substantial compliance with this article and the rules adopted pursuant to this article and section 36-2301 or that is in substantial compliance but refuses to carry out a plan of correction acceptable to the department of any deficiencies that are listed on the department's statement of deficiency, the department may do any of the following:

(a) Assess a civil penalty pursuant to section 36-431.01.

(b) Impose an intermediate sanction pursuant to section 36-427.

(c) Suspend or revoke a license pursuant to section 36-427.

(d) Deny a license.

(e) Bring an action for an injunction pursuant to section 36-430.

2. In determining the appropriate enforcement action, the department consider the threat to the health, safety and welfare of the abortion clinic's patients or the general public, including:

(a) Whether the abortion clinic has repeated violations of statutes or rules.

(b) Whether the abortion clinic has engaged in a pattern of noncompliance.

(c) The type, severity and number of violations.

J. K. The department shall not release personally identifiable patient or physician information.

K. L. The rules adopted by the director pursuant to this section do not limit the ability of a physician or other health professional to advise a patient on any health issue.

Sec. 8. Section 36-2151, Arizona Revised Statutes, is amended to read:

36-2151. Definitions

In this article, unless the context otherwise requires:

1. "Abortion" means the use of any means to terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will cause, with reasonable likelihood, the death of the unborn child. Abortion does not include birth control devices, oral contraceptives used to inhibit or prevent ovulation, conception or the implantation of a fertilized ovum in the uterus or the use of any means to save the life or preserve the health of the unborn child, to preserve the life or health of the child after a live birth, to terminate an ectopic pregnancy or to remove a dead fetus.

2. "Auscultation" means the act of listening for sounds made by internal organs of the unborn child, specifically for a heartbeat, using an ultrasound transducer and fetal heart rate monitor.

3. "BODILY REMAINS" MEANS THE PHYSICAL REMAINS, CORPSE OR BODY PARTS OF AN UNBORN CHILD WHO HAS BEEN EXPELLED OR EXTRACTED FROM HIS OR HER MOTHER THROUGH ABORTION.

3. 4. "Conception" means the fusion of a human spermatozoon with a human ovum.

5. "FINAL DISPOSITION" HAS THE SAME MEANING PRESCRIBED IN SECTION 36-301.

6. "GENETIC ABNORMALITY" HAS THE SAME MEANING PRESCRIBED IN SECTION 13-3603.02.

4. 7. "Gestational age" means the age of the unborn child as calculated from the first day of the last menstrual period of the pregnant woman.

5. 8. "Health professional" has the same meaning prescribed in section 32-3201.

6. 9. "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

7. 10. "Medication abortion" means the use of any medication, drug or other substance that is intended to cause or induce an abortion.

8. 11. "Physician" means a person who is licensed pursuant to title 32, chapter 13 or 17.

9. 12. "Pregnant" or "pregnancy" means a female reproductive condition of having a developing unborn child in the body and that begins with conception.

10. 13. "Probable gestational age" means the gestational age of the unborn child at the time the abortion is planned to be performed and as determined with reasonable probability by the attending physician.

11. 14. "Surgical abortion" means the use of a surgical instrument or a machine to terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will cause, with reasonable likelihood, the death of the unborn child. �Surgical abortion does not include the use of any means to increase the probability of a live birth, to preserve the life or health of the child after a live birth, to terminate an ectopic pregnancy or to remove a dead fetus.� Surgical abortion does not include patient care incidental to the procedure.

12. 15. "Ultrasound" means the use of ultrasonic waves for diagnostic or therapeutic purposes to monitor a developing unborn child.

13. 16. "Unborn child" means the offspring of human beings from conception until birth.

Sec. 9. Section 36-2153, Arizona Revised Statutes, is amended to read:

36-2153. Informed consent; requirements; information; website; signage; violation; civil relief; statute of limitations

A. An abortion shall not be performed or induced without the voluntary and informed consent of the woman on whom the abortion is to be performed or induced. Except in the case of a medical emergency and in addition to the other requirements of this chapter, consent to an abortion is voluntary and informed only if all of the following are true:

1. At least twenty-four hours before the abortion, the physician who is to perform the abortion or the referring physician has informed the woman, orally and in person, of:

(a) The name of the physician who will perform the abortion.

(b) The nature of the proposed procedure or treatment.

(c) The immediate and long-term medical risks associated with the procedure that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

(d) Alternatives to the procedure or treatment that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

(e) The probable gestational age of the unborn child at the time the abortion is to be performed.

(f) The probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed.

(g) The medical risks associated with carrying the child to term.

2. At least twenty-four hours before the abortion, the physician who is to perform the abortion, the referring physician or a qualified physician, physician assistant, nurse, psychologist or licensed behavioral health professional to whom the responsibility has been delegated by either physician has informed the woman, orally and in person, that:

(a) Medical assistance benefits may be available for prenatal care, childbirth and neonatal care.

(b) The father of the unborn child is liable to assist in the support of the child, even if he has offered to pay for the abortion.� In the case of rape or incest, this information may be omitted.

(c) Public and private agencies and services are available to assist the woman during her pregnancy and after the birth of her child if she chooses not to have an abortion, whether she chooses to keep the child or place the child for adoption.

(d) It is unlawful for any person to coerce a woman to undergo an abortion.

(e) The woman is free to withhold or withdraw her consent to the abortion at any time without affecting her right to future care or treatment and without the loss of any state or federally funded benefits to which she might otherwise be entitled.

(f) The department of health services maintains a website that describes the unborn child and lists the agencies that offer alternatives to abortion.

(g) The woman has a ~~a~~ THE right to review the website and that a printed copy of the materials on the website will be provided to her free of charge if she chooses to review these materials.

(h) IN THE CASE OF A SURGICAL ABORTION, THE WOMAN HAS THE RIGHT TO DETERMINE FINAL DISPOSITION OF BODILY REMAINS AND TO BE INFORMED OF THE AVAILABLE OPTIONS FOR LOCATIONS AND METHODS FOR DISPOSITION OF BODILY REMAINS.

3. The information in paragraphs 1 and 2 of this subsection is provided to the woman individually and in a private room to protect her privacy and to ensure that the information focuses on her individual circumstances and that she has adequate opportunity to ask questions.

4. The woman certifies in writing before the abortion that the information required to be provided pursuant to paragraphs 1 and 2 of this subsection has been provided.

5. IN THE CASE OF A SURGICAL ABORTION, IF THE WOMAN DESIRES TO EXERCISE HER RIGHT TO DETERMINE FINAL DISPOSITION OF BODILY REMAINS, THE WOMAN INDICATES IN WRITING HER CHOICE FOR THE LOCATION AND METHOD OF FINAL DISPOSITION OF BODILY REMAINS.

B. If a woman has taken mifepristone as part of a two-drug regimen to terminate her pregnancy, has not yet taken the second drug and consults an abortion clinic questioning her decision to terminate her pregnancy or seeking information regarding the health of her fetus or the efficacy of mifepristone alone to terminate a pregnancy, the abortion clinic staff shall inform the woman that the use of mifepristone alone to end a pregnancy is not always effective and that she should immediately consult a physician if she would like more information.

C. If a medical emergency compels the performance of an abortion, the physician shall inform the woman, before the abortion if possible, of the medical indications supporting the physician's judgment that an abortion is necessary to avert the woman's death or to avert substantial and irreversible impairment of a major bodily function.

D. The department of health services shall establish and shall annually update a website that includes a link to a printable version of all materials listed on the website.� The materials must be written in an easily understood manner and printed in a typeface that is large enough to be clearly legible. The website must include all of the following materials:

1. Information that is organized geographically by location and that is designed to inform the woman about public and private agencies and services that are available to assist a woman through pregnancy, at childbirth and while her child is dependent, including adoption agencies.� The materials shall include a comprehensive list of the agencies, a description of the services they offer and the manner in which these agencies may be contacted, including the agencies' telephone numbers and website addresses.

2. Information on the availability of medical assistance benefits for prenatal care, childbirth and neonatal care.

3. A statement that it is unlawful for any person to coerce a woman to undergo an abortion.

4. A statement that any physician who performs an abortion on a woman without obtaining the woman's voluntary and informed consent or without affording her a private medical consultation may be liable to the woman for damages in a civil action.

5. A statement that the father of a child is liable to assist in the support of that child, even if the father has offered to pay for an abortion, and that the law allows adoptive parents to pay costs of prenatal care, childbirth and neonatal care.

6. Information that is designed to inform the woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term, including pictures or drawings representing the development of unborn children at two-week gestational increments and any relevant information on the possibility of the unborn child's survival. The pictures or drawings must contain the dimensions of the unborn child and must be realistic and appropriate for each stage of pregnancy. The information provided pursuant to this paragraph must be objective, nonjudgmental and designed to convey only accurate scientific information about the unborn child at the various gestational ages.

7. Objective information that describes the methods of abortion procedures commonly employed, the medical risks commonly associated with each procedure, the possible detrimental

psychological effects of abortion and the medical risks commonly associated with carrying a child to term.

8. Information explaining the efficacy of mifepristone taken alone, without a follow-up drug as part of a two-drug regimen, to terminate a pregnancy and advising a woman to immediately contact a physician if the woman has taken only mifepristone and questions her decision to terminate her pregnancy or seeks information regarding the health of her fetus.

E. An individual who is not a physician shall not perform a surgical abortion.

F. A person shall not write or communicate a prescription for a drug or drugs to induce an abortion or require or obtain payment for a service provided to a patient who has inquired about an abortion or scheduled an abortion until the ~~expiration of the~~ twenty-four-hour reflection period required by subsection A of this section EXPIRES.

G. A person shall not intimidate or coerce in any way any person to obtain an abortion.� A parent, a guardian or any other person shall not coerce a minor to obtain an abortion. If a minor is denied financial support by the minor's parents, guardians or custodian due to the minor's refusal to have an abortion performed, the minor is deemed emancipated for the purposes of eligibility for public assistance benefits, except that the emancipated minor may not use these benefits to obtain an abortion.

H. An abortion clinic as defined in section 36-449.01 shall conspicuously post signs that are visible to all who enter the abortion clinic, that are clearly readable and that state it is unlawful for any person to force a woman to have an abortion and a woman who is being forced to have an abortion has the right to contact any local or state law enforcement or social service agency to receive protection from any actual or threatened physical, emotional or psychological abuse. The signs shall be posted in the waiting room, consultation rooms and procedure rooms.

I. A person shall not require a woman to obtain an abortion as a provision in a contract or as a condition of employment.

J. A physician who knowingly violates this section commits an act of unprofessional conduct and is subject to license suspension or revocation pursuant to title 32, chapter 13 or 17.

K. In addition to other remedies available under the common or statutory law of this state, any of the following may file a civil action to obtain appropriate relief for a violation of this section:

1. A woman on whom an abortion has been performed without her informed consent as required by this section.

2. The father of the unborn child if the father was married to the mother at the time she received the abortion, unless the pregnancy resulted from the plaintiff's criminal conduct.

3. ~~The~~ A maternal ~~grandparents~~ GRANDPARENT of the unborn child if the mother was not at least eighteen years of age at the time of the abortion, unless the pregnancy resulted from the plaintiff's criminal conduct.

L. A civil action filed pursuant to subsection K of this section shall be brought in the superior court in the county in which the woman on whom the abortion was performed resides and may be based on a claim that failure to obtain informed consent was a result of simple negligence, gross negligence, wantonness, wilfulness, intention or any other legal standard of care. Relief pursuant to subsection K of this section includes the following:

1. Money damages for all psychological, emotional and physical injuries resulting from the violation of this section.

2. Statutory damages in an amount equal to ~~five thousand dollars~~ $5,000 or three times the cost of the abortion, whichever is greater.

3. Reasonable attorney fees and costs.

M. A civil action brought pursuant to this section must be initiated within six years after the violation occurred.

Sec. 10. Section 36-2157, Arizona Revised Statutes, is amended to read:

36-2157. Affidavit

A person shall not knowingly perform or induce an abortion before that person completes an affidavit that:

1. States that the person making the affidavit is not aborting the child because of the child's sex or race OR BECAUSE OF A GENETIC ABNORMALITY OF THE CHILD and has no knowledge that the child to be aborted is being aborted because of the child's sex or race OR BECAUSE OF A GENETIC ABNORMALITY OF THE CHILD.

2. Is signed by the person performing or inducing the abortion.

Sec. 11. Section 36-2158, Arizona Revised Statutes, is amended to read:

**36-2158.** Informed consent; fetal condition; website; unprofessional conduct; civil relief; statute of limitations; definitions

A. A person shall not perform or induce an abortion without first obtaining the voluntary and informed consent of the woman on whom the abortion is to be performed or induced.� Except in the case of a medical emergency and in addition to the other requirements of this chapter, consent to an abortion is voluntary and informed only if all of the following occur:

1. In the case of a woman seeking an abortion of her unborn child diagnosed with a lethal fetal condition, at least twenty-four hours before the abortion the physician who is to perform the abortion or the referring physician has informed the woman, orally and in person, that:

(a) Perinatal hospice services are available and the physician has offered this care as an alternative to abortion.

(b) The department of health services maintains a website that lists perinatal hospice programs that are available both in this state and nationally and that are organized geographically by location.

(c) The woman has a right to review the website and that a printed copy of the materials on the website will be provided to her free of charge if she chooses to review these materials.

2. In the case of a woman seeking an abortion of her unborn child diagnosed with a nonlethal fetal condition, at least twenty-four hours before the abortion the physician who is to perform the abortion or the referring physician has informed the woman, orally and in person:

(a) Of up-to-date, evidence-based information concerning the range of outcomes for individuals living with the diagnosed condition, including physical, developmental, educational and psychosocial outcomes.

(b) That the department of health services maintains a website that lists information regarding support services, hotlines, resource centers or clearinghouses, national and local peer support groups and other education and support programs available to assist the woman and her unborn child, any national or local registries of families willing to adopt newborns with the nonlethal fetal condition and contact information for adoption agencies willing to place newborns with the nonlethal fetal condition with families willing to adopt.

(c) That the woman has a right to review the website and that a printed copy of the materials on the website will be provided to her free of charge if she chooses to review these materials.

(d) THAT SECTION 13-3603.02 PROHIBITS ABORTION BECAUSE OF THE UNBORN CHILD'S SEX OR RACE OR BECAUSE OF A GENETIC ABNORMALITY.

3. The woman certifies in writing before the abortion that the information required to be provided pursuant to this subsection has been provided.

B. The department of health services shall establish a website within ninety days after the effective date of this section and shall annually update the A website.� The website shall include THAT INCLUDES the information prescribed in subsection A, paragraph 1, subdivision (b) and paragraph 2, subdivision (b) of this section.

C. A physician who knowingly violates this section commits an act of unprofessional conduct and is subject to license suspension or revocation pursuant to title 32, chapter 13 or 17.

D. In addition to other remedies available under the common or statutory law of this state, any of the following individuals may file a civil action to obtain appropriate relief for a violation of this section:

1. A woman on whom an abortion has been performed without her informed consent as required by this section.

2. The father of the unborn child if the father is WAS married to the mother at the time she received the abortion, unless the pregnancy resulted from the father's criminal conduct.

3. The A maternal grandparents GRANDPARENT of the unborn child if the mother was not at least eighteen years of age at the time of the abortion, unless the pregnancy resulted from either of the maternal grandparent's criminal conduct.

E. A civil action filed pursuant to subsection D of this section shall be brought in the superior court in the county in which the woman on whom the abortion was performed resides and may be based on a claim that failure to obtain informed consent was a result of simple negligence, gross

negligence, wantonness, wilfulness, intention or any other legal standard of care.� Relief pursuant to this subsection includes the following:

1. Money damages for all psychological, emotional and physical injuries resulting from the violation of this section.

2. Statutory damages in an amount equal to ~~five thousand dollars~~ $5,000 or three times the cost of the abortion, whichever is greater.

3. Reasonable attorney fees and costs.

F. A civil action brought pursuant to this section must be initiated within six years after the violation occurred.

G. For the purposes of this section:

1. "Lethal fetal condition" means a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth.

2. "Nonlethal fetal condition" means a fetal condition that is diagnosed before birth and that will not result in the death of the unborn child within three months after birth but may result in physical or mental disability or abnormality.

3. "Perinatal hospice" means comprehensive support to the pregnant woman and her family that includes supportive care from the time of diagnosis through the time of birth and death of the infant and through the postpartum period. Supportive care may include counseling and medical care by maternal-fetal medical specialists, obstetricians, neonatologists, anesthesia specialists, clergy, social workers and specialty nurses who are focused on alleviating fear and ensuring that the woman and her family experience the life and death of the child in a comfortable and supportive environment.

Sec. 12. Title 36, chapter 20, article 1, Arizona Revised Statutes, is amended by adding section 36-2160, to read:

**36-2160. Abortion-inducing drugs; definition**

A. AN ABORTION-INDUCING DRUG MAY BE PROVIDED ONLY BY A QUALIFIED PHYSICIAN IN ACCORDANCE WITH THE REQUIREMENTS OF THIS CHAPTER.

B. A MANUFACTURER, SUPPLIER OR PHYSICIAN OR ANY OTHER PERSON IS PROHIBITED FROM PROVIDING AN ABORTION-INDUCING DRUG VIA COURIER, DELIVERY OR MAIL SERVICE.

C. THIS SECTION DOES NOT APPLY TO DRUGS THAT MAY BE KNOWN TO CAUSE AN ABORTION BUT THAT ARE PRESCRIBED FOR OTHER MEDICAL INDICATIONS.

D. FOR THE PURPOSES OF THIS SECTION, "ABORTION-INDUCING DRUG" MEANS A MEDICINE OR DRUG OR ANY OTHER SUBSTANCE USED FOR A MEDICATION ABORTION.

Sec. 13. Section 36-2161, Arizona Revised Statutes, is amended to read:

**36-2161. Abortions; reporting requirements**

A. A hospital or facility in this state where abortions are performed must submit to the department of health services on a form prescribed by the department a report of each abortion performed in the hospital or facility. The report shall not identify the individual patient by name or include any other information or identifier that would make it possible to identify, in any manner or under any circumstances, a woman who has obtained or sought to obtain an abortion.� The report must include the following information:

1. The name and address of the facility where the abortion was performed.

2. The type of facility where the abortion was performed.

3. The county where the abortion was performed.

4. The woman's age.

5. The woman's educational background by highest grade completed and, if applicable, level of college completed.

6. The county and state in which the woman resides.

7. The woman's race and ethnicity.

8. The woman's marital status.

9. The number of prior pregnancies and prior abortions of the woman.

10. The number of previous spontaneous terminations of pregnancy of the woman.

11. The gestational age of the unborn child at the time of the abortion.

12. The reason for the abortion, including at least one of the following:

(a) The abortion is elective.

**(b) The abortion is due to maternal health considerations, including one of the following:**

**(i) A premature rupture of membranes.**

**(ii) An anatomical abnormality.**

**(iii) Chorioamnionitis.**

**(iv) Preeclampsia.**

**(v) Other.**

**(c) The abortion is due to fetal health considerations, including the fetus being diagnosed with at least one of the following:**

**(i) A lethal anomaly.**

**(ii) A central nervous system anomaly.**

~~**(iii) Trisomy 18.**~~

~~**(iv) Trisomy 21.**~~

~~**(v) Triploidy.**~~

~~**(vi)**~~ **(iii) Other.**

**(d) The pregnancy is the result of a sexual assault.**

**(e) The pregnancy is the result of incest.**

**(f) The woman is being coerced into obtaining an abortion.**

**(g) The woman is a victim of sex trafficking.**

**(h) The woman is a victim of domestic violence.**

**(i) Other.**

**(j) The woman declined to answer.**

**13. The type of procedure performed or prescribed and the date of the abortion.**

**14. Any preexisting medical conditions of the woman that would complicate pregnancy.**

**15. Any known medical complication that resulted from the abortion, including at least one of the following:**

**(a) Shock.**

**(b) Uterine perforation.**

**(c) Cervical laceration requiring suture or repair.**

**(d) Heavy bleeding or hemorrhage with estimated blood loss of at least five hundred cubic centimeters.**

**(e) Aspiration or allergic response.**

**(f) Postprocedure infection.**

**(g) Sepsis.**

**(h) Incomplete abortion retaining part of the fetus requiring reevacuation.**

**(i) Damage to the uterus.**

**(j) Failed termination of pregnancy.**

**(k) Death of the patient.**

**(l) Other.**

**(m) None.**

**16. The basis for any medical judgment that a medical emergency existed that excused the physician from compliance with the requirements of this chapter.**

**17. The physician's statement if required pursuant to section 36-2301.01.**

**18. If applicable, the weight of the aborted fetus for any abortion performed pursuant to section 36-2301.01.**

**19. Whether a fetus or embryo was delivered alive as defined in section 36-2301 during or immediately after an attempted abortion and the efforts made to promote, preserve and maintain the life of the fetus or embryo pursuant to section 36-2301.**

**20. Statements by the physician and all clinical staff who observed the fetus or embryo during or immediately after the abortion certifying under penalty of perjury that, to the best of their knowledge, the aborted fetus or embryo was not delivered alive as defined in section 36-2301.**

**21. The medical specialty of the physician performing the abortion, including one of the following:**

**(a) Obstetrics-gynecology.**

**(b) General or family practice.**

**(c) Emergency medicine.**

**(d) Other.**

**22. The type of admission for the patient, including whether the abortion was performed:**

(a) As an outpatient procedure in an abortion clinic.

(b) As an outpatient procedure at a hospital.

(c) As an inpatient procedure at a hospital.

(d) As an outpatient procedure at a health care institution other than an abortion clinic or hospital.

23. Whether anesthesia was administered to the mother.

24. Whether anesthesia was administered to the unborn child.

25. WHETHER ANY GENETIC ABNORMALITY OF THE UNBORN CHILD WAS DETECTED AT OR BEFORE THE TIME OF THE ABORTION BY GENETIC TESTING, SUCH AS MATERNAL SERUM TESTS, OR BY ULTRASOUND, SUCH AS NUCHAL TRANSLUCENCY SCREENING, OR BY OTHER FORMS OF TESTING.

26. IF A SURGICAL ABORTION WAS PERFORMED, THE METHOD OF FINAL DISPOSITION OF BODILY REMAINS AND WHETHER THE WOMAN EXERCISED HER RIGHT TO CHOOSE THE FINAL DISPOSITION OF BODILY REMAINS.

B. The hospital or facility shall request the information specified in subsection A, paragraph 12 of this section at the same time the information pursuant to section 36-2153 is provided to the woman individually and in a private room to protect the woman's privacy. The information requested pursuant to subsection A, paragraph 12 of this section may be obtained on a medical form provided to the woman to complete if the woman completes the form individually and in a private room.

C. If the woman who is seeking the abortion discloses that the abortion is being sought because of a reason described in subsection A, paragraph 12, subdivision (d), (e), (f), (g) or (h) of this section, the hospital or facility shall provide the woman with information regarding the woman's right to report a crime to law enforcement and resources available for assistance and services, including a national human trafficking resource hotline.

D. The report must be signed by the physician who performed the abortion or, if a health professional other than a physician is authorized by law to prescribe or administer abortion medication, the signature and title of the person who prescribed or administered the abortion medication.� The form may be signed electronically and shall indicate that the person who signs the report is attesting that the information in the report is correct to the best of the person's knowledge. The hospital or facility must transmit the report to the department within fifteen days after the last day of each reporting month.

E. Any report filed pursuant to this section shall be filed electronically at an internet website that is designated by the department unless the person required to file the report applies for a waiver from electronic reporting by submitting a written request to the department.

Sec. 14. Exemption from rulemaking

For the purposes of this act, the department of health services is exempt from the rulemaking requirements of title 41, chapter 6, Arizona Revised Statutes, for one year after the effective date of this act.

Sec. 15. Legislative findings and intent

The Legislature finds that prohibiting persons from performing abortions knowing that the abortion is sought because of a genetic abnormality of the child advances at least three compelling state interests. First, this act protects the disability community from discriminatory abortions, including for example Down-syndrome-selective abortions. The Legislature finds that in the United States and abroad fetuses with Down syndrome are disproportionately targeted for abortions, with between 61 percent and 91 percent choosing abortion when it is discovered on a prenatal test. See Box v. Planned Parenthood of Indiana and Kentucky, Inc., 139 S. Ct. 1780, 1790-91 (2019) (Thomas, J., concurring). The Legislature intends to send an unambiguous message that children with genetic abnormalities, whether born or unborn, are equal in dignity and value to their peers without genetic abnormalities, born or unborn.� Second, this act protects against coercive health care practices that encourage selective abortions of persons with genetic abnormalities.� The Sixth Circuit Court of Appeals recently found that empirical reports from parents of children with Down syndrome attest that their doctors explicitly encouraged abortion or emphasized the challenges of raising children with Down syndrome, and there is medical literature to that effect.� See Preterm-Cleveland v. McCloud, No. 18-3329, __ F.3d __, 2021 WL 1377279, at *2 (6th Cir. Apr. 13, 2021) (citing David A. Savitz, How Far Can Prenatal Screening Go in Preventing Birth Defects, 152 J. of Pediatrics 3, 3 (2008) (arguing that "selective pregnancy terminations and reduced birth prevalence [of Down

syndrome is] a desirable and attainable goal")).◆ Third, this act protects the integrity and ethics of the medical profession by preventing doctors from becoming witting participants in genetic-abnormality-selective abortions. The Legislature finds that an industry that is associated with the view that some lives or potential lives are worth more than others is less likely to earn or retain the public's trust. All three of these purposes are also present for the similar prohibition in Arizona law on performing abortions knowing that the abortion is sought based on the sex or race of the child or the race of a parent of that child.◆ The Legislature incorporates into its findings the statistics recently provided by this state and other states to the Supreme Court of the United States.◆ See Brief of the States of Wisconsin et al. at pages 17-25, Box v. Planned Parenthood of Indiana and Kentucky Inc., No. 18-483, 2018 WL 6042853, available at https://www.supremecourt.gov/DocketPDF/18/18-483/72184/20181115122354603_18-483%20Brief%20of%20States%20of%20Wisconsin%20et%20al%20Supporting%20Petitioners.pdf.

Sec. 16. Intervention

The Legislature, by concurrent resolution, may appoint one or more of its members who sponsored or cosponsored this act in the member's official capacity to intervene as a matter of right in any case in which the constitutionality of this act is challenged.

Sec. 17. Construction

This act does not create or recognize a right to an abortion and does not make lawful an abortion that is currently unlawful.

Sec. 18. Severability

If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

**APPROVED BY THE GOVERNOR APRIL 27, 2021.**

**FILED IN THE OFFICE OF THE SECRETARY OF STATE APRIL 27, 2021.**