No. 23-15234

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

PAUL A. ISAACSON, M.D., ET AL.,
*Plaintiffs-Appellants,*

v.

KRISTIN K. MAYES, ATTORNEY GENERAL OF ARIZONA, IN HER
OFFICIAL CAPACITY, ET AL.,
*Defendants-Appellees.*

On Appeal from the United States district court for the District of Arizona
No. 2:21-cv-01417-DLR

_____

## PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
## VOLUME 2 OF 3

_____

Jessica Sklarsky
Gail Deady
Catherine Coquillette
Center For Reproductive Rights
199 Water Street
New York, NY 10038
Telephone: (917) 637-3600
jsklarsky@reprorights.org
gdeady@reprorights.org
ccoquillette@reprorights.org

*Counsel for Paul A. Isaacson, M.D.,
National Council of Jewish Women
(Arizona Section), Inc., and Arizona
National Organization for Women*

Jared G. Keenan
American Civil Liberties Union
    Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
jkeenan@acluaz.org

*Counsel for Plaintiffs-
Appellants*

[Additional Counsel Below]

Jen Samantha D. Rasay
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC 20006
Telephone: (202) 628-0286
jrasay@reprorights.org

Beth Wilkinson
Anastasia Pastan
Anthony Ferrara
Elizabeth Keys
Wilkinson Stekloff LLP
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
aferrara@wilkinsonstekloff.com
ekeys@wilkinsonstekloff.com

Ralia Polechronis
Justin Mungai
Wilkinson Stekloff LLP
130 West 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-9410
rpolechronis@wilkinsonstekloff.com
jmungai@wilkinsonstekloff.com

*Counsel for Paul A. Isaacson, M.D.,
National Council of Jewish Women
(Arizona Section), Inc., and Arizona
National Organization for Women*

Alexa Kolbi-Molinas
Rebecca Chan
Ryan Mendías
Lindsey Kaley
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
akolbi-molinas@aclu.org
rebeccac@aclu.org
rmendias@aclu.org
lkaley@aclu.org

*Counsel for Eric M. Reuss, M.D.,
M.P.H., and Arizona Medical
Association*

1  **KRISTIN K. MAYES**
   **ATTORNEY GENERAL**
2  Firm State Bar No. 14000

3  Kevin Ray (No. 007485)
   Aubrey Joy Corcoran (No. 025423)
4  Office of the Arizona Attorney General
   2005 N. Central Ave.
5  Phoenix, AZ 85004
   Telephone: (602) 542-8328
6  Fax: (602) 364-0700
   EducationHealth@azag.gov
7  Kevin.Ray@azag.gov
   AubreyJoy.Corcoran@azag.gov

8
9  *Attorneys for Defendants Arizona*
   *Department of Health Services and*
   *Jennifer Cunico, in her official capacity*
10 *as Interim Director of the Arizona*
   *Department of Health Services*

11
                **UNITED STATES DISTRICT COURT**
12                   **DISTRICT OF ARIZONA**

13
   Paul A. Isaacson, on behalf of            Case No. 2:21-CV-01417-DLR
14 himself and his patients, et al.,

15         Plaintiffs,

16 vs.                                        **RESPONSE TO MOTION TO**
                                              **INTERVENE**
17 Kristin K. Mayes, Attorney General
   of Arizona, in her official capacity,
18 et al.,

19         Defendants,

23

21
        The Arizona Department of Health Services and Jennifer Cunico[1], in her official
22
   capacity as Interim Director of the Arizona Department of Health Services, take no
23
   position on Arizona Senate President Petersen's and Speaker of the Arizona House of
24
   Representatives Toma's Motion to Intervene.  (Doc. 155.)  Additionally, they do not
25

26
   ---
   [1] Ms. Cunico has replaced Don Herrington as the Interim Director of Arizona Department
   of Health Services.

anticipate taking an active role in any future proceedings.  The Department complies with the laws that are in effect.

Respectfully submitted this 17th day of February, 2023.

KRISTIN K. MAYES
ATTORNEY GENERAL

By  /s/ Aubrey Joy Corcoran
Kevin Ray (No. 007485)
Aubrey Joy Corcoran (No. 025423)
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004
Telephone: (602) 542-8328
Fax: (602) 364-0700
EducationHealth@azag.gov
Kevin.Ray@azag.gov
AubreyJoy.Corcoran@azag.gov
*Attorneys for Defendants Arizona Department of Health Services and Jennifer Cunico, in her official capacity as Interim Director of the Arizona Department of Health Services*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of February, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for all parties are registered CM/ECF users and will be served by the CM/ECF system pursuant to the notice of electronic filing.

By: */s/ Bernadette Roybal*

#11038229

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joshua D. Bendor (No. 031908)
Alexander W. Samuels (No. 028926)
2005 N. Central Ave.
Phoenix, AZ 85004-1592
Telephone: (602) 542-3333
Joshua.Bendor@azag.gov
Alexander.Samuels@azag.gov

*Attorneys for Defendant Kristin K. Mayes*
*in her official capacity as Arizona Attorney*
*General*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | Case No. 2:21-cv-01417-DLR |
|     Plaintiffs, | |
|     v. | **RESPONSE TO MOTION TO INTERVENE** |
| Kristin K. Mayes, Attorney General of Arizona, in her official capacity, et al., | |
|     Defendants. | |

On February 3, 2023, Arizona Senate President Petersen and Speaker of the Arizona House of Representatives Toma moved to intervene in this matter. *See* Doc. 155. Attorney General Mayes takes no position on that motion to intervene.

Additionally, Attorney General Mayes advises this Court that she has concluded the state laws challenged in this litigation are unconstitutional. She will not defend the constitutionality of those laws going forward.

RESPECTFULLY SUBMITTED this 17th day of February, 2023.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**

By  */s/ Alexander W. Samuels*
Joshua D. Bendor (No. 031908)
Alexander W. Samuels (028926)
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
Telephone: (602) 542-3333
Fax: (602) 542-8308
Joshua.Bendor@azag.gov
Alexander.Samuels@azag.gov
ACL@azag.gov

*Attorneys for Defendant Kristin K. Mayes in*
*her official capacity as Arizona Attorney*
*General*

1  **KRISTIN K. MAYES**
   **ATTORNEY GENERAL**
2  Firm State Bar No. 14000

3  Marc H. Harris (No. 013551)
   Assistant Attorney General
4  Carrie H. Smith (No. 022701)
   Assistant Attorney General
5  Licensing and Enforcement Section
   2005 N. Central Ave.
6  Phoenix, Arizona 85004-1592
   Telephone: (602) 542-7992
7  Telephone: (602) 542-7033
   Fax: (602) 364-3202
8
   *Attorneys for Defendant Patricia McSorley, Executive Director of the Arizona Medical*
9  *Board, in her official capacity and the Arizona Medical Board.*

10 **E-mail Address for Court Use Only:**
   LicensingEnforcement@azag.gov
11
                    **UNITED STATES DISTRICT COURT**
12                      **DISTRICT OF ARIZONA**

13
   Paul A. Isaacson, on behalf of        Case No. 2:21-CV-01417-DLR
14 himself and his patients, et al.,

15              Plaintiffs,

16 vs.                                    **RESPONSE TO MOTION TO**
                                          **INTERVENE**
17 Kristin K. Mayes, Attorney General
   of Arizona, in her official capacity,
18 et al.,

19              Defendants,

23
          Executive Director Patricia McSorley and the Arizona Medical Board take no
21
   position on the Motion to Intervene filed by Arizona Senate President Petersen and
22
   Speaker of the Arizona House of Representatives Toma.
23
          Additionally, Executive Director Patricia McSorley and the Arizona Medical
24
   Board do not anticipate taking an active role in future proceedings. Ms. McSorley and
25
   the Arizona Medical Board comply with the laws that are in effect and will continue to
26
   do so when regulating allopathic physicians practicing in the State of Arizona.

Respectfully submitted this 17th day of February, 2023.


                              KRISTIN K. MAYES
                              ATTORNEY GENERAL

                              */s/ Marc H. Harris*
                              Marc H. Harris (No. 013551)
                              Carrie Smith (No. 022701)
                              Assistant Attorneys General
                              Office of the Arizona Attorney General
                              Licensing and Enforcement Section
                              2005 N. Central Ave.
                              Phoenix, Arizona 85004-1592
                              Telephone: (602) 542-7994
                              Telephone: (602) 542-7033
                              Fax: (602) 364-3202
                               LicensingEnforcement@azag.gov

                              *Attorneys for Patricia McSorley, in her official*
                              *capacity as the Executive Director of the*
                              *Arizona Medical Board, and the Arizona*
                              *Medical Board.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a notice of electronic filing to the CM/ECF registrants.

By:*/s/ Brian Kolosick*
   Office Administrator

CHS:bk #11037629

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Paul A Isaacson, et al.,                    No. CV-21-01417-PHX-DLR

10                      Plaintiffs,              **ORDER**

11   v.

12   Mark Brnovich, et al.,

13                      Defendants.

14

15

16          The Court has Plaintiffs' renewed motion for a preliminary injunction under

17   advisement. After extensive review, research, and consideration, it would be helpful to hear

18   the parties' positions on the following three issues:

19          **1.** Defendants argue Plaintiffs' pre-enforcement facial vagueness challenge is not

20   ripe. Ripeness has both constitutional (i.e., jurisdictional) and prudential (i.e.,

21   discretionary) components. *Alaska Right to Life Political Action Committee v. Feldman*,

22   504 F.3d 840, 849 (9th Cir. 2007). The existing briefing appears to conflate the two. "[T]he

23   constitutional ripeness inquiry focuses on (1) whether the plaintiffs have articulated a

24   concrete plan to violate the law in question, (2) whether the prosecuting authorities have

25   communicated a specific warning or threat to initiate proceedings, and (3) the history of

26   past prosecution or enforcement under the challenged statute." *Id.* (citation omitted). The

27   parties have not explained whether and how this pre-enforcement facial vagueness claim

28   satisfies this three-part jurisdictional test.

**2.** In *Kashem v. Barr*, the Ninth Circuit reaffirmed "the longstanding rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." 941 F.3d 358, 375-76 (9th Cir. 2019). The court explained: "[T]he principle that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge rests on an independent foundation, apart from the vague-in-all-applications rule," and therefore the Supreme Court's recent decisions in *United States v. Johnson*, 576 U.S. 591 (2015) and *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018) "did not alter the general rule that a [litigant] whose conduct is clearly prohibited cannot be the one to make a facial vagueness challenge to a statute." *Id.*

This rule makes sense in a post-enforcement case, where the Court can examine the plaintiff's conduct and determine whether the challenged law clearly prohibits it. Less clear is how this rule applies in the pre-enforcement context, where, as here, the plaintiff has not yet engaged in any specific conduct. The parties have not explained whether or how this general rule applies in the pre-enforcement context. In particular, what specific conduct should the Court examine in order to determine whether Plaintiffs are among the class of persons entitled to make a facial vagueness challenge? In addition, it is unclear whether Plaintiffs are arguing they satisfy the general rule or only that this case warrants an exception to the rule. *See Kashem*, 941 F.3d at 376 ("The relevant question, therefore, is simply whether this case, like *Johnson* and *Dimaya*, warrants an exception to this rule.").

**3.** Plaintiffs assert a facial vagueness claim. Ordinarily, to succeed on a facial challenge, a litigant "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228, 2275 n.60 (2022) (signaling that a majority of the Supreme Court endorses the *Salerno* test for facial challenges). But the Ninth Circuit recently held that "*Johnson* and *Dimaya* expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope." *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018). Thus, the Ninth Circuit has "lowered the burden for parties . . . that bring facial void

- 2 -

1  for vagueness challenges as the government cannot defeat challenges by simply offering a
2  single example where a law could be clearly applied." *Helicopters for Agriculture v. Cnty.*
3  *of Napa*, 384 F.Supp.3d 1035, 1039 (N.D. Cal. Apr. 18, 2019).

4        Plaintiffs have the burden of proof and highlighting how the government cannot
5  defeat a facial vagueness challenge sheds little light on what Plaintiffs must show to
6  succeed on one. Though the Ninth Circuit made clear that *Salerno*'s test does not apply to
7  facial vagueness challenges, this Court has been unable to determine what substantive test
8  applies instead. The existing briefing does not address what substantive standard (other
9  than *Salerno*'s) governs facial vagueness claims that do **not** implicate First Amendment
10 rights.[1] Put simply, if a plaintiff mounting a facial vagueness claim no longer needs to show
11 the law is vague in all applications, then how many applications suffice?

12       **IT IS ORDERED** that, by no later than **December 12, 2022**, Plaintiffs submit a
13 supplemental brief, limited to 10 pages, addressing only the issues identified in this order.
14 By no later than **December 15, 2022**, Defendants shall submit a supplemental response,
15 also limited to 10 pages. Plaintiffs may file an optional reply, limited to 5 pages, by no later
16 than **December 16, 2022**.

17       Dated this 7th day of December, 2022.

Douglas L. Rayes
United States District Judge

___

[1] Based on the Court's research, it appears the standard governing First Amendment overbreadth claims also governs facial vagueness claims when the challenged law implicates First Amendment rights. But if the parties see it differently, they are free to provide their views on this issue, as well.

- 3 -

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

```
Paul A. Isaacson, et al.,     )
                              )   No.  CV-21-01417-PHX-DLR
          Plaintiffs,         )
                              )
          vs.                 )       Phoenix, Arizona
                              )       October 25, 2022
Mark Brnovich, et al.,        )       1:59 p.m.
                              )
          Defendants.         )
_____)
```

**BEFORE:   THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TELEPHONIC ORAL ARGUMENT**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2    For Plaintiffs Isaacson, NCJW Arizona, and Arizona Now:

3         Center for Reproductive Rights
          By:  Jessica L. Sklarsky, Esq.
4              Gail M. Deady, Esq.
               Jen Samantha D. Rasay, Esq.
5         199 Water Street, 22nd Floor
          New York, NY 10038
6
          Wilkinson Stekloff LLP
7         By:  Ralia E. Polechronis, Esq.
          130 West 42nd Street, 24th Floor
8         New York, NY 10036

9         Wilkinson Stekloff LLP
          By:  Anastasia Pastan, Esq.
10        2001 M Street NW, 10th Floor
          Washington, DC 20036
11
     For Plaintiffs Reuss and Arizona Medical Association:
12
          American Civil Liberties Union
13        By:  Ryan Mendias, Esq.
          125 Broad Street, 18th Floor
14        New York, NY 10004

15   For Defendant Brnovich:

16        Office of the Attorney General
          By:  Michael S. Catlett, Esq.
17             Kate B. Sawyer, Esq.
               Katlyn J. Divis, Esq.
18        2005 N. Central Avenue
          Phoenix, AZ 85004
19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                    **A P P E A R A N C E S (Continued)**

2

For Defendants Arizona Department of Health Services and Don
3    Herrington:

4         Office of the Attorney General
          Education and Health Section
5         By:  Kevin D. Ray, Esq.
               Aubrey Joy Corcoran, Esq.
6         2005 N. Central Avenue
          Phoenix, AZ 85004

7

For Defendants Arizona Medical Board and Patricia McSorley:
8
          Office of the Attorney General
9         By:  Carrie H. Smith, Esq.
               Marc H. Harris, Esq.
10        2005 N. Central Avenue
          Phoenix, AZ 85004

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2              (Proceedings commenced at 1:59 p.m.)

3              THE COURTROOM DEPUTY:  This is Case No. CV-2021-1417,

4    Isaacson and others versus Brnovich and others.  This is the

5    time set for telephonic oral argument on the motion for

6    preliminary injunction.

7              Would the parties please announce for the record.

8              MS. SKLARSKY:  Hello, this is Jessica Sklarsky on

9    behalf of Dr. Isaacson, NCJW Arizona, and Arizona NOW.  I

10   believe some of my colleagues are also on the -- sorry, I

11   couldn't hear them.  Go ahead.

12             MS. PASTAN:  Good afternoon.  I apologize.  Good

13   afternoon.  This is Anastasia Pastan from Wilkinson Stekloff.

14   We represent plaintiffs Dr. Isaacson, NCJW Arizona, as well as

15   Arizona NOW, but I will be speaking on behalf of all plaintiffs

16   today.  And with me is Ralia Polechronis, also of Wilkinson

17   Stekloff.

18             THE COURT:  Ms. Pastan, this is Judge Rayes.  You're

19   already speaking too fast.  Could you please slow down.

20             MS. PASTAN:  Absolutely.  Thank you, Your Honor.

21             THE COURT:  Thank you.

22             MR. CATLETT:  Good afternoon, Your Honor.  This is

23   Mike Catlett from the Attorney General's Office.  I have my

24   colleagues Kate Sawyer and Katlyn Divis here with me, and I

25   represent Attorney General Mark Brnovich.

UNITED STATES DISTRICT COURT

1        MR. RAY:  Good afternoon, Your Honor.  This is Kevin

2   Ray from the Attorney General's Office.  My colleague Aubrey

3   Joy Corcoran is also here with me.  We jointly represent the

4   interim director Herrington and the Arizona Department of

5   Health Services.

6        MS. SMITH:  Good afternoon, Your Honor.  This is

7   Carrie Smith and Marc Harris.  We jointly represent executive

8   director Patricia McSorley and the Arizona Medical Board.

9        MS. DEADY:  Good afternoon, Your Honor.  This is Gail

10  Deady from the Center for Reproductive Rights, representing the

11  plaintiffs Dr. Isaacson, NCJW Arizona, and Arizona NOW.

12       MS. RASAY:  Good afternoon, Your Honor.  This is Jen

13  Rasay on behalf of plaintiffs Isaacson, NCJW, as well as

14  Arizona NOW.

15       MR. MENDIAS:  Good afternoon.  This is Ryan Mendias on

16  behalf of Dr. Eric Reuss and the Arizona Medical Association.

17       THE COURT:  Ryan, what's your last name again, please?

18       MR. MENDIAS:  Mendias, M-E-N-D-I-A-S.

19       THE COURT:  I just didn't hear what you said.  Thank

20  you.

21       MS. SKLARSKY:  And, Your Honor, this is Jessica

22  Sklarsky here on behalf of Dr. Isaacson, NCJW Arizona, and

23  Arizona NOW.

24       THE COURT:  Okay.  Is that everybody?  Must be.

25       All right.  Who will be arguing on behalf of the

1  plaintiffs?  It will be Ms. Pastan?

2          MS. PASTAN:  Yes.

3          THE COURT:  Okay.  And on behalf of the defendants?

4          MR. CATLETT:  Your Honor, that would be me, Mike

5  Catlett.

6          THE COURT:  Okay.

7          All right.  Robert has already reminded you; let me

8  remind you again, though.  Please identify yourself when you

9  speak, and please be careful to not speak too fast.  If you

10  talk too fast, you probably won't do yourself much good.

11          We're going to -- if we don't finish by 3:30, we'll

12  break at 3:30 for a recess and come back at 3:45.

13          The questions have been teed up, so the parties should

14  be ready to give direct answers to each one.  So let's get

15  started.

16          At issue -- and let me remind you, at issue are

17  plaintiffs' motion to preliminarily enjoin the collection of

18  laws that during this argument we'll refer to as the "reason

19  regulations."

20          Okay.  For the plaintiffs, the first question:

21  Plaintiffs argue that the reason regulations implicate First

22  Amendment rights in order to show that they can bring

23  pre-enforcement facial vagueness claim.  But at this stage

24  they're not asking the Court to determine whether the reason

25  regulations actually violate the First Amendment; they're

7

1    asking the Court to determine only whether the reason

2    regulations are too vague.

3          Is this a correct understanding of your motion?

4          MS. PASTAN:  Yes, Your Honor, that is correct.

5    Although plaintiffs' complaint included a freestanding First

6    Amendment claim, we have not moved on that claim in this PI

7    motion.

8          As the Court correctly recognizes, plaintiffs point

9    out the reason regulations' implication for speech to show that

10   we are entitled to bring a pre-enforcement facial vagueness

11   claim as well as to emphasize the stringency of review that the

12   reason regulations are subject to and to illustrate the

13   irreparable harm that is being caused by those reason

14   regulations in Arizona.

15         THE COURT:  Okay.

16         MS. PASTAN:  As to the first point --

17         THE COURT:  Go ahead.

18         MS. PASTAN:  As to the first point, regarding the

19   appropriateness of facial relief, in *Kashem v. Barr*, the Ninth

20   Circuit identified two scenarios where facial relief might be

21   appropriate, and both of them apply here.  First --

22         THE COURT:  Whoa, whoa, whoa.  Slow down.

23         MS. PASTAN:  In *Kashem*, the Ninth Circuit identified

24   two scenarios where facial relief might be appropriate, and

25   both of them apply here.

1          First, *Kashem* noted that the requirements governing

2    facial challenges are relaxed in the First Amendment context.

3    The fact that the regulations also implicate constitutionally

4    protected speech supports our showing that facial relief is

5    appropriate here, because it means that plaintiffs are not

6    required to show that the reason regulations are vague in every

7    application.

8          THE COURT:  Okay.  Thank you.  Now --

9          MS. PASTAN:  Second --

10         THE COURT:  I'm sorry.  Go ahead.

11         MS. PASTAN:  Second, *Kashem* also noted that facial

12   relief is appropriate under *Johnson* and *Dimaya*, where the

13   statute is so indeterminate that it might be vague even as

14   applied to the plaintiffs in those cases.  And plaintiffs here

15   have already shown that the reason regulations are so vague in

16   myriad circumstances.

17         THE COURT:  Okay.  Now, sometimes your answer may

18   spill over into the next question, but I'm going to ask every

19   question so I understand -- I want an answer to every one of

20   these questions.

21         So number 2:  States may regulate professional conduct

22   even if doing so incidentally involves speech.  Why aren't the

23   reason regulations best viewed as regulations of professional

24   conduct that incidentally involve speech?

25         MS. PASTAN:  So related to the first question, Your

1    Honor, it's important to keep in mind that plaintiffs are not

2    asking the Court to hold that the reason regulations violate

3    the First Amendment on this motion.

4          Whether the reason regulations are restrictions on

5    speech or regulations of conduct is really beside the point.

6    Even if Arizona may regulate speech incidental to the

7    performance of abortions, the reason regulations are both

8    chilling speech that occurs entirely apart from the abortion

9    procedure and chilling some speech related to abortion

10   procedures that may very well be permitted under the law.

11         The physician -- the physician declarations the

12   plaintiffs submitted to support our motion illustrate that.

13   The extreme vagueness of the reason regulations already chills

14   constitutionally protected speech far beyond the conduct

15   regulated by the law.

16         For example, Dr. Glaser's supplemental declaration,

17   and this is at paragraph 6, describes Arizona physicians who

18   have expressed, quote, significant concern about how honest

19   they can be with their patients when discussing pregnancy

20   options in the context of fetal anomalies.

21         Even though these doctors don't provide abortion care,

22   the reason regulations are so vague that they are still causing

23   these doctors to fear prosecution, leading them to curtail

24   their otherwise protected speech.

25         In that second category, relatedly, Dr. Isaacson's

1    supplemental declaration describes how the uncertainty about

2    the regulations' meaning has inhibited his communication with

3    other physicians, to the detriment of the care for his

4    patients.

5         For example, he has stopped accepting any referrals

6    from maternal-fetal medicine specialists or genetic counselors,

7    no matter what the diagnosis or the role the diagnosis might

8    have played in the patient's decision-making.  The law is

9    simply too vague and the penalties are simply too harsh for him

10   to risk continuing to engage in this communication.

11        THE COURT:  Well, let me interrupt you for a second,

12   and let me remind you, you're tailing off a little bit when

13   you're talking.  We're trying to hear what you're saying, and

14   the court reporter is trying to keep a good record, so please

15   try to keep your speech up and don't talk too fast.

16        But my question is this:  What provision of the reason

17   regulations are these doctors who aren't performing the

18   abortions worried about violating?

19        MS. PASTAN:  So doctors who are not performing

20   abortions are worried about accomplice liability and aiding and

21   abetting liability for the criminal liability provisions.

22        THE COURT:  Hang on a second.  I didn't quite

23   understand.  I didn't hear what you said about that.

24        They're worried about violating what?

25        MS. PASTAN:  They are worried about being found liable

UNITED STATES DISTRICT COURT

1    under theories of accomplice liability or aiding and abetting.

2            THE COURT:  Okay.  I didn't hear that.  Okay.  Go

3    ahead.

4            All right.  Go ahead.  Anything else in response to my

5    Question No. 2?

6            MS. PASTAN:  There are also -- the only thing I would

7    add, Your Honor, is that there are also concerns they could be

8    held liable for failing to report.  So there is a provision --

9    the reporting provision requires doctors to report violations,

10   and they are worried that they could be guilty under that

11   provision as well.

12           THE COURT:  So it's the aid and abet and the reporting

13   provision that you're concerned about?

14           MS. PASTAN:  Yes, Your Honor.

15           THE COURT:  Well, wouldn't accomplice and aiding and

16   abetting liability require them to know that the doctor who

17   ultimately performs the abortion knows the woman seeking the

18   abortion has a prohibited motive?  Isn't that a long,

19   attenuated causal chain?

20           MS. PASTAN:  Potentially, Your Honor.  But as

21   discussed in our briefs and in the declarations we've submitted

22   in support of the motion, many times the circumstances of an

23   abortion could reveal to any of the healthcare providers

24   involved the likely motive that the patient has.

25           So an example might be learning about -- you know, the

UNITED STATES DISTRICT COURT

1      patient learns about their results of the fetal diagnosis and

2      immediately reaches out for information about abortion care.

3              THE COURT:  But how would the nonperforming doctor

4      know that the performing doctor knows the patient's motive?

5              MS. PASTAN:  So, again, as is noted in several of the

6      declarations plaintiffs have submitted in support of their

7      brief, typically physicians will share medical records for

8      patients related to referrals.  That is one way that the

9      initial doctor who is not the abortion care provider might

10     expect the -- expect an abortion care provider to learn about

11     the patient's likely motive, because they know that the

12     abortion care provider is likely to have reviewed the patient's

13     medical records.

14             THE COURT:  So you're saying that the doctor might

15     have liability if he sends to the referring doctor his patient

16     notes, which might indicate the patient's motive?

17             MS. PASTAN:  Yes, Your Honor.  That is one example of

18     where this might come to pass.

19             THE COURT:  Okay.  Number 3:  *Dobbs* criticized the way

20     in which abortion cases had distorted principles of third-party

21     standing.

22             Outside the abortion context, what is plaintiffs' best

23     authority for the proposition that doctors have third-party

24     standing to assert First Amendment rights of their patients?

25             MS. PASTAN:  I want to be clear, Your Honor.

1    Plaintiffs are not asserting third-party standing here.  We are

2    not trying to bring First Amendment claims on behalf of their

3    patients.

4         Plaintiffs' motion relies on their own First Amendment

5    right to speak freely with their patients and with other

6    medical providers, as well as their own Fourteenth Amendment

7    procedural due process rights not to be subject to

8    unconstitutionally vague criminal laws.

9         THE COURT:  Their declarations say they're vindicating

10   their own rights and the rights of their patients.  So you're

11   saying they're actually only vindicating their own rights, not

12   the rights of their patients.  True?

13        MS. PASTAN:  Yes.  Plaintiffs' motion relies on

14   plaintiffs' own rights, Dr. Isaacson's rights, and the members

15   of the American Medical Association are bringing their

16   vagueness and free speech claim on behalf of themselves and

17   their members, not on behalf of their patients.

18        THE COURT:  So we're not looking at the patients'

19   First Amendment rights here at all; we're only looking at the

20   doctors' First Amendment rights.  Is that right?

21        MS. PASTAN:  Yes.

22        THE COURT:  All right.  Let's go to 4:  Aside from

23   counseling and advice, how is a patient's motive medically

24   relevant to the abortion procedure?  For example, does a doctor

25   need to know a patient's motive in order to safely perform the

1   abortion?  Does a patient's motive impact whether or how a

2   doctor performs the procedure?

3          MS. PASTAN:  Your Honor, while knowing a patient's

4   motive for seeking an abortion does not change the physical

5   steps of how the procedure is performed or make the procedure

6   more or less safe, it may very well affect aspects of abortion

7   care, such as bedside manner, conversations with the patient or

8   other physicians, and other ancillary reproductive healthcare.

9          The decision to end a pregnancy is often a complex

10  one, and the ability for doctors and patients to communicate

11  candidly is just absolutely crucial to the provision of

12  high-quality compassionate care.  Part of providing

13  high-quality compassionate care is being able to adjust bedside

14  manner to the patient's needs, by providing reassurance, and

15  answering questions.

16         As explained in Dr. Isaacson's declarations, because

17  of the reason regulations, he no longer feels comfortable

18  taking referrals from maternal-fetal medicine specialists or

19  other specialists, and he is no longer able to work

20  collaboratively with providers to provide the highest quality

21  care.

22         As an example, before the reason regulations went into

23  effect, referring maternal-fetal medicine specialists or other

24  specialists would typically contact Dr. Isaacson or another

25  clinic's physician directly, speak with them about the patient

1   and/or the fetal diagnosis at issue, and then usually send the

2   patient's medical records to the clinic so that Dr. Isaacson or

3   one of the other physicians could review the patient's medical

4   history and any information regarding the fetal diagnosis

5   before the patient's appointment.

6          It was also his practice to speak directly with

7   patients about their diagnosis if referred by a maternal-fetal

8   medicine specialist or another specialist during the patient's

9   pre-abortion counseling.  This allowed him to provide the most

10  tailored sensitive care to his patients.

11         Now, because Dr. Isaacson no longer takes referrals

12  from MFMs and other specialists, none of those conversations

13  can take place at all.  Moreover, he fears that the reason

14  regulations will discourage his patients from having open and

15  honest conversations with him, which is further interfering

16  with the doctor-patient relationship in which, as I noted

17  before, candor is essential to delivering quality patient care.

18         THE COURT:  Okay.  Let's go to 5.  Arizona -- Arizona

19  law defines "genetic abnormality" as:  The presence or presumed

20  presence of an abnormal gene expression in an unborn child,

21  including a chromosomal disorder or morphological malfunction

22  occurring as a result of abnormal gene expression.

23         First part of Question 5:  One of your arguments is

24  that doctors deal in probabilities, not certainties, so there

25  rarely, if ever, is 100 percent certainty that a fetal

UNITED STATES DISTRICT COURT

1     condition exists or has a genetic cause.  For this reason, you

2     argue that they don't know what degree of probability brings a

3     condition within the scope of the reason regulations.

4           You also argue that the doctors might disagree over

5     the nature or cause of a fetal condition, so the reason

6     regulations can expose doctors to liability if they guess wrong

7     or if a prosecution expert testifies that she would have made a

8     different call.

9           How is this dynamic different from medical malpractice

10     cases, where litigants routinely present competing medical

11     experts offering different views on the standard of care and

12     causation?

13           MS. PASTAN:  The medical malpractice context is

14     different in multiple ways.  Perhaps most importantly here,

15     unlike in civil tort, doctors face --

16           THE COURT:  Hang on a second.  I didn't understand

17     you.

18           Unlike what?

19           MS. PASTAN:  Sorry.  Unlike in civil tort --

20           THE COURT:  Okay.

21           MS. PASTAN:  -- doctors face severe criminal penalty

22     for violations of the reason regulations.  Just as a reminder,

23     a doctor found guilty of violating the solicitation provision

24     could be sentenced to up to 8 and 3/4 years in prison, in

25     addition to extensive civil penalties.

1        Indeed, the fact that the reason regulations

2   potentially expose healthcare providers to severe criminal

3   sanctions is one of the reasons they are subject to the most

4   stringent vagueness review.

5        One of the principles underlying vagueness doctrine is

6   that more uncertainty is tolerable when the consequences are

7   less grave.  Here, the consequences are very severe, and the

8   Constitution requires the Arizona Legislature to provide clear

9   notice of what the reason regulations prohibit and sufficiently

10  clear terms to guide the discretion of law enforcement,

11  prosecutors, judges, and juries.

12       There are some very significant practical distinctions

13  as well.  For one, the risk that doctors may face large damages

14  judgments where reasonable experts might reach different

15  conclusions about the standard of care or what caused an injury

16  is why doctors, especially OB-GYNs, carry significant medical

17  malpractice insurance.

18       Separately, while facing or losing a medical

19  malpractice lawsuit does not necessarily end a doctor's medical

20  career -- in fact, I don't think it typically does -- it is

21  much more likely that the stigma of a felony conviction will

22  discourage most, if not all, patients from choosing that

23  doctor, even if the doctor is allowed to keep her license,

24  which she very likely will be unable to do in part because of

25  the reason regulations.

1          And while the performance provision focuses on

2     abortion care providers who are doctors, who are routinely

3     subject to the tort standards that are noted in Your Honor's

4     question, the reason regulations' prohibitions extend far

5     beyond doctors, to individuals who are strangers to the medical

6     malpractice system.

7          For example, the solicitation provision, which carries

8     the highest criminal penalties, could apply to those who raise

9     funds for abortion care in the context of a covered condition.

10    As another example, criminal aiding and abetting liability

11    could extent to office support personnel who are not medical

12    doctors, or even to others who are entirely outside of the

13    medical field and would not be subject to a malpractice claim.

14         THE COURT:  I think you might be missing the point.  I

15    know a lot of cases in criminal matters where experts have

16    testified, and the experts give opinions and the other side

17    brings an expert who gives another opinion.  I've seen shaken

18    baby cases, I've seen vehicular manslaughter cases, I've seen

19    just a whole litany of cases where there are competing experts

20    who give opinions.  And I understand the difference between the

21    consequences of a criminal case and a civil case.

22         But I'm trying to understand, why is this case

23    different where the proof probably, on the circumstances we

24    talk about here, would require expert testimony on both --

25    well, at least on the prosecution's side, assuming that defense

1    would probably have their own expert.

2           Why can't the battle of the experts be -- why can it

3    be acceptable in other types of criminal cases but not in this

4    type of criminal case?

5           MS. PASTAN:  Your Honor, I think one key distinction

6    here is that the definitions at issue are far too subjective,

7    and there are many layers of that.  I think some of your other

8    questions get to this; you know, the definition of when a

9    genetic abnormality occurs, the definition of when it is

10   present or presumed to be present or detected.

11          THE COURT:  Can you say that -- I'm having a hard time

12   understanding what you're saying sometimes.  You fade out and

13   talk a little fast.  Can you just slow it down a little bit.

14          MS. PASTAN:  I apologize, Your Honor.  I will try to

15   speak more slowly.

16          I think the difference here from some of the types of

17   criminal cases that you mentioned is that the definition of a

18   fetal genetic abnormality is just far too subjective, and there

19   are many layers of subjectivity in this statute that would add

20   to that and make it even more difficult for a doctor to know

21   what -- what is required under the law.

22          The other question -- the other thing that is

23   different about this kind of case versus the sort of criminal

24   cases I think Your Honor is referring to is that here it is not

25   clear what kind of conduct a prosecutor would even be charging

1    the physician with.  The statute is so unclear, it does not --

2    you do not even know -- it does not articulate what the conduct

3    that is unlawful is.

4            It's very different to have experts testifying about

5    whether liability has been proven versus having people debate

6    or having experts debate whether conduct is even -- falls

7    within the law.

8            THE COURT:  Hang on a second.  I didn't understand

9    that last sentence.  Can you restate that?  I didn't hear you.

10           MS. PASTAN:  Sorry.  I think, to go back to the point

11   about charging versus liability, the reason regulations are so

12   vague, it is unclear what conduct is even chargeable as a crime

13   under the law.  And that is very different from a situation in

14   a criminal court where you have clearly unlawful conduct and

15   the question is whether the defendant is liable for that

16   conduct.

17           Here --

18           THE COURT:  No, I heard that part of the argument.  I

19   just didn't -- I just didn't understand your last sentence.  It

20   was run together, and I didn't understand what you said.  I

21   heard what you said before.  I'm just trying to understand that

22   last sentence.

23           MS. PASTAN:  I'm sorry, Your Honor.  I think I was

24   just restating that.  So if I said it unclearly, I apologize.

25           THE COURT:  Let me ask you this:  In the narrow

1    question of whether a fetal condition exists and has a genetic

2    cause, why isn't a battle of the experts an adequate way to

3    deal with this, the same as in other criminal cases?

4         MS. PASTAN:  I'm sorry, I didn't quite hear Your

5    Honor.  Did you say the question of whether a fetal genetic

6    abnormality exists?

7         THE COURT:  Let me restate it.

8         In the narrow question of whether a fetal condition

9    exists, fetal abnormality condition exists and has a genetic

10   cause, why isn't a battle of the experts an adequate way to

11   deal with this, the same as other criminal cases?

12        MS. PASTAN:  The issue here, Your Honor, is that the

13   definition of a fetal genetic abnormality is itself so vague

14   that it would lead -- it would be very difficult for a

15   physician to make -- to understand what the law is asking them

16   to assess.

17        THE COURT:  Okay.  All right.  Let's go on to the

18   final question in Subpart 5.  Is there an accepted consensus in

19   the medical community on the degree of probability required for

20   a condition to be considered "present"?

21        MS. PASTAN:  That depends, Your Honor, on what stage

22   of the screening or diagnostic testing process a patient and

23   her doctor are in.  And it's really important to distinguish

24   between those phases.

25        As discussed in plaintiffs' supporting declarations,

1  genetic screening and diagnostic testing is a complex,

2  multidimensional process.  Initial screening tests, which can

3  occur beginning around ten weeks, are the beginning of this

4  process and provide information about the likelihood or risk

5  that a condition may be present.

6        The degree of certainty provided by a screening test

7  varies, depending on the test, depending on the condition.

8  Screening tests can also produce false positives, false

9  negatives, and sometimes they have uninterpretable results.

10        Because of this, plaintiff physicians would not tell a

11  patient that a condition is, quote, "present" based on a

12  screening test alone.  Rather, only confirmatory diagnostic

13  testing, through, for example, CVS, chorionic villus sampling,

14  or amniocentesis would allow them to say that a particular

15  genetic condition is present.

16        A real concern here, though, Your Honor, is that

17  genetic abnormality, in the reason regulations, is also defined

18  to incorporate conditions that are presumed present, and it is

19  unclear when or what triggers that presumption along the

20  complex continuum of genetic screening and testing that I just

21  described.

22        For example, in many scenarios, diagnostic testing has

23  either not been pursued by a patient or is simply not

24  available.  And in those circumstances, it is unclear when

25  positive screening results or other circumstances like family

1    history could place the care within the scope of the

2    definitions in the reason regulations.

3            THE COURT:  Well, let me back up.

4            Is presence different from diagnosis?

5            MS. PASTAN:  Sorry, I did not hear the first part of

6    that, Your Honor.

7            THE COURT:  Is presence, is it different from

8    diagnosis?

9            MS. PASTAN:  I think, Your Honor, plaintiffs' position

10   is that if there is a diagnosis, then a condition could be said

11   to be present.

12           THE COURT:  Okay.  Thank you.

13           Let's go to number 6.  The reason regulations is an

14   umbrella term that covers various provisions of Arizona law.

15   Some of your arguments require the Court to analyze the reason

16   regulations collectively.  For example, you argue the reason

17   regulations are vague because one section prohibits a doctor

18   from performing abortions if they know the patient is seeking

19   the procedure solely because of a fetal genetic abnormality

20   while other sections do not use the word "solely."

21           But it's common for different offenses to have

22   different elements, and criminal laws aren't vague just because

23   different offenses have slightly different elements.

24           Why should the Court analyze the reason regulations as

25   a collective whole rather than each provision on its own

1  merits?

2        MS. PASTAN:  To begin with, it is important to

3  remember that all of these provisions were passed together as

4  part of one act supported by a single statement of legislative

5  intent, which was to regulate discriminatory abortions.

6        In light of that history and that statement of intent,

7  it does not make any sense to analyze the reason regulations'

8  provisions as independent offenses with varying elements.

9  Rather, this is a set of interlocking provisions, and they must

10  be read together to ensure that each is given effect.

11        The problem is, that's not possible here.  For one, if

12  we accept that in almost all instances doctors take money for

13  the provision of abortion care, the solicitation provision

14  renders the performance provision largely meaningless.

15        Worse, two of the provisions purportedly set out

16  representations of what the law is supposed to mean, yet they

17  are inconsistent with the other provisions and with each other.

18        The affidavit provision, which logically is a

19  statement by the physician that she has complied with the law,

20  requires a doctor to attest that she has no knowledge that an

21  abortion was performed because of a genetic abnormality of the

22  child.  But this seems to require the doctor to attest that

23  they have complied with a standard that is not articulated in

24  either the performance provision or the solicitation provision,

25  both of which employ a totally different mens rea, knowledge as

UNITED STATES DISTRICT COURT

1  opposed to no knowledge; and further, the performance provision

2  only prohibits abortions that are sought solely because of a

3  genetic abnormality of a child, not merely because of a genetic

4  abnormality.

5       Put differently, the affidavit provision suggests that

6  the act bars conduct that neither the performance provision nor

7  the solicitation provision contemplates being unlawful.

8       And then in a similar vein, the notification provision

9  requires a doctor to tell her patient that the performance

10 provision prohibits abortions because of a genetic abnormality,

11 which Your Honor has acknowledged appears to be a misstatement

12 of the law.  Surely the Arizona Legislature did not actually

13 intend for doctors to lie to their patients, so the

14 notification provision must reflect some understanding of the

15 law.  But it cannot be squared with the other provisions, and

16 taken together, it is impossible to parse these interlocking

17 provisions.

18      Notably, even defendants do not suggest that the

19 reason regulations can simply be read separately.  The sole

20 example the State has given to clarify the meaning, that of a

21 pregnant person who directly informs her doctor that she is

22 ending her pregnancy solely because of a covered condition,

23 it's the rare case that would seem to fall within all the

24 schemes' interlocking confusing prohibitions.

25      And admittedly, that would be a simpler case, if the

1   law involved only one provision, restricting abortions in a

2   limited circumstance when a patient discloses that a covered

3   fetal condition is the sole reason she is seeking care, as

4   defendants have suggested the reason regulations do.  But

5   that's not the law the legislature enacted, and it's not the

6   case before Your Honor.

7           THE COURT:  Okay.  Thank you.

8           All right.  For the remainder of the questions, I want

9   plaintiffs to analyze each provision on its own, without

10  reference to how the language of one provision might differ

11  slightly from the language of another.

12          All right.  Section 13-3603.02(A)(2) says:  Except in

13  a medical emergency, a person who knowingly performs an

14  abortion knowing that the abortion is sought solely because of

15  a genetic abnormality of the child is guilty of a Class 6

16  felony.

17          I'm going to refer to this as the "performance

18  provision."  What is vague about the language in the

19  performance provision?

20          MS. PASTAN:  The performance provision, even taken on

21  its own, suffers from at least two independent sources of

22  vagueness.

23          First, it uses the phrase "genetic abnormality," and

24  as discussed in plaintiffs' briefing and previous arguments,

25  given the statutory definition of this term and along with its

1    imprecise exception for lethal fetal conditions, physicians do

2    not understand what conditions -- excuse me, Your Honor --

3    pardon me -- fall within the scope of its prohibitions.

4           Second, the performance provision still requires

5    physicians --

6           THE COURT:  Do you need to get a drink of water?  I

7    can feel your throat tightening up on you.  Do you want to take

8    a moment to get some water?

9           MS. PASTAN:  Yes, Your Honor.  I had a sip of water.

10   Thank you.  I apologize.

11          THE COURT:  Okay.

12          MS. PASTAN:  Okay.  Second, the -- first, the phrase

13   "genetic abnormality" is itself vague.

14          Second, the performance provision still requires

15   doctors to make an inherently subjective assessment about how

16   various factors contributed to a patient's decision to

17   terminate pregnancy; not their own decision, their patient's

18   decision.  And the use of the qualifier "solely" doesn't change

19   that.

20          You previously credited declarations by Drs. Isaacson,

21   Reuss, and Glaser, that explained how their patients' decisions

22   to terminate a pregnancy are often complex and involve many

23   interrelated considerations.

24          Those declarations, they explain how, particularly in

25   the context of a fetal diagnosis, a patient's reason for

1    terminating is often inextricably intertwined with many other

2    considerations, including a lack of financial, emotional,

3    family, or community support.

4            In that context it is impossible to tease apart, at

5    least it is often impossible to tease apart, how the diagnosis

6    contributed to the plaintiff's -- I'm sorry, to the patient's

7    ultimate decision, especially if other considerations all stem

8    from the fetal diagnosis itself.

9            Ultimately, anyone's assessment of what role a

10   particular reason played in another person's decision to end

11   their pregnancy is inherently subjective, and that is true

12   whether the doctor must assess if it is the sole reason or a

13   but-for reason.

14           It might be -- it might be helpful, Your Honor, to

15   consider an example of where that wouldn't be the case, so, for

16   example, if the statute said, "in whole or in part because of,"

17   which is the language that has been used in other recent bans

18   throughout the country.  For example, it was used in Ohio's

19   recent ban.

20           And the reason this "in whole or in part of" language

21   did not raise vagueness concerns was because all the doctor

22   needed to know under those laws was that the prohibited reason

23   played any role in the patient 's decision-making.  There was

24   no need to make a subjective assessment about the exact causal

25   role the prohibited reason played in the patient's decision.

1          It was much more akin to a true-false determination,

2     asking was the prohibited reason a factor or wasn't it?  That

3     is much more straightforward than the determination at issue

4     here.

5          THE COURT:  Well, if a patient has a mixed motive,

6     then isn't it clear that a genetic abnormality isn't the sole

7     motive?

8          MS. PASTAN:  That's not necessarily the case, Your

9     Honor, because, you know, there are many different ways you

10    look at the complicated decision to end a pregnancy.  And there

11    are different standards you can apply, you know, for whether

12    something qualifies as being the cause of the genetic

13    abnormality.

14         So the mixed motive standard doesn't necessarily

15    clarify things.

16         THE COURT:  Okay.  So I guess my question is, I'm --

17    if the patient has a mixed motive, then it -- wouldn't you

18    agree that the genetic abnormality is not the sole motive?

19         MS. PASTAN:  I think Your Honor is actually -- is kind

20    of getting at the next question, right?  Which is --

21         THE COURT:  Well, let me follow up.

22         MS. PASTAN:  -- whether --

23         THE COURT:  If it's -- if it is impossible to know how

24    the fetal diagnosis impacted the patient's decision, doesn't

25    that mean that the State won't be able to prove beyond a

1   reasonable doubt that it was the sole motive?

2          MS. PASTAN:  That's not necessarily the case, because

3   knowledge is typically proven through circumstantial evidence,

4   and -- or it can be proven through circumstantial evidence, and

5   in fact, in most situations it would be proven through

6   circumstantial evidence.

7          In that case, a jury would have to consider all of the

8   different circumstances that the physician defendant would have

9   been aware of at the time that the abortion occurred.  And that

10  would, again, require the jury to tease apart whether the

11  physician defendant, based on all those facts and

12  circumstances, understood what the patient's motive was for

13  seeking the abortion.  And --

14         THE COURT:  Well, let me back up for a second.

15         MS. PASTAN:  -- it's a very --

16         THE COURT:  Haven't you just defined a question of

17  fact?  I mean, it's not unusual in criminal cases where

18  knowledge is an element of the offense, and the way it's proven

19  is through a variety of circumstances that the jury has to

20  weigh and decide if that -- those circumstances -- based on

21  those circumstances, the defendant knew.

22         How is this different?

23         MS. PASTAN:  Your Honor, this is different because

24  this is the rare situation, possibly the unique situation,

25  where the criminal -- the question being asked is did the

1      criminal defendant understand what was happening in somebody

2      else's mind.  Did they understand why somebody did something.

3             And so the element that would need to be proven is

4      itself totally unclear.

5             THE COURT:  Okay.  So you're arguing a matter of

6      proof.  How is the defendant -- how is the prosecution going to

7      prove it and how is the defendant going to defend it.  Is that

8      basically what you're arguing?

9             MS. PASTAN:  I'm sorry.  How the -- how the

10     prosecution?

11            THE COURT:  Would prove it and how the defendant would

12     defend against it.

13            MS. PASTAN:  I am -- so plaintiffs are arguing that

14     unlike any other criminal prohibition, or at least any that

15     plaintiffs are aware of, this would ask -- ask a jury to

16     determine a very subjective question, which is what somebody

17     else -- not the doctor, but the patient -- was thinking when

18     they decided to seek abortion care.  And that assessment is

19     incredibly difficult to make.

20            And because that assessment would be so difficult to

21     make, because it could depend on a variety of different

22     factors, and because there could be circumstantial evidence

23     suggesting the physician defendant's knowledge, okay, it would

24     be almost impossible for a doctor faced with a patient seeking

25     abortion care to know what is permissible conduct.

UNITED STATES DISTRICT COURT

1          THE COURT:  I'm sorry, to know what?

2          MS. PASTAN:  To know what is permissible conduct.  It

3     would be very challenging for a physician who is faced with

4     someone seeking abortion care in the context of a fetal

5     condition to know what conduct is permissible.

6          THE COURT:  Okay.  Let's go to the second part of

7     Question 7:  The performance provision applies when a fetal

8     genetic abnormality is the only reason why the patient is

9     seeking an abortion.  If a patient has mixed motives or

10    multiple but-for reasons for seeking an abortion, the

11    performance provision does not apply.

12         What is wrong with that interpretation?

13         MS. PASTAN:  First, I don't think I can emphasize

14    enough the extreme difficulty of determining a patient's

15    motivation for terminating a pregnancy.  The Court recognized

16    in the earlier PI order, in the first PI order, that under the

17    reason regulations, a doctor risks criminal prosecution based

18    entirely on the subjective motivations of another individual,

19    even if they are not expressed.

20         For example, if a woman was planning on continuing an

21    unplanned pregnancy --

22         THE COURT:  Whoa, whoa, whoa.  Stop, stop.  Can you

23    start all over again?  I didn't keep up with you on that.  Say

24    that sentence again.

25         MS. PASTAN:  Okay.  First, it's important to emphasize

UNITED STATES DISTRICT COURT

1    the extreme difficulty of determining a patient's motivation

2    for ending her pregnancy.  This Court recognized in its first

3    PI order that under the reason regulations, a doctor risks

4    criminal prosecution based entirely on the subjective

5    motivations of another individual, even if they are not

6    directly expressed.

7         And as an example, Your Honor, if a woman was planning

8    on continuing her -- an unplanned pregnancy but after a fetal

9    diagnosis decides raising a child with special needs is not

10   within her financial means and chooses to have an abortion, is

11   this an abortion solely because of a fetal diagnosis?  On the

12   one hand, it wasn't the diagnosis alone that contributed to her

13   decision given the financial considerations; but on the other

14   hand, those financial concerns are a direct result of the

15   diagnosis.

16        In this situation, can we say that the diagnosis is a

17   distinct reason from the financial concerns such that they

18   constitute mixed motives, or are they part and parcel of the

19   same sole reason for seeking the abortion?

20        THE COURT:  Well, let me ask you this.  Let me just

21   see if I can understand this better.

22        Under the statute, the doctor doesn't face liability

23   solely based on the subjective motives of another person.  The

24   doctor faces liability only if she actually knows the

25   subject -- subjective motives of the other person.

1          So there are two parts:  first, the patient's

2    subjective motive, and second, the doctor's actual knowledge.

3    Why isn't the doctor capable of determining whether she knows

4    something?

5          MS. PASTAN:  The question isn't, Your Honor, when --

6    whether the doctor is capable of determining whether the doctor

7    knows something.  The question is whether the doctor knows,

8    under all of the facts and circumstances of the case, whether

9    she could be liable -- criminally liable under the statute

10   because of how she interpreted and understood the patient's

11   motive for seeking an abortion.

12         THE COURT:  Okay.  I think that leads us into the next

13   one, Subpart (c) of Question 7:  If a doctor wants to ensure

14   that she does not violate this law, couldn't she ask the

15   patient whether she's seeking the abortion solely because of a

16   fetal genetic abnormality?  Though the patient's answer might

17   make it harder for the patient to receive an abortion,

18   something she no longer has a constitutional right to anyway,

19   wouldn't the answer put the doctor on sufficient notice of

20   whether she can or cannot perform the procedure, which is the

21   concern of the vagueness challenge?

22         MS. PASTAN:  No.  The answer would not necessarily put

23   the doctor on sufficient notice, and it also would not address

24   another equally important concern of vagueness doctrine, which

25   is arbitrary enforcement.

1          While a doctor certainly could ask her patient whether

2     the abortion is sought solely because of a genetic abnormality

3     and would likely be very well advised to not provide care if a

4     patient indicates that a fetal condition is the sole reason

5     they are seeking care, there would still be problems that would

6     arise under the performance provision whenever a covered

7     condition is involved and a patient indicates that the covered

8     condition is not the sole reason they are seeking abortion

9     care.

10          Part of that is because, regardless of what the

11     patient discloses, plaintiff physicians -- this is in

12     Dr. Isaacson and Dr. Reuss's declarations -- regularly

13     encounter situations where, based on the circumstances, they

14     can make some inference regarding the patient's reason for

15     terminating a pregnancy.

16          And examples of that might be a patient is initially

17     excited to learn about a pregnancy but decides to terminate

18     after receiving genetic test results.  Or the patient may

19     schedule an abortion immediately after receiving genetic test

20     results.  Or the patient receives an abortion in the context of

21     a genetic diagnosis and asks before the procedure how quickly

22     they can become pregnant again.

23          Given Arizona's broad definition of knowledge, and as

24     I mentioned earlier, the reality that knowledge can be --

25     probably more often is proven through circumstantial evidence,

1    each of these fact patterns would likely be sufficient to

2    establish a prima facie case for criminal liability under the

3    performance provision, even when the patient told their

4    physician that the diagnosis was not their sole reason for

5    seeking care.

6           THE COURT:  Okay.  So just let me make -- you're

7    arguing that a doctor can be successfully prosecuted under the

8    performance provision even if a patient affirmatively says the

9    genetic abnormality is not the sole reason for seeking an

10   abortion?  Is that what you're saying?

11          MS. PASTAN:  Yes, where there are circumstances where

12   the doctor would have to infer that, regardless of the

13   patient's words -- or not even would have to infer.  Where the

14   doctor could infer, regardless of the patient's words, that in

15   fact a genetic diagnosis was the cause.

16          THE COURT:  Okay.  So you're saying there could be

17   circumstantial evidence that, despite the patient's denial to

18   the doctor, that could lead to a prosecution of the doctor for

19   performing an abortion that the patient intended solely because

20   of the abnormality -- genetic abnormality even though she told

21   the doctor, who in good faith believed her, that it wasn't?

22          MS. PASTAN:  Yes, that is -- that is the theoretical

23   scenario, and I don't think it is theoretical.  I think doctors

24   are faced with those facts regularly, as shown in our

25   declarations.

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  All right.  Let's go to number 8.

2          Section 13-3603.02(B)(2) says:  Except in a medical

3    emergency, a person who knowingly solicits or accepts monies to

4    finance an abortion because of a genetic abnormality of the

5    child is guilty of a Class 3 felony.  I'm going to call this

6    the "solicitation provision."

7          First, what is vague about the language of the

8    solicitation provision?

9          MS. PASTAN:  The solicitation provision has several

10   sources of vagueness.  I will kind of go through them in turn.

11         First, as I mentioned earlier, it employs the term

12   "genetic abnormality," and as plaintiffs have argued to the

13   Court, given the statutory definition of that phrase,

14   physicians don't know what falls within the scope.

15         Second, the solicitation provision's "because of"

16   language just does not make clear what role a genetic

17   abnormality must play in a patient's decision-making to trigger

18   the prohibition.

19         While "because of" often refers to but-for causation,

20   it's not clear that that's how it would be interpreted under

21   Arizona rules of construction.  But even assuming but-for

22   causation is the standard, there are two variants of but-for

23   causation.  And the distinction between them is relevant here.

24         The first is the strictest form of but-for causation.

25   And under that version, if there are multiple independently

1    sufficient causes, none of them is a but-for cause.  So as an

2    example, if someone terminates a pregnancy due to financial

3    concerns and a fetal diagnosis and both the financial concerns

4    and the fetal diagnosis on their own would have caused the

5    patient to end the pregnancy, then neither the financial

6    concerns nor the fetal diagnosis is a but-for cause.

7              There is a more --

8              THE COURT:  Well, let me ask you this.  Let me

9    interrupt you.  I'm sorry.

10             But is there any reason to believe Arizona courts

11   interpret "because of" to mean something different than

12   traditional but-for causation as described in the *Bostock* case?

13             MS. PASTAN:  Plaintiffs are not aware of a case

14   describing -- defining "because of" as but-for causation under

15   Arizona law definitively.

16             But that is -- that's actually, you know, why I said

17   even assuming that but-for causation is the standard, which,

18   you know, is just not clear, even the but-for causation

19   standard has two versions.

20             And so there is this strict form, which I just

21   described, but there is also a more lenient version that allows

22   for multiple but-for causes.  And, actually, this is -- this

23   is, I believe, the version that is used in *Bostock*, the case

24   that you just mentioned.

25             Under the more lenient version, there can be multiple

1    but-for causes when each is independently sufficient to bring

2    about a result.  It's sometimes called the special rule.  And

3    if you were to use the hypothetical I gave a moment ago about

4    the person with financial concerns and a fetal diagnosis, under

5    the special rule, both the financial concerns and the fetal

6    diagnosis would be but-for causes.

7            THE COURT:  Okay.  Let's go to (b) again.  If a doctor

8    wanted to ensure that she did not violate the law, couldn't she

9    ask the patient whether she would still want an abortion if the

10   fetus did not have a genetic abnormality?  And why wouldn't the

11   patient's answer to this question put the doctor on sufficient

12   notice of whether she can or cannot accept money to finance the

13   procedure?

14           MS. PASTAN:  No, Your Honor.  The answer to this

15   question would not put the doctor on sufficient notice, and it

16   also is similar to the previous one, would do nothing to

17   alleviate the breadth of arbitrary enforcement.

18           First, accepting the assumption in your question that

19   "because of" means but-for causation, it is --

20           THE COURT:  Whoa, whoa, whoa.  Can you restate that?

21   That was kind of run together and I didn't understand each

22   word.

23           MS. PASTAN:  First, accepting the assumption in your

24   question that "because of" means but-for cause causation, it

25   would still be unclear whether the solicitation provision

1    employs the strict definition that I described a moment ago or

2    whether it utilizes the special rule, which was employed in

3    *Bostock* and is used in Title VII cases too, which allows for

4    multiple independently sufficient causes to all be but-for

5    causes.

6           As I described in the earlier example of the patient

7    where there are two independently sufficient reasons for

8    termination, financial concerns and a fetal diagnosis, a

9    patient would say in response to this question that they would

10   terminate the pregnancy regardless of the fetal diagnosis.

11          Under the strict version of but-for causation, the

12   fact that there is an independently sufficient reason for the

13   termination would avoid a finding of but-for causation.  But

14   under the special rule, the fetal diagnosis would still be a

15   but-for cause.

16          And second, and this just goes back to what we talked

17   about a moment ago, putting the definitional issue aside, even

18   when a patient responds to this question saying that they would

19   terminate even without the fetal diagnosis, potentially

20   indicating that the condition is not a but-for cause, the

21   circumstances surrounding the patient's care could cause a

22   physician, a police officer, a prosecutor, or a judge to infer

23   otherwise, and as both Dr. Isaacson and Dr. Reuss's

24   declarations show.

25          And that goes to what we spoke about earlier:

1   Arizona's broad definition of knowledge and the reality that it

2   can be proven through circumstantial evidence even in the case

3   of a different statement from the patient herself.

4           THE COURT:  Well, your argument basically is that any

5   criminal statute in Arizona that uses a "because of" causation

6   standard is vague?  Is that what you're saying?

7           MS. PASTAN:  No, Your Honor.  This is vague because

8   the object, the thing that needs to be determined by the doctor

9   in order to know whether his or her conduct is permissible

10  under the statute, is the motivation of a patient.  And that is

11  a very difficult thing to know in the context of an abortion

12  decision, which often involves multiple interrelated factors,

13  on top of the fact that it is a motivation that is in someone

14  else other than the hypothetical doctor defendant's mind.

15          THE COURT:  Okay.  Let's go to 9.

16          Section 13-3603.02(D) says:  The father of the unborn

17  child who is married to the mother at the time she receives an

18  abortion because of a genetic abnormality of the child, or, if

19  the mother has not attained 18 years of age at the time of the

20  abortion, a maternal grandparent of the unborn child, may bring

21  a civil action on behalf of the unborn child to obtain

22  appropriate relief with respect to a violation of the

23  performance or solicitation provisions.  I'm going to call this

24  the "civil liability provision."

25          Assume the performance and solicitation provisions are

1    not vague.  In that case, is there anything vague about the

2    language of the civil liability provision?

3            MS. PASTAN:  No, Your Honor.  Assuming the Court does

4    not find the performance or the solicitation provision vague

5    and similarly would not find the language "because of a genetic

6    abnormality" vague when used in the civil liability provision

7    itself, then plaintiffs are not aware of anything that is vague

8    about the civil liability provision.

9            THE COURT:  Okay.  Then going on to number 10,

10   Section 13-3603.02(E) says:  A physician, physician's

11   assistant, nurse, counselor, or other medical or mental health

12   professional who knowingly does not report known violations of

13   the performance or solicitation provisions to appropriate law

14   enforcement authorities shall be subject to a civil fine of not

15   less -- excuse me, not more than $10,000.  I'm going to call

16   this the "reporting provision."

17           Assume the performance and solicitation provisions are

18   not vague.  In that case, is there anything about this language

19   of the reporting provision that is vague?

20           MS. PASTAN:  No, Your Honor.  Taking all the

21   assumptions, assuming the Court does not find the performance

22   or the solicitation provision vague, then plaintiffs are not

23   aware of anything vague about the notification provision.

24           THE COURT:  Okay.  Then let's go to number 11.

25           MS. PASTAN:  Sorry, the reporting provision.

UNITED STATES DISTRICT COURT

43

1          THE COURT:  Section 36-2157 says:  A person shall not

2     knowingly perform or induce an abortion before that person

3     completes an affidavit that states that the person making the

4     affidavit is not aborting the child because of a genetic

5     abnormality of the child and has no knowledge that the child to

6     be aborted is being aborted because of a genetic abnormality of

7     the child.  I'm going to call this the "affidavit provision."

8          Assume the definition of genetic abnormality is not

9     vague and that "because of" means traditional but-for

10    causation.  In that case, is there anything vague about the

11    language of the affidavit provision?

12         MS. PASTAN:  When the Court's assumptions are taken

13    into account and the affidavit provision is read in isolation,

14    the affidavit provision is less vague than the others for two

15    reasons.

16         First, the provision asks the doctor to swear to his

17    or her own motivations, and discerning one's own motivations --

18         THE COURT:  Hang on a second.  Let me interrupt you.

19         Is it vague or not vague?  I don't care about the

20    degrees of vagueness.  Are you claiming it's unconstitutionally

21    vague?

22         MS. PASTAN:  Even if it seems, when read in isolation,

23    less vague than the others, it raises a question of why a

24    physician must attest to something under penalty of perjury and

25    threat of losing their license --

1           THE COURT:  Whoa, whoa, whoa, whoa.  Slow down,

2     please.

3           And I'm just asking yes or no.  Are you claiming it's

4     unconstitutionally vague given the parameters of my question?

5           MS. PASTAN:  If it cannot be -- if it cannot be

6     considered at all in the context of any of the other

7     provisions, even though it is completely inconsistent with

8     them, the answer is no, given your parameters.

9           THE COURT:  Okay.  Thank you.

10          So let me make sure.  The answer to my Question No. 11

11    is no.  Is that true?

12          MS. PASTAN:  Yes, Your Honor.  No to this question.

13          THE COURT:  All right.  Thank you.

14          All right.  Section 36-2158(A)(2)(d) requires that in

15    the case of a woman seeking an abortion of an unborn child

16    diagnosed with a nonlethal fetal condition, the doctor

17    performing the abortion or the referring doctor inform the

18    patient orally and in person that the 13-3603.02 prohibits

19    abortion because of a genetic abnormality.  I'm going to call

20    this the "notification provision."

21          First, there is a reasonable argument that the

22    notification provision requires doctors to inaccurately

23    describe Section 13-3603.02 to their patients.  But how does

24    that make it vague?

25          MS. PASTAN:  You're -- yes, you're correct that there

1    is a reasonable argument that the notification provision

2    requires doctors to inaccurately describe Section 13-3603.02

3    because that specific statutory provision, the performance

4    provision, only prohibits abortion solely because of a genetic

5    abnormality of the child and does not employ the broader

6    "because of" standard used elsewhere, such as in the

7    solicitation and affidavit provision.

8           Moreover, neither the performance provision nor any

9    other provision in the reason regulations makes it unlawful for

10    a pregnant person to have an abortion because of a fetal

11    genetic abnormality.  But this language implies that this is

12    the case.  In other words, it requires a disclosure that

13    arguably broadens abortions prohibited by 3603.02.

14           THE COURT:  Whoa, whoa, whoa.  You know, you're

15    tailing off there and talking pretty fast.  I'm not keeping up

16    with you there.

17           But let me just ask you, I think we're in agreement

18    that this may not accurately describe the law, but how is it

19    vague?

20           MS. PASTAN:  The notification provision is vague

21    because it forces the doctor to interpret an inconsistent

22    statutory scheme and then advise their patient on that basis.

23    It's not as simple as the doctor saying to the patient, I must

24    notify you that Section 13-3603.02 prohibits abortions because

25    of genetic abnormalities.

1          Can she then explain that the words are actually a

2    misstatement of what Section 13-3603.02 says and that it

3    actually only prohibits performing abortions that are solely

4    because of genetic abnormalities and it only criminalizes the

5    physician for providing care if they know that a genetic

6    abnormality is your sole reason?

7          The vagueness of the provision lies in the very fact

8    that the physician either, one, has to follow a law that

9    seemingly requires them to misinform their patients about the

10   law; or, two, correct the misstatement and risk that their

11   correction is somehow inaccurate.

12         The doctor should not have to guess, and she should

13   not have to consult a lawyer before fulfilling her medical

14   duties.

15         Your Honor, I have a hypothetical that I think is

16   helpful.  There's a law on the books that says driving

17   instructors must advise new drivers that Section XYZ prohibits

18   passing yellow lights and red lights.  And Section XYZ actually

19   says that only red lights can be run.

20         Even though the driving instructor can technically

21   follow the language of the statute, those words can come out of

22   the instructor's mouth.  The statutory scheme wouldn't make any

23   sense, and it isn't the instructor's responsibility to figure

24   out how to make sense of conflicting laws.

25              THE COURT:  Okay.  Let's move on.

1          As I understand your argument, if a woman is seeking

2     abortion of a fetus diagnosed with a nonlethal fetal condition,

3     there's nothing vague about what the notification provision

4     requires the doctor to do.  But because the definition of

5     nonlethal fetal condition is vague, it's unclear how doctors

6     are to determine when the notification provision is triggered.

7          Is that -- is that your argument?

8          MS. PASTAN:  Your Honor, that describes one source of

9     vagueness in the provision, but it's not the whole story and it

10    is not plaintiffs' biggest concern.

11         The definition of nonlethal fetal condition is vague,

12    but so is the definition of lethal fetal condition.  And even

13    before the reason regulations were passed, physicians were

14    required to give certain disclosures to patients, to any

15    patient with a diagnosed lethal fetal condition.  Although

16    plaintiffs did not know what that meant, they simply provided

17    that required disclosure to all patients with a diagnosed fetal

18    condition in order to ensure they satisfied the law.

19         If the definition of nonlethal fetal condition was the

20    only issue in the notification provision, they would simply do

21    the same here, and it wouldn't be an issue.

22         But the issue here is different.  The notification

23    provision seemingly requires a doctor to inaccurately describe

24    the performance provision to their patients.  Not only does

25    that make it unclear whether doctors can correct the

1    misstatement to ensure they aren't lying to their patients, but

2    it also makes it unclear whether they can read the performance

3    provision based on its plain language.

4         In short, it infuses even more confusion into the

5    other statutory provisions governing both the doctor and the

6    patient.

7         THE COURT:  Okay.  Thank you.

8         Now, Subpart (c) of that question asks:  Arizona law

9    defines "nonlethal fetal condition" as a fetal condition that

10   is diagnosed before birth and that will not result in the death

11   of the unborn child within three months after birth, but may

12   result in physical or mental disability or abnormality,

13   Section 36-2158(G)(2).

14        What is vague about this language?

15        MS. PASTAN:  Your Honor, it is almost impossible to

16   know whether a fetal condition will result in the death of an

17   unborn child within three months.  The physician declarations

18   make clear that genetic conditions and other structural issues

19   that may be related to genetics have a spectrum of

20   expressivity.  And that refers to the degree or intensity of

21   the condition it manifests.

22        Some fetal anomalies lead to the need for ongoing

23   medical or other support interventions throughout life, and

24   some are incompatible with life.  That's quoting from the

25   declarations.

1           There may be considerable uncertainty as to how long a

2    child born with an anomaly may live.  In other words, assessing

3    the length of time an unborn child may live after birth with a

4    specific fetal condition is difficult and subjective.  It can

5    also depend on factors like at what gestational age the fetus

6    is eventually born that a doctor and patient will not know at

7    the time the decision to end a pregnancy is made.

8           And then aside from the complete uncertainty about

9    when a specific fetal condition might result in death, the

10   provision is also vague because it is not clear on whether

11   medical interventions should be taken into account in assessing

12   how long an unborn child might live.

13          Should the doctor consider whether the patient --

14   sorry, whether the parent would undertake those medical

15   treatments?  Should the doctor consider whether the parent

16   could afford medical treatments that might extend an unborn

17   child's life beyond three months?

18          What if the medical treatments or interventions are

19   only available in certain places, but not at all medical

20   centers, and those interventions are not easily accessible?

21   What if the treatments would subject the child to physical pain

22   or discomfort and the parent to mental distress?

23          It's just unclear what is to be considered in reaching

24   this determination.

25          THE COURT:  All right.  Let's go to (d).

1          Suppose Arizona law defined "nonlethal fetal

2    condition" this way:  A fetal condition that is diagnosed

3    before birth and that, to a reasonable degree of medical

4    probability, will not result in the death of the unborn child

5    within three months after birth but may result in physical or

6    mental disability or abnormality.

7          Would that definition be vague?

8          MS. PASTAN:  Assuming the legislature had written the

9    statute the way you suggest, it still suffers from some

10   vagueness, because an assessment of how long a particular child

11   with a particular condition will survive is inherently

12   uncertain and subjective, particularly when it's made weeks,

13   maybe even months before the child is born.

14         Different doctors could reasonably reach different

15   conclusions, and because the definition includes an objective

16   standard, there is just way too high of a chance that the State

17   could present at a criminal trial an expert who views the

18   situation very differently than the doctor defendant does.

19         But more importantly, even with this additional

20   language, the definition still fails to advise how or whether

21   countless factors are to be taken into account when making the

22   assessment.

23         As I mentioned a moment ago, should all medical

24   interventions be considered?  Only those that are actually

25   available to the patient?  The definition is just -- doesn't

1     fit.

2            And this level of uncertainty is why laws like this,

3     like emergency exceptions, typically include a subjective good

4     faith judgment standard, rather than an objective reasonable

5     standard.  A standard that incorporates the doctor's good faith

6     judgment allows doctors to practice medicine without fear that

7     a different doctor's judgment will cause them to be convicted

8     of a crime and land in prison.

9            THE COURT:  So are you saying that it would be

10    impossible for reasonable doctors to come up with an opinion as

11    to the "within three months after birth" part of the statute?

12            MS. PASTAN:  Because -- because it is such an

13    uncertain issue, because there are many different factors and

14    potential interventions that would be considered --

15            THE COURT:  Well, let me just interrupt you.  Let

16    me -- I apologize.

17            But it seems like when we're dealing with medical

18    issues, we're talking about medical probabilities.  And you're

19    saying -- what you're saying is that we couldn't find

20    reasonable doctors to render medical probabilities in these

21    kind of cases because there's so much uncertainty.  Is that

22    what you're saying?

23            MS. PASTAN:  Our position is that reasonable doctors

24    could have different reasonable views.  In light of the number

25    of unknown factors here, an individual doctor's subjective

1    view, if considered wrong by the State, could subject them to

2    criminal prosecution when their judgment, based on as many

3    factors as they were aware of, is challenged by a reasonable

4    doctor's different reasonable view of the circumstances.

5              It's just too complicated to subject the hypothetical

6    doctor defendant to criminal prosecution on that basis.

7              THE COURT:  So are you saying that it would be

8    impossible for the legislature to regulate the medical

9    profession using an objective rather than a subjective good

10   faith standard?

11             MS. PASTAN:  Our position is that, no, but there are

12   circumstances where a subjective good faith standard makes more

13   sense to allow doctors to make judgments based on numerous

14   complicated factors without risk of criminal prosecution.

15             THE COURT:  Okay.  Let's go to (e).

16             Typically, when medical experts testify in court --

17   I'm getting some background noise.  Someone -- we're hearing

18   background conversations.

19             Okay.  It sounds like it went away.

20             Typically, when medical experts testify in court, they

21   must testify to a reasonable degree of medical probability.

22   Why isn't it reasonable to interpret the reason regulations as

23   incorporating that standard of probability?

24             For example, in a criminal prosecution, wouldn't a

25   state medical expert need to testify to a reasonable degree of

1  medical probability in order for the State to obtain a

2  conviction?

3       MS. PASTAN:  As explained in response to the previous

4  question, the objective reasonable degree of medical certainty

5  standard is -- does not fix the issue because these types of

6  assessments are so subjective.

7       It would be very easy for the State to find an

8  opposing expert that disagrees with the doctor's judgment, and

9  because of this, it is impermissible under the vagueness

10  doctrine to threaten doctors with extreme criminal punishment,

11  including potentially a lengthy prison sentence, based on such

12  a determination.

13       This is why, as I said a moment ago, things like

14  viability determinations and medical emergency determinations

15  are almost always left to the good faith judgment of

16  physicians, so that they can take into account all of the many

17  relevant factors in reaching decisions and not be subject to

18  prosecution based on another doctor's judgment.

19       THE COURT:  Boy, that last sentence was kind of run

20  together.  Can you say that again?  I didn't catch everything

21  you said.

22       MS. PASTAN:  I said, and not be subject to prosecution

23  based on, you know, another -- an expert doctor's different

24  judgment.

25       THE COURT:  Okay.  Thank you.

1          So it seems like the logical implication is that the

2     doctors can't be criminally prosecuted under an objective

3     standard.  Is that right?

4          MS. PASTAN:  That is -- that is not plaintiffs'

5     position.  Plaintiffs' position is that in this case where

6     there are so many unknown factors and the statute does not

7     provide even guidance about which factors are to be considered,

8     layering that with an objective standard creates impermissible

9     vagueness, facing impermissible risk that their judgment will

10    be called into question in criminal court and an opposing

11    expert's different statements could land them in prison.

12         THE COURT:  I'm not seeing how these issues are

13    different than what we see in any criminal statute where the

14    State uses an objective standard.

15         MS. PASTAN:  The difference here, Your Honor, and

16    obviously we are discussing this in a vacuum, but the issue

17    with this particular statute is that it involves something that

18    is very difficult to determine, that is based on, you know,

19    countless unknown factors that the doctor has to consider in

20    order to reach a determination.

21         It's not a straightforward yes-no question of whether

22    a particular condition is going to lead to death within three

23    months.  There are countless things that a physician has to

24    take into consideration, and without any guidance in the

25    statute, plaintiff physicians simply do not know what they are

1    expected to do.

2           THE COURT:  Okay.  So explain to me, why is abortion

3    so special?  Plenty of criminal laws use an objective standard,

4    and you're saying in this context we can't use that.

5           Why is this one context where we can't use the

6    objective standard?

7           MS. PASTAN:  Your Honor, the provision we're talking

8    about right now is not abortion in general.  It is about a

9    specific determination whether there -- as a result of a fetal

10   genetic abnormality, a -- whether, as a result of a fetal

11   genetic abnormality, a fetus is certain not to survive for

12   three months after birth.  That's much smaller.

13          But the other issue is that we must look to the terms

14   of the statute as it was written, including the definition that

15   was written here.  This is not about regulating abortion in

16   general.  It is about the specific statute that the Arizona

17   Legislature subjected doctors to, and it does not provide

18   guidance for their conduct.

19          THE COURT:  Okay.  We're down to the last question.

20   It has three parts.  As soon as we're done with this, we'll

21   take a break.

22          Section 36-2161(A)(25) adds to the list of information

23   that doctors performing abortions must report to the State

24   Health Department the following:  Whether any genetic

25   abnormality of the unborn child was detected at or before the

1    time of the abortion by genetic testing, such as maternal serum

2    tests, or by ultrasound, such as nuchal translucency screening,

3    or by other forms of testing.

4         First question:  Other than the definition of genetic

5    abnormality, what about this language is vague?

6         MS. PASTAN:  As we discussed earlier, the process of

7    assessing whether a genetic abnormality exists is a complex one

8    involving multiple steps.  Against that backdrop, "detect"

9    could potentially mean many things.  It could mean a positive

10   result on a screening test, a structural anomaly observed on an

11   ultrasound, an actual diagnosis, or a high likelihood of

12   occurrence based on a variety of factors such as genetic, the

13   environment, trauma in utero.

14        To give just one example, in plaintiffs' supporting

15   declaration, Dr. Isaacson stated that in some cases a physician

16   can notice or detect a fetal condition on an ultrasound.  This

17   type of early detection does not reflect an actual diagnosis of

18   a fetal condition, only a risk or likelihood of there being

19   one.

20        Therefore, even if a condition is noticed or detected

21   during an ultrasound, it cannot be diagnosed until further

22   testing is conducted.  In other words, the initial ultrasound

23   detection could prompt testing to determine whether an

24   abnormality exists but doesn't mean there is one.

25        THE COURT:  Well, the statute's not asking about a

1    diagnosis, just asking if it was detected.

2            MS. PASTAN:  Right.  But whether there exists a

3    genetic abnormality requires something -- the point of the --

4    of Dr. Isaacson's declaration is that whether that genetic

5    abnormality exists, you know, turns on something more than

6    detection.

7            And it raises the question whether, in a situation

8    where something is seen on an ultrasound like that, does the

9    doctor have to report that condition even if there is no

10   diagnosis?  If the doctor does report the condition, will it be

11   used as evidence that there was a genetic abnormality or --

12           THE COURT:  Let me interrupt you.  You're going

13   outside the context of the question.  The question asked you to

14   assume that "genetic abnormality" is not vague.

15           So other than the definition of genetic abnormality,

16   what about this language is vague?  Is there anything outside

17   of genetic abnormality that you would think would lead to a

18   finding that this statute's vague?

19           MS. PASTAN:  The concern here is with the word

20   "detect."  And detect can sometimes mean there is a diagnosis,

21   and it can also sometimes mean that there is an indication of a

22   possible diagnosis and more information is needed.

23           THE COURT:  Okay.  So "detect" makes it vague.

24   Anything else?

25           MS. PASTAN:  No.

1        THE COURT:  All right.  Part (b):  Does the medical

2   community have a common, accepted understanding of what it

3   is -- means to detect something that is different from the

4   ordinary dictionary definition of the word?

5        MS. PASTAN:  Plaintiffs are not aware of any common,

6   accepted understanding of what it means in the medical

7   community, which is why, as plaintiffs' declarations say, they

8   do not understand what the term means.

9        The common dictionary definition, such as to discover

10  the true character of or to discover or determine the existence

11  of, do not provide any guidance given the complex

12  multidimensional nature of genetic screening and testing.

13        THE COURT:  Okay.  The last question:  If "detected"

14  is too vague, what verb would make the statute clear?

15        MS. PASTAN:  At least in the -- in Your Honor's

16  filing, you proposed the word "diagnosed."  And plaintiffs

17  agree there is an accepted understanding of what a diagnosis

18  is.  So putting aside the issues related to genetic

19  abnormality, there would be nothing inherently vague about a

20  word like "diagnosed."

21        THE COURT:  Okay.  So in answer to my question,

22  "diagnosed" would be the word that would make the statute

23  clear?

24        MS. PASTAN:  "Diagnosed" would make that portion of

25  the statute clear, yes.

UNITED STATES DISTRICT COURT

1       THE COURT:  So if we took out "detected" and put in

2   "diagnosed," you'd be okay with that, right?

3       MS. PASTAN:  In the context of this provision.

4       THE COURT:  All right.  Those are all the questions I

5   have.  Let's take 15 minutes, come back at -- I'm showing 3:35.

6   We'll come back at 10 minutes to 4:00 to finish up with the

7   defendant's questions.

8       MS. PASTAN:  Thank you, Your Honor.

9       (Recess taken, 3:34 p.m. to 3:50 p.m.)

10      THE COURT:  Okay.  It's the defendants' turn.

11  Mr. Catlett?

12      MR. CATLETT:  Yes, Your Honor.

13      THE COURT:  We've -- just like the plaintiffs, you

14  guys have had the questions I have, so let's just get started

15  with the first one.

16      MR. CATLETT:  Sounds good.

17      THE COURT:  In general, a plaintiff may not bring a

18  facial vagueness claim unless the law at issue implicates First

19  Amendment rights or is vague in all applications.  Defendants

20  argue the reason regulations do not implicate First Amendment

21  rights because a state may regulate professional conduct that

22  incidentally involves speech without violating the First

23  Amendment, but that argument conflates laws that implicate

24  First Amendment rights with laws that violate First Amendment

25  rights.

UNITED STATES DISTRICT COURT

1          In *Tingley*, the plaintiff brought a facial vagueness

2   and First Amendment challenge to laws banning conversion

3   therapy.  The Ninth Circuit found the laws did not violate the

4   First Amendment and were not vague, but the Ninth Circuit

5   rejected the vagueness argument on its merits, not on its

6   ripeness grounds.

7          Doesn't *Tingley* support the view that a plaintiff may

8   bring a facial vagueness challenge so long as the laws at issue

9   implicate First Amendment rights, regardless of whether the

10  laws actually violate those rights?

11         MR. CATLETT:  Your Honor, thank you.

12         We don't think that *Tingley* supports the view that a

13  plaintiff may bring a facial vagueness challenge so long as the

14  laws at issue just implicate First Amendment rights, regardless

15  of whether they actually violate those rights.

16         THE COURT:  Are you aware of any cases?

17         MR. CATLETT:  Yes, Your Honor.  There's several.

18  First, in *Kashem v. Barr*, which is 941 F.3d 358, at page 375,

19  the Ninth Circuit, in 2019, stated that, quote:  Vagueness

20  challenges to statutes that do not involve First Amendment

21  violations -- so it says "violations" -- must be examined as

22  applied to the defendant.

23         13 years earlier, in *United States versus Kim*, which

24  is at 449 F.3d 933, the Ninth Circuit says, quote:  Kim

25  concedes, as he must, that vagueness challenges to statutes

1    that do not involve First Amendment violations must be examined

2    as applied to the defendant.

3          In *Village of Hoffman Estates versus Flipside, Hoffman*

4    *Estates*, which is a U.S. Supreme Court case from 1982, which is

5    reported at 455 U.S. 489, at page 495 of that opinion, Judge,

6    the Court starts its vagueness analysis by explaining that,

7    quote:  We first examine whether the ordinance infringes

8    Flipside's First Amendment rights.

9          And then later, when after the Court concludes that

10   the answer to the infringement question is no, the Court goes

11   on to say that to succeed, therefore, the plaintiff must,

12   quote:  demonstrate that the law is impermissibly vague in all

13   of its applications.

14         And that second portion of the case or the reasoning

15   is at page 497 of the opinion.

16         Finally, Your Honor, in *Schwartzmiller versus Gardner*,

17   which is reported at 752 F.2d 1341, it's a Ninth Circuit case

18   from 1984, and it's the primary case that is cited by the Ninth

19   Circuit in *Easyriders Freedom F.I.G.H.T.*, which is the case

20   Your Honor cites in the question.  In *Schwartzmiller*, the Ninth

21   Circuit provides a lengthy explanation on the origin of the

22   purported exception for First Amendment facial vagueness

23   challenges.

24         And the Ninth Circuit explains in that case that

25   the -- that purported exception originated in a case called

1    *Kolender versus Lawson*, which is a U.S. Supreme Court from 1983

2    that dealt with California's vagrancy statute.  And in

3    explaining the *Kolender* decision, the Ninth Circuit explains

4    that the U.S. Supreme Court, quote, suggested that facial

5    vagueness review was also appropriate because of the statute's

6    infringement on First Amendment freedoms and the right to free

7    movement.

8            And the Ninth Circuit then points out that even after

9    *Kolender*, the U.S. Supreme Court, in a case called *Regan versus*

10   *Time Inc.*, which is at 468 U.S. 641, the U.S. Supreme Court in

11   that case, according to the Ninth Circuit, quote, refused to

12   apply facial vagueness review to a statute that arguably

13   infringed on First Amendment rights as a matter of both

14   constitutional limitation and prudential restraint.

15           And the Ninth Circuit in *Schwartzmiller*, therefore,

16   questions whether the First Amendment exception exists at all,

17   explaining that it might not because otherwise facial vagueness

18   would just completely overlap with facial overbreadth.  But

19   ultimately, the Ninth Circuit says that even if there is a

20   First Amendment exception, the challenger must, quote, at least

21   demonstrate implication of a substantial amount of

22   constitutionally protected conduct.

23           And so we think, based on all that, this case isn't

24   like *Tingley* or any of the other cases that I just discussed,

25   Your Honor.  As plaintiffs admit, they say in their renewed

1    motion that the sole claim on which the motion for preliminary

2    injunctive relief is based is a vagueness claim.

3           And if you look at plaintiffs' complaint, in Count 3,

4    for vagueness, it doesn't mention the First Amendment at all.

5    And I believe plaintiffs' counsel, in response to Your Honor's

6    first question today, admitted that the First Amendment claim

7    is a claim that's independent from their vagueness claim, which

8    is the sole basis for their motion for preliminary injunction.

9           So at the end of the day, it's the State defendants'

10   position that plaintiffs cannot avail themselves of the lowered

11   standard for a facial vagueness claim just by saying that their

12   First Amendment rights are implicated.

13          Thank you, Your Honor.

14          THE COURT:  All right.  Let's move on to number 2.

15          Arizona law defines "genetic abnormality" as:  The

16   presence or presumed presence of an abnormal gene expression in

17   an unborn child, including a chromosomal disorder or

18   morphological malfunction, occurring as the result of abnormal

19   gene expression.

20          First, what does it mean for an abnormal gene

21   expression to be present?

22          MR. CATLETT:  Thank you, Your Honor.

23          Generally, to be present, according to the dictionary

24   definition means, quote, now existing.  And you can find that

25   definition both in Black's Law Dictionary and in

UNITED STATES DISTRICT COURT

64

1    Merriam-Webster dictionary.  So in this case, there would have

2    to be an indication that an abnormal gene expression exists,

3    and that would have to be the sole reason for wanting to obtain

4    an abortion.

5           Plaintiffs admit, in response to Your Honor's

6    questions this afternoon, that a diagnosis would mean that an

7    abnormal gene expression is present.  And another example is

8    that detection could occur through testing, and in that

9    instance, it's the State defendants' position that an abnormal

10   gene expression could be present.

11          THE COURT:  Okay.  Subpart (b):  What does it mean for

12   an abnormal gene expression to be "presumed present"?

13          MR. CATLETT:  Thank you, Your Honor.

14          The legal definition of presume, again, from

15   Merriam-Webster's dictionary, is to, quote, to suppose to be

16   true without proof or before inquiry, end quote.

17          And so, again, applying that to the context here,

18   "presume" would mean to suppose, for whatever reason, even

19   without proof or inquiry, that an abnormal gene expression

20   exists.

21          And the State defendants don't think you should read

22   the terms "present" and "presumed present" as separate and

23   independent.  The State defendants believe that those terms are

24   complimentary in the statute and collectively mean that an

25   abnormal gene expression is present or the woman supposes it

1    is.

2         The statute then applies if that is the sole reason

3    for obtaining an abortion and the physician knows that is the

4    sole reason.

5         THE COURT:  Okay.  Let me back up.

6         You said it's either present or the patient presumes

7    it's present?  Is that what you -- I didn't quite understand

8    what you said.

9         MR. CATLETT:  Correct, Your Honor.  The -- yes.  I

10   used the term "woman," but the "patient" is also correct.

11        THE COURT:  So it comes down to what the patient

12   believes?

13        MR. CATLETT:  It comes down to, yes, the patient's

14   motivations as -- as known by the physician.  This, at the end

15   of the day, is a discriminatory -- a statute aimed at

16   prohibiting or regulating discriminatory abortions, and so

17   really it's aimed at the motivation behind an abortion.

18        And the motivation to obtain an abortion because an

19   abnormal gene expression is present or presumed present, it is

20   our position, is sufficient even if at the end of the day the

21   woman is incorrect that that abnormal gene expression actually

22   exists.

23        THE COURT:  Okay.  That's one of my -- that's a

24   question I have coming up later.  You may have already answered

25   it, but we'll ask that when we get to it, though.

1          MR. CATLETT:  Thank you.

2          THE COURT:  So what level of probability, if any, is

3     required for something to be presumed present?

4          MR. CATLETT:  Thank you, Your Honor.

5          It's the State defendants' position that the language

6     of the statute does not indicate that any level of probability

7     is required for something to be presumed present, and neither

8     does the definition of "presume."

9          Taking the Court's Question 3(c) a little out of

10    order, and I'll be happy to repeat this answer again when we

11    get there, but I think it's a good example.  If a woman has a

12    vivid dream and based on that dream presumes the presence of an

13    abnormal gene expression and communicates that to the

14    physician, that she therefore wants to obtain an abortion based

15    solely on that dream, the physician cannot perform the abortion

16    even if the probability of a genetic abnormality actually

17    existing is small.

18         And the same would be true if the woman sought an

19    abortion based on a dream that the baby would be a certain race

20    or gender and therefore sought an abortion.  The reason

21    regulations are aimed at stopping abortions from being

22    performed for discriminatory reasons based on certain immutable

23    characteristics, regardless of what --

24         THE COURT:  Okay.  Let me interrupt you.

25         So no matter how unbelievable or unreasonable the

UNITED STATES DISTRICT COURT

1    woman carrying the child's beliefs are about her carrying a

2    pregnancy that may have an abnormal gene expression, it's

3    unlawful for the doctor to perform that abortion because she

4    has those beliefs?  Is that what you're saying?

5            MR. CATLETT:  Correct.  Yes, Your Honor.  Because if

6    she -- if the doctor knows that the reason for the abortion is

7    discriminatory, because the woman believes that the unborn

8    child has an immutable characteristic covered by the statute,

9    then -- and presumes that characteristic to be present, then

10   the statute prohibits the abortion from being performed if that

11   is the sole reason for it.

12           THE COURT:  Okay.  So you're saying the doctor can be

13   prosecuted if there are no facts showing that that was actually

14   true; it's just what the woman thought?

15           MR. CATLETT:  Yes, Your Honor.  If, for example, a

16   woman communicates the discriminatory motive to the doctor and

17   says, that is the sole reason I'm obtaining this abortion, and

18   the doctor proceeds with the abortion, it doesn't matter

19   whether or not, at the end of the day, the unborn child

20   actually had that immutable characteristic.  The discrimination

21   has occurred and the -- and has prompted the abortion, and that

22   is what the statute is aimed at regulating.

23           THE COURT:  Okay.  Let's move on to number 3.

24           Outside the context of abortion, are you aware of any

25   other offenses that require a defendant to know the subjective

1    motives of another person?

2            MR. CATLETT:  Thank you, Your Honor.

3            Yes, we -- I have several examples for you of statutes

4    or situations where criminal liability turns on a defendant's

5    knowledge of another's mental state.

6            First, federal conspiracy laws require proof of a,

7    quote, meeting of the minds.  And this is from a Ninth Circuit

8    case from 2015 called *United States versus Johnston*, at 789

9    F.3d 934, and it's at 940, Footnote 1.  And the Court says that

10   what that meeting of the minds means is that if two defendants

11   act in concert to achieve a different goal, the government has

12   not shown a meeting of the minds as to a common scheme or plan.

13           So that is an example where a criminal defendant has

14   to know what the goals of his codefendant are to be subject to

15   the criminal prohibition in the statute.

16           In Arizona, facilitation of a felony requires proof

17   that the defendant acted, quote, with knowledge that another

18   person is committing or intends to commit an offense.  And

19   that's in ARS Section 13-1004(A).

20           Assisted suicide requires proof of, quote, knowledge

21   that the person intends to die by suicide.  And that's at ARS

22   Section 13-1103(A)(3).

23           Encouragement of minor suicide requires proof of,

24   quote, knowledge that the minor intends to die by suicide.  And

25   that's at ARS Section 13-1103(B).

1          Sexual abuse requires proof that, quote, the defendant

2    knew the defined sexual contact was without the consent of the

3    victim.  And that's at *State v. Witwer*, which is 175 Ariz. 305.

4    It's a Court of Appeals case from 1993.

5          Also, Your Honor, Judge Thapar, in his partial

6    concurrence in *Memphis Center for Reproductive Health versus*

7    *Slatery*, talks about this issue, and I think he gives several

8    additional good examples of statutes along the lines of what

9    Your Honor has asked about.

10          And in that concurrence, Judge Thapar gives as one

11    example aiding and abetting of a hate crime.  And when you're

12    charged with aiding and abetting a hate crime, the State must

13    show that the defendant took certain action because of a

14    victim's protected characteristic.

15          And to prove that another individual aided and abetted

16    that hate crime, the State must then show that the second

17    individual knew of the crime that he was assisting; namely,

18    that the first defendant's action was because of a protected

19    characteristic.

20          The other examples Judge Thapar gives are, you can't

21    hire an applicant to work as a schoolteacher if you know a

22    prior employer fired her because of allegations of sexual

23    misconduct.  You cannot provide shelter to a person if you know

24    that the person seeks shelter because of his recent escape from

25    prison.  And you cannot invest based on information that you

1    know the informant learned because of an insider position.

2         And that discussion is all found at page 460 of the

3    *Memphis Center for Reproductive Health* decision.

4         Thank you, Your Honor.

5         THE COURT:  Thank you.  Let's move on to number 4.

6         You argue that if the Court finds discrete sections of

7    the reason regulations vague, it has an obligation to determine

8    whether those sections may be severed.

9         First, suppose the Court finds the definition of

10   "genetic abnormality" vague.  How would severability work in

11   that case?

12        MR. CATLETT:  Thank you, Your Honor.

13        So Senate Bill 1457, which is the bill at issue in

14   this case, at Section 18, contains a severability provision.

15   And that provision says that, quote, if a provision of this act

16   or its application to any person or circumstance is held

17   invalid, the invalidity does not affect other provisions or

18   applications of this act that can be given effect without

19   invalid provision or application, and to this end, the

20   provisions of this act are severable.

21        Now, to be perfectly candid with Your Honor, the term

22   "genetic abnormality" is present throughout the challenged

23   provisions, which Your Honor has previously referred to as the

24   reason regulations, and without it, the State defendants -- or,

25   you know, admit that it doesn't seem that any of the challenged

1   reason regulations could be given effect.

2          So in that circumstance, we do think, though, that

3   severability still plays a role because there are other

4   provisions in SB 1457 that could be severed.  For example,

5   SB 1457 created a medical emergency exception for the

6   regulation of race- and gender-based abortions.  It reduced the

7   penalty for performing discriminatory abortions from a Class 3

8   felony to a Class 6 felony.

9          It enacted the interpretation provision, which Your

10  Honor is familiar with, given prior decisions in this case.  It

11  repealed 13-3604, which made it a crime for a woman to procure

12  an abortion, and it included new provisions on the disposition

13  of fetal remains.

14         And State defendants think that each of those

15  provisions can be severed from the reason regulations that

16  contain the term "genetic abnormality."

17         THE COURT:  Okay.  Part (b):  Suppose the Court finds

18  only that the "presumed presence" portion of the definition of

19  genetic abnormality is vague.  How would severability work in

20  that case?

21         MR. CATLETT:  Thank you, Your Honor.

22         So this is -- this is an example where we believe one

23  provision can be held or one part of a provision can be held

24  invalid but the other part of the same provisions or

25  applications, as Section 18 of SB 1457 refers to them, other

1    applications can be given effect.

2          So it's our position that even if "presumed presence"

3    were held invalid -- and, again, we don't think it should be --

4    but a physician would still be prohibited from performing an

5    abortion if the physician knew that the sole reason for the

6    abortion was the presence of a genetic abnormality.

7          And, again, plaintiffs, in the argument this

8    afternoon, Your Honor, have given an example of "presence" as

9    being a diagnosis, and then it also responded to Your Honor

10   that the term "diagnosis" is not vague.

11         So we think "presence" could stay, and then the

12   statute would still largely be effective.  Removing "presumed

13   presence" from the definition of genetic abnormality would

14   leave effective and enforceable provisions.

15         And the primary -- the performance provision, for

16   example, as Your Honor has referred to it in its questions,

17   would change such that it would only apply when an abnormal

18   gene expression was present.  But we think that that's

19   perfectly consistent with the Arizona Legislature's intent in

20   including the severability provision in SB 1457.

21         Thank you.

22         THE COURT:  Okay.  Let's move on to number 5.  One of

23   your arguments is that doctors deal in -- excuse me, one of the

24   plaintiffs' arguments is that doctors deal in probabilities,

25   not certainties, and they don't know what degree of probability

1    brings a condition within the scope of the reason regulations.

2          Do defendants have a view on what degree of

3    probability is required to bring a condition within the scope

4    of the reason regulations?

5          MR. CATLETT:  Thank you, Your Honor.

6          And I think I've probably already hinted in some of my

7    prior answers as to what our view is on Your Honor's question

8    here.  We think that plaintiffs' arguments about doctors

9    dealing in probabilities misunderstands both the text and the

10   purpose of the statute.

11          Again, the statute is an antidiscrimination provision.

12   If an abortion is performed solely because of a genetic

13   abnormality, and it's later discovered that there was no

14   genetic abnormality, the statute has still been violated.  And

15   we think the same is true with respect to the limitations on

16   performing race-based or sex-based abortions as well.

17          It doesn't matter if the unborn child ends up actually

18   having the sex or the race that was the but-for cause of the

19   abortion; if the discriminatory motive is present, the statute

20   is violated.

21          Therefore, the State defendants' position is that the

22   statute's language doesn't lend to percentages or

23   probabilities, but rather, to motive.

24          Thank you, Your Honor.

25          THE COURT:  All right.  Now, this is one that you've

1    probably been preparing for.  Can you walk me through how you

2    envision a prosecution under the performance provision plays

3    out.  For example, would the State retain a medical expert to

4    testify to a reasonable degree of medical probability that the

5    aborted fetus had a nonlethal fetal genetic abnormality?

6              MR. CATLETT:  Thank you, Your Honor.

7              So as with any prosecution, the State would bear the

8    burden to prove all the elements of the offense beyond a

9    reasonable doubt.  The State would have to prove the

10   discriminatory motivation for the abortion, that the

11   discriminatory motivation was the sole motivation, and that the

12   doctor knew that was the sole motivation.

13             The State defendants don't think an expert witness

14   would necessarily be required, but the State may call one if it

15   thinks it would be helpful to prove its case or to explain to

16   the jury whether an abnormal gene expression was present and

17   rebut any arguments that a criminal -- that the defendant might

18   have as to why an abnormal gene expression was not present.

19             I do think that it's evident from the statutory

20   language that the State would not need to prove that a fetal

21   genetic abnormality was nonlethal.  That would only need to be

22   rebutted by the State if the defendant raised that as an

23   affirmative defense, at which point I strongly suspect the

24   State would want to call a medical expert to rebut that

25   defense, particularly if the defense has called a medical

1    expert to testify that a genetic abnormality was lethal.

2         I do want to point out, though --

3         THE COURT:  Let me just interrupt you so I can follow

4    you on this.

5         Without the evidence of a fetal genetic abnormality,

6    what you're saying, then, it would be basically communications

7    between the patient and the doctor that the State would be

8    relying on in proving it?  Is that right?

9         MR. CATLETT:  That -- yes, Your Honor.  That could be

10   one aspect of the evidence that the State uses in the

11   prosecution.  Other evidence would be diagnoses or testing and,

12   you know, statements that were made by the patient as to, you

13   know, the motivation -- or others, as to the motivation of the

14   patient in obtaining the abortion.

15        And then, obviously, the State would have to have

16   evidence that the doctor -- well, one, that that was the sole

17   motivation; and, two, that the doctor knew that it was the sole

18   motivation.

19        THE COURT:  I'm just curious.  What is your position

20   with regard to any sort of privilege that might attach to the

21   patient's records or the communications with her doctor?

22        MR. CATLETT:  I do think the privilege would apply,

23   Your Honor, and I think that would be a challenge that the

24   State would have to overcome and I think would have to consider

25   in deciding whether to exercise prosecutorial discretion to

1    bring the case in the first instance.

2         THE COURT:  But the doctor would be at the mercy of

3    the patient whether the patient wants to allow the privileged

4    information to be disclosed or not?

5         MR. CATLETT:  The privilege would belong to the

6    patient, Your Honor, so if a patient decided to waive the

7    privilege, then that evidence -- I'm sorry, that information

8    could come into evidence.

9         THE COURT:  All right.  Number 7:  You argue that many

10   of plaintiffs' concerns are addressed by the reasonable doubt

11   standard in criminal cases, but the reason regulations also

12   have civil liability provisions, and the ordinary standard for

13   civil liability in cases involving civil cases is a

14   preponderance of the evidence.

15        How does your argument fare in the civil context?

16        MR. CATLETT:  Thank you, Your Honor.

17        We think it still fares well.  I think there are a

18   couple of aspects that might be, you know, altered if we're in

19   a civil versus a criminal context.

20        The first is that if the case were civil in nature,

21   then the prosecutorial discretion prong of vagueness obviously

22   doesn't apply.  But really, we don't think it applies anyway

23   here, according to the Ninth Circuit, because what we have is a

24   pre-enforcement challenge.  And I think the courts have been

25   fairly clear that when you have a pre-enforcement vagueness

1    challenge, the prosecutorial discretion of vagueness doesn't

2    really play a role because there hasn't been enforcement yet.

3         Second, the Ninth Circuit has explained that the

4    degree of vagueness tolerated by the Constitution depends in

5    part on the nature of the enactment.  And then the Ninth

6    Circuit says, as an example, a statute providing for civil

7    sanctions is reviewed for vagueness with somewhat greater

8    tolerance than one involving criminal penalties because the

9    consequences of imprecision are less severe.

10        And that's from *Craft versus National Park Service*,

11   which is reported at 34 F.3d 918, and that quote is at page

12   922.  It's a Ninth Circuit case from 1994.

13        Ultimately, however, Your Honor, I just want to make

14   clear that the State defendants don't argue that the burden of

15   proof to be applied alters whether the terms of the reason

16   regulations are overly vague or not.  What we're actually

17   arguing is that much of the difficulty of determining whether

18   discriminatory intent triggers the statute is addressed by the

19   inclusion of knowing mens rea and the fact that the statute is

20   not triggered unless discrimination is the sole reason for the

21   abortion.

22        But even in the rare case where it is difficult to

23   determine a person's motivations for obtaining an abortion, the

24   U.S. Supreme Court has explained that it is not a vagueness

25   issue.  It's really an issue to be addressed by the standard of

1    liability and the traditional function of the jury.  And that's

2    what the Court explained in *U.S. versus Williams*, which is

3    discussed in the parties' papers and is reported at

4    553 U.S. 285.

5            And what the Supreme Court says there I think is

6    important.  The Court says:  What renders a statute vague is

7    not the possibility that it will sometimes be difficult to

8    determine whether the incriminating fact it establishes has

9    been proved; but rather the indeterminacy of precisely what

10   that fact is.

11           Thus, we have struck down statutes that tied criminal

12   culpability to whether the defendant's conduct was annoying or

13   indecent, which are wholly subjective judgments without

14   statutory definitions, narrowing context, or settled legal

15   meanings.  Whether someone held a belief or had an intent is a

16   true-or-false determination, not a subjective judgment such as

17   whether conduct is annoying or indecent.

18           To be sure, it may be difficult in some cases to

19   determine whether these clear requirements have been met, but

20   courts and juries every day pass upon knowledge, belief, and

21   intent, the state of men's minds, having before them no more

22   than evidence of their words and conduct from which an ordinary

23   human experience mental condition may be inferred.

24           We think that statement is exceedingly relevant to the

25   plaintiffs' claim that the reason regulations are vague, and we

1  think that the Supreme Court's rejection of the proposition

2  that a statute requiring a jury or court to infer belief or

3  intent is not vague applies here, regardless of whether it is a

4  civil or criminal jury that is making the ultimate

5  determination.

6         Thank you, Your Honor.

7         THE COURT:  All right.  I think you've answered all my

8  questions.

9         Ms. Pastan, is there anything else you want to argue

10  before we close out?

11         MS. PASTAN:  Yes, Your Honor.  Just a few brief

12  points.

13         I first want to refer back to the cases defendants

14  relied on to suggest that a facial vagueness challenge is

15  inappropriate here.  And defendants went through a long list of

16  cases, Your Honor, and I think you will find, if you look at

17  those cases, in all of those instances, the statute was

18  actually found not vague as applied to the defendant in the

19  case.

20         And so -- which is unlike here.  And that is why, in

21  that context of a criminal prosecution, they could not raise

22  the vagueness of the statute in other contexts as a defense.

23         That's a very different scenario than we are looking

24  at here, where plaintiff physicians simply do not know how to

25  conform their conduct and are challenging the reason

1    regulations on their face.

2         You also, Your Honor, asked many questions today about

3    the challenges surrounding the requirement that a doctor know

4    the subjective motivations of his patients.  I'd just like to

5    add here one note that relates to Your Honor's opening remarks

6    along with the oral argument topics.

7         There, the Court noted a concern that it had relied

8    upon the Sixth Circuit panel opinion in *Memphis Center for*

9    *Reproductive Health* as support for why it is impermissible to

10   impose criminal penalties based on a physician's knowledge of

11   the subjective motivations of their patients.

12        While it is true, as Your Honor remarked, that this

13   panel opinion was vacated when the Sixth Circuit granted

14   en banc review and that the preliminary injunction was

15   ultimately vacated after *Dobbs*, it may be helpful to place that

16   procedural history in just a little bit of greater context.

17        The en banc Sixth Circuit never heard argument in that

18   case or issued a ruling on the merits, and the preliminary

19   injunction was vacated and the case ultimately dismissed

20   because the claims against Tennessee's reason ban had become

21   moot.

22        Tennessee had a six-week abortion ban that was almost

23   immediately allowed to go into effect following *Dobbs*, and it

24   also had a trigger ban outlawing all abortions in the state

25   that was scheduled to go into effect and went into effect

1    shortly after the *Dobbs* judgment issued, actually taking their

2    reason ban off the books.

3        Because of this, the plaintiffs' vagueness claim there

4    with respect to the reason ban was mooted, and plaintiffs

5    affirmatively sought dismissal without prejudice so they could

6    bring their vagueness claim against the reason ban should

7    abortion care ever resume in Tennessee.  Importantly, dismissal

8    without prejudice was granted.

9        Accordingly, to this day, no merits opinion has ever

10   been issued calling into question the district court's opinion

11   or the Sixth Circuit panel decision in *Memphis Center for*

12   *Reproductive Health*.  To the extent the Court found the

13   rationale articulated in those opinions persuasive before,

14   there is no reason to ignore or discredit the same logic here.

15       I think, related to that, defendants have gone through

16   some examples of crimes where defendants are required to be

17   aware of the motivations of another person.  And in each of

18   those that were listed by the defendants, assisted suicide,

19   encouraging a minor -- encouragement of minor suicide, sexual

20   abuse, federal conspiracy laws, the examples only required the

21   defendant to make a binary determination:  Did the person

22   intend to commit a crime or not?  Does the person consent or

23   not?

24       The defendant only had to make a true-false analysis

25   of what the other person's intent was.  That is very different

1    from this situation, which requires a physician to know the

2    reasons why a patient has decided to end a pregnancy, not

3    whether the patient intends to end the pregnancy, but what are

4    the motivations for doing so and whether they played a

5    sufficient role to trigger the prohibitions.

6              There were also a number of hypotheticals on the issue

7    that were raised from Judge Thapar's dissent in that case, such

8    as aiding and abetting a hate crime.  And, Your Honor,

9    plaintiffs would note that in many of, if not all, of those

10   examples, the other person is already committing a criminal

11   act.  And so --

12             THE COURT:  Let me interrupt you, and I apologize.

13             How is it not a true-or-false determination whether

14   the patient had the motive or not?

15             MS. PASTAN:  The determination is whether a genetic

16   abnormality played a role in the decision -- in the patient's

17   decision, and actually, what level of role it played in the

18   patient's decision is, you know, unclear under the statute as

19   well.

20             But that is not a yes-no decision -- that is not a

21   yes-no determination because of the many factors these

22   considerations -- these decisions usually involve.

23             And we -- plaintiffs went through a number of those

24   today:  financial, social, community support.  There are so

25   many factors that go into these decisions.  This is very

1    frequently a complicated decision and one that is very

2    challenging.

3          THE COURT:  Whoa, slow down.  Slow down, please.

4          But isn't -- you're just talking about the evidence

5    that it takes to prove the true-or-false question.  I mean,

6    it's really yes or no:  Is there motive or not to have the

7    abortion based on a genetic defect?

8          MS. PASTAN:  I think, Your Honor, you know, many of

9    the hypotheticals that plaintiff raised earlier today involve

10   what you might call multiple motives, what you might call

11   interrelated motives, what you might call considerations that

12   all stem from a single motive, and requiring a doctor to

13   determine which of those it is under threat of criminal

14   prosecution is really what is the core problem with the

15   statute.

16         THE COURT:  Well, let me ask you a question.  You may

17   have addressed this, but I want to make sure I know your

18   answer.

19         Do you want to address whether you need to show that

20   the laws implicate the First Amendment rights or whether they

21   actually -- you have to show a First Amendment violation?

22         MS. PASTAN:  Your Honor, are you asking about whether

23   a facial vagueness challenge is appropriate in the context of

24   implication of First Amendment rights?

25         THE COURT:  No.  I'm going back to the question that I

UNITED STATES DISTRICT COURT

1  asked the defendant about the First Amendment claim, and I was

2  wondering whether it has to be an actual First Amendment

3  violation or just has to implicate the First Amendment to be

4  where you could have a challenge for vagueness on that.

5  　　　　　MS. PASTAN:  Your Honor, plaintiffs would agree with

6  Your Honor's premise in the question that under *Tingley* and

7  other cases, the fact that the law implicates First Amendment

8  rights is what makes it particularly suspect and subjects it to

9  heightened vagueness review and subjects it to pre-enforcement

10  vagueness review.

11  　　　　　THE COURT:  Do you have any authority --

12  　　　　　MS. PASTAN:  Whether it --

13  　　　　　THE COURT:  Do you have any other authority to support

14  that?

15  　　　　　MS. PASTAN:  Other than *Tingley*, Your Honor?

16  　　　　　THE COURT:  Yes.  Any other authority?

17  　　　　　MS. PASTAN:  At my fingertips, I do not.

18  　　　　　THE COURT:  Okay.

19  　　　　　All right.  Is there anything else you wanted to tell

20  me?

21  　　　　　MS. PASTAN:  Yes.  Just as a final point, Your Honor

22  and defendants have offered many ways that the statutes at

23  issue could be altered or written differently in order to make

24  them more clear.  And there have been many times this afternoon

25  where plaintiffs have agreed that if the statute were written

1    in one of these ways or construed in one of these ways, it

2    would, in fact, be less vague and perhaps would be

3    constitutional.

4            But that is not the statute that is before Your Honor,

5    and it is not within the Court's power to rewrite the reason

6    regulations' terms in an effort to conform with constitutional

7    requirements.

8            THE COURT:  Okay.  I think I understand that.

9            All right.  Well, I'll take this under advisement.

10   Thank you for your arguments.  It was enlightening, and I

11   appreciate it.

12           We'll stand in recess.

13           (Proceedings concluded at 4:31 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control to the best of my

12   ability due to the limitations in technology.

13         DATED at Phoenix, Arizona, this 29th day of October,

14   2022.

15

16

17
                         s/Jennifer A. Pancratz_____
18                       Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

19

20

21

22

23

24

25

1  Jared Keenan (027068)
2  Victoria Lopez (330042)
   American Civil Liberties Union
3  Foundation of Arizona
   3707 North 7th Street, Suite 235
4  Phoenix, Arizona 85014
5  Telephone: (602) 650-1854
   jkeenan@acluaz.org
6  vlopez@acluaz.org
7  *Counsel for Plaintiffs*

8
   Jen Samantha D. Rasay, *pro hac vice*
9  Center For Reproductive Rights
   1634 Eye Street, NW, Suite 600
10 Washington, DC 20006
   Telephone: (202) 628-0286
11 jrasay@reprorights.org
12 *Counsel for Paul A. Isaacson, M.D.,*
   *National Council of Jewish Women*
13 *(Arizona Section), Inc., and Arizona*
14 *National Organization for Women*

15
   COUNSEL CONTINUED
16 ON NEXT PAGE

17

18         **IN THE UNITED STATES DISTRICT COURT**
19          **FOR THE DISTRICT OF ARIZONA**

20 Paul A. Isaacson, M.D., on behalf of
21 himself and his patients, et al.,          Case No. 2:21-CV-1417-DLR
                        Plaintiffs,
22        v.                                **PLAINTIFFS' RENEWED MOTION**
                                            **FOR PRELIMINARY INJUNCTION**
23 Mark Brnovich, Attorney General of        **AND MEMORANDUM OF POINTS**
   Arizona, in his official capacity; et al., **AND AUTHORITIES IN SUPPORT**
24                      Defendants.
25                                           **ORAL ARGUMENT REQUESTED**

26

27

28

1   Jessica Leah Sklarsky, *pro hac vice*
2   Gail Deady, *pro hac vice*
    Catherine Coquillette, *pro hac vice*
3   Center For Reproductive Rights
    199 Water Street, 22nd Floor
4   New York, NY 10038
5   Telephone: (917) 637-3600
    jsklarsky@reprorights.org
6   gdeady@reprorights.org
    ccoquillette@reprorights.org
7   *Counsel for Paul A. Isaacson, M.D.,*
8   *National Council of Jewish Women*
    *(Arizona Section), Inc., and Arizona*
9   *National Organization for Women*

10

11  Alexa Kolbi-Molinas, *pro hac vice*
    Rebecca Chan, *pro hac vice*
12  American Civil Liberties Union
    125 Broad Street, 18th Floor
13  New York, NY 10004
14  Telephone: (212) 549-2633
    akolbi-molinas@aclu.org
15  rebeccac@aclu.org
16  *Counsel for Eric M. Reuss, M.D., M.P.H.,*
    *and Arizona Medical Association*

17

18  Beth Wilkinson, *pro hac vice*
    Anastasia Pastan, *pro hac vice*
19  Wilkinson Stekloff LLP
    2001 M Street, NW
20  10th Floor
21  Washington, DC 20036
    Telephone: (202) 847-4000
22  bwilkinson@wilkinsonstekloff.com
23  apastan@wilkinsonstekloff.com
24  *Counsel for Paul A. Isaacson, M.D.,*
    *National Council of Jewish Women*
25  *(Arizona Section), Inc., and Arizona*
    *National Organization for Women*
26

27

28

1  Ralia Polechronis, *pro hac vice*
2  Wilkinson Stekloff LLP
   130 West 42nd Street
3  24th Floor
   New York, NY 10036
4  Telephone: (212) 294-9410
5  rpolechronis@wilkinsonstekloff.com
   *Counsel for Paul A. Isaacson, M.D.,*
6  *National Council of Jewish Women*
   *(Arizona Section), Inc., and Arizona*
7  *National Organization for Women*
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**TABLE OF CONTENTS**

2     INTRODUCTION ................................................................................................ 1

3     BACKGROUND ................................................................................................. 3

4         A.    The Reason Scheme ............................................................................ 3

5         B.    The Complexities of Fetal Screening and Diagnosis ......................... 4

6         C.    Patient-Provider Communications in Pregnancy Decision-Making ..... 5

7         D.    Plaintiff Physicians Do Not Understand What Care the Scheme Prohibits ........... 6

8         E.    The Scheme Chills Abortion Care and Patient-Provider Communications ........... 8

9
      LEGAL STANDARD .......................................................................................... 10
10
      ARGUMENT ...................................................................................................... 10
11
          A.    Plaintiffs Are Likely to Succeed on the Merits ............................... 10
12
              1.    The Scheme Must Satisfy a Stringent Due Process Standard ........... 10
13
              2.    The Scheme Provides Inadequate Notice and Invites Arbitrary Enforcement . 11
14
              3.    Facial Relief is Warranted Under the Circumstances ...................... 14
15
          B.    Plaintiffs Will Continue Suffering Irreparable Harm Absent an Injunction ......... 15
16
          C.    The Balance of Equities Tips Strongly in Plaintiffs' Favor and an Injunction
17
                Is In the Public Interest ......................................................................... 17
18
      CONCLUSION .................................................................................................... 17
19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bellotti v. Baird*, 443 U.S. 622 (1979)..............................................................................17

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020)........................................................13

*Box v. Planned Parenthood of Ind. & Ky., Inc.*, 142 S. Ct. 2893 (2022)..........................1

*Brnovich v. Isaacson*, 142 S. Ct. 2893 (2022)..............................................................1, 2

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002).......................................................11, 16

*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).......................2

*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) ...............14

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)............................................12

*Forbes v. Napolitano*, 236 F.3d 1009 (9th Cir. 2000)...............................................10, 11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972).............................................10, 11, 16

*Harris v. Bd. of Supervisors*, 366 F.3d 754 (9th Cir. 2004)..........................................17

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019)..............................................................14

*Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018)..........................................................14

*Latta v. Otter*, 771 F.3d 496 (9th Cir. 2014) ...............................................................17

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)...........................................15, 16, 17

*Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868 (D. Ariz. 2012)......................................................................................................................17

*Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905 (9th Cir. 2014)....................17

*Rutledge v. Little Rock Family Planning Servs.*, 142 S. Ct. 2894 (2022).........................1

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ...............................................................11

*State v. Noriega*, 928 P.2d 706 (Ariz. Ct. App. 1996) ..................................................14

*State v. Tison*, 633 P.2d 355 (Ariz. 1981) ...................................................................14

*Stutson v. United States*, 516 U.S. 193 (1996) ..............................................................2

*United States v. Williams*, 553 U.S. 285 (2008)............................................................14

- ii -

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489

(1982) ............................................................................................ 2, 10, 11

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................... 10

*Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293 (11th Cir. 2017) ...................................... 16

**Statutes**

A.R.S. § 1-219 ......................................................................................................... 1

A.R.S. § 13-105 .................................................................................................... 14

A.R.S. § 13-301 ............................................................................................... 4, 11

A.R.S. § 13-303 ............................................................................................... 4, 11

A.R.S. § 13-3603.02 .................................................................................... passim

A.R.S. § 13-702 ...................................................................................................... 3

A.R.S. § 32-1401 .................................................................................................... 3

A.R.S. § 32-1403 .................................................................................................... 3

A.R.S. § 32-1403.01 .............................................................................................. 3

A.R.S. § 32-1451 .................................................................................................... 3

A.R.S. § 36-2157 ......................................................................................... 1, 4, 13

A.R.S. § 36-2158 ...................................................................................... 1, 4, 7, 13

A.R.S. § 36-2161 ............................................................................................... 1, 4

**Rules**

Fed. R. Civ. P. 65 ............................................................................................ 1, 17

2-ER-119

**RENEWED MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs move this Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction to preserve the status quo during litigation, based on Plaintiffs' strong likelihood of prevailing on their constitutional claim and the threat of irreparable harm to them, to those they serve, and to patients, physicians, and medical care throughout Arizona. Specifically, Plaintiffs move this Court to once again enjoin certain provisions of S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021), §§ 2, 10, 11, and 13 (codified at A.R.S. §§ 13-3603.02, 36-2157, 36-2158(A)(2)(d), 36-2161(A)(25)) (collectively, the "Reason Scheme" or "Scheme") on the ground that the Reason Scheme is unconstitutionally vague.

**INTRODUCTION**

Last year, Plaintiffs—who are individual physicians, the largest physicians' association in Arizona, and two organizations that educate Arizonans about their constitutional rights—challenged and sought to preliminarily enjoin the Reason Scheme.[1] On September 28, 2021, this Court enjoined the Scheme, concluding that Plaintiffs satisfied each preliminary injunction factor, including that Plaintiffs were likely to succeed on the merits of both their claim that the Reason Scheme violates patients' substantive due process right to abortion (*i.e.*, undue burden) *and* their claim that the Reason Scheme is unconstitutionally vague. First PI Order at 16, 25, 28-29.

Despite Arizona's several attempts to stay a portion of this Court's injunction, the entire Scheme remained enjoined until June 30, 2022, when the Supreme Court summarily disposed of all three cases pending before it that involved reason-based abortion restrictions. *See Brnovich v. Isaacson*, 142 S. Ct. 2893 (2022); *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 142 S. Ct. 2893 (2022); *Rutledge v. Little Rock Family Planning Servs.*, 142 S. Ct. 2894 (2022).

---

[1] Plaintiffs also challenged and sought to enjoin A.R.S. § 1-219 (the "Interpretation Policy"). After initially denying Plaintiffs' request to preliminarily enjoin that law on its face, *see* Order, ECF No. 52 ("First PI Order") at 9, 29, this Court preliminarily enjoined it as applied to abortion care on July 11, 2022, Order, ECF No. 121 ("Second PI Order").

1     Although Arizona had not filed a petition for certiorari and had only asked the
2  Supreme Court to stay limited portions of the Court's First PI Order, the Supreme Court
3  treated Arizona's application identically to the petitions for certiorari pending before it in
4  *Box* and *Little Rock*. The Supreme Court converted Arizona's stay application to a petition
5  for certiorari before judgment, granted Arizona's petition, vacated the Court's entire First
6  PI Order (even those portions pertaining to the Interpretation Policy, which was not the
7  subject of the State's application to the Supreme Court), and remanded the case to the Ninth
8  Circuit with instructions to remand the case to this Court for further consideration in light
9  of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *See Brnovich*,
10  142 S. Ct. at 2893.

11     While the Supreme Court's decision in *Dobbs* plainly reversed this Court's holding
12  on Plaintiffs' substantive due process claim against the Reason Scheme, the Supreme
13  Court's grant, vacate, and remand order does not represent any conclusion as to whether
14  *Dobbs* is determinative of the entire suit—only that it is potentially relevant to *some* of
15  Plaintiffs' claims. *See Stutson v. United States*, 516 U.S. 193, 196-97 (1996) (grant, vacate,
16  and remand order issued to allow consideration of a recently decided case that was
17  potentially relevant, even if not determinative). Importantly, neither the Supreme Court nor
18  the Ninth Circuit has issued any opinion addressing—or in any way calling into question—
19  this Court's well-reasoned and well-supported holding on Plaintiffs' vagueness claim. That
20  is the sole claim on which this renewed motion for preliminary injunctive relief is based.

21     As was the case last September, the Reason Scheme still demands the most stringent
22  vagueness review. *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc*., 455 U.S.
23  489, 498-99 (1982). Its "squishy" terms and reliance on physicians' "knowledge" of "the
24  subjective motivations of another individual" still fail to adequately notify Plaintiffs of
25  what activity is proscribed and impermissibly expose them to arbitrary criminal
26  prosecutions and other severe penalties, contrary to due process. First PI Order at 14-16.
27  Thus, because some Arizona physicians, including Dr. Isaacson, have resumed offering
28  abortion care after a temporary suspension following *Dobbs*, the Reason Scheme is now

1    inflicting and will continue to inflict irreparable harm—including the violation of

2    Plaintiffs' constitutional due process rights, the chilling of protected First Amendment

3    speech, and other "concrete harms" to both "Plaintiffs and their patients," *id.* at 29. This

4    outweighs any harm to Arizona, which would only be prevented from enforcing "a likely

5    unconstitutional set of laws." *Id.* Accordingly, Plaintiffs respectfully request the Court

6    grant this renewed motion for a preliminary injunction of the Reason Scheme.

### BACKGROUND[2]

7

8    **A. The Reason Scheme**

9          The Reason Scheme consists of several interdependent and internally inconsistent

10   provisions that collectively prohibit the provision of abortion if a provider "knows" that

11   the patient is to some uncertain degree motivated by a "genetic abnormality" in the fetus

12   or embryo. The Scheme subjects violators to severe criminal penalties, including

13   imprisonment (A.R.S. §§ 13-3603.02(A)(2), (B)(2), -702(D)); civil penalties (A.R.S.

14   §§ 13-3603.02(D), (E)); and loss of medical licensure and professional censure (A.R.S.

15   §§ 32-1401(27), -1403(A)(2), (A)(5), -1403.01(A) , -1451(A), (D)-(E), (I)-(K)).

16         The Scheme makes it a class 6 felony for any person to "[p]erform[] an abortion

17   knowing that the abortion is sought *solely because of* a genetic abnormality"[3] of the fetus

18   or embryo. A.R.S. § 13-3603.02(A)(2). It also makes it a class 3 felony for any person to

19   "[s]olicit[] or accept[] monies to finance . . . an abortion *because of* a genetic abnormality"

20   of the fetus or embryo. *Id.* § 13-3603.02(B)(2).[4] In addition, the Scheme broadly imposes

21   liability on any "physician, physician's assistant, nurse, counselor or other medical or

22   mental health professional who *knowingly* does not report *known* violations [of A.R.S.

23

24   [2] Unless otherwise indicated, for all citations herein, all emphases are added.

     [3] Where not directly quoting the language of the Scheme, Plaintiffs herein refer to "genetic
25   abnormalities" as "fetal conditions" or "fetal diagnoses."

     [4] Potential accomplice liability could also extend to advocates in Arizona, who intend to
26   raise funds to assist individuals in defraying the cost of accessing abortion care and thereby
27   risk running afoul of this solicitation provision if they know that the abortion is sought on
     account of fetal testing or diagnosis. A.R.S. § 13-3603.02(B)(2); Declaration of Dianne
28   Post, ECF No. 10-2 ¶¶ 20-23; Declaration of Civia Tamarkin, ECF No. 10-2 ¶¶ 29, 34, 37.

1    § 13-3603.02] to appropriate law enforcement authorities." *Id.* § 13-3603.02(E).[5]

2            The Scheme also prohibits abortion care unless the provider first executes an

3    affidavit swearing "*no knowledge* that the" pregnancy is being terminated "*because of* a

4    genetic abnormality" of the fetus or embryo. A.R.S. § 36-2157. It further prohibits abortion

5    care unless the provider first tells any patient "diagnosed with a nonlethal fetal condition"

6    that Arizona law "prohibits abortion . . . *because of* a genetic abnormality." *Id.* § 36-

7    2158(A)(2)(d). Finally, the Scheme requires providers to report to the Arizona Department

8    of Health Services ("ADHS") "[w]hether any genetic abnormality . . . was detected at or

9    before the time of the abortion by genetic testing, such as maternal serum tests, or by

10   ultrasound, such as nuchal translucency screening, or by other forms of testing." *Id.* § 36-

11   2161(A)(25). This is in addition to the pre-existing requirement that providers ask every

12   patient's "reason for the abortion," including whether the "abortion is due to fetal health

13   considerations," and report to ADHS any such reasons provided. *Id.* § 36-2161(A)(12).

14          The Scheme defines "genetic abnormality" as the "presence or presumed presence

15   of an abnormal gene expression in an unborn child, including a chromosomal disorder or

16   morphological malformation occurring as the result of abnormal gene expression." A.R.S.

17   § 13-3603.02(G)(2)(a). It does not provide any guidance about the level of certainty

18   required for a fetal condition to be deemed "presen[t] or presumed presen[t]." *Id.*

19   Additionally, under the Scheme, "lethal fetal conditions"—those "diagnosed before birth

20   and that will result, with reasonable certainty, in the death of the unborn child within three

21   months after birth"—are excluded. A.R.S. § 13-3603.02(G)(2)(b), incorporating A.R.S.

22   § 36-2158(G)(1).

23   **B.  The Complexities of Fetal Screening and Diagnosis**

24          Leading authorities in obstetrics and gynecological care, including the American

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

     [5]  In addition, after fetal testing or diagnosis, medical professionals and service

27   organizations that refer patients for, or provide information about, abortion care could
     potentially face liability for aiding or facilitating another person in obtaining a prohibited

28   abortion. *See* A.R.S. §§ 13-301, -303.

College of Obstetricians and Gynecologists ("ACOG") and the Society for Maternal-Fetal Medicine ("SMFM"), recommend patients routinely be offered fetal genetic testing options. Declaration of Dr. Eric M. Reuss, ECF No. 10-2 ("Reuss Decl.") ¶ 20. There are a variety of tests and exams during pregnancy that screen for or may diagnose a fetal genetic condition. *See* First PI Order at 12; Reuss Decl. ¶¶ 17-26, 32-40; Declaration of Dr. Katherine B. Glaser, ECF No. 10-2 ("Glaser Decl.") ¶¶ 9-11. Those tests include ultrasounds, which are a routine part of the prenatal care offered to pregnant patients, as well as genetic testing options that examine fetal cells in maternal blood or the DNA of fetal cells sampled through chorionic villus sampling ("CVS") or amniocentesis. Reuss Decl. ¶¶ 32-40. Many of these screening and diagnostic tests occur between 10-13 weeks of pregnancy. *Id.* ¶¶ 18, 32, 36.

There are inherent uncertainties in fetal testing and diagnosis. *Id.* ¶¶ 21, 33; First PI Order at 12. Fetal screening tests provide information about the likelihood or risk that a fetal condition may be present. Reuss Decl. ¶ 21. While some fetal screening tests are quite sensitive and specific, they can produce false-positives, false-negatives, and uninterpretable results. *Id.* ¶ 33. Diagnostic tests—if available and pursued—aim to determine whether a specific genetic condition is present in the fetus. *Id.* ¶ 21. However, diagnostic testing—like fetal screening—has limits and uncertainties. *Id.* Moreover, because of the small risk of pregnancy loss, some patients do not pursue diagnostic testing. *Id.* ¶ 35; First PI Order at 12. Yet even when a diagnosis is made in utero, that cannot tell the patient and their physicians specifically how a condition will manifest over a child's lifetime or exactly how long a particular child might live. First PI Order at 12-13; Reuss Decl. ¶¶ 18, 21, 68-70; Declaration of Dr. Paul A. Isaacson, ECF No. 10-2 ("Isaacson Decl.") ¶¶ 37-42. The prognosis for fetal conditions that are or may be present is extremely varied, both among different conditions and, in almost all instances, within any one diagnosis. Reuss Decl. ¶¶ 68-70; Isaacson Decl. ¶¶ 37-42.

**C. Patient-Provider Communications in Pregnancy Decision-Making**

As the ACOG and SMFM guidelines emphasize, testing should occur with

- 5 -

1    complete, non-directive counseling both pre- and post-test. Reuss Decl. ¶¶ 20, 28, 43.

2    Physicians, genetic counselors, and other healthcare professionals, including Plaintiffs Dr.

3    Reuss, Dr. Isaacson, and members of the Arizona Medical Association ("ArMA")

4    (collectively, "Plaintiff Physicians"), offer confidential, non-directive counseling, answer

5    questions, and provide facts to their patients. *Id.* ¶¶ 37, 43, 53-54; Isaacson Decl. ¶¶ 9-14;

6    Glaser Decl. ¶¶ 8, 20-21. Without such counseling, patients may exaggerate the

7    significance or likely consequences of a given condition, or confuse it with other genetic

8    and/or structural manifestations. Reuss Decl. ¶ 29. Non-directive counseling thus ensures

9    that "patients realize there is a broad range of clinical presentations, or phenotypes, for

10   many genetic disorders and that the results of genetic testing cannot predict all outcomes."

11   *Id.*

12       Ultimately, each patient's decision about whether to terminate a pregnancy is deeply

13   personal, "complex," and "often . . . motivated by a variety of considerations, some of

14   which are inextricably intertwined with the detection of a fetal genetic abnormality." First

15   PI Order at 14 (citing Reuss Decl. ¶¶ 47, 49; Isaacson Decl. ¶ 51); *see also* Reuss Decl.

16   ¶¶ 48, 50. The combination of the multifaceted nature of pregnancy decision-making with

17   the inherent uncertainty around fetal diagnoses necessitates frank, honest, compassionate,

18   and open communication between healthcare providers and their patients. Reuss Decl.

19   ¶¶ 28-31, 42-44; Glaser Decl. ¶¶ 19-22; Isaacson Decl. ¶¶ 60-63.

20   **D.  Plaintiff Physicians Do Not Understand What Care the Scheme Prohibits**

21       The Scheme's operative language and interplay with existing Arizona law are

22   confusing and inconsistent. Isaacson Decl. ¶ 31; Reuss Decl. ¶ 68; Supplemental

23   Declaration of Dr. Paul A. Isaacson, attached as Ex. 3 ("Suppl. Isaacson Decl.") ¶ 4;

24   Supplemental Declaration of Dr. Eric M. Reuss, attached as Ex. 1 ("Suppl. Reuss Decl.")

25   ¶ 5; Supplemental Declaration of Dr. Katherine B. Glaser, attached as Ex. 2 ("Suppl. Glaser

26   Decl.") ¶¶ 5-6.

27       To begin, Plaintiff Physicians do not understand which fetal conditions constitute

28   "genetic abnormalities," when such conditions will be deemed "presen[t] or presumed

presen[t]," or what it means to "detect" such a condition. Isaacson Decl. ¶¶ 33-34; Reuss Decl. ¶ 71. Inherent uncertainties in fetal testing make it difficult for doctors to assess whether a condition falls under the Scheme's definition of "genetic abnormality" or whether it falls under one of the Scheme's exceptions. First PI Order at 12 (citing Reuss Decl. ¶ 21; Isaacson Decl. ¶ 33). For example, the Scheme defines "genetic abnormality" to include "morphological malformation[s]" resulting from "abnormal gene expression." A.R.S. § 13-3603.02(G)(2)(a). However, "morphological malformation[s]" may result from multiple genes, infectious diseases, environmental factors, or other factors; the cause is not always clear, and reasonable physicians may disagree. Reuss Decl. ¶¶ 26, 70; Isaacson Decl. ¶ 33; *see* First PI Order at 12. It is also unclear at what point during the screening and diagnostic process one can be said to "know" or to have detected that such a covered condition is present. First PI Order at 12 (citing Reuss Decl. ¶¶ 68-70; Isaacson Decl. ¶¶ 34-35).

The definition also excludes "lethal fetal conditions," A.R.S. § 13-3603.02(G)(2)(b)—those "diagnosed before birth and that will result with reasonable certainty in the death of the unborn child within three months after birth," A.R.S. § 36-2158(G)(1). Yet the Scheme provides no further information or elaboration about which fetal conditions qualify as "lethal"; nor how one would determine with "reasonable certainty" that a condition will result in death within three months after birth or who must make this determination; nor whether or how external factors, such as potential medical interventions, should be considered. As noted *supra*, there is "considerable uncertainty" regarding how a condition will manifest over a child's lifetime or exactly how long a particular child might live, even when a fetal genetic diagnosis is made in utero. Isaacson Decl. ¶¶ 38-42; Suppl. Reuss Decl. ¶ 7. And there is potential for disagreement among physicians. First PI Order at 12-13 (citing Reuss Decl. ¶ 31; Isaacson Decl. ¶¶ 37-42); *see also* Reuss Decl. ¶¶ 18, 21, 42, 68-70.

Apart from these definitional inadequacies, Plaintiff Physicians also do not understand what role a "genetic abnormality" must play in a patient's decision-making to

1  trigger the Scheme's prohibitions. Isaacson Decl. ¶¶ 32, 51; Reuss Decl. ¶ 68. Must the

2  patient seek abortion care "solely because of" a "genetic abnormality"? Or if it is merely

3  "because of" a "genetic abnormality," does that suffice? Or is it sufficient that there is

4  merely the possibility that a "genetic abnormality" factored into the patient's decision? *Id.*

5       Regardless, it is often difficult for Plaintiff Physicians to delineate how any one

6  reason contributed to a patient's decision-making. First PI Order at 14 (citing Reuss Decl.

7  ¶¶ 47, 49; Isaacson Decl. ¶ 51); Isaacson Decl. ¶ 13. Their declarations capture the

8  complexity of providers' conversations with their patients concerning the pregnant

9  individual's decision to end a pregnancy, both generally and in the specific context of those

10  patients who have chosen to terminate a pregnancy after learning of a fetal diagnosis. Reuss

11  Decl. ¶¶ 45-54; Glaser Decl. ¶¶ 19-22; Isaacson Decl. ¶¶ 51, 61-63. For many patients with

12  a fetal diagnosis, Plaintiff Physicians do not know how to decipher whether the diagnosis

13  played a sufficient role in the patient's decision-making to trigger the Reason Scheme's

14  prohibitions. *See* First PI Order at 14.

15  **E.** **The Scheme Chills Abortion Care and Patient-Provider Communications**

16       Given the Reason Scheme's severe penalties and Plaintiff Physicians' uncertainty

17  regarding when the Scheme's prohibitions are triggered, Plaintiff Physicians fear

18  prosecution under innumerable scenarios and therefore can no longer offer abortion care

19  whenever there is even the slightest indication of a covered fetal condition. First PI Order

20  at 24 (citing Reuss Decl. ¶ 66; Isaacson Decl. ¶¶ 35-36, 43); Isaacson Decl. ¶¶ 28-63; Reuss

21  Decl. ¶¶ 65-73; Suppl. Isaacson Decl. ¶ 4; Suppl. Reuss Decl. ¶ 5.

22       Beyond not understanding which conditions are included in the definition of

23  "genetic abnormalit[ies]" or the requisite role such a condition must play in a patient's

24  decision-making, Plaintiff Physicians do not know when they will be deemed to "know"

25  that a covered condition exists or that such a condition played an impermissible role in the

26  patient's decision-making. There are "myriad ways in which [physicians] can and often do

27  infer a patient's motive for terminating a pregnancy." First PI Order at 13 (citing Reuss

28  Decl. ¶¶ 44, 73; Isaacson Decl. ¶¶ 18, 48-49). While some patients disclose fetal test results

1    and their motivations for seeking care, others do not, yet the circumstances surrounding
2    their care still may lead to the inference that a fetal condition played a role in their decision-
3    making. *See* Isaacson Decl. ¶¶ 44-53; Reuss Decl. ¶¶ 44, 73. As the Court previously
4    concluded, there are "many realistic scenarios in which surrounding circumstances could
5    provide evidence of a provider's 'knowledge' that a patient sought an abortion because of
6    a fetal genetic abnormality—likely sufficient to establish a *prima facie* case for criminal or
7    civil liability—even though a patient did not explicitly state that was her motive." First PI
8    Order at 15. As a result, patients who receive a fetal diagnosis and wish to terminate their
9    pregnancy will be denied time-sensitive medical treatment and forced to seek other options.
10   *See* Reuss Decl. ¶ 83; Isaacson Decl. ¶ 28; Glaser Decl. ¶ 27.

11              In addition to interfering with time-sensitive medical care, the Reason Scheme
12   severely inhibits the physician-patient relationship as well as conversations amongst
13   physicians regarding patient care. For Drs. Reuss, Glaser, and others, the Reason Scheme
14   forces them to limit non-directive options counseling, referrals, and open discussion with
15   their patients. Suppl. Reuss Decl. ¶ 6; Suppl. Glaser Decl. ¶¶ 5-7. By curtailing these
16   conversations, the Scheme gravely impairs the physician-patient relationship. Glaser Decl.
17   ¶¶ 19-21; Reuss Decl. ¶¶ 67, 72; Suppl. Isaacson Decl. ¶¶ 7-8; Suppl. Reuss Decl. ¶ 6;
18   Suppl. Glaser Decl. ¶ 7.

19              Further, because Plaintiff Physicians cannot offer abortion care whenever there is
20   even the slightest indication of a covered fetal condition, First PI Order at 24 (citing Reuss
21   Decl. ¶ 66; Isaacson Decl. ¶¶ 35-36, 43); Isaacson Decl. ¶¶ 28-63; Reuss Decl. ¶¶ 65-73;
22   Suppl. Isaacson Decl. ¶ 4; Suppl. Reuss Decl. ¶ 5, physicians like Dr. Isaacson no longer
23   accept referrals from maternal fetal medicine specialists ("MFMs") and genetic counselors.
24   Suppl. Isaacson Decl. ¶¶ 5-6. As a result, the Reason Scheme also inhibits conversations
25   between abortion providers and other medical professionals who have historically worked
26   to care collaboratively and compassionately for patients with fetal diagnoses, and to ensure
27   such patients receive the medical care and information that enables them to make the best
28   decision for their unique circumstances. *Id.* ¶ 6; Isaacson Decl. ¶ 47; *see also* Reuss Decl.

1  ¶¶ 37-38, 41, 43-44. Further, Dr. Isaacson worries that the Reason Scheme's prohibitions

2  will discourage patients from engaging in open and honest communication with him and

3  his staff about their medical diagnoses and options out of fear that they will otherwise be

4  unable to receive an abortion. Suppl. Isaacson Decl. ¶ 7.

5  ## LEGAL STANDARD

6  To obtain a preliminary injunction, Plaintiffs must establish: (1) likelihood of

7  "success on the merits"; (2) likelihood of irreparable harm absent preliminary relief; (3)

8  that "the balance of equities tips in [their] favor"; and (4) that "an injunction is in the public

9  interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As this Court

10  previously held, Plaintiffs satisfy all four factors here. First PI Order at 29.

11  ## ARGUMENT

12  **A. Plaintiffs Are Likely to Succeed on the Merits**

13  **1. The Scheme Must Satisfy a Stringent Due Process Standard**

14  The Due Process Clause ensures that those governed by a state law have fair warning

15  and those charged with its enforcement have explicit standards, so that arbitrary or

16  discriminatory use of the law cannot ensue. *Hoffman Ests.*, 455 U.S. at 498. "The degree

17  of vagueness that the Constitution tolerates—as well as the relative importance of fair

18  notice and fair enforcement—depends in part on the nature of the enactment." *Id.* "If a

19  statute subjects transgressors to criminal penalties," the due process need for definite

20  standards "is even more exacting." *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir.

21  2000).

22  Additionally, courts are especially vigilant in prohibiting vagueness when a "statute

23  'abut(s) upon sensitive areas of basic First Amendment freedoms,'" to avoid inhibiting "the

24  exercise of (those) freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). *See*

25  *also Hoffman Ests.*, 455 U.S. at 499 ("[P]erhaps the most important factor affecting the

26  clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise

27  of constitutionally protected rights."). Even in the absence of a constitutional right to

28  abortion, the Reason Scheme interferes with constitutionally-protected activities by

1    dangerously intruding upon the frank, open, and honest communications between

2    healthcare professionals and their patients. *See Conant v. Walters*, 309 F.3d 629, 637 (9th

3    Cir. 2002). Not only does the Reason Scheme deter patients from engaging in open

4    communications with abortion providers, Suppl. Isaacson Decl. ¶¶ 7-8, it also severely

5    inhibits the conversations between patients and a "host of Arizonans who, while not

6    directly performing abortions, nonetheless help patients access such care[,]" First PI Order

7    at 16.[6]

8              Under these standards, the Reason Scheme plainly triggers the most stringent

9    vagueness review. Not only does the Scheme threaten physicians and others with severe

10   criminal penalties in addition to serious civil penalties that carry a "prohibitory and

11   stigmatizing effect," *see Hoffman Ests.*, 455 U.S. at 499, it also chills the exercise of

12   constitutionally-protected speech.

13   **2.  The Scheme Provides Inadequate Notice and Invites Arbitrary Enforcement**

14             A law is unconstitutionally vague if it fails to provide a "reasonable opportunity to

15   discern whether [one's] conduct is proscribed" or it is so indefinite as to "encourage

16   arbitrary and discriminatory enforcement." *Forbes*, 236 F.3d at 1011; *see also Grayned*,

17   408 U.S. at 108 (explaining that a law must provide "fair warning" by giving "[a] person

18   of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he

19   may act accordingly"); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (beyond

20

21   ───────────────

22   [6] This is for two reasons, as the Court previously identified. First PI Order at 16. First,
     Arizona's inchoate liability statutes "potentially implicat[e]" healthcare professionals—
     and threaten them with severe criminal penalties—for "refer[ring] a patient to an abortion
23   provider knowing that the patient has decided to terminate her pregnancy because of a fetal
     genetic abnormality, and that such motive easily will be inferred by the new doctor." *Id.*
24   (citing A.R.S. §§ 13-301, -303). Second, the Reason Scheme itself imposes severe civil
     penalties on these providers for failing to report "known" violations of A.R.S. § 13-
25   3603.02. *Id.* (citing A.R.S. § 13-3603.02(E)). This will severely interfere with and chill
     their communications with patients, degrading both their practices and the level of care
26   they can provide. It also chills speech between abortion providers and various other
     healthcare professionals who would otherwise work together to provide care
27   "collaboratively and compassionately" to patients with fetal diagnoses. *See supra* pp. 9-10.

28

- 11 -

1  guaranteeing "fair notice," the void-for-vagueness doctrine also "guards against arbitrary

2  or discriminatory law enforcement by insisting that a statute provide standards to govern

3  the actions of police officers, prosecutors, juries, and judges"). A statute may be

4  unconstitutionally vague under either theory: lack of notice or lack of standards. *FCC v.*

5  *Fox Television Stations*, *Inc.*, 567 U.S. 239, 253 (2012). As this Court correctly held last

6  year, the Reason Scheme is facially unconstitutional because it is "so plagued" by

7  indeterminacy that it *both* "deprive[s] those of ordinary intelligence fair notice of what

8  conduct is forbidden" and is "susceptible to arbitrary enforcement." First PI Order at 10,

9  16. Nothing has changed that would justify a different conclusion now.

10  As this Court has already held, the Reason Scheme suffers from vagueness in

11  several respects—all of which "conspire" to create the harms the vagueness doctrine is

12  intended to prevent. *Id.* at 16.

13  First, the Reason Scheme provides a "squishy" definition of "genetic abnormality"

14  which "does not offer" Plaintiffs "workable guidance about which fetal conditions bring

15  abortion care within the scope" of the Scheme. *Id.* at 11, 14. As the Court previously

16  concluded, "the uncertainties and limitations inherent in genetic screening and diagnostic

17  testing" make it difficult to determine "whether a condition has a genetic or solely genetic

18  cause," or when "one can be said to know or to have detected" the "presence or presumed

19  presence" of such a condition. *Id.* at 11-12. Similarly, given the "considerable uncertainty

20  as to how long a child born with a genetic anomaly may live," it is difficult for a physician

21  to "know whether a particular fetal genetic abnormality or condition qualifies as a 'lethal

22  fetal condition' under Arizona law." *Id.* at 13. The Scheme's definition of "genetic

23  abnormality," therefore, "does not amount to an objective criterion." *Id.* at 14.

24  Second, it is unclear what role a "genetic abnormality" must play in a patient's

25  decision-making to trigger the Reason Scheme's prohibitions or how healthcare providers

26  are to parse through patients' often complex decision-making. As a preliminary matter, the

27  Scheme employs three different motivation standards—each of which could trigger severe

28  criminal or civil penalties. Under A.R.S. § 13-3603.02(A)(2), it is a class 6 felony for

2-ER-131

1    physicians to provide care if they "know" that the abortion is sought "solely because of a
2    genetic abnormality." Yet, as this Court has recognized, "solely" does not appear in A.R.S.
3    § 13-3603.02(B)(2), which makes accepting money to finance an abortion sought "because
4    of"[7] a "genetic abnormality" a class 3 felony. First PI Order at 15. Moreover, the Reason
5    Scheme elsewhere prohibits physicians from providing care unless they first sign an
6    affidavit attesting that they have "no knowledge" that the abortion is sought "because of"
7    a "genetic abnormality." A.R.S. § 36-2157(1). Requiring "no knowledge" that an abortion
8    is sought "because of" a "genetic abnormality" seemingly engulfs some amount of
9    additional care even beyond where the provider "knows" the abortion is sought "because
10   of" a "genetic abnormality."

11        Regardless of which motivation standard governs, the Reason Scheme imposes
12   severe criminal and civil penalties based on "the subjective motivations of another
13   individual, even if not directly expressed." First PI Order at 14. As the Court has
14   recognized, answering any of these questions about the role a "genetic abnormality" played
15   in a patient's decision to end a pregnancy is "exacerbated by the reality that the decision to
16   terminate a pregnancy is a complex one, and often is motivated by a variety of
17   considerations, some of which are inextricably intertwined with the detection of a fetal
18   genetic abnormality." *Id.*; Isaacson Decl. ¶ 51; Reuss Decl. ¶¶ 47-50. As such, under any
19   of these motivation standards, the Scheme calls on physicians to interpret patients'
20   subjective beliefs and motivations and to assess how a particular factor contributed to an
21   often complex and deeply personal decision. Imposing severe criminal and civil liability
22   based on such a "subjective judgment" is no different than laws—clearly
23

---

24   [7] Similarly, A.R.S. § 36-2158(A)(2)(d) prohibits abortion care unless the provider first tells
25   any patient "diagnosed with a nonlethal fetal condition" that Arizona law "prohibits
     abortion . . . *because of* a genetic abnormality." As the Court previously concluded,
26   "'because of' is not reasonably susceptible to the construction 'solely because of.'" First
27   PI Order at 15 n.9 (citing *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020)). While
     that much may be clear, it is unclear if "because of" here refers to "but for" causation,
28   proximal causation, or some other causal standard that is not defined in the statute.

1  unconstitutional—that impose liability based on "whether conduct is 'annoying' or
2  'indecent.'" *United States v. Williams*, 553 U.S. 285, 306 (2008).

3        Finally, the aforementioned vagueness in both the Reason Scheme's definitions and
4  motivation standards is further compounded by the Scheme's "knowingly" *mens rea*
5  requirement, which—as the Court previously recognized—raises "special difficulties"
6  here. First PI Order at 13. Because Arizona law defines "knowingly" to mean "that a person
7  is aware or believes that the person's conduct is of that nature or that the circumstance
8  exists," A.R.S. § 13-105(10)(b), it is "unclear" when during "the multidimensional
9  screening and diagnostic process a doctor can be deemed to be 'aware' or 'believe' that a
10  fetal genetic abnormality exists," and, even "[m]ore troubling," it is similarly unclear when
11  "a doctor [can] be deemed to 'know' or 'believe' what is in the mind of a patient[.]" First
12  PI Order at 13. This is particularly problematic given "the reality that knowledge can be
13  and most often is proven through circumstantial, rather than direct, evidence." *Id.* at 15
14  (citing *State v. Noriega*, 928 P.2d 706, 710 (Ariz. Ct. App. 1996) (a criminal defendant's
15  "mental state will rarely be provable by direct evidence and the jury will usually have to
16  infer it from . . . circumstances surrounding the event")); *see also State v. Tison*, 633 P.2d
17  355, 363-64 (Ariz. 1981) (noting that a criminal conviction may rest solely on
18  circumstantial evidence). As the Court previously concluded, this impermissibly relies on
19  the "discretion of 'police officers, prosecutors, and judges' to essentially define the crimes
20  that Arizona's legislature has created." First PI Order at 15-16 (citing *Knox v. Brnovich*,
21  907 F.3d 1167, 1182 (9th Cir. 2018)).

22  **3.  Facial Relief is Warranted Under the Circumstances**

23        Facial relief is warranted where, as here, the law implicates the First Amendment
24  rights of Arizona patients, providers, and their extended support networks. *Cf. Kashem v.*
25  *Barr*, 941 F.3d 358, 375 (9th Cir. 2019); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92
26  F.3d 1486, 1493 (9th Cir. 1996). Facial relief is further warranted here because the Scheme
27  is "plagued by such indeterminacy" that it will be vague as applied to Plaintiffs in countless
28  instances. *Kashem*, 941 F.3d at 376-77.

1                                    *        *        *

2              For all these reasons—and as the Court previously concluded—Plaintiffs have a

3      high likelihood of success on the merits of their facial vagueness claim against the Reason

4      Scheme. First PI Order at 9.

5      **B.  Plaintiffs Will Continue Suffering Irreparable Harm Absent an Injunction**

6              Absent injunctive relief from this Court, the Reason Scheme is inflicting and will

7      continue to inflict irreparable harm on Plaintiffs, their members, and their patients. "It is

8      well established that the deprivation of constitutional rights 'unquestionably constitutes

9      irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

10     *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As was the case with the Interpretation Policy,

11     the Reason Scheme's impermissibly vague contours unconstitutionally subject Plaintiffs to

12     uncertain legal obligations and risks of arbitrary prosecution. Such a vague law "deprives

13     Plaintiffs of their Fourteenth Amendment procedural due process rights." Second PI Order

14     at 15.

15             Moreover, because the Reason Scheme is now in effect, Plaintiff Physicians have

16     broadly ceased providing abortion care at the slightest indication that a covered fetal

17     diagnosis may have played some role in the patient's decision-making process to seek an

18     abortion (even for pregnant patients whose care the Reason Scheme arguably is not

19     intended to cover)—lest they risk facing harsh criminal prosecution, civil liability, and

20     licensing penalties. Suppl. Isaacson Decl. ¶ 4; Suppl. Reuss Decl. ¶ 5. The Court already

21     found this response reasonable and, indeed, concluded "many other providers in Arizona,"

22     including Plaintiff ArMA's members, would  similarly be "chilled" from providing care

23     given the "many realistic scenarios in which surrounding circumstances could provide

24     evidence of a provider's 'knowledge' that a patient sought an abortion because of a fetal

25     genetic abnormality—likely sufficient to establish a *prima facie* case for criminal or civil

26     liability—even though a patient did not explicitly state that was her motive," First PI Order

27     at 15, 24; *see also* Suppl. Glaser Decl. ¶ 6.

28             Further, the Reason Scheme "abut(s) upon sensitive areas of basic First Amendment

- 15 -

1    freedoms," *Grayned*, 408 U.S. at 109. As Defendants have previously represented to this

2    Court, First Oral Arg. Tr., ECF No. 61, at 58, the Reason Scheme coerces patients to

3    withhold information or lie to their physicians to evade its prohibitions. Similarly, Plaintiff

4    Physicians—including members of Plaintiff ArMA who do not regularly provide abortion

5    care—now must walk a tightrope every time they speak with patients. *See* Suppl. Glaser

6    Decl. ¶¶ 5-7. Arizona physicians fear that discussing abortion as one option among many

7    during non-directive counseling sessions, or simply recommending fetal testing options to

8    their patients, could be interpreted by any prosecutor to be aiding and abetting an abortion

9    prohibited by the Reason Scheme. *See id.*; Glaser Decl. ¶ 16. Further, abortion providers,

10   like Dr. Isaacson, can no longer communicate openly and honestly with various healthcare

11   professionals to provide collaborative and compassionate care to patients with fetal

12   diagnoses—as they are now afraid this will be viewed as evidence that they knew the

13   patient was seeking abortion care because of a fetal diagnosis. Suppl. Isaacson Decl. ¶¶ 5-

14   6.

15   The Reason Scheme's chilling effects on physicians' and patients' speech

16   implicates "core First Amendment values," *Conant*, 309 F.3d at 637, and undeniably

17   constitute irreparable harm. *See Melendres*, 695 F.3d at 1002. This is because "[a]n integral

18   component of the practice of medicine is the communication between a doctor and a

19   patient. Physicians must be able to speak frankly and openly to patients." *Conant*, 309 F.3d

20   at 636; *see also Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1328 (11th Cir. 2017) (en

21   banc) (W. Pryor, J., concurring) ("Doctors help patients make deeply personal decisions,

22   and their candor is crucial. If anything, the doctor-patient relationship provides more

23   justification for free speech, not less.").

24   In addition to constitutional injuries, the Reason Scheme irreparably harms the

25   health and wellbeing of countless Arizonans. *See* Second PI Order at 15 (finding harm to

26   patients "who are denied time-sensitive medical treatment"). Inevitably, some of Plaintiff

27   Physicians' patients will be denied time-sensitive medical treatment and forced to seek

28   other options. *See id.*; Isaacson Decl. ¶ 28; Suppl. Isaacson Decl. ¶ 6. And because abortion

1    care is a medical procedure that "simply cannot be postponed," *Bellotti v. Baird*, 443 U.S.

2    622, 643 (1979), the presumption of irreparable harm applies with particular force here,

3    *see Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014). Patients

4    who are denied care and who have the means could travel out of state, but the need to travel

5    itself causes delays in access to care. Patients who are unable to travel may manage their

6    own abortions, risking potential criminal penalties, or will be forced to give birth against

7    their will. *See, e.g.*, *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004)

8    (establishing likelihood of irreparable harm upon showing that plaintiffs would experience

9    pain, complications, and other adverse effects from delayed medical treatment).

10   **C.**  **The Balance of Equities Tips Strongly in Plaintiffs' Favor and an Injunction Is In**

11      **the Public Interest**

12       This Court correctly determined that the "Reason [Scheme] will visit concrete harms

13   on Plaintiffs and their patients." First PI Order at 29. Since Plaintiff Physicians have

14   resumed providing care, the Reason Scheme has and will continue to inflict the above

15   constitutional and irreparable harms. Suppl. Isaacson Decl. ¶¶ 7-8. In stark contrast,

16   Defendants stand only to lose the ability to enforce likely unconstitutional laws. *See Latta*

17   *v. Otter*, 771 F.3d 496, 500 n.1 (9th Cir. 2014) ("No opinion for the Court adopts [the]

18   view" that "a state suffers irreparable injury when one of its laws is enjoined.").

19       Furthermore, granting injunctive relief "is always in the public interest," where—as

20   here—it "prevent[s] the violation of a party's constitutional rights." *See Melendres*, 695

21   F.3d at 1002. Ensuring that pregnant patients have access to time-sensitive abortion care is

22   also in the public interest. *See Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d

23   868, 887 (D. Ariz. 2012) (finding it in the public interest for patients to "receive health care

24   services from the health care provider they have chosen").

25                         **CONCLUSION**

26       For the foregoing reasons, Plaintiffs respectfully request that the Court issue a

27   preliminary injunction against the Reason Scheme and waive the bond requirement under

28   Federal Rule of Civil Procedure 65(c).

1

2     Dated: September 2, 2022

3     By: /s/ Jessica Leah Sklarsky
      _____

4     Jessica Leah Sklarsky, *pro hac vice*

5     Gail Deady, *pro hac vice*
      Catherine Coquillette, *pro hac vice*

6     Center For Reproductive Rights
      199 Water Street, 22nd Floor

7     New York, NY 10038

8     Telephone: (917) 637-3600
      jsklarsky@reprorights.org

9     gdeady@reprorights.org

10    ccoquillette@reprorights.org

11
      Jen Samantha D. Rasay, *pro hac vice*

12    Center For Reproductive Rights
      1634 Eye Street, NW, Suite 600

13    Washington, DC 20006

14    Telephone: (202) 628-0286
      jrasay@reprorights.org

15

16    *Counsel for Paul A. Isaacson, M.D.,*

17    *National Council of Jewish Women*
      *(Arizona Section), Inc., and Arizona*

18    *National Organization for Women*

19
      Jared Keenan (027068)

20    Victoria Lopez (330042)

21    American Civil Liberties Union Foundation
      of Arizona

22    3707 North 7th Street, Suite 235
      Phoenix, AZ 85014

23    Telephone (602) 650-1854

24    jkeenan@acluaz.org
      vlopez@acluaz.org

25

26    *Counsel for Plaintiffs*

27    COUNSEL CONTINUED
      ON NEXT PAGE

28

1
2
3
4
5
6
7

Alexa Kolbi-Molinas, *pro hac vice*
Rebecca Chan, *pro hac vice*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
akolbi-molinas@aclu.org
rebeccac@aclu.org
*Counsel for Eric M. Reuss M.D., M.P.H.,*
*and Arizona Medical Association*

8
9
10
11
12
13
14
15
16

Beth Wilkinson, *pro hac vice*
Anastasia Pastan, *pro hac vice*
Wilkinson Stekloff LLP
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

17
18
19
20
21
22
23
24

Ralia Polechronis, *pro hac vice*
Wilkinson Stekloff LLP
130 West 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-9410
rpolechronis@wilkinsonstekloff.com
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

25
26
27
28

1    **CERTIFICATE OF SERVICE**

2          I hereby certify that on September 2, 2022, I electronically transmitted the attached

3    document to the Clerk's Office using the CM/ECF System for filing.  All counsel of record

4    are registrants and are therefore served via this filing and transmittal.

5

6                                                        /s/ Jessica Leah Sklarsky

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

9

Paul A. Isaacson, M.D., on behalf of
himself and his patients, et al.,

10

11

Plaintiffs,

12

v.

13

Mark Brnovich, Attorney General of
Arizona, in his official capacity; et al.,

14

15

Defendants.

Case No. 2:21-CV-01417-DLR

**INDEX OF EXHIBITS IN SUPPORT**
**OF PLAINTIFFS' RENEWED**
**MOTION FOR PRELIMINARY**
**INJUNCTION**

16

17

18

19

20

21

22

23

24

25

26

27

28

# INDEX OF EXHIBITS

| Exhibit No. | Description |
|:---:|:---|
| 1 | Supplemental Declaration of Eric M. Reuss, M.D., M.P.H. dated August 30, 2022 |
| 2 | Supplemental Declaration of Katherine B. Glaser, M.D., M.P.H. dated August 25, 2022 |
| 3 | Supplemental Declaration of Paul A. Isaacson, M.D. dated August 26, 2022 |

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Paul A. Isaacson, M.D., on behalf of himself
and his patients, et al.,

         Plaintiffs,

    v.

Mark Brnovich, Attorney General of
Arizona, in his official capacity; et al.

         Defendants.

Case No. 2:21-CV-1417-DLR

**SUPPLEMENTAL DECLARATION
OF ERIC M. REUSS, M.D., M.P.H.,
IN SUPPORT OF PLAINTIFFS'
RENEWED MOTION FOR
PRELIMINARY INJUNCTION**

I, Eric M. Reuss, M.D., M.P.H., pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am an obstetrician and gynecologist ("OB/GYN") licensed in Arizona. I have maintained an independent OB/GYN practice, Scottsdale Obstetrics & Gynecology, P.C., since 2001. I am participating as a plaintiff in this suit on behalf of myself, my staff, and my patients to enforce important constitutional protections and ensure that I can continue to provide high-quality care to patients without risking serious criminal and civil penalties. I submit this supplemental declaration in support of Plaintiffs' Renewed Motion for a Preliminary Injunction against enforcement of provisions of A.R.S. §§ 13-3603.02(A)(2), (B)(2), (D), (E), 36-2157(A)(1), 36-2158(A)(2)(d), 36-2161(A)(25) ("the Reason Scheme").

2.     I previously submitted a declaration in support of Plaintiffs' Motion for Preliminary Injunction, Declaration of Eric M. Reuss, M.D., M.P.H., ECF No. 7-2, Ex. 1. My experience and qualifications are set forth more fully in my prior declaration, and I incorporate by reference all statements made in my earlier declaration.

3.      My statements herein are based on my personal knowledge as well as my experience providing obstetrical and gynecological care, including abortions, to patients in Arizona.

4.      I understand that, although the Reason Scheme was enjoined by the Court last year, as a result of the Supreme Court's order in this case on June 30, 2022, the Reason Scheme is now effect.

5.      Now that the Reason Scheme is in effect, I am no longer offering or providing abortions to patients whenever, at a minimum, a nonlethal fetal anomaly factors into their decision. As I previously explained, given the confusing and inconsistent language in the law, this is the only way for me to avoid even a circumstantial indication that I may be violating the Reason Scheme, and the only way for me to continue my medical practice for as many patients as possible and avoid criminal consequences.

6.      Moreover, because I must now deprive some patients of a medical option for their pregnancies, I am unable to continue to provide the full, standard non-directive counseling that is critical to the physician-patient relationship.

7.      As I previously explained, even the exception for lethal fetal conditions does not create an objective safe harbor. Who decides whether there is a "reasonable certainty" that the child would die within three months? How much certainty is reasonable? Is that considered with or without every conceivable medical intervention? I simply do not know what I will do if faced with a patient who *might* qualify for that exception, given the risk that my good faith decision to provide an abortion could be second-guessed and targeted by enforcement authorities after the fact.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on August 30, 2022.

_____

Eric M. Reuss, M.D., M.P.H.

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Paul A. Isaacson, M.D., on behalf of himself
and his patients, et al.,

        Plaintiffs,

    v.

Mark Brnovich, Attorney General of
Arizona, in his official capacity; et al.

        Defendants.

Case No. 2:21-CV-1417-DLR

**SUPPLEMENTAL DECLARATION OF KATHERINE B. GLASER, M.D., M.P.H., IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION**

I, Katherine B. Glaser, M.D., M.P.H., declare as follows:

1.    I am a board-certified obstetrician-gynecologist licensed to practice in Arizona and a member of the Arizona Medical Association, a plaintiff in this lawsuit. I submit this supplemental declaration in support of Plaintiffs' Renewed Motion for a Preliminary Injunction against enforcement of provisions of A.R.S. §§ 13-3603.02(A)(2), (B)(2), (D), (E), 36-2157(A)(1), 36-2158(A)(2)(d), 36-2161(A)(25) ("the Reason Scheme").

2.    I previously submitted a declaration in support of Plaintiffs' Motion for Preliminary Injunction, Declaration of Dr. Katherine B. Glaser, ECF No. 10-2, Ex. 2. My experience and qualifications are set forth more fully in my prior declaration, and I incorporate by reference all statements made in my earlier declaration.

3.    My statements herein are based on my personal knowledge as well as my

experience providing obstetrical and gynecological care to patients in Arizona and, in particular, to rural and medically under-served patient populations.

4.      I understand that, although the Reason Scheme was enjoined by the Court last year, as a result of the U.S. Supreme Court's June 30, 2022 order in this case, the Reason Scheme is now effect.

5.      As stated in my first declaration, the Reason Scheme's convoluted and unclear provisions leave me unsure whether I could get caught up in a criminal prosecution, including as an accomplice or aider of criminalized care, simply for providing non-directive options counseling and referrals and engaging in the open discussion that is the foundation of the care we provide our pregnant patients.

6.      I am not alone in this regard. I have spoken to colleagues who have expressed significant concerns about how honest they can be with their patients when discussing pregnancy options in the context of fetal anomalies, as they are worried about risking arrest and prosecution under the Reason Scheme.

7.      I continue to be deeply concerned that, as long as the Reason Scheme remains in effect, communications between patients and healthcare providers will be further impaired, to the detriment of the doctor-patient relationship and patient care. I am particularly concerned about the impact this will have on the patients that I serve in Tuba City, who already experience an array of significant challenges ranging, for example, from financial insecurity to family insecurity, to caregiving challenges and serious health issues that preceded the pregnancy, to lack of access to any other reliable health information sources.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on August 25, 2022

Katherine B. Glaser, M.D., M.P.H.

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Paul A. Isaacson, M.D., on behalf of himself
and his patients, et al.,

    Plaintiffs,

  v.

Mark Brnovich, Attorney General of
Arizona, in his official capacity; et al.

    Defendants.

Case No. 2:21-CV-1417-DLR

## DECLARATION OF PAUL A. ISAACSON, M.D., IN SUPPORT OF
## PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION

I, PAUL A. ISAACSON, M.D., pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Plaintiff in this lawsuit and a physician at Reproductive Choice Arizona, PLC, doing business as Family Planning Associates Medical Group ("FPA"). I submit this declaration in support of Plaintiffs' Renewed Motion for a Preliminary Injunction against enforcement of provisions of A.R.S. §§ 13-3603.02(A)(2), (B)(2), (D), (E), 36-2157(A)(1), 36-2158(A)(2)(d), 36-2161(A)(25) ("the Reason Scheme"). I previously submitted a declaration in support of Plaintiffs' Motion for Preliminary Injunction, Declaration of Dr. Paul A. Isaacson, ECF No. 10-2 ("Isaacson Decl."). I incorporate by reference herein all statements made in my earlier declaration.

2. My statements herein are based on my personal knowledge as well as my experience providing obstetrical and gynecological care, including abortion care, to

1

patients in Arizona.

3.      It is my understanding that the Reason Scheme went into effect shortly after the Supreme Court's order on June 30, 2022. At the time, however, FPA had temporarily suspended abortion services in Arizona due to the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, and because of the related uncertainty surrounding the legality of abortion in Arizona. FPA has recently restarted providing abortion care up to 16 weeks after a patient's last menstrual period ("LMP").

4.      Now that FPA has resumed providing care, because of the uncertainty about what abortion care the Reason Scheme prohibits and the threat of severe penalties, just as I feared in my first declaration, I am now forced to err on the side of caution and deny abortion care to any of my patients whom I know have a fetal diagnosis, even if that diagnosis could arguably fall within one of the exceptions. Isaacson Decl. ¶¶ 31-43.

5.      As an example, given the Reason Scheme's severe penalties, I fear that officials enforcing the Reason Scheme will interpret a patient's referral to FPA by a maternal-fetal medicine specialist ("MFM") or genetic counselor as evidence that I knew the patient was seeking abortion care because of a fetal diagnosis they received from the referring provider. Isaacson Decl. ¶ 46.  As a result, now that the Reason Scheme is in effect, I am afraid to provide abortion care to patients referred to me or to FPA by an MFM or genetic counselor. *Id.*

6.      I am therefore unable to work with MFMs and genetic counselors to collaboratively and compassionately care for patients with fetal diagnoses, and to ensure they receive the medical care and information that enables them to make the best decision

2

for their unique circumstances. This will undoubtedly result in some patients with fetal diagnoses being denied abortion care in Arizona altogether, and other patients being delayed in receiving care or otherwise receiving less complete care that would have been available before the Reason Scheme went into effect.

7.      Although I believe it will be extremely difficult for me or my medical staff to avoid discovering that some patients have fetal diagnoses and inferring that those patients are seeking an abortion due to a fetal diagnosis, *see* Isaacson Decl. ¶¶ 44-63, I fear the Reason Scheme will discourage some patients from engaging in open and honest communication with me and my staff about their medical diagnoses and options, lest by doing so they are unable to receive an abortion.

8.      If the Reason Scheme remains in effect, I am very concerned that my communication with my patients and other providers will be impaired, to the detriment of patient care.

9.      Prior to the decision in *Dobbs*, FPA was the foremost medical practice in Arizona providing care to patients referred by other physicians and who were seeking abortion care because of medical indications, including following a diagnosis of a fetal condition. Our practice received significantly more of these referrals than other abortion providers. Now that the Reason Scheme is in effect and FPA has resumed providing services, I expect that we will once again encounter patients who we know or will discover through the circumstances of their care have received a fetal diagnosis.

10.     I understand that a 15-week abortion ban is set to go into effect in late September, but even after that law takes effect, the Reason Scheme will continue to impact

3

the care I am able to provide. Even before 15 weeks, there are numerous screening and diagnostic tests that could indicate the potential for or diagnose a fetal genetic condition.

Pursuant to 28 U.S.C. § 1746, I hereby declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated this 26th day of August, 2022.

Paul A. Isaacson, M.D.

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A Isaacson, et al., | No. CV-21-01417-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Mark Brnovich, et al., | |
| Defendants. | |

Plaintiffs are Drs. Paul Isaacson and Eric Reuss, obstetrician and gynecologists ("OB/GYNs") who provide abortion care in Arizona; the National Council of Jewish Women (Arizona Section), Inc. ("NCJW AZ"), and the Arizona National Organization of Women ("AZ NOW"), which are non-profit organizations that, among other things, support and advocate for reproductive rights and care; and the Arizona Medical Association. (Doc. 1 ¶¶ 13-16, 18.)[1]  At issue is Plaintiffs' motion for a preliminary injunction (Doc. 10), which is fully briefed (Docs. 46, 48).  The parties agreed that an evidentiary hearing is unnecessary and that the Court could resolve Plaintiffs' motion based on the evidence submitted with the briefs.  (Doc. 18 ¶ 4(c).)  This evidence consists of declarations from Drs. Isaacson and Reuss, Dr. Katherine Glaser (another OB/GYN who offers abortion services in Arizona), AZ NOW State Political Action Coordinator Dianne

---

[1] Except for citations to the oral argument transcript, record citations refer to the docket and page numbers in the Court's Case Management/Electronic Case Files ("CM/ECF") system.

Post, NCJW AZ President Civia Tamarkin, Arizona Medical Association President Dr. Miriam Anand, and Steven Baily, Chief of the Bureau of Public Health Statistics at the Arizona Department of Health Services ("ADHS"), along with a copy of ADHS's 2019 "Abortions in Arizona" report.  (Docs. 10-2 and 46-1.)  The Court heard oral argument telephonically on September 22, 2021.  (Doc. 49.)  Having considered the parties' briefs, evidence, and presentations at oral argument, the Court will grant Plaintiffs' motion in part and deny it in part.

## BACKGROUND

In April 2021, Arizona enacted Senate Bill 1457, which makes changes to Arizona's laws governing abortion and is scheduled to take effect on September 29, 2021.  S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) (hereinafter "the Act").  On August 17, 2021, Plaintiffs filed this lawsuit against Arizona officials charged with implementing and enforcing the Act.[2]  (Doc. 1.)  Plaintiffs challenge five sections of the Act: §§ 1, 2, 10, 11, and 13.

Section 1 of the Act provides:

> A. The laws of this state shall be interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of this state, subject only to the constitution of the United States and decisional interpretations thereof by the United States [S]upreme [C]ourt.
>
> B. This section does not create a cause of action against:
>
> 1. A person who performs in vitro fertilization procedures as authorized under the laws of this state.

---

[2] Defendants are Arizona Attorney General Mark Brnovich; Michael Whiting, Brian McIntyre, William Ring, Bradley Beauchamp, Scott Bennett, Jeremy Ford, Tony Rogers, Allister Adel, Matthew Smith, Brad Carlyon, Laura Conover, Kent Volkmer, George Silva, Sheila Polk, and Jon Smith, who are the County Attorneys for Arizona's fifteen counties; the Arizona Medical Board ("AMB"); Patricia McSorely, Executive Director of the AMB; AMB members R. Screven Farmer, James Gillard, Lois Krahn, Jodi Bain, Bruce Bethancourt, David Beyer, Laura Dorrell, Gary Figge, Pamela Jones, and Eileen Oswald; ADHS; and Don Herrington, Interim Director of ADHS.  (Doc. 1 ¶¶ 20-26; Doc. 47.)  By stipulation of the parties, the Court excused the County Attorneys from participating in this matter and designated Attorney General Brnovich as the single representative responsible for coordinating arguments on behalf of all Defendants.  (Doc. 36.)

      2. A woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.

      C. For the purposes of this section, "unborn child" has the same meaning prescribed in section 36-2151.

Act § 1; A.R.S. § 1-219.[3]  The Court will refer to § 1 of the Act as the "Interpretation Policy."

      Section 2 of the Act amends A.R.S. § 13-3603.02 to provide that, "[e]xcept in a medical emergency," a person who "[p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" is guilty of a class 6 felony, and a person who knowingly "[s]olicits or accepts monies to finance . . . an abortion because of a genetic abnormality of the child" is guilty of a class 3 felony.[4]  Act § 2; A.R.S. § 13-3603.02(A)(2), (B)(2).[5]  The Court will refer to the former as the "Performance Provision," the latter as the "Solicitation Provision," and the two collectively as the "Criminal Liability Provisions."  The penalties for a class 6 felony include imprisonment of up to two years; for a class 3 felony they include imprisonment of up to 8.75 years.  A.R.S. § 13-702(D).  In addition to criminal penalties, those who violate these provisions could face civil liability.  Specifically, "[t]he father of the unborn child who is married to the mother at the time she receives . . . an abortion because of a genetic abnormality of the child, or, if the mother has not attained eighteen years of age at the time of the abortion, a maternal grandparent of the unborn child, may bring a civil action on behalf of the unborn

      [3] Plaintiffs refer to those who are pregnant as "pregnant people."  (See, e.g., Doc. 10 at 8.)  This gender-neutral term reflects the reality that not all people who become pregnant, seek abortion care, or have children identify as women.  Arizona's statutes and the judicial decisions that the Court will be discussing in this order refer to pregnant people as women and use feminine pronouns.  To avoid confusion, the Court will do the same in this order.  The Court's intent, however, is not to ignore or write off trans and non-binary people who experience pregnancy.

      [4]Since 2011, Arizona law has included similar prohibitions with respect to race- and sex-selective abortions.  See A.R.S. § 13-3603.02(A) (Effective July 20, 2011).  Plaintiffs do not challenge the race and sex provisions.

      [5] Section 2 of the Act also provides that a person who "[u]ses force or the threat of force to intentionally injure or intimidate any person for the purpose of coercing . . . an abortion because of a genetic abnormality of the child" is guilty of a class 3 felony.  Act § 2; A.R.S. § 13-3603.02(B)(1).  Plaintiffs do not discuss this portion of the Act in their complaint or preliminary injunction motion.  The Court therefore does not consider this portion of the Act to be at issue and does not address it further.

child to obtain appropriate relief with respect to a violation of" the Criminal Liability Provisions. Act § 2; A.R.S. § 13-3603.02(D). Further, "[a] physician, physician's assistant, nurse, counselor, or other medical or mental health professional who knowingly does not report known violations . . . to appropriate law enforcement authorities" is subject to a civil fine of up to $10,000. Act § 2; A.R.S. § 13-3603.02(E). Although § 2 creates the potential for criminal and civil liability for someone performing, accepting money to finance, or failing to report the performance of an abortion because of a fetal genetic abnormality, a woman who receives an abortion because of a fetal genetic abnormality is not subject to civil or criminal liability for any violation. Act § 2; A.R.S. § 13-3603.02(F).

Section 10 of the Act amends A.R.S. § 36-2157 to prohibit a person from knowingly performing or inducing an abortion without first executing an affidavit stating the abortion is not being performed "because of a genetic abnormality of the child" and that the affiant "has no knowledge that the child to be aborted is being aborted . . . because of a genetic abnormality of the child." Act § 10; A.R.S. § 36-2157(A)(1).[6] The Court will refer to this as the "Affidavit Provision."

Section 11 of the Act amends A.R.S. § 36-2158, an informed consent statute that lists information a provider must tell a patient before the provider can perform an abortion. As relevant here, "[i]n the case of a woman seeking an abortion of her unborn child diagnosed with a nonlethal fetal condition," § 11 of the Act requires providers to tell such patients that § 2 of the Act "prohibits abortion . . . because of a genetic abnormality." Act § 11; A.R.S. § 3602158(A)(2)(d). The Court will refer to this as the "Notification Provision."

Finally, as relevant here, § 13 of the Act amends A.R.S. § 36-2161 by adding to a list of information that doctors performing abortions must report to ADHS the following: "Whether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing, such as maternal serum tests, or by ultrasound, such as

---

[6] Since 2011, Arizona law has imposed a similar affidavit requirement with respect to race- and sex-selective abortions. *See* A.R.S. § 36-2157 (Effective July 20, 2011). Plaintiffs do not challenge this pre-existing requirement.

1    nuchal translucency screening, or by other forms of testing."  Act § 13; A.R.S. § 36-

2    2161(A)(25).  The Court will refer to this as the "Reporting Provision," and will refer to

3    the challenged portions of §§ 2, 10, 11, and 13 of the Act collectively as the "Reason

4    Regulations."

5         Plaintiffs move to preliminarily enjoin Defendants from enforcing the Interpretation

6    Policy and the Reason Regulations.  (Doc. 10.)  They argue that the Interpretation Policy

7    is unconstitutionally vague, and that the Reason Regulations (1) violate the rights of

8    women to terminate pre-viability pregnancies,[7] (2) are unconstitutionally vague, and (3)

9    unconstitutionally pit First Amendment rights against abortion rights by forcing women to

10   sacrifice open and honest communication with their medical providers in order to exercise

11   their rights to terminate pre-viability pregnancies.

12                          **LEGAL STANDARD**

13        To obtain a preliminary injunction, a plaintiff must show (1) a likelihood of success

14   on the merits, (2) a likelihood that irreparable harm will occur in the absence of preliminary

15   relief, (3) a balance of equities that favors a preliminary injunction, and (4) that the

16   requested injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555

17   U.S. 7, 20 (2008).  These elements can be balanced on a sliding scale, with a stronger

18   showing of one element offsetting a weaker showing of another, although all factors still

19   must be satisfied.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1134-

20   35 (9th Cir. 2011).  A preliminary injunction order does not conclusively resolve the factual

21   and legal issues in a case.  Parties typically seek preliminary injunctions early in litigation.

22   An order on a preliminary injunction motion reflects a court's best predictive judgment—

23   often reached under tight time constraints and with imperfect or incomplete information—

24   of the probability that a plaintiff ultimately will prevail on the merits.  Even when a court

25   grants a preliminary injunction, it remains possible that new facts or an intervening change

26   or clarification of law might lead to a different result later on.  A preliminary injunction

27

28   _____

          [7] Because Arizona law already prohibits post-viability abortions, A.R.S. § 36-
     2301.01(A), these restrictions will only ever apply to pre-viability abortions.

- 5 -

merely preserves the status quo in order to avoid harm while litigation is pending.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

**ANALYSIS**

### I.    The Interpretation Policy

Plaintiffs urge the Court to preliminarily enjoin enforcement of the Interpretation Policy because, in their view, it is unconstitutionally vague.  (Doc. 10 at 25.)

"The void-for-vagueness doctrine is primarily a criminal doctrine."  *Griffin v. Bryant*, 30 F.Supp.3d 1139, 1173 (D.N.M. 2014).  The doctrine is rooted in the Due Process clauses of the Fifth and Fourteenth Amendments, the former applying to the Federal Government and the latter to the states.  *Johnson v. U.S.*, 576 U.S. 591, 595 (2015); *Kolender v. Lawson*, 461 U.S. 352, 353 (1983).  The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  A state violates due process of law "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement," *Johnson*, 576 U.S. at 595.

A criminal statute violates the "fair notice" requirement if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," and violates the "arbitrary enforcement" requirement if it is "so indefinite that it encourages arbitrary and erratic arrests and convictions."  *Colautti v. Franklin*, 439 U.S. 379, 390, (1979) (internal quotations and citations omitted).  "In other words, ordinary notions of fair play and the settled rules of law are violated if police officers, prosecutors, and judges are essentially defining crimes and fixing penalties by filling statutory gaps so large that doing so becomes essentially legislative."  *Knox v. Brnovich*, 907 F.3d 1167, 1182 (9th Cir. 2018) (internal quotations and citations omitted).  "These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences." *Johnson*, 576 U.S. at 596.

Non-penal statutes, even when vague by the standards applied to criminal laws, ordinarily are not struck down for vagueness. *See Griffin*, 30 F.Supp.3d at 1174. "To find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'" *Seniors Civil Liberties Ass'n, Inc. v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)).

The Interpretation Policy is neither a penal statute nor a civil regulatory provision. It is a directive that all other provisions of Arizona law be interpreted in a certain manner. Plaintiffs acknowledge this. They argue that the Interpretation Policy "alters the meaning of *other* provisions of the Arizona Revised Statutes," (Doc. 10 at 25 (emphasis in original)), "render[ing] numerous criminal and civil provisions of Arizona law impermissibly vague and subject to arbitrary enforcement," (*id.* at 26), and "creating vast uncertainty for physicians and pregnant patients about what actions give rise to criminal and civil liability under numerous sections of the Arizona Code," (*id.* at 28). But Plaintiffs do not challenge the specific statutes that they believe will become vague; they challenge the interpretive rule that would, in their view, render vast swaths of Arizona law vague if applied by law enforcement agencies, prosecutors, courts, juries, and regulators.

The most useful guidance for addressing Plaintiffs' challenge to the Interpretation Provision is the Supreme Court's decision in *Webster v. Reproductive Health Services*, 492 U.S. 490 (1989). In that case, a group of health care professionals brought a facial constitutional challenge to, among other provisions, a section of Missouri law that read:

> 1. The general assembly of this state finds that:
>
> (1) The life of each human being begins at conception;
>
> (2) Unborn children have protectable interests in life, health, and well-being;
>
> (3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child.
>
> 2. Effective January 1, 1988, the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, subject only to the Constitution of

- 7 -

the United States, and decisional interpretations thereof by the United States Supreme Court and specific provisions to the contrary in the statutes and constitution of this state.

3. As used in this section, the term "unborn children" or "unborn child" shall include all unborn child or children or the offspring of human beings from the moment of conception until birth at every stage of biological development.

4. Nothing in this section shall be interpreted as creating a cause of action against a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.

Mo. Rev. Stat. § 1.205.1. The Supreme Court, however, refused to entertain the constitutional challenge, finding that this provision could fairly be read as a preamble—inoperative precatory language—expressing a value judgment favoring childbirth over abortion. *Webster*, 492 U.S. at 506. Besides, the Supreme Court explained that "the extent to which the preamble's language might be used to interpret other state statutes or regulations is something that only the courts of Missouri can definitively decide." *Id.* The Supreme Court did not foreclose the possibility that a federal court could address the preamble "should it be applied to restrict the activities" of the plaintiffs "in some concrete way." *Id.* But until then, the Supreme Court concluded it lacked power to decide whether the preamble's directive was unconstitutional. *Id.* at 506-07.

The language in the Missouri law at issue in *Webster* should sound familiar; it is substantially and materially similar to the Interpretation Policy challenged here. As such, Plaintiffs' facial challenge to the Interpretation Policy likely will meet the same fate when the Court enters its final order on the merits. Whether and to what extent the Interpretation Policy might be used to interpret other provisions of Arizona law is something that Arizona courts must decide in the first instance. And if a particular application of the Interpretation Policy restricts Plaintiffs' activities "in some concrete way," the federal courts stand ready to address any constitutional challenges as to that specific application. But this Court is not positioned to decide "abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it." *Webster*, 492 U.S. at 507.

- 8 -

1    Because Plaintiffs have not shown a likelihood that their pre-enforcement facial

2    challenge to Arizona's Interpretation Policy will meet a different fate than the facial

3    challenge to Missouri's similar provision, the Court need not address the remaining

4    preliminary injunction factors.  Plaintiffs' motion to preliminarily enjoin the Interpretation

5    Policy is denied.

6    **II.    The Reason Regulations**

7       **A. Likelihood of Success on the Merits**

8       Plaintiffs are likely to succeed on their claims that the Reason Regulations are

9    unconstitutionally vague and unduly burden the rights of women to terminate pre-viability

10   pregnancies.  Because these are sufficient grounds to grant preliminary relief, the Court

11   does not address Plaintiffs' claim that the Reason Regulations unconstitutionally pit

12   patients' First Amendment rights against their rights to terminate pre-viability pregnancies.

13              **1.  Vagueness**

14      Plaintiffs assert a pre-enforcement facial vagueness challenge to the Criminal

15   Liability, Affidavit, and Reporting Provisions.[8]   As a preliminary matter, however,

16   Defendants argue that Plaintiffs' vagueness challenge is not ripe, "fails if a statute is clear

17   in even one application and does not succeed merely because its application is unclear in

18   other situations." (Doc. 46 at 18-19.)  The Court disagrees.

19      Ordinarily, a plaintiff mounting a facial vagueness challenge must establish that "no

20   set of circumstances exists under which the statute would be valid."  *United States v.*

21   *Salerno*, 481 U.S. 739, 745 (1987).  If a statute could clearly be applied in at least some

22   circumstances, a plaintiff cannot challenge it facially; instead, a plaintiff would need to

23   challenge particular applications of the statute as they arise.  *See Easyriders Freedom*

24   *F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1493-94 (9th Cir. 1996) ("Where a law at issue does

25   not implicate First Amendment rights, it may be challenged for vagueness only as applied,

26   unless the enactment is impermissibly vague in all of its applications." (internal quotations

27   and citations omitted)).

28   _____
     [8] Plaintiffs reference the Notification Provision in their vagueness analysis, but only
     to highlight the vagueness in the other provisions.  (Doc. 10 at 24.)

1      In 2018, however, the Ninth Circuit concluded that the Supreme Court in *Johnson*
2 and *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018) "expressly rejected the notion that a
3 statutory provision survives a facial vagueness challenge merely because some conduct
4 clearly falls within the statute's scope." *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir.
5 2018). The Ninth Circuit narrowed this holding a year later in *Kashem v. Barr*, 941 F.3d
6 358 (9th Cir. 2019). In that case, the Ninth Circuit clarified that it remains the rule that "a
7 litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial
8 vagueness challenge." *Id.* at 375. The Ninth Circuit characterized *Johnson* and *Dimaya*
9 as articulating an exception to that rule, applicable under "exceptional circumstances," such
10 as when a statue is "plagued by such indeterminacy that [it] might be vague even as applied
11 to the challengers." *Id.* at 377. As detailed in the merits discussion below, the Court finds
12 that the Criminal Liability, Affidavit, and Reporting Provisions are so plagued.

13      Moreover, the Ninth Circuit has held that *Salerno*'s "no set of facts" test does not
14 apply in the context of undue burden challenges to abortion regulations. *See Planned*
15 *Parenthood of S. Ariz. v. Lawall*, 180 F.3d 1022, 1027 (9th Cir. 1999). Plaintiffs raise an
16 undue burden claim here, and part of that analysis rests on the premise that the vagueness
17 of the Criminal Liability, Affidavit, and Reporting Provisions will chill providers from
18 offering abortions to patients who have received genetic testing results that reveal a fetal
19 genetic abnormality, thereby making it appreciably more difficult for such patients to
20 exercise their rights to terminate pre-viability pregnancies. Plaintiffs' vagueness and undue
21 burden claims therefore are intertwined and precluding Plaintiffs from raising a facial
22 vagueness challenge would impede their ability to meaningfully advance their facial undue
23 burden claim, which is not subject to such a high bar. This interconnectedness is, in the
24 Court's view, an "exceptional circumstance" that justifies application of the more lenient
25 rule recognized in *Johnson* and *Dimaya*.

26      Having concluded that Plaintiffs' vagueness challenge is ripe, the Court will move
27 on to its merits.

28

- 10 -

As a refresher, the Criminal Liability Provisions make it a felony for any person to perform an abortion "knowing that the abortion is sought solely because of a genetic abnormality of the child" or to knowingly solicit or accept money to finance "an abortion because of a genetic abnormality of the child." Act § 2; A.R.S. §§ 13-3603.02(A)(2), (B)(2). The Affidavit Provision prohibits a person from knowingly performing or inducing an abortion without first executing an affidavit stating the abortion is not being performed "because of a genetic abnormality of the child" and that the affiant "has no knowledge that the child to be aborted is being aborted . . . because of a genetic abnormality of the child." Act § 10; A.R.S. § 36-2157(A)(1). And the Reporting Provision requires doctors performing abortions to report to ADHS "[w]hether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing, such as maternal serum tests, or by ultrasound, such as nuchal translucency screening, or by other forms of testing." Act § 13; A.R.S. § 36-2161(A)(25). Although the Affidavit and Reporting Provisions do not, themselves, impose criminal penalties, the Arizona Medical Board is authorized to investigate whether any doctor has "violat[ed] any federal or state laws, rules or regulations applicable to the practice of medicine," A.R.S. § 32-1401(27)(a), and to discipline doctors based on those findings, including by suspending or revoking a doctor's license and imposing civil penalties, A.R.S. §§ 32-1403(A)(5), 32-1403.01(A), 32-1451(D)-(E), (I), (K). Thus, violations of these provisions can result in the deprivation of a doctor's liberty or property.

These provisions likely are unconstitutionally vague for three reasons.

First, Arizona law does not offer workable guidance about which fetal conditions bring abortion care within the scope of these provisions. Section 2 of the Act defines "genetic abnormality" as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression," except that it "[d]oes not include a lethal fetal condition." Act § 2; A.R.S. § 13-3603.02(G)(2). Elsewhere, Arizona law defines "lethal fetal condition" as "a fetal condition that is diagnosed before

- 11 -

birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth."  A.R.S. § 36-2158(G)(1).  The evidence shows, however, that there can be considerable uncertainty as to whether a fetal condition exists, has a genetic cause, or will result in death within three months after birth.

The process for detecting and diagnosing a fetal genetic condition unfolds over time. (Doc. 10-2 at 6 ¶ 18.)  The two principal dimensions of this process are screening and diagnosis.  Screening tests provide information that helps gauge the probability that a genetic abnormality might be present, and diagnostic tests attempt to determine whether a specific genetic abnormality or condition is present.  Each comes with its own uncertainties and limitations.  (*Id.* at 7 ¶ 21.)

Testing commonly occurs for chromosomal anomalies (such as Down Syndrome), single-gene disorders (such as sickle cell anemia and cystic fibrosis), and isolated structural anomalies (such as spina bifida).  (*Id.* at 8 ¶¶ 23-26.)  Of the three, isolated structural anomalies are the most common, but their causes are not always clear.  They may result from multiple genes, infectious diseases, environmental factors, or other causes, which means the presence of an isolated structural anomaly is not always and necessarily the result of a genetic abnormality.  (*Id.* at 8 ¶ 26.)  Cell-free DNA testing is commonly used to screen for chromosomal anomalies, but such tests are not infallible; they can produce false-positives, false-negatives, or uninterpretable results.  (*Id.* at 11 ¶ 33.)  Moreover, cell-free DNA testing is a screening test, not a diagnostic test.  Diagnostic testing requires the direct collection of placental or fetal cells, either through Chorionic Villus Sampling ("CVS") or amniocentesis.  (*Id.* at 11 ¶ 35.)  Because these procedures carry risks, not all patients decide to proceed with them, meaning some patients might receive positive genetic screening results but not receive diagnostic testing.  (*Id.*)  And because of the uncertainties and limitations inherent in genetic screening and diagnostic testing, it is not always clear whether a condition has a genetic or solely genetic cause.  (*Id.* at 39 ¶ 33.)  It also is unclear at what point in this screening and diagnostic process one can be said to know or to have detected that such a condition is present.  (*Id.* at 18-19 ¶¶ 68-70; 39-40 ¶¶ 34-35.)  What's

- 12 -

more, there can be considerable uncertainty as to how long a child born with a genetic anomaly may live, making it difficult for a doctor to know whether a particular fetal genetic abnormality or condition qualifies as a "lethal fetal condition" under Arizona law. (*Id.* at 10 ¶ 31; 40-42 ¶¶ 37-42.) Given these uncertainties, the Criminal Liability, Affidavit, and Reporting Provisions produce a result just as vague as prohibiting abortions after delivering "a substantial portion" of the fetus; "doctors might question" what amounts to a genetic abnormality, *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007).

Second, although scienter requirements ordinarily alleviate vagueness concerns, *see id.*, the "knowingly" *mens rea* requirement in the Criminal Liability and Affidavit Provisions present special difficulties here. Arizona law defines "knowingly" to mean "that a person is aware or believes that the person's conduct is of that nature or that the circumstance exists." A.R.S. § 13-105(10)(b). It is unclear at what point in the multidimensional screening and diagnostic process a doctor can be deemed to be "aware" or "believe" that a fetal genetic abnormality exists. More troubling, however, is that "the distinct wording of this law requires that a doctor know the motivations underlying the action of another person to avoid prosecution, while simultaneously evaluating whether the decision is because of that subjective knowledge." *Memphis Ctr. for Reproductive Health v. Slatery*, No. 20-5969, 2021 WL 4127691, at *14 (6th Cir. 2021) (internal quotations and citation omitted).

At what point can a doctor be deemed to "know" or "believe" what is in the mind of a patient? Drs. Reuss and Isaacson detail myriad ways in which they can and often do infer a patient's motive for terminating a pregnancy, even though the patient might not have explicitly disclosed that information. For example, sometimes a patient who initially reacted to a positive pregnancy test with excitement will suddenly decide to terminate a pregnancy after receiving abnormal genetic test results, or a patient who volunteered no initial reaction to the pregnancy nonetheless schedules an abortion immediately after receiving and discussing genetic test results; sometimes a patient is referred for an abortion shortly after receiving genetic screening or diagnostic results; and sometimes a patient

- 13 -

1    receiving an abortion after receiving genetic test results asks how quickly after the

2    procedure she can get pregnant, indicating that she wants to carry a pregnancy to term, just

3    not this one.  (Doc. 10-2 at 13 ¶ 44; 20 ¶ 73; 35 ¶ 18; 43-44 ¶¶ 48-49.)  In these scenarios,

4    Drs. Reuss and Isaacson state it is often impossible to avoid inferring or believing that the

5    patient is seeking to terminate the pregnancy because of the abnormal genetic test results.

6        Together, the squishy "genetic abnormality" threshold and expansive scienter

7    render the Criminal Liability, Affidavit, and Reporting Provisions vaguer than the

8    challenged law in *Gonzales*.  The law there prohibited doctors from "deliberately and

9    intentionally" aborting a fetus that was delivered to a clear anatomical landmark.  *Gonzales*,

10   550 U.S. at 149.  The Supreme Court rejected a void-for-vagueness challenge because the

11   law "sets forth relatively clear guidelines as to prohibited conduct and provides objective

12   criteria to evaluate whether a doctor has performed a prohibited procedure."  *Id.* (internal

13   quotations and citation omitted).  Arizona's definition of "genetic abnormality" does not

14   amount to an objective criterion, and the "knowingly" *mens rea* injects an extra dose of

15   vagueness because it applies to the subjective motivations of another individual, even if

16   not directly expressed.

17       This problem is exacerbated by the reality that the decision to terminate a pregnancy

18   is a complex one, and often is motivated by a variety of considerations, some of which are

19   inextricably intertwined with the detection of a fetal genetic abnormality.  For example,

20   patients sometimes report that they are terminating a pregnancy because they lack the

21   financial, emotional, family, or community support to raise a child with special and

22   sometimes challenging needs.  (Doc. 10-2 at 14-15 ¶¶ 47, 49; 45 ¶ 51.)  Can a doctor faced

23   with such information truthfully execute the affidavit that § 10 of the Act requires?  If a

24   doctor accepts money to finance such an abortion, as both Drs. Isaacson and Reuss do (*id.*

25   at 5 ¶ 15; 16 ¶ 57; 33 ¶ 7), can that doctor face felony prosecution or a civil lawsuit?

26       Defendants' counterarguments do not assuage these concerns.  Defendants note, for

27   example, that § 2's Performance Provision limits criminal liability to those who perform

28   abortions knowing that the abortion is sought *solely* because of a fetal genetic abnormality.

- 14 -

(Doc. 46 at 7; Oral Argument Tr. at 79.) But the word solely does not appear in the Solicitation Provision, which criminalizes the acceptance of money to finance such an abortion, nor in the Affidavit Provision.[9] Moreover, considering many providers accept money for their services (for example, from the patient directly or an insurer), it appears likely that liability under the Solicitation Provision would eclipse liability under the Performance Provision in most circumstances.

Defendants also appear to take the position, both in their brief and during oral argument, that the knowledge requirement in these provisions will be satisfied only if the patient explicitly discloses her motive. (Doc. 46 at 13; Oral Argument Tr. 79.) But this position is irreconcilable with Arizona's much broader definition of knowledge, and with the reality that knowledge can be and most often is proven through circumstantial, rather than direct, evidence. *See State v. Noriega*, 928 P.2d 706, 710 (Ariz. Ct. App. 1996) ("[T]he defendant's mental state will rarely be provable by direct evidence and the jury will usually have to infer it from his behaviors and other circumstances surrounding the event."). Drs. Reuss and Isaacson describe many realistic scenarios in which surrounding circumstances could provide evidence of a provider's "knowledge" that a patient sought an abortion because of a fetal genetic abnormality—likely sufficient to establish a *prima facie* case for criminal or civil liability—even though a patient did not explicitly state that was her motive. If Arizona wanted liability to attach only when the patient directly informs her provider that a fetal genetic abnormality is her sole motive for seeking to terminate a pregnancy, it could and should have written that narrower language into the law. What Arizona cannot do is rely on the discretion of "police officers, prosecutors, and judges" to

---

[9] At oral argument, Defendants suggested that the Court could, under the canon of constitutional avoidance, read the word "solely" into these provisions to avoid a constitutional problem. (Oral Argument Tr. at 48.) But "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them." *Clark v. Martinez*, 543 U.S. 371, 385 (2005) (emphasis omitted). The phrase "because of" is not reasonably susceptible to the construction "solely because of." *See Bostock v. Clayton Cty.*, 140 S.Ct. 1731, 1739 (2020) (noting that if Congress intended "because of" to mean "solely because of" in Title VII, it could and should have added it).

1    essentially define the crimes that Arizona's legislature has created.  *See Knox*, 907 F.3d at

2    1182.

3          Third, and finally, these same uncertainties fall upon the host of Arizonans who,

4    while not directly performing abortions, nonetheless help patients access such care in two

5    ways.  First, health professionals who fail to report known violations of the Criminal

6    Liability Provisions are subject to a fine of up to $10,000.  Act § 2; A.R.S. § 13-3603.02(E).

7    Second, Arizona law provides for both accomplice and facilitation liability, potentially

8    implicating those who refer a patient to an abortion provider knowing that the patient has

9    decided to terminate her pregnancy because of a fetal genetic abnormality, and that such

10   motive easily will be inferred by the new doctor.  A.R.S. §§ 13-301, -303.

11         These three defects conspire to deprive those of ordinary intelligence fair notice of

12   what conduct is forbidden.  Indeed, Drs. Isaacson, Reuss, and Glaser all declared that they

13   are uncertain how to comply with these new provisions.  (Doc. 10-2 at 17 ¶ 65; 27 ¶ 16; 42

14   ¶ 43.)  These defects also render the Criminal Liability, Affidavit, and Reporting Provisions

15   susceptible to arbitrary enforcement.[10]  As such, these provisions likely are

16   unconstitutionally vague.  *See Memphis Ctr. for Reproductive Health*, 2021 WL 4127691,

17   at *17 (6th Cir. 2021) (concluding that similar prohibitions under Tennessee law were

18   likely unconstitutionally vague).

19              **2.  Undue Burden**

20         Plaintiffs further contend that the Reason Regulations violate the rights of women

21   to terminate pre-viability pregnancies.  "A woman has a constitutional right to choose to

22   terminate her pregnancy before the fetus is viable without undue interference by the state."

23   *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013) (citing *Planned Parenthood v.*

24         [10] Defendants argue that, despite being on the books for years, Plaintiffs have

25   identified no instances of arbitrary enforcement of Arizona's similar, pre-existing
      provisions applicable to race- and sex-selective abortions.  (Doc. 46 at 21 n.11.)  At oral
      argument, however, Plaintiffs explained that they are unaware of any instances in which a

26   patient has sought such an abortion.  (Oral Argument Tr. at 11.)  It should come as no
      surprise that a provision penalizing conduct that rarely if ever occurs does not have a

27   history of arbitrary enforcement.  In contrast, the record in this case indicates that, unlike
      race or sex, the presence of a fetal genetic anomaly is, for some patients, a factor that

28   informs their decision to terminate a pregnancy.  Moreover, a determination of race or sex
      is not plagued by as much uncertainty as is the detection of a fetal genetic abnormality.

- 16 -

*Casey*, 505 U.S. 833, 846 (1992)). "Before viability, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'" *Gonzales*, 550 U.S. at 146 (quoting *Casey*, 505 U.S. at 879). The Ninth Circuit has interpreted existing Supreme Court precedent as imposing a bright-line rule that a "state may not proscribe abortion before fetal viability." *Isaacson*, 716 F.3d at 1224. "A prohibition on the exercise of that right is *per se* unconstitutional. While the state may regulate the mode and manner of abortion prior to fetal viability, it may not proscribe a woman from electing abortion, nor may it impose an undue burden on her choice through regulation."[11] *Id.* at 1217.

Plaintiffs argue principally that the Reason Regulations fall within the scope of this bright-line rule by "prohibiting abortions in cases with fetal diagnoses and thus banning previability abortion for an entire group of pregnant people[.]" (Doc. 10 at 17.) The Court disagrees. The Reason Regulations do not ban women from terminating pre-viability pregnancies because of a fetal genetic abnormality; they prohibit providers from performing such abortions if they know the patient's motive.[12] *See Preterm-Cleveland v. McCloud*, 994 F.3d 512, 521 (6th Cir. 2021) (en banc) (reaching similar conclusion regarding Ohio's restrictions on abortions performed because of a fetal Down Syndrome

[11] Defendants argue that there is no absolute right to terminate a pre-viability pregnancy for any reason whatsoever. (Doc. 46 at 10.) Defendants therefore contend that they are free to prohibit women from terminating a pregnancy for what Defendants characterize as "discriminatory reasons." (*Id.*) Defendants' position is incompatible with existing Supreme Court and Ninth Circuit precedent. The Supreme Court clearly held in *Casey* that "a State may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879 (emphasis added). Any woman means any woman, not any woman (except those who wish to terminate a pre-viability pregnancy for a reason the government finds objectionable). On this question, the Court is not writing on a blank slate. Both the Seventh and Eighth Circuits have concluded that a State may not prohibit a woman from choosing to terminate a pregnancy for a particular purpose. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 307 (7th Cir. 2018), *cert. denied in part and granted in part, judgment rev'd in part on other grounds sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019); *Little Rock Family Planning Servs. v. Rutledge*, 984 F.3d 682, 690 (8th Cir. 2021). And, as noted, the Ninth Circuit has held unequivocally that a state may not proscribe abortion pre-viability. *Isaacson*, 716 F.3d at 1226.
[12] The word "solely" in the Performance Provision has little relevance to the undue burden analysis because the word appears nowhere in the Affidavit Requirement, and providers may not proceed with an abortion without first executing and affidavit swearing no knowledge that the abortion is sought because of a fetal genetic abnormality. The Affidavit Requirement therefore precludes a provider from knowingly performing a mixed-motive abortion, so long as the presence of a genetic abnormality is at least one but-for cause.

- 17 -

diagnosis). As such, they regulate the mode and manner of abortion by requiring that a woman seeking an abortion because of a fetal genetic abnormality obtain the abortion from a provider who is unaware of her motive for terminating the pregnancy. Though this rule no doubt will shrink the pool of providers eligible to provide abortions to such women, it does not ban those women from choosing to terminate their pre-viability pregnancies or from receiving such an abortion from an eligible provider.[13] As such, the Reason Regulations are not *per se* unconstitutional.

But that does not end the inquiry. Although states may regulate the mode and manner of pre-viability abortion, they may not do so in a manner that imposes an undue burden on the woman's ultimate choice. *See Isaacson*, 716 F.3d at 1217. The determinative question, then, is whether the Reason Regulations likely will have the effect of unduly burdening this right.

In *Casey*, the Supreme Court held that "[a]n undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U.S. at 878. The Court elaborated:

> A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free

---

[13] The only hypothetical woman who would be "banned" from terminating a pre-viability pregnancy under the Reason Regulations is a woman who (1) wants to terminate a pregnancy because of a fetal genetic condition and (2) wants that procedure to be performed only by a provider who knows of the woman's motive. Plaintiffs offer no evidence that any such woman exists, and at oral argument they confirmed that they are not arguing there are women in Arizona who want to terminate their pre-viability pregnancies because of a fetal genetic abnormality but will do so only if they can also tell their doctors about their motives. (Oral Argument Tr. at 28-29.) Rightfully so. It strains credulity to believe that a woman who wants to terminate her pregnancy because of a fetal genetic abnormality would nonetheless choose to carry her unwanted pregnancy to term because the procedure cannot be performed by a doctor who knows of her motive for seeking the abortion. Regardless, even if this were Plaintiffs' position, they offer no support for the proposition that a limitation on the pool of eligible providers constitutes a *per se* unconstitutional ban, rather than a mode and manner regulation assessed under the undue burden standard. *But cf. Mazurek v. Armstrong*, 520 U.S. 968, 971 (1997) (analyzing Montana statute restricting performance of abortions to licensed physicians under the undue burden standard).

- 18 -

choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Id.* at 877. The Court added that "the State may enact regulations to further the health or safety of a woman seeking an abortion," but "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on that right." *Id.* at 878. Otherwise, a regulation that does not impose a substantial obstacle is permissible so long as it is reasonably related to a legitimate state interest. *See id.* at 877.

*Casey* also articulated the standard for facial challenges to abortion regulations. An abortion regulation is unconstitutional on its face if "it will operate as a substantial obstacle to a woman's choice to undergo an abortion" in "a large fraction of the cases in which [it] is relevant." *Id.* at 895. The denominator in this fraction is not all women, or even all women seeking abortions; it is those for whom the challenged law will operate as "an actual rather than an irrelevant restriction." *Id.* This fraction "is more conceptual than mathematical," *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006), meaning a court may make a qualitative judgment based on the evidence and common sense and need "not conduct a mathematical determination of the fraction," *Preterm-Cleveland*, 994 F.3d at 535.

The undue burden standard articulated in *Casey* does not contemplate balancing the benefits and burdens of a challenged law, save perhaps for the special case of health regulations, which requires a court to assess whether the regulations are unnecessary.[14] Instead, *Casey* sets out a clear rule: if a regulation has the purpose or effect of placing a substantial obstacle in the paths of women seeking pre-viability abortions, it is unconstitutional. Once a court determines that a statute has such a purpose or effect, there is no balancing left to be done because, regardless of whether a statute serves a valid state interest, "placing a substantial obstacle in the path of a woman's choice cannot be

---

[14] It is difficult to conceptualize how a court would determine the necessity of a health regulation without reference to its benefits.

- 19 -

considered a permissible means of serving its legitimate ends." *Casey,* 505 U.S. at 877. And if a statute does not present a substantial obstacle to a woman seeking to terminate a pre-viability pregnancy, then the statute is permissible so long as it is reasonably related to a legitimate state interest.

2016 marked a departure from this understanding. In *Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292 (2016), the Supreme Court enjoined Texas' admitting privileges and surgical center requirements for abortion providers, enacted ostensibly for health reasons. The Supreme Court held that "[t]he rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2309. In one sense, *Whole Women's Health*'s articulation of the undue burden standard is more protective of abortion rights than *Casey*'s because it subjects all state abortion regulations to a benefits-burdens balancing test. As such, under *Whole Women's Health*, a law that presents obstacles to pre-viability abortion that are more than *de minimis* but less than substantial might still impose an undue burden if the law's benefits are outweighed by its burdens. In another sense, however, *Whole Women's Health*'s rule is less protective than *Casey*'s because it leaves open the possibility that a law that presents a substantial obstacle to pre-viability abortion in objective, absolute terms might nonetheless be valid if its benefits are even more substantial than the obstacle it imposes. This is a door *Casey* had appeared to close.[15] *Casey*, 505 U.S. at 877.

The sands shifted yet again in 2020 with *June Medical Services LLC v. Russo*, 140 S.Ct. 2103 (2020), a fractured decision that enjoined a Louisiana admitting-privileges law similar to Texas', but which did not produce a majority opinion. The four-member *June Medical* plurality reaffirmed *Whole Women's Health*'s benefits-burdens balancing test and

---

[15] One plausible way to reconcile the two cases is to read *Whole Women's Health* purely as a health regulations case. As noted, *Casey* held that a state "may not impose unnecessary health regulations that present a substantial obstacle to a woman seeking an abortion," *Id.* at 837, and assessing whether a health regulation is necessary requires consideration of the regulation's benefits. Accordingly, it could be that *Whole Women's Health*'s benefits-burdens balancing test applies only when a court is tasked with assessing the necessity of a regulation enacted ostensibly for health reasons. However, this narrower reading of *Whole Women's Health* seems unlikely given the opinion's broad articulation of the standard.

used it to analyze the regulations at issue. *June Medical*, 140 S.Ct. at 2112-13 (plurality opinion). The Chief Justice provided the crucial fifth vote, concurring in the plurality opinion's judgment but not in its reasoning. The Chief Justice criticized *Whole Women's Health*'s benefits-burdens balancing test as inconsistent with *Casey*. *Id.* at 2136 (Roberts, C.J., concurring). In his view, so long as an abortion regulation is reasonably related to a valid state goal, "the only question for a court is whether [the] law has the effect of placing a substantial in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 2138 (internal quotations and citation omitted). The Chief Justice concurred with the plurality's judgment because, in his view, principles of *stare decisis* required him to treat like cases alike, and if the Texas admitting privileges requirement placed a substantial obstacle in the paths of women seeking pre-viability abortions in *Whole Women's Health*, the same must be true for the nearly identical requirement in Louisiana. *Id.* at 2141-42.

*June Medical*'s fractured decision has created uncertainty as to whose reading of *Casey*—the *June Medical* plurality's or the Chief Justice's—now controls. In *Marks v. United States*, the Supreme Court instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977) (internal quotations and citation omitted). Applying the *Marks* rule, three circuit courts have concluded that the Chief Justice's concurring opinion in *June Medical* controls because his vote was necessary to the judgment and was premised on a narrower rule (the presence of a substantial obstacle alone, as opposed to the presence of a substantial obstacle balanced against the challenged law's benefits). *See Whole Woman's Health v. Paxton*, 10 F.4th 430, 440-42 (5th Cir. 2021); *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 433 (6th Cir. 2020); *Hopkins v. Jegley*, 968 F.3d 912, 915 (8th Cir. 2020). One circuit court has reached the opposite conclusion, reasoning that the narrowest common denominator between the *June Medical* plurality opinion and the Chief Justice's concurrence is that *Whole Women's Health* is entitled to *stare decisis* effect, meaning lower

- 21 -

courts must continue to treat it as binding precedent. *See Planned Parenthood of Ind. and Ky., Inc. v. Box*, 991 F.3d 740, 748 (7th Cir. 2021).

"[T]he scope of *June Medical* and the effect of the concurrence has been controversial." *Id.* at 751. The Ninth Circuit has not yet weighed in on this question, and the parties have not briefed it here. Accordingly, out of caution, the Court will apply both tests, which lead to the same result.

### i. Substantial Obstacle

The Reason Regulations will have the effect of placing a substantial obstacle in the paths of a large fraction of women seeking pre-viability abortions. The denominator in this "large fraction" consists of women who wish to terminate a pre-viability pregnancy because of a fetal genetic abnormality. These are the women to whom the Reason Regulations will operate as an actual, rather than irrelevant, restriction. The Reason Regulations will substantially obstruct these women from making the ultimate choice to terminate their pregnancies.

The reason why is best understood by considering why Defendants believe the Reason Regulations will impose no undue burden. Defendants contend that a woman desiring a pre-viability abortion because of a fetal genetic abnormality can get one so long as she does not disclose her motive to her doctor. (Doc. 46 at 11-12.) They note that ADHS's 2019 report shows that 161 women reported the primary reason for obtaining an abortion was due to fetal health/medical considerations, and an additional 30 women reported "other" as their reason and then specified that their reason for obtaining an abortion was due to a genetic risk/fetal abnormality. (*Id.*; Doc. 46-1 at ¶ 10.) From this, Defendants infer that a woman will rarely explicitly disclose that she is seeking to terminate a pregnancy because of a fetal genetic abnormality. (Doc. 46 at 13.) And if she does disclose her motive, either intentionally or unintentionally, Defendants argue that she "can still obtain an abortion from another doctor who lacks the knowledge[.]" (*Id.*) The evidence, however, shows that this sort of doctor shopping will be easier said than done.

- 22 -

To begin, the Notification Provision will make it less likely that a woman who wants to terminate her pre-viability pregnancy because of a fetal genetic abnormality will know that she has the right to do so. The Notification Provision requires providers to tell such women that § 2 of the Act "prohibits abortion . . . because of a genetic abnormality." Act § 11; A.R.S. § 3602158(A)(2)(d). This, however, is a clear misstatement of the law, a fact Defendants acknowledged during oral argument. (Oral Argument Tr. at 51.) Nowhere does § 2 of the Act outright prohibit abortions because of a fetal genetic abnormality. The Criminal Liability Provisions do not prohibit women from receiving pre-viability abortions because of a fetal genetic abnormality, nor do they *per se* prohibit doctors from performing abortions for such women. Instead, the Criminal Liability Provisions prohibit a provider from performing such an abortion *if the provider knows the woman's motive*. Under no circumstance is the woman liable, and the woman remains free to receive such an abortion from a provider who is unaware of her motive.

The Notification Provision essentially requires providers to mislead their patients into believing that their constitutionally protected choice is unlawful. The only reasonable inference the Court can draw is that the purpose and intended effect of the Notification Provision is to make it less likely that a woman, though desiring to terminate her pregnancy because of a fetal genetic abnormality, will successfully exercise her right to do so.

Assuming a woman who wants to terminate her pregnancy because of a fetal genetic abnormality learns—in the face of state-mandated misinformation—that she has the right to do so, she then must find a provider who is both eligible and willing to perform the procedure. This will be a vexing task because such women are already choosing from a more limited pool of providers, and the chilling effect of the Reason Regulations will only make that pool smaller.

Very few Arizona providers offer abortion at the later stages of pregnancy, when certain fetal conditions are likely to be detected. (Doc. 10-2 at 34 ¶ 11.) According to Dr. Issacson, only a handful of doctors in the state provide abortion care after 16 weeks gestation, and only three medical practices in the state (including Dr. Isaacson's) regularly

- 23 -

provide abortion care up to 23 weeks, 6 days gestation. (*Id.* at 33 ¶ 5; 34 ¶ 11.) Fetal genetic screening and testing is a multidimensional process that can begin with screening tests as early as 10 weeks gestation and continue well beyond 16 weeks gestation. (*Id.* at 6 ¶ 18; 10 ¶ 32; 11 ¶ 36; 12 ¶ 38.) Consequently, at the point women receive a fetal genetic diagnosis, they likely will be at a stage of pregnancy for which there are relatively few doctors providing abortion care.

The Reason Regulations then remove from this pool any providers who are expressly informed of the patient's motive. Arizona law requires providers to collect and report information about abortions, including "the reason for the abortion[.]" A.R.S. § 36-2161(12). Although a patient may choose not to answer, ADHS figures indicate that some do (Doc. 46-1 at ¶ 10), so it is reasonable to expect that at least some providers clearly will be unable to serve particular patients because those patients will have expressly disclosed that they are seeking an abortion because of a fetal genetic abnormality.

More important, however, is the chilling effect the Reason Regulations will have on those providers who remain. Drs. Ruess and Isaacson have persuasively explained that it often will be difficult for providers to avoid the inference that a patient seeking an abortion soon after receiving abnormal genetic testing results is doing so at least in part because of those results. (Doc. 10-2 at 13 ¶ 44; 14 ¶ 46; 20 ¶ 73; 42-45 ¶¶ 44-50, 53.) Given Arizona's broad definition of knowledge and the vagueness of the Reason Regulations' criminal and civil liability provisions, Drs. Isaacson and Reuss avow that they will stop performing abortions out of fear of prosecution if the Reason Regulations take effect. (*Id.* at 18 ¶ 66; 40 ¶¶ 35-36; 42 ¶ 43.) The evidence, along with common sense, leads the Court to find it likely that many other providers in Arizona will be chilled from performing abortions whenever they have information from which they might infer that a fetal genetic abnormality is a reason why a patient is seeking to terminate a pregnancy. *See Casey*, 505 U.S. at 892 (reinforcing evidence with "what common sense would suggest"); *Whole Women's Health*, 136 S.Ct. at 2299 (viewing evidence in light of common sense). Thus,

- 24 -

1    the Reason Regulations will have the effect of drying up the supply of providers willing

2    and able to provide services to these women.

3         Moreover, such women are racing against a clock because Arizona law prohibits

4    post-viability abortions, A.R.S. § 36-2301.01(A), and viability usually occurs between 23-

5    and 24-weeks gestation, *Isaacson*, 716 F.3d at 1225. Fetal genetic abnormalities might not

6    be diagnosed until a woman nears that mark, and the time it takes her to do the sort of

7    doctor shopping suggested by Defendants could push her past viability. If the Reason

8    Regulations take effect, it is likely that women who wish to terminate their pregnancies

9    because of a fetal genetic abnormality will find it substantially more difficult to find willing

10   and eligible providers in time to exercise their rights.

11        For all these reasons, the Court finds that the Reason Regulations place a substantial

12   obstacle in the paths of women seeking to terminate their pre-viability pregnancies because

13   of a fetal genetic abnormality. Under the undue burden test articulated by the Chief Justice

14   in his *June Medical* concurrence, this finding means the Reason Regulations likely are

15   invalid.

16                            **ii.     Benefits**

17        Under *Whole Women's Health*, however, the Court is required to also consider the

18   Reason Regulations' goals and benefits. The Court will begin with the Arizona

19   legislature's findings and intent in enacting the Reason Regulations. Although the Court

20   must review legislative findings deferentially, it also must not place dispositive weigh on

21   them. *Whole Women's Health*, 136 S.Ct. at 2310. Instead, the Court has an independent

22   duty to review legislative factual findings when constitutional rights are at stake. *Id.*

23        According to § 15 of the Act:

24             The Legislature finds that prohibiting persons from performing
               abortions knowing that the abortion is sought because of a
25             genetic abnormality of the child advances at least three
               compelling state interests. First, this act protects the disability
26             community from discriminatory abortions, including for
               example Down-syndrome-selective abortions. The Legislature
27             finds that in the United States and abroad fetuses with Down
               syndrome are disproportionately targeted for abortions, with
28             between 61 percent and 91 percent choosing abortion when it
               is discovered on a prenatal test. *See Box v. Planned*

                                       - 25 -

*Parenthood of Indiana and Kentucky, Inc.*, 139 S. Ct. 1780, 1790-91 (2019) (Thomas, J., concurring). The Legislature intends to send an unambiguous message that children with genetic abnormalities, whether born or unborn, are equal in dignity and value to their peers without genetic abnormalities, born or unborn. Second, this act protects against coercive health care practices that encourage selective abortions of persons with genetic abnormalities. The Sixth Circuit Court of Appeals recently found that empirical reports from parents of children with Down syndrome attest that their doctors explicitly encouraged abortion or emphasized the challenges of raising children with Down syndrome, and there is medical literature to that effect. *See Preterm-Cleveland v. McCloud*, No. 18-3329, __ F.3d _, 2021 WL 1377279, at *2 (6th Cir. Apr. 13, 2021) (citing David A. Savitz, How Far Can Prenatal Screening Go in Preventing Birth Defects, 152 J. Of Pediatrics 3, 3 (2008) (arguing that "selective pregnancy terminations and reduced birth prevalence of Down syndrome is a desirable and attainable goal")). Third, this act protects the integrity and ethics of the medical profession by preventing doctors from becoming witting participants in genetic-abnormality-selective abortions. The Legislature finds that an industry that is associated with the view that some lives or potential lives are worth more than others is less likely to earn or retain the public's trust. All three of these purposes are also present for the similar prohibition in Arizona law on performing abortions knowing that the abortion is sought based on the sex or race of the child or the race of a parent of that child. The Legislature incorporates into its findings the statistics recently provided by this state and other states to the Supreme Court of the United States. *See* Brief of the States of Wisconsin et al. at pages 17-25, *Box v. Planned Parenthood of Indiana and Kentucky Inc.*, No. 18-483, 2018 WL 6042853, available at https://www.supremecourt.gov/DocketPDF/18/18–483/72184/20181115122354603_18–483%20Brief%20of%20States%20of%20Wisconsin%20et%20al%20Supporting%20Petitioners.pdf.

Act § 15; Note to A.R.S. § 13-3603.02.

The legislature's first goal—"to protect[] the disability community from discriminatory abortions, including for example Down-syndrome-selective abortions"— would be legitimate if viewed as the State's expression of a value judgment favoring childbirth over abortion in cases of fetal genetic abnormality. *See Webster*, 492 U.S. at 506. *Casey* makes clear that states may "enact rules and regulations designed to encourage [women] to know that there are philosophic and social arguments of great weight that can be brough to bear in favor of continuing the pregnancy to full term[.]" 505 U.S. at 872. States may also enact measures designed to persuade women "to choose childbirth over

- 26 -

abortion." *Id.* at 878. If a state can express and promote a preference for childbirth over abortion in general, then the Court sees no reason why a state could not also express and promote a similar preference for childbirth over abortion in the specific case of fetal genetic abnormality.

The problem is that the mechanism Arizona has chosen is not designed to *encourage* women choose childbirth; it is designed to *thwart* them from making any other choice. The mechanism a state chooses to further its interest in potential life—here, in the potential life of those who might be born with disabilities—"must be calculated to inform the woman's free choice, not hinder it." *Id.* at 877. Arizona remains free to "send an unambiguous message" about the "equal dignity and value" of people born with genetic abnormalities through such measures as precatory language expressing the State's value judgment, or through mechanisms that provide accurate information to women about philosophic and social arguments in favor of childbirth. But Arizona may not further its interest by erecting a substantial obstacle in the paths of women who have chosen to terminate their pre-viability pregnancies, which is what Arizona has done here.

Arizona's second goal—to "protect against coercive health care practices that encourage selective abortions of persons with genetic abnormalities"—is legitimate. The state has an interest in ensuring that a woman's choice is voluntary and well-informed. *See Gonzales*, 550 U.S. at 159. This interest, however, does not outweigh the burdens the Reason Regulations impose for two reasons.

First, the evidence raises doubt about whether such coercive heath care practices are problem in Arizona. For example, the American College of Obstetricians and Gynecologists, the preeminent national professional organization for OB/GYNs, recommends that doctors provide "non-directive" counseling to patients, in which doctors answer patients' questions and discuss their concerns, but do not direct or otherwise attempt to determine their patients' decisions. (Doc. 10-2 at 6 ¶ 20; 9 ¶ 28.) Further, Drs. Reuss, Issacson, and Glaser stated that they and the specialists they work with employ non-directive counseling in their practices. (*Id.* at 13 ¶ 43; 28 ¶ 21; 34 ¶ 13.)

Second, the Reason Regulations are too blunt an instrument to further this narrow goal. Rather than enact measures regulating or proscribing specific coercive practices, Arizona has chosen instead to enact a broad penal and regulatory scheme that ensnares physicians like Drs. Reuss, Isaacson, and Glaser, who do not appear to engage in any such coercive practices. And in the process, Arizona is placing a substantial obstacle in the paths of those women who have freely and intelligently made the decision to terminate their pregnancies because of a fetal genetic abnormality. The lack of evidence that coercive medical practices are prevalent in Arizona, combined with the overbreadth of the Reason Regulations in relation to this stated goal, is strong evidence that the benefits of the Reason Regulations do not outweigh their burdens.

Lastly, although Arizona has an interest in protecting the integrity and ethics of the medical profession, *Gonzales*, 550 U.S. at 157, there are serious question as to whether "preventing doctors from becoming witting participants in genetic-abnormality-selective abortions" outweighs the concrete harms the Reason Regulations will visit upon the doctor-patient relationship. Dr. Reuss explains what should be self-evident: "The doctor-patient relationship is an active partnership that is dependent on trust and open communication." (Doc. 10-2 at 5 ¶ 16.) Drs. Reuss, Isaacson, and Glaser all expressed deep concern that the Reason Regulations would damage the integrity of this relationship by discouraging frank, open, and honest communication, and adversely impact the quality of care as a result. (*Id.* at 18 ¶ 67; 19 ¶ 72; 27-28 ¶¶ 18-19; 48 ¶ 62.) If a woman wishes to terminate her pre-viability pregnancy because of a fetal genetic abnormality, the Reason Regulations require her to conceal this information from or lie to her doctor, neither of which fosters trust or encourages open dialogue. Arizona's more abstract concern with how the public might perceive the medical profession does not outweigh the concrete damage that the Reason Regulations would do to the doctor-patient relationship.

For these reasons, under the *Whole Women's Health* benefits-burdens balancing test, the Court finds both that the Reason Regulations place a substantial obstacle in the paths of women seeking to terminate pre-viability pregnancies because of a fetal genetic

- 28 -

1    abnormality, and that the potential benefits of the Reason Regulations do not outweigh

2    their likely burdens.  The Reason Regulations therefore are likely unconstitutional.

3        **B. Likelihood of Irreparable Harm, Balance of Hardships, and the Public**

4           **Interest**

5        Having concluded that Plaintiffs are likely to succeed on the merits of their

6    vagueness and undue burden claims against the Reason Regulations, the Court finds that

7    the remaining preliminary injunction factors favor relief.  "It is well established that the

8    deprivation of constitutional rights unquestionably constitutes irreparable injury" and "it is

9    always in the public interest to prevent the violation of a party's constitutional rights."

10   *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotations and citations

11   omitted).  As for the balance hardships, the evidence suggests that the Reason Regulations

12   will visit concrete harms on Plaintiffs and their patients.  In contrast, Defendants stand only

13   to lose the ability to immediately implement and enforce a likely unconstitutional set of

14   laws.  Plaintiffs therefore have carried their burden on all four elements of the preliminary

15   injunction test.[16]

16                          **CONCLUSION**

17       To summarize, the Court denies Plaintiffs' request to preliminary enjoin

18   implementation of the Interpretation Policy.  Under *Webster*, a challenge to this sort of

19   provision needs to be brought in an as-applied challenge after Arizona's courts have had

20   an opportunity to construe its scope and effect.  The Court grants Plaintiffs' request to

21   preliminarily enjoin enforcement of the Reason Regulations as they relate to fetal genetic

22   abnormalities.  The Reason Regulations likely are void for vagueness and impose an undue

23   burden on the rights of women to terminate pre-viability pregnancies.  Nothing in this order

24

25   _____

26       [16] Federal Rule of Civil Procedure 65(c) provides that the Court may issue a
     preliminary injunction "only if the movant gives security in an amount that the court
     considers proper to pay the costs and damages sustained by any party found to have been

27   wrongfully enjoined or restrained."  There is no evidence that Defendants will face any
     monetary injury if a preliminary injunction is issued.  The Court therefore exercises its

28   discretion to waive the bond requirement.  *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th
     Cir. 2011).

enjoins enforcement of Arizona's regulations of race- and sex-selective abortions, which are not at issue in this case.

IT IS ORDERED that Plaintiffs' motion for a preliminary injunction (Doc. 10) is **GRANTED IN PART** and **DENIED IN PART** as explained herein.

IT IS FURTHER ORDERED that Defendants are preliminarily enjoined from enforcing the following provisions of Arizona Senate Bill 1457:

1.  Section 2, to be codified as A.R.S. § 13-3603.02(A)(2), (B)(2), (D) (as it applies to subsections (A)(2) and (B)(2)), and (E) (as it applies to subsections (A)(2), (B)(2));

2.  Section 10, to be codified as A.R.S. § 36-2157(A)(1) (as it applies to genetic abnormalities);

3.  Section 11, to be codified as A.R.S. § 36-2158(A)(2)(d) (as it applies to genetic abnormalities); and

4.  Section 13, to be codified as A.R.S. § 36-2161(A)(25).

Dated this 28th day of September, 2021.

Douglas L. Rayes
United States District Judge

Victoria Lopez (330042)
American Civil Liberties Union
Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
vlopez@acluaz.org
*Counsel for Plaintiffs*

Emily Nestler*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC  20006
Telephone: (202) 629-2657
enestler@reprorights.org
*Counsel for Paul A. Isaacson, M.D.,
National Council for Jewish Women
(Arizona Section), Inc. and Arizona
National Organization for Women*

**Pro hac vice* application forthcoming

COUNSEL CONTINUED ON NEXT
PAGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | Case No. |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; et al., | |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

Gail Deady*
Jen Samantha D. Rasay*
Center For Reproductive Rights
199 Water Street
New York, NY 10038
Telephone: (917) 637-3600
gdeady@reprorights.org
jrasay@reprorights.org
*Counsel for Paul A. Isaacson, M.D.,*
*National Council for Jewish Women*
*(Arizona Section), Inc. and Arizona*
*National Organization for Women*

Ruth E. Harlow*
Rebecca Chan*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
rharlow@aclu.org
rebeccac@aclu.org
*Counsel for Eric M. Reuss, M.D., M.P.H.,*
*and Arizona Medical Association*

*Pro hac vice* application forthcoming

- 2 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

MOTION FOR PRELIMINARY INJUNCTION ................................................................. 1

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 3

   I. THE REASON BAN SCHEME ....................................................................................... 3

      A. Terms of the Reason Ban ........................................................................................... 3

      B. The Reason Ban Reporting Requirements ............................................................... 4

      C. Liability for Medical Professionals and Others who Provide Counselling and
      Referral for Patients Upon Fetal Testing or Diagnoses .......................................... 5

      D. The Complexities of Fetal Testing and Pregnancy Decision -making ................. 5

   II. THE PERSONHOOD PROVISION ................................................................................. 8

LEGAL STANDARD ............................................................................................................... 9

ARGUMENT ............................................................................................................................. 9

   I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .............................. 9

      A. The Reason Ban Is Unconstitutional ....................................................................... 9

         1. S.B. 1457 Imposes an Unlawful Ban on Previability Abortion ..................... 9

         2. Any Argument that Patients Should Conceal Information from their Medical
         Providers Does Not Save This Unconstitutional Statute .............................. 11

            *a) The Ban Will Eliminate Previability Abortion Access Regardless  of
            Whether Patients Affirmatively Tell Providers Their Reason* .................... 12

            *b) Under the Unconstitutional Conditions Doctrine the State Cannot  Force
            Plaintiffs to Cede Free Speech Rights in Exchange for Abortion Access* ... 13

         3. The Reason Ban Is Unconstitutionally Vague .............................................. 14

      B. The Personhood Provision Is Unconstitutionally Vague .................................... 18

   II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARMS ABSENT A
      PRELIMINARY INJUNCTION ................................................................................... 21

   III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR .............
      PRELIMINARY INJUNCTIVE RELIEF .................................................................. 22

   IV. THIS COURT SHOULD WAIVE THE BOND REQUIREMENT ..................... 22

CONCLUSION ........................................................................................................................ 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013) .................................................................................... 14

*Bellotti v. Baird,*
  443 U.S. 622 (1979) .................................................................................... 21

*Diaz v. Brewer,*
  656 F.3d 1008 (9th Cir. 2011) ................................................................... 22

*Doe v. Harris,*
  772 F.3d 533 (9th Cir. 2014) ..................................................................... 22

*F.C.C. v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012) .................................................................................... 14

*Gonzalez v. Carhart,*
  550 U.S. 124 (2007) .................................................................................... 10

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .................................................................................... 14

*Hunt v. City of Los Angeles,*
  638 F.3d 703 (9th Cir. 2011) ..................................................................... 17

*Isaacson v. Horne,*
  716 F.3d 1213 (9th Cir. 2013), *cert. denied*, 571 U.S. 1127 (2014) ............... 9, 10, 11

*Kilmon v. State,*
  905 A.2d 306 (Md. 2006) ........................................................................... 20

*Kolender v. Lawson,*
  461 U.S. 352 (1983) .................................................................................... 15

*Little Rock Family Planning Servs. v. Rutledge,*
  984 F.3d 682 (8th Cir. 2021), *petition for cert. filed*, No. 20-1434 (Apr.
  13, 2021) ..................................................................................................... 10

*McCormack v. Herzog,*
  788 F.3d 1017 (9th Cir. 2015) ................................................................... 14

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ................................................................. 22

*Papachristou v. City of Jacksonville*,
  405 U.S. 156 (1972) ............................................................................. 15

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ............................................................................. 13

*Planned Parenthood Arizona, Inc. v. Humble*,
  753 F.3d 905 (9th Cir. 2014) ............................................................ 9, 21

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of
  Health*,
  888 F.3d 300 (7th Cir. 2018), *cert. denied in part and granted in part,
  judgment rev'd in part on other grounds sub nom. Box v. Planned
  Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019) ........................... 10

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ............................................................... *passim*

*Preterm v. McCloud*,
  994 F.3d 512 (6th Cir. 2021) ........................................................ 12, 13

*Roe v. Wade*,
  410 U.S. 113 (1973) ......................................................................... 10, 22

*State v. Noriega*,
  928 P.2d 706 (Ariz. Ct. App. 1996) ...................................................... 16

*State v. Tison*,
  633 P.2d 355 (Ariz. 1981) .................................................................... 16

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ............................................................................. 10

*Tucson Woman's Clinic v. Eden*,
  379 F.3d 531 (9th Cir. 2004) ........................................................ 14, 15

*Village of Hoffman Estates v. Flipside, Hoffman Estates*,
  455 U.S. 489 (1982) ............................................................................. 14

*Whole Woman's Health v. Hellerstedt*,
  136 S. Ct. 2292 (2016) ........................................................................... 9

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................... 9

- iii -

**Statutes**

A.R.S. § 1-219 ..................................................................................... *passim*

A.R.S. § 13-301 ............................................................................................ 5

A.R.S. § 13-303 ........................................................................................ 5, 6

A.R.S. § 13-702 ............................................................................................ 4

A.R.S. § 13-1201 ........................................................................................ 19

A.R.S. § 13-1203 .......................................................................................... 2

A.R.S. § 13-3409 ........................................................................................ 18

A.R.S. § 13-3603.02 ........................................................................... *passim*

A.R.S. § 13-3612 ........................................................................................ 18

A.R.S. § 13-3613 ........................................................................................ 18

A.R.S. § 13-3619 ........................................................................................ 21

A.R.S. § 13-3623 ............................................................................. 2, 18, 19

A.R.S. § 32-1401 .......................................................................................... 4

A.R.S. § 32-1403 .......................................................................................... 4

A.R.S. § 32-1403.01 ..................................................................................... 4

A.R.S. § 32-1451 .......................................................................................... 4

A.R.S. § 36-2151 ................................................................................ 2, 8, 19

A.R.S. § 36-2157 ................................................................................... 1, 16

A.R.S. § 36-2158 ........................................................................ 1, 4, 15, 17

A.R.S. § 36-2161 ................................................................................. 1, 5, 12

A.R.S. § 36-2301.01 ..................................................................................... 9

**Other Authorities**

Fed. R. Civ. P. 65(c) ............................................................................. 1, 22

Julie B. Erlich, *Breaking the Law By Giving Birth: The War on Drugs, the War on Reproductive Freedom, and The War on Women*, 32 N.Y.U. Rev. L. & Soc. Change 281 (2008)................................................................................. 20

# **MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs move this Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction to preserve the status quo during litigation, based on Plaintiffs' strong likelihood of prevailing on their constitutional claims and the threatened irreparable harm to them, to those they serve, and to patients, physicians, and medical care throughout Arizona. Plaintiffs move to enjoin certain provisions of S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) ("S.B. 1457" or the "Act"), before the Act's effective date, including Act § 1, A.R.S. § 1-219 (the "Personhood Provision"), Act §§ 2, 10, A.R.S. §§ 13-3603.02, 36-2157 (the "Reason Ban" or the "Ban"), Act § 11, A.R.S. § 36-2158(A)(2)(d),[1] Act § 13, A.R.S. § 36-2161(A)(25) (collectively, the "Reason Ban Reporting Requirements").[2]

# **INTRODUCTION**

Plaintiffs challenge a law that bans previability abortions for an entire group of Arizona patients and establishes felonies to criminalize physicians if they provide that care. This law also threatens maternal health care by creating new personhood rights for fertilized eggs, embryos, and fetuses, and thereby places medical professionals and pregnant people at risk of arbitrary prosecution. S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) (hereinafter "S.B. 1457" or the "Act"). The Act is set to take effect on September 29, 2021. Plaintiffs are likely to succeed on their claims that two aspects of the Act are unconstitutional: (1) the Reason Ban Scheme; and (2) the Personhood Provision.

*First*, the Act bans abortion whenever a provider "know[s]" that the pregnancy is being terminated due to "a genetic abnormality of the child." Act § 2, A.R.S. § 13-3603.02; Act § 10, A.R.S. § 36-2157. The Reason Ban Scheme targets pregnant people who face deeply complex and personal decisions following a fetal diagnosis, and intrudes upon their private decision-making by wrenching away their right to choose previability abortion. This Ban violates the Due Process Clause of the Fourteenth Amendment and decades of

---

[1] The Reason Ban and the Reason Ban Reporting Requirements are collectively referred to herein as the "Reason Ban Scheme."

[2] All references to the Act are to the amended version.

1  Supreme Court precedent confirming that "a State may not prohibit *any* woman from

2  making the ultimate decision to terminate her pregnancy before viability." *Planned*

3  *Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992) (emphasis added).

4      The Reason Ban also places an unconstitutional condition on the ability of abortion

5  patients to exercise their fundamental rights, by pitting their right to abortion against their

6  right to speak openly with their medical providers. In many cases, it is impossible for an

7  abortion provider to avoid the inference that their patients are seeking abortions for the

8  prohibited reason—*i.e.*, because it is apparent based on the patient's circumstances or

9  medical chart. The Ban unlawfully stops those patients from proceeding. But, to the extent

10  this law might be construed to allow abortion access for some patients by forcing them to

11  obscure or even lie about fetal testing or their reason for seeking an abortion, it still violates

12  the Constitution. Under the doctrine of unconstitutional conditions, the State may not

13  condition the exercise of one constitutional right (the right to access previability abortion)

14  upon a person's willingness to forego their freedom of speech.

15      Moreover, the Reason Ban Scheme is unconstitutionally vague. It fails to provide

16  the requisite notice of what fetal conditions trigger its prohibition, or under what

17  circumstances a provider could be deemed to "know" that the patient seeks an abortion

18  "because of" the prohibited reason. Under the Ban, providers are thus left to guess what is

19  prohibited and risk arbitrary and discriminatory enforcement, unless they broadly withhold

20  constitutionally-protected care.

21      *Second*, the Act threatens health care even more broadly, by imposing a new

22  "Personhood Provision" that amends all Arizona Revised Statutes to be "interpreted and

23  construed" in a manner that gives all fertilized eggs, embryos, and fetuses the same "rights,

24  privileges and immunities available to other persons." Act § 1, A.R.S. § 1-219(A); A.R.S.

25  § 36-2151(16). As a result, statutes criminalizing harm to "persons" or "children" in

26  Arizona—*e.g.*, A.R.S. § 13-1203 (assault); § 13-3623 (child abuse)—may now be read to

27  prohibit a vast array of medical care that is regularly provided to pregnant patients (if it

28  poses any corresponding risk of harm to a fetus or embryo), notwithstanding the needs of

- 2 -

pregnant patients and the judgment of medical professionals.

Accordingly, Plaintiffs are likely to succeed on their claims that S.B. 1457's Reason Ban Scheme and Personhood Provision are unconstitutional under the Fourteenth and First Amendments of the U.S. Constitution.[3] Absent immediate court intervention, the constitutional rights of Plaintiffs and their patients seeking abortion will be irreparably harmed, and access to medical care will be irrevocably lost. As detailed further below, the Act invades the physician-patient relationship; limits and punishes essential communication in that private sphere; and takes away patients' right to personally determine whether to continue a previability pregnancy. Plaintiffs' motion for preliminary injunction should be granted.

## **FACTUAL BACKGROUND**

Plaintiffs are individual physicians, the largest physicians' association in Arizona, and two organizations that support and educate Arizonans regarding exercise of their reproductive rights. The National Council for Jewish Women Arizona ("NCJW AZ"), Arizona NOW ("AZ NOW"), and Arizona Medical Association ("ArMA") bring this lawsuit to protect important health care in Arizona, and to advance their own and their members' interests. *See* Compl. ¶¶ 15-28.  Plaintiffs Dr. Reuss, Dr. Isaacson, and ArMA's member physicians (collectively, "Plaintiff Physicians") sue to protect their own and their patients' rights. *Id*. 13-14.

The challenged laws are set to take effect on September 29, 2021.

## I.   THE REASON BAN SCHEME

### A.   Terms of the Reason Ban

Section 2 of S.B. 1457 makes any person who "[p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" guilty of a class 6 felony. Act § 2, A.R.S. § 13-3603.02(A)(2). It further makes any person who "solicits or accepts monies to finance . . . an abortion because of a genetic abnormality of the child"

---

[3] Plaintiffs' motion for a preliminary injunction focuses on the constitutional claims pled in Counts I, III, IV, and V, in the Complaint.

- 3 -

guilty of a class 3 felony. *Id.* § 13-3603.02(B)(2). Section 10 adds the prohibition that no abortion can proceed unless and until a provider executes an affidavit swearing "no knowledge that the" pregnancy is being aborted "because of a genetic abnormality of the child." Act § 10, A.R.S. § 36-2157(1)-(2). The Act defines "genetic abnormality" as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression." *Id.* § 13-3603.02(G). The Act's definition of "genetic abnormality" excludes a "lethal fetal condition," *id.*, which is defined as "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth." *Id.* § 36-2158(G)(1). The Act provides no further information or guidance about which conditions qualify as a "lethal fetal condition," nor how one would determine with "reasonable certainty" that it will result in death within three months after birth. The Act does not state whether potential medical interventions are to be considered, nor does it define the degree of certainty that constitutes "reasonable." S.B. 1457 also requires physicians to inform pregnant patients with a "diagnosed" "nonlethal fetal condition" that abortions because of a fetal diagnosis are prohibited. Act § 11, A.R.S. § 36-2158(A)(2)(d).

Violation of the Reason Ban carries severe criminal penalties, including imprisonment of at least four months and up to 8.75 years, A.R.S. §§ 13-3603.02(A)(2), (B)(2), 13-702(D)[4], as well as loss of professional licensure. *See id.* §§ 32-1401(27), -1403(A)(2), -1451(A), -1403(A)(5), -1403.01(A), -1451(D-E), (I), and (K).

**B.     The Reason Ban Reporting Requirements**

The impact of the Reason Ban is further compounded by Arizona's elaborate statutory and regulatory scheme for abortion, which requires, *inter alia*, that providers report to the Arizona Department of Health Services "[t]he reason for" each abortion they perform, including whether the abortion is "due to fetal health considerations, including

---

[4] A physician who violates the Reason Bans also risks civil liability resulting in attorney fees and monetary damages. *See* Act § 2, A.R.S. § 13-3603.02(D).

1    "the fetus being diagnosed with at least one" lethal, central nervous system, or other
2    "anomaly." A.R.S. §§ 36-2161(A)(12)(c)(i)-(iii).

3        S.B. 1457 further adds a new line item to the State's existing reporting
4    requirements, whereby providers are now also required to report: "[w]hether any genetic
5    abnormality of the unborn child was detected at or before the time of the abortion by genetic
6    testing, such as maternal serum tests, or by ultrasound, such as a nuchal translucency
7    screening, or by other form of testing." Act § 13, A.R.S. § 36-2161(A)(25). This reporting
8    must be signed by the physician who performed the abortion and "shall indicate that the
9    person who signs the report is attesting that the information in the report is correct to the
10   best of the person's knowledge." Act § 13, A.R.S. § 36-2161(D).

11   **C.    Liability for Medical Professionals and Others who Provide Counselling**
12   **        and Referral for Patients Upon Fetal Testing or Diagnoses**

13       The Act also includes newly expanded reporting requirements and potential
14   accomplice liability for a broad range of medical professionals, counsellors and
15   reproductive justice advocates across Arizona. Section 2(E) of the Act imposes a reporting
16   obligation on *all* physicians, nurses, counsellors, or other medical or mental health
17   professionals to report any known violation of the Reason Ban; if those health care
18   providers fail to report to "appropriate law enforcement authorities," they are subject to a
19   fine of up to $10,000.  A.R.S. § 13-3603.02.

20       And, after fetal testing or diagnosis, medical professionals or service organizations
21   that refer patients for, or provide information about, abortion care could also be charged
22   with criminal accomplice liability—in light of the criminal Reason Ban's prohibitions—
23   for aiding that activity. *See* A.R.S. § 13-303.[5]

24   **D.    The Complexities of Fetal Testing and Pregnancy Decision-making**

25       As Dr. Reuss and Dr. Glaser explain in their declarations, there are a variety of tests

26

---

27   [5] "Accomplice" is defined, *inter alia*, as "a person . . . who with the intent to promote or
     facilitate the commission of an offense . . . (2) [a]ids, counsels, agrees to aid or attempts to
28   aid another person in planning or committing an offense." A.R.S. § 13-301.

- 5 -

and exams during pregnancy that screen for or may diagnose a fetal genetic anomaly. Exhibit 1, Declaration of Dr. Eric M. Reuss ("Reuss Decl.") ¶¶ 17-26, 32-40; Exhibit 2, Declaration of Dr. Katherine B. Glaser ("Glaser Decl.") ¶¶ 9-11. Those include the ultrasound exams that each patient in their prenatal care receives, and a number of genetic testing options routinely offered to patients that might examine, for example, fetal cells in maternal blood or the DNA of fetal cells sampled through amniocentesis. *Id.* Initial screening tests provide the likelihood of fetal conditions, while an actual diagnosis (if possible) typically involves multiple steps. *Id.* If diagnosis in utero does occur, that cannot tell the patient and their physicians specifically how a condition will manifest over a child's lifetime or exactly how long a particular child might live. Reuss Decl. ¶¶ 18, 21, 43, 68-70; Exhibit 3, Declaration of Dr. Paul A. Isaacson ("Isaacson Decl.") ¶¶ 37-42. The prognosis for fetal conditions that are or may be present in pregnancy is extremely varied, both among different conditions and, in almost all instances, within any one diagnosis. *See id.* In addition, not all conditions have been linked to genetic causes; environmental and other disruptive factors can also cause the "morphological malformation" included Act's definition of "genetic abnormalities". A.R.S. § 13-3603.02(G)(2)(a). Reuss Decl. ¶¶ 26, 70; Isaacson Decl. ¶ 33.

The leading authorities in obstetrics care, the American College of Obstetricians and Gynecologists ("ACOG") and the Society of Maternal-Fetal Medicine ("SMFM"), make clear in practice guidelines that all pregnant patients should be offered genetic testing. Reuss Decl. ¶¶ 19-20. That is because it may provide additional information for possible prenatal treatment, for optimal delivery staff and location, and to inform consideration of abortion if that is an option the patient is considering. *Id.* ¶¶ 27-30. For patients with positive indications of a fetal diagnosis, it also helps those patients with preparation for care after birth, if they decide to continue the pregnancy. *Id.* As the ACOG / SMFM guidelines emphasize, testing should occur with complete, non-directive counselling both pre- and post-test. *Id.* ¶ 20. Such counselling provides the patient with detailed factual information about the test(s), the fetal condition(s) at issue, the range of possible outcomes,

- 6 -

1  community resources, etc., while answering questions to facilitate the patient's own

2  decision-making. *Id*. ¶¶ 28-44; Glaser Decl. ¶¶ 18-22.

3    The possible or diagnosed presence of a fetal condition adds another complex layer

4  to decision-making related to pregnancy. Pregnant patients face a wide range of complex

5  personal considerations—including, *e.g.*, their own health problems, worries about family

6  stability, economic concerns, and existing care-giving responsibilities—in deciding

7  whether to continue a pregnancy. Isaacson Decl. ¶¶ 13, 48, 51; Reuss Decl. ¶¶ 46-51;

8  Glaser Decl. ¶¶ 22-23. Again, as the declarants explain, physicians, genetic counsellors,

9  and/or other health care professionals offer confidential, non-directive counselling, answer

10  questions, and provide facts, and patients may consult other trusted advisors, but it is the

11  patient that must evaluate their situation and make the decision. *Id.*; *see also* Isaacson Decl.

12  ¶¶ 9-14; Reuss Decl. ¶¶ 53-54.

13    Among patients who decide on abortion after fetal testing, many directly inform

14  their abortion provider that the test results or diagnosis motivated them.  Isaacson Decl. ¶¶

15  48-50. Referring providers may also send a patients' fetal testing results to the abortion

16  physician to add to their file. *Id.* Others seek abortion care after an appointment with or

17  referral by a genetic counsellor or specialist in diagnosing fetal conditions. *Id.* ¶¶ 9, 44-48.

18  Still others remain under the care of the same physician throughout a pregnancy, and

19  initially express joy over the pregnancy, but later request an abortion after intervening fetal

20  testing. Reuss Decl. ¶¶ 44, 72-73.  In these and other varied scenarios, there may be much

21  circumstantial or direct evidence that the patient is acting based on a genetic condition.

22  *See, e.g.,* Isaacson Decl. ¶¶ 55-63.

23    The declarations in support of this motion explain the complexity and uncertainty

24  inherent in fetal testing and fetal diagnosis; the importance of full, non-directive patient

25  information and counselling; the private nature of abortion decision-making; and the

26  difficulties that physicians will have if they must map the Reason Ban's unclear terms onto

27  actual patient care. Because of the vagueness of the Reason Ban, and its criminal sanctions

28  and severe penalties, including potential loss of their medical license, physicians will have

1   no choice but to err on the side of turning away patients seeking previability abortions

2   when a fetal diagnosis is implicated. Isaacson Decl. ¶¶ 28-63; Reuss Decl. ¶¶ 65-73.

3   **II.    THE PERSONHOOD PROVISION**

4       S.B. 1457 amends the Arizona Revised Statutes' "General Rules of Statutory

5   Construction" to include a new section titled "Interpretation of laws; unborn child;

6   definition," which reads:

7       The laws of this State shall be interpreted and construed to acknowledge, on
8       behalf of an unborn child at every stage of development, all rights, privileges
        and immunities available to other persons, citizens and residents of the state,
9       subject only to the Constitution of the United States and decisional
        interpretations thereof by the United States Supreme Court.
10

11  Act § 1, A.R.S. § 1-219(A). This "Personhood Provision" expressly incorporates

12  the statutory definition of "unborn child," Act § 1, A.R.S. 1-219(C), which includes "the

13  offspring of human beings from conception until birth." A.R.S. § 36-2151(16). And the

14  statutes elsewhere define "conception" to mean "the fusion of a human spermatozoon with

15  a human ovum," regardless of whether the resulting fertilized egg is implanted in the uterus

16  and results in a pregnancy. A.R.S. § 36-2151(4).

17      The Personhood Provision contains only two exceptions. It "does not create a cause

18  of action against": (1) "[a] person who performs in vitro fertilization procedures as

19  authorized under the laws" of Arizona; or (2) "[a] woman for indirectly harming her unborn

20  child by failing to properly care for herself or by failing to follow any particular program

21  of prenatal care." Act § 1, A.R.S. § 1-219(B). By contrast, the Personhood Provision neither

22  specifies nor offers any further clarity as to when or how it *does* create a cause of action in

23  other contexts—*i.e.,* when read in conjunction with all other provisions of the Arizona

24  Revised Statutes to which it applies. Given its inclusion in the Arizona Revised Statutes'

25  rules of construction, the Personhood Provision likely expands numerous civil and criminal

26  statutes to reach a range of actions taken by pregnant people and medical providers to the

27  extent such actions are found to harm, or to risk harming, a fetus, embryo, or fertilized egg.

28

- 8 -

1  **LEGAL STANDARD**

2      To obtain a preliminary injunction, plaintiffs must establish: (1) likelihood of

3  "success on the merits," (2) likelihood of irreparable harm absent preliminary relief, (3)

4  that "the balance of equities tips in [their] favor," and (4) that "an injunction is in the public

5  interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Planned*

6  *Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014). All four elements

7  strongly support a preliminary injunction here.

8  **ARGUMENT**

9  **I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

10      The Reason Ban and Personhood Provision are unconstitutional. First, the Reason

11  Ban ignores decades of Supreme Court precedent that confirm the right of *each* pregnant

12  patient to previability abortion. Second, the Reason Ban imposes an unconstitutional

13  condition by pitting patients' First Amendment right to freedom of speech against their

14  right to pre-viability abortion. Finally, both the Reason Ban and the Personhood Provision

15  are unconstitutionally vague, and leave physicians without discernible standards that will

16  protect them from arbitrary enforcement.

17      **A.  The Reason Ban Is Unconstitutional**

18          1.  S.B. 1457 Imposes an Unlawful Ban on Previability Abortion

19      S.B. 1457 bans abortion for any patient who is seeking to terminate a pregnancy

20  because of a "genetic abnormality" detected in the fetus or embryo. Because Arizona law

21  already prohibits post-viability abortions in the state, A.R.S. § 36-2301.01(A), the Act

22  newly bans only previability abortions. As the Ninth Circuit has recognized, where a law

23  does not allow for abortions "in cases of fetal anomaly" the challenged provision

24  "operate[s] as a complete bar to the rights of some women to choose to terminate their

25  pregnancies before the fetus is viable." *Isaacson v. Horne*, 716 F.3d 1213, 1228 (9th Cir.

26  2013), *cert. denied*, 571 U.S. 1127 (2014).

27      Unwavering Supreme Court precedent holds that under the Due Process Clause of

28  the Fourteenth Amendment, a state may not ban abortion prior to viability. *Whole Woman's*

1    *Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016); *Gonzalez v. Carhart*, 550 U.S. 124,

2    146 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000); *Casey*, 505 U.S. at 846; *Roe*

3    *v. Wade*, 410 U.S. 113, 163-64 (1973). As the Ninth Circuit explained, the Supreme Court

4    has been "unalterably clear regarding [the] basic point" that "a woman has a constitutional

5    right to choose to terminate her pregnancy before the fetus is viable." *Isaacson*, 716 F.3d

6    at 1217. This right to previability abortion is fundamental to a pregnant person's bodily

7    and decisional autonomy, the protection of which is "implicit in the meaning of liberty."

8    *Casey*, 505 U.S. at 869. Because the decision to terminate a pregnancy "involve[s] the most

9    intimate and personal choices a person may make in a lifetime, choices central to personal

10   dignity and autonomy," and implicates "personal decisions concerning not only the

11   meaning of procreation but also human responsibility and respect for it"—the decision

12   must be left to the individual, not the state. *Id.* at 851, 853; *Roe*, 410 U.S. at 164-65.

13          By prohibiting abortions in cases with fetal diagnoses, and thus banning previability

14   abortion for an entire group of pregnant people, S.B. 1457 directly contravenes this binding

15   precedent. "Nothing in the Fourteenth Amendment or Supreme Court precedent allows the

16   State to invade [the] privacy realm to examine the underlying basis for a woman's decision

17   to terminate her pregnancy prior to viability." *Planned Parenthood of Ind. & Ky., Inc. v.*

18   *Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 307 (7th Cir. 2018) (permanently

19   enjoining Indiana law criminalizing abortions based solely on a patient's prohibited

20   reason), *cert. denied in part and granted in part, judgment rev'd in part on other grounds*

21   *sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019). This is

22   because it is "inconsistent to hold that a woman's right of privacy to terminate a pregnancy

23   exists if . . . the State can eliminate this privacy right if [the patient] wants to terminate her

24   pregnancy for a particular purpose." *Little Rock Family Planning Servs. v. Rutledge*, 984

25   F.3d 682, 690 (8th Cir. 2021) (citations omitted) (affirming preliminary injunction against

26   Arkansas law banning physicians from performing an abortion based on a patient's

27   prohibited reason), *petition for cert. filed*, No. 20-1434 (Apr. 13, 2021). The right to have

28   a previability abortion thus leaves no room for the state to erect a ban based on the reason

1    for a pregnant person's abortion decision.

2          The Ninth Circuit has come to that same conclusion. In *Isaacson v. Horne*, the Ninth

3    Circuit struck down Arizona's 20-week abortion ban, rejecting the view that the ban's

4    "medical emergency exception . . . transform[ed] it from a ban into a limitation [on] the

5    mode or manner of conducting abortions." 716 F.3d at 1227. The court explained that,

6    regardless of its exceptions, "the challenged provision continues to operate as a complete

7    bar to the rights of some women to choose to terminate their pregnancies before the fetus is

8    viable." *Id.* at 1228. And, as an example of which patients' rights would be violated, the

9    Court noted that "*significantly, the emergency exception does not authorize abortions in*

10   *cases of fetal anomaly.*" *Id.* (emphasis added). The court continued: "*Casey* is crystal clear

11   on this point: 'a State may not prohibit *any woman* from making the ultimate decision to

12   terminate her pregnancy before viability." *Id.* at 1227 (quoting *Casey*, 505 U.S. at 879).

13   Where, as here, the Reason Ban operates as a complete bar to patients with a presumed or

14   actual fetal diagnosis—the very group whose rights the Ninth Circuit expressly

15   acknowledged in *Isaacson*—this reasoning would plainly apply.

16         Accordingly, because the Reason Ban prohibits abortion before viability, it is "per

17   se unconstitutional." *Isaacson*, 716 F.3d at 1217.[6] Plaintiffs' claims are likely to succeed.

18               2.    Any Argument that Patients Should Conceal Information from their
19                     Medical Providers Does Not Save This Unconstitutional Statute

20         Because the Act bans abortion when the provider "knows" about the prohibited

21   reason, it may coerce some patients into curbing their communications with medical

22   providers about a fetal test, risk, or diagnosis, in an attempt to salvage their abortion right.

23

---

24   [6] The undue burden test does not apply to the Reason Ban because it is not a regulation, but
25   rather an outright ban on abortion care. *See Isaacson*, 716 F.3d at 1225 (the "'undue
     burden'/'substantial obstacle' mode of analysis has no place where, as here, the state is
26   *forbidding* certain women from choosing pre-viability abortions rather than specifying the
     conditions under which such abortions are to be allowed"). In any case, this law imposes a
27   substantial obstacle—indeed a complete one—and, as the Supreme Court has already
     found, no state interest is "strong enough to support a prohibition of abortion" before
28   viability. *Casey*, 505 U.S. at 846, 860.

- 11 -

1    Or the State may affirmatively argue that patients should attempt to hide their motivation

2    from physicians. However, any contention that patients could conceal their reasons from

3    medical providers would fail to save the ban's constitutionality as a matter of fact and law.

4            *a) The Ban Will Eliminate Previability Abortion Access Regardless*
5            *of Whether Patients Affirmatively Tell Providers Their Reason*

6            In many, if not most, cases, it will be impossible for the abortion provider to avoid

7    knowledge that a patient is seeking an abortion for the prohibited reason, regardless of

8    whether the patient directly discloses that information. All abortion providers receive direct

9    and circumstantial information about their patients from a variety of sources, including

10   from referring physicians and from patients' medical history. Isaacson Decl. ¶¶ 44-50, 55-

11   63; Reuss Decl. ¶¶ 44, 72-73; Glaser Decl. ¶¶ 12, 18-22. In some cases, a fetal diagnosis

12   will be explicit in the patient's records. In others, the mere fact that the patient was referred

13   by a geneticist, or that genetic testing occurred earlier in the pregnancy, could be deemed

14   "knowledge" under the law. *See infra* Argument Part I.B (discussing vagueness of the

15   Ban's *mens rea* and other elements).

16           Moreover, S.B. 1457 creates an affirmative obligation for providers to report

17   "[w]hether any genetic abnormality of the unborn child was detected at or before the time

18   of the abortion[.]" Act § 13, A.R.S. § 36-2161(A)(25), on top of Arizona's longstanding

19   requirement that abortion providers collect and report information about the patient's

20   reason for seeking an abortion, including whether it is "due to fetal health

21   considerations[.]" A.R.S. § 36-2161(A)(12). And an abortion provider cannot proceed

22   without first swearing that they have "no knowledge" that a fetal "genetic abnormality" is

23   the patient's reason. Act § 10, A.R.S. § 36-2157(A). These reporting and affidavit

24   requirements go to the heart of the Reason Ban, making it practically impossible for a

25   provider to side-step patients' circumstances that would trigger its prohibition.[7]

26   _____

27   [7] For these reasons, the Sixth Circuit's decision in *Preterm v. McCloud*, 994 F.3d 512 (6th
     Cir. 2021), has no application here. The *Preterm* Court upheld Ohio's law banning
28   abortions when the provider knows the woman's reason is a Down syndrome diagnosis, on

Because the Ban applies regardless of how the patient's reason becomes "known" to their abortion provider, it will remain a complete bar to previability abortion for many patients regardless of whether they directly disclose information about a fetal diagnosis.

> b) *Under the Unconstitutional Conditions Doctrine the State Cannot Force Plaintiffs to Cede Free Speech Rights in Exchange for Abortion Access*

Even if the Reason Ban allowed some patients to access abortion by avoiding speech and other communication with their providers, it would still violate those patients' constitutional rights, because the State cannot force patients to trade one constitutional violation for another. Under the doctrine of unconstitutional conditions, the State may not indirectly censor speech by pitting First Amendment freedoms against another constitutional right. *See Preterm*, 994 F.3d at 551 (J. Cole, dissenting) (explaining that turning a reason ban into a "don't ask, don't tell" law violates the right to abortion and First Amendment free speech laws "[b]ecause states cannot force citizens to trade one constitutional right for another");[8] Here, under the unconstitutional conditions doctrine, the State may not condition access to one constitutional right (*i.e.*, the right to previability abortion) on a person's willingness to forego freedom of speech. "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited . . . allow[ing] the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

By banning abortions unless the provider has "no knowledge" about their patients'

---

the theory that pregnant patients in Ohio could still access abortion by merely opting for a doctor who does not know their reason. *Id.* at 522-23. Plaintiffs disagree with the reasoning of that decision, which is not binding on this Court. But, in any event, as explained above, even the alternative contemplated by the majority in *Preterm* would not be an option for many pregnant women in Arizona, as to whom it will be impossible for an abortion provider to avoid inferring that the patient is seeking an abortion for the prohibited reason.

[8] The *Preterm* majority made explicit that it did not take these First Amendment implications into account. *Id.* at 522 (noting that the First Amendment Free Speech argument "is not properly before us" and therefore was not considered by the majority).

1   prohibited reason for seeking care, the Reason Ban pits patients' right to previability
2   abortion against their right to speak openly with their medical providers. Under the Act, a
3   patient seeking an abortion because of a fetal diagnosis must *either* give up their right to
4   communicate about that information with their medical providers *or* give up their right to
5   an abortion. This the First and Fourteenth Amendments do not allow. "[T]he Government
6   ''may not deny a benefit to a person on a basis that infringes his constitutionally protected
7   ... freedom of speech[.]'" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S.
8   205, 214 (2013) (citations omitted).

9               3.    The Reason Ban Is Unconstitutionally Vague

10          The Ban is unlawful for the additional reason that it is unconstitutionally vague and
11   deprives physicians of their due process rights. "The requirement of clarity in regulation is
12   essential[.]" *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is
13   unconstitutional if it fails to "provide a reasonable opportunity to know what conduct is
14   prohibited" and/or it "is so indefinite as to allow arbitrary and discriminatory enforcement."
15   *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554 (9th Cir. 2004).

16          A law must provide "fair warning" by giving "[a] person of ordinary intelligence a
17   reasonable opportunity to know what is prohibited, so that he may act accordingly."
18   *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). If a statute subjects violators to
19   criminal penalties, the need for clear line-drawing "is even more exacting." *McCormack v.*
20   *Herzog*, 788 F.3d 1017, 1031 (9th Cir. 2015) (quoting *Forbes v. Napolitano,* 236 F.3d
21   1009, 1011 (9th Cir. 2000)). And "perhaps the most important factor affecting the clarity
22   that the Constitution demands of a law is whether it threatens to inhibit the exercise of
23   constitutionally protected rights." *Village of Hoffman Estates v. Flipside, Hoffman Estates*,
24   455 U.S. 489, 499 (1982). In such instances, "a more stringent vagueness test should
25   apply." *Id*.

26          In addition, a law is unconstitutionally vague if it fails to provide "explicit standards
27   for those who apply them," such that it could lead to "arbitrary and discriminatory
28   enforcement." *Grayned*, 408 U.S. at 108. That risk is heightened if the law targets

"particular groups deemed to merit [enforcement authorities'] displeasure." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) (citations omitted). Thus, the Ninth Circuit has recognized that "[g]iven the potential for harassment of abortion providers, it is particularly important that enforcement of any unconstitutionally vague provisions of [an abortion restriction] be enjoined." *Tucson Woman's Clinic*, 379 F.3d at 554 (citations omitted).

The Reason Ban lacks the requisite clarity to pass constitutional muster. First, the Ban does not give workable guidance about which fetal conditions bring abortion care within the scope of its prohibition. It is entirely unclear what suffices to show the "presence or presumed presence of an abnormal gene expression," Act § 2; A.R.S. § 13-3603.02(G)(2)(a), in this context—where screening deals only in likelihoods and where attempts at diagnosis may involve multiple steps and still be imprecise. How is the presumption part of the definition determined? And, because the definition of "genetic abnormality" apparently applies to structural or "morphological malformations" only if they are "occurring as the result of abnormal gene expression," *id.*, are some structural conditions excluded? The Act's vague language leaves these key questions entirely unanswerable.

Second, this lack of clarity is exacerbated by the Ban's subjective and practically-imprecise exception for "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth." Act § 11, A.R.S. § 36-2158(G)(1). This exception is not sufficient to guide enforcers or providers. Isaacson Decl. ¶¶ 37-42; Reuss Decl. ¶¶ 31, 69-70. Must the condition be formally diagnosed? What likelihood of death within three months satisfies "reasonable certainty"? Who determines that prognosis—the practicing physician, the enforcer, or someone else? Are potential medical interventions that could prolong a child's life a few weeks or months to be taken into account?

Third, the Ban's *mens rea* element is similarly unclear and evades any practical application. It prohibits a physician from "knowingly" providing abortion care for the

- 15 -

prohibited reason. Act § 2, A.R.S. § 13-3603.02(A)(2). But, given the uncertainty regarding which genetic conditions are covered by the Ban, and the inherent impossibility of knowing another person's reasons for seeking an abortion with any confidence, any indication of a fetal diagnosis or even prenatal genetic testing could be deemed circumstantial evidence of the prohibited "knowledge." Reuss Decl. ¶¶ 65-73; Isaacson Decl. ¶¶ 31-63. Because Arizona law allows culpability to be proved through circumstantial evidence alone, an inconspicuous note on the patient's medical record that they were referred to the abortion provider by a geneticist, even without any mention of a fetal diagnosis, could be used to prosecute a physician. *See State v. Tison*, 633 P.2d 355, 363-64 (Ariz. 1981) (noting that a criminal conviction may rest solely on circumstantial evidence); *see also State v. Noriega*, 928 P.2d 706, 710 (Ariz. Ct. App. 1996) (a criminal defendant's "mental state will rarely be provable by direct evidence and the jury will usually have to infer it from circumstances surrounding the event"). Providers thus understandably fear criminal enforcement and civil liability based on the slightest implication that they "knowingly" provided an abortion sought because of a fetal indication. Reuss Decl. ¶¶ 65-73; Isaacson Decl. ¶¶ 31-63.

Moreover, the Act's use of "solely because of" in one clause does nothing to limit or alleviate these vagueness concerns and is itself unclear. While the Ban in one provision prohibits a physician from "knowingly" providing abortion care when it is sought "solely because of" a covered genetic condition, A.R.S. § 13-3603.02(A)(2), the Ban without explanation changes to prohibit any abortion sought "because of" the covered fetal conditions in the numerous other, interlocking provisions. For example, the Act creates criminal liability for "accept[ing] monies to finance" an abortion "because of a genetic abnormality," which constitutes a higher-grade felony than the provision that uses the phrase "solely because of." Act § 2, A.R.S. § 13-3603.02(B)(2);[9] *see also, e.g.*, Act § 10,

---

[9] Here, where all abortion providers accept money for their provision of health care services from some source—e.g., the patient or insurance—the "because of standard" would seem to eclipse the "solely because of" phrase to set the terms of Ban. Again, the law is unclear.

1    A.R.S. § 36-2157(A)(1) (requiring affidavit attesting provider is "not aborting the child . .

2    . *because of* a genetic abnormality" and has "no knowledge that the child to be aborted is

3    being aborted *because of* a genetic abnormality") (emphasis added); Act § 11, A.R.S. § 36-

4    2158(2)(d) (requiring provider to inform patient "that Section 13-3603.02 prohibits

5    abortion . . . *because of* a genetic abnormality") (emphasis added).

6          In any event, the use of "solely" as a qualifier only further confuses any

7    understanding of what circumstances the Act purports to cover. Pregnant patients often

8    seek abortion for a multitude of interrelated considerations. Isaacson Decl. ¶¶ 13, 51; Reuss

9    Decl. ¶¶ 46-51; Glaser Decl. ¶¶ 22-23. The increased risk or diagnosis of a fetal condition

10    is among, and intrinsically linked with, other circumstances that often inform a patient's

11    decision to terminate a pregnancy—including financial resources, existing children, and

12    family support. *See id*. By taking fetal conditions out of this context, the Ban injects layers

13    of definitional uncertainty, leaving providers unable to discern whether a patient is seeking

14    an abortion "solely because of" the "presence or presumed presence" of a "genetic

15    abnormality." *Id.*; Isaacson Decl. ¶¶ 33-36, 46-63; Reuss Decl. ¶¶ 68-73. For example, is

16    an abortion sought "solely because of" a fetal condition if the patient determines they lack

17    sufficient financial resources or family assistance to care for a child with a disability?

18          Finally, all of these same uncertainties are imposed upon the spectrum of Arizonans

19    who help patients access abortion care—including the Plaintiffs in this case and their

20    members—through the Act's creation of possible criminal accomplice liability and its

21    imposition of civil penalties upon any medical professional who fails to report a "known

22    violation" of the Ban. *See* Glaser Decl. ¶¶ 14-22. Because of these realities, providers will

23    be forced to withhold abortion care and circumscribe counselling in a wide array of

24    situations, even if the Reason Ban may not ultimately apply. *See Hunt v. City of Los

25    Angeles*, 638 F.3d 703, 713 (9th Cir. 2011) (when individuals do not "know whether the

26    [law] allows their conduct," it will "inhibit" a physician's provision of legal abortion

27    services "for fear of being criminally punished"). Moreover, because of the Ban's unclear

28    language, local prosecutors and other enforcers will have broad discretion to apply it based

1    on their "personal predilections."

2            Accordingly, it is not clear which previability abortion care is prohibited under the

3    Ban and how physicians are to draw the requisite lines for their conduct. Given the extreme

4    consequences of a violation, providers will be unable to perform previability abortions for

5    any patient where a fetal diagnosis is implicated, lest they otherwise face arbitrary and

6    discriminatory enforcement. Reuss Decl. ¶¶ 65-73; Isaacson Decl. ¶¶ 31-63.

7        **B.     The Personhood Provision Is Unconstitutionally Vague**

8            The Personhood Provision amends large swaths of the Arizona Revised Statutes

9    without sufficient clarity to survive constitutional scrutiny. By expanding the legal rights

10   of fetuses, embryos, and fertilized eggs for purposes of all Arizona state laws, the Act

11   makes it impossible for the Plaintiff Physicians and their pregnant patients to identify

12   whether a vast array of actions may now put them at risk of criminal prosecution or other

13   legal penalties. Thus, the Personhood Provision violates their due process rights because it

14   fails to provide adequate notice of prohibited conduct, and also because it will lead to

15   arbitrary enforcement. *See supra* Argument I.A.3.

16           By its terms, the Personhood Provision alters the meaning of *other* provisions of the

17   Arizona Revised Statutes by mandating how "the laws of this State shall be interpreted and

18   construed." Act § 1; A.R.S. § 1-219(A). By definition then, each time the terms "person,"

19   "child," or similar words appear in the Arizona Revised Statutes, they must be read to

20   include comparable rights for fetuses, embryos, and fertilized eggs at any stage of

21   development. *See, e.g.,* A.R.S. § 13-3623 (criminalizing behavior that "causes a child . . .

22   to suffer physical injury" both "under circumstances likely to produce death or serious

23   physical injury" and "[u]nder circumstances other than those likely to produce death or

24   serious physical injury to a child"); *id.* § 13-3409(A)(2) (criminalizing "transfer" of a broad

25   range of substances to a "minor," including "dangerous drugs" and narcotic drugs); *id.* §

26   13-3613 ("A person who by any act, causes, encourages or contributes to the . . .

27   delinquency of a child . . . or who for any cause is responsible therefor is guilty of a class

28   1 misdemeanor.") and *id.* § 13-3612 (defining "delinquency" as "any act that tends to

- 18 -

debase or injure the morals, health or welfare of a child"). Given this broad reach, the Personhood Provision unsurprisingly renders numerous criminal and civil provisions of Arizona law impermissibly vague and subject to arbitrary enforcement against medical providers and pregnant people.

First, the Personhood Provision apparently alters many provisions of the Arizona Code in a manner that could be read to restrict or prohibit medical care that is otherwise regularly provided to pregnant patients—thereby subjecting health care providers to criminal liability when they provide that care. For example, the Arizona criminal endangerment statute makes it unlawful to "recklessly endanger[] another person with a substantial risk of imminent death or physical injury." A.R.S. § 13-1201(A). And a person commits child abuse if they cause physical injury to a child—whether intentionally, knowingly, recklessly, *or* negligently. *Id*. § 13-3623 (emphasis added). Under the Personhood Provision, these laws would apply from "conception" onward—even if the person is not yet pregnant or is unaware of their pregnancy.[10] A variety of medical care can harm or endanger a fertilized egg, embryo, or fetus—*e.g.,* gynecological care, hormone therapy, cancer screening and treatment, and substance use treatment. *See* Glaser Decl. ¶¶ 23-24; Reuss ¶¶ 74-82. Neither the Act nor any other relevant provisions of the Arizona Revised Statutes clarify or provide an objective standard by which to measure when a medical provider must prioritize a fertilized egg, embryo, or fetus over medical care for a pregnant patient if the fertilized egg, fetus, or embryo now has equal personhood rights.

Yet, notwithstanding the absence of any clear basis for liability or workable standard, the Personhood Provision appears to contemplate prosecution of medical providers under at least some (unknowable) circumstances. For example, the Personhood

---

[10] The Act defines "unborn child" as "the offspring of human beings from conception until birth." Act § 1, A.R.S. § 1-219(C) (incorporating A.R.S. § 36-2151(16)). Conception is statutorily defined as "the fusion of a human spermatozoon with a human ovum." A.R.S. § 36-2151(4). However, even if an ovum fuses with a sperm, a pregnancy does not occur unless the resulting blastocyte (fertilized egg) successfully implants in the uterine wall. Earliest pregnancy tests cannot detect whether implantation has caused a pregnancy to occur until weeks after the spermatozoon has fully fused with an ovum.

Provision contains a narrowly-worded exception whereby it "does not create a cause of action against [] a person who performs in vitro fertilization procedures under the laws of this state." *Id.* § 1-219(B)(1). Conversely, if actions against *other* types of medical providers were neither contemplated nor possible under the Personhood Provision, this exception would be entirely unnecessary.

Second, the Personhood Provision creates ambiguity about whether and when a pregnant person can be prosecuted for harm to their fetus or embryo. While the provision narrowly excludes "a cause of action against [ ] [a] woman for *indirectly* harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care," *id.* § 1-219 (B)(2) (emphasis added), it conspicuously does not foreclose a cause of action against a pregnant person who *directly* causes harm to their pregnancy, or a person who "indirectly" harms her pregnancy by means other than failure to "properly care for herself" or to follow a "program of prenatal care—suggesting such actions may be subject to criminal prosecution or civil penalties. But many actions could negatively affect a fertilized egg, fetus, or embryo. *See e.g.* Julie B. Erlich, *Breaking the Law By Giving Birth: The War on Drugs, the War on Reproductive Freedom, and The War on Women*, 32 N.Y.U. Rev. L. & Soc. Change 281, 393–94 (2008). Without clarity as to what constitutes "direct" versus "indirect" harm, Plaintiff Physicians' patients and other Arizonans have no notice of what actions could give rise to criminal or civil liability if they become and remain pregnant.[11]

For example, under Arizona's child abuse and neglect statute, "[a] person having custody of a minor under sixteen years of age who knowingly causes or permits the life of such minor to be endangered, its health to be injured or its moral welfare to be imperiled,

---

[11] For example, under another law enacted in 2021, courts may appoint a *guardian ad litem* to represent the interests of an "unborn . . . person". *See* S.B. 1390, 55th Leg., 1st Reg. Sess. (Ariz. 2021). If construed in conjunction with the Personhood Provision, this new law may enable a third party, such as a pregnant person's spouse or parent, to seek a protective order and appointment of a *guardian ad litem* to represent the fetus's interests against, *e.g.*, a pregnant person seeking abortion care or whose actions during pregnancy are otherwise alleged to put the fetus at risk of harm.

- 20 -

2-ER-212

by neglect, abuse or immoral associations, is guilty of a class 1 misdemeanor." A.R.S. §
13-3619. Under the Personhood Provision, it is unclear whether the term "minor" must be
construed to include fertilized eggs, embryos, and fetuses, thus leaving people at risk of
being prosecuted for criminal child endangerment for, *e.g.*, taking aspirin or prescribed
medications, undergoing cancer treatment or opioid agonist pharmacotherapy, working a
stressful or dangerous job, or experiencing family abuse or violence when a fertilized egg
is inside their body or during pregnancy. And the list goes on. Applying the Personhood
Provision to the child endangerment law could easily lead to the criminalization of a broad
range of behavior, leaving state officials, law enforcement, prosecutors, and courts to
determine, *ex post facto*, which behaviors will be prosecuted because of harm or risk of
harm to a fertilized egg, fetus, or embryo.

By creating vast uncertainty for physicians and pregnant patients about what actions
give rise to criminal and civil liability under numerous sections of the Arizona Code, and
leaving enforcers without cabining standards, the Personhood Provision violates both
principles underlying the vagueness doctrine. Accordingly, Plaintiffs are likely to succeed
on their claim that the Act's Personhood Provision violates the Due Process Clause.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARMS ABSENT A PRELIMINARY INJUNCTION

"[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable
injury.'" *Humble*, 753 F.3d at 911 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th
Cir. 2012) and *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

If the Act takes effect on September 29, 2021, Plaintiff Physicians' patients and
other Arizonans will be left unable to receive constitutionally-protected abortion care.
Because abortion care is a time-sensitive form of medical care that "simply cannot be
postponed," *Bellotti v. Baird*, 443 U.S. 622, 643 (1979), the presumption of irreparable
harm applies with particular force, *Humble*, 753 F.3d at 911. Banning abortion and forcing
a person to carry a pregnancy to term against their will imposes immense irreparable
injuries because of the invasion of their bodily autonomy and ability to control their own

1  future. *Roe*, 410 U.S. at 153. Furthermore, the Reason Ban Scheme and the Personhood

2  Provisions expose Plaintiffs to uncertain legal obligations and arbitrary prosecution as soon

3  as the laws go into effect. *See supra* Argument A.3 and B.[12]

4  **III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR**
5  **PRELIMINARY INJUNCTIVE RELIEF**

6      Furthermore, while Plaintiffs will suffer these serious harms if the law takes effect,

7  Defendants only stand to lose the ability to enforce a law that is plainly unconstitutional

8  under decades of Supreme Court precedent. Thus, granting an injunction in this case will

9  *serve* the public interest. "[I]t is always in the public interest to prevent the violation of a

10  party's constitutional rights." *Melandres*, 695 F.3d 990 at 1002; *see Doe v. Harris*, 772

11  F.3d 533, 583 (9th Cir. 2014).

12  **IV.   THIS COURT SHOULD WAIVE THE BOND REQUIREMENT**

13      Because Plaintiff Providers and their patients stand to lose their constitutional rights,

14  and Defendants are not faced with any monetary injury if a preliminary injunction is issued,

15  no bond should be required under Fed. R. Civ. P. 65(c). *See Diaz v. Brewer*, 656 F.3d 1008,

16  1015 (9th Cir. 2011) (affirming district court's waiver of bond in constitutional rights case).

**CONCLUSION**

18      For the foregoing reasons, a preliminary injunction should be granted.

---

[12] *See also* Exhibit 4, Declaration of Dianne Post, Arizona National Organization for Women; Exhibit 5, Declaration of Civia Tamarkin, National Council of Jewish Women (Arizona Section), Inc; and Exhibit 6, Declaration of Dr. Miriam Anand, Arizona Medical Association.

- 22 -

**2-ER-214**

Dated: August 17, 2021

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA

By: /s/ *Victoria Lopez*

    Victoria Lopez

Emily Nestler*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC 20006
Telephone: (202) 629-2657
enestler@reprorights.org

Gail Deady*
Jen Samantha D. Rasay*
Center For Reproductive Rights
199 Water Street
New York, NY 10038
Telephone: (917) 637-3600
gdeady@reprorights.org
jrasay@reprorights.org

*Counsel for Paul A. Isaacson, M.D.,
National Council for Jewish Women
(Arizona Section), Inc., and Arizona
National Organization for Women,*

Victoria Lopez (330042)
American Civil Liberties Union Foundation
of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone (602) 650-1854
vlopez@acluaz.org

*Counsel for Plaintiffs*

Ruth Harlow*
Rebecca Chan*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
rharlow@aclu.org
rebeccac@aclu.org

*Counsel for Eric M. Reuss, M.D., M.P.H.
and Arizona Medical Association*

*Application for admission pro hac vice
forthcoming

- 23 -

**2-ER-215**

1    **<u>CERTIFICATE OF SERVICE</u>**

2          I hereby certify that on August 17, 2021, I electronically transmitted the attached

3    document to the Clerk's Office using the CM/ECF System for filing.  All counsel of record

4    are registrants and are therefore served via this filing and transmittal.

5

6                                                    /s/ *Victoria Lopez*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | Case No. _____ |
|---|---|
| Plaintiffs, | |
| v. | |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; et al., | **INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | |

**INDEX OF EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 1 | Declaration of Eric M. Reuss, M.D., M.P.H. dated August 14, 2021 |
| 2 | Declaration of Katherine B. Glaser, M.D., M. P. H. dated August 16, 2021 |
| 3 | Declaration of Paul A. Isaacson, M.D. dated August 13, 2021 |
| 4 | Declaration of Dianne Post, State Coordinator for Political Action, Arizona National Organization for Women dated August 16, 2021 |
| 5 | Declaration of Civia Tamarkin, President of the National Council of Jewish Women (Arizona Section), Inc. dated August 13, 2021 |
| 6 | Declaration of Miriam Anand, M.D., President of the Arizona Medical Association dated August 13, 2021 |

- 2 -

2-ER-218

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | |
| Plaintiffs, | Case No. |
| v. | |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; et al. | |
| Defendants. | |

## DECLARATION OF ERIC M. REUSS, M.D., M.P.H.,
## IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Eric M. Reuss, M.D., M.P.H., declare as follows:

1.      I am an obstetrician and gynecologist ("OB/GYN") licensed in Arizona.  I have maintained an independent OB/GYN practice, Scottsdale Obstetrics & Gynecology, P.C., since 2001.  I participate as a plaintiff in this suit on behalf of myself, my staff, and my patients to enforce important constitutional protections and ensure that I can continue to provide high-quality care to patients without risking serious criminal and civil penalties.

2.      I earned my medical degree and a Master's of Public Health degree from Tulane University in 1997.  I completed my internship and residency training at the University of California San Diego from 1997 to 2001.

3.      I am board certified in obstetrics and gynecology and a fellow of the American College of Obstetricians and Gynecologist ("ACOG").

1

4. I served as Chairman of the Department of Obstetrics & Gynecology at Scottsdale Healthcare Osborn Hospital from 2008 to 2014. I also have held leadership positions in the Arizona Section of ACOG. I am a member of the Arizona Medical Association.

5. During my two decades of practice, I have been named to numerous top doctor, patients' choice, and compassionate doctor lists.

6. This declaration is based on my education, training, practical experience, and personal knowledge as an OB/GYN; consultation and other interactions with fellow medical professionals; and review of professional practice guidelines and other medical literature.

7. I have reviewed the law recently enacted as Senate Bill 1457 ("SB 1457"), which amends and adds to Arizona's statutes governing abortion and introduces new rules of interpretation for all Arizona laws.

8. As detailed below, SB 1457's new ban on abortions sought after a pregnant patient learns of a possible fetal anomaly will significantly interfere with the health care that I provide to patients; is contrary to standard obstetrics care; and will seriously compromise the physician-patient relationship. It creates the risk of criminal and serious civil penalties for me—and for many other medical professionals, including genetic counselors and perinatologists/maternal-fetal medicine specialists—while depriving my patients of constitutionally-protected options. And this new ban on certain abortions is extremely unclear, internally contradictory, and subjective, leaving me and my pregnant patients without any discernible line that demarcates what is and what is not permitted.

9. In addition, the new law appears to create new "rights, privileges, and immunities" in "unborn children" in a manner that may expose a wide spectrum of physicians, others caring for pregnant patients, and those patients to potential criminal and other liability.

2

Again, however, this language that attempts to vest new rights in fertilized eggs, embryos, and fetuses is vague and highly uncertain in how it purportedly affects all Arizona laws and criminal or civil liability.

10.     This declaration describes (a) my practice and my patients; (b) how fetal anomaly screening and diagnosis proceed during pregnancy; and (c) important context for understanding patients' abortion decision-making.  I then discuss some of the specifics of SB 1457 and highlight some of the serious harms it threatens for me, other medical professionals, and patients.

### Background on My Practice and My Patients

11.     I have a broad solo OB/GYN practice.  My practice includes gynecological care, gynecological surgery, prenatal care, labor and delivery, and abortion care.  I provide contraceptives and counsel patients about basic fertility issues.  When patients need more specialized testing, diagnosis, counseling, or treatment than I provide, I refer them to other appropriate resources, include perinatologists/maternal-fetal medicine specialists ("MFMs") and reproductive endocrinologists.  I often consult with those specialists and other medical professionals about my patients.

12.     I routinely provide pregnancy testing and then care for many pregnant patients.  I deliver approximately 15-20 babies per month and have delivered thousands of babies over the course of my career.

13.     I provide medication abortion and procedural abortions in my office during the first trimester for those patients that decide on that course.   Later in pregnancy—the time period when abortions that follow a fetal anomaly indication often occur—I provide dilation and evacuation ("D&E") abortion procedures for my patients at HonorHealth Scottsdale Osborn Medical Center.

14.     Many of my patients have been seeing me for years and for a range of needs.  I have treated a number of patients from young adulthood through their reproductive years, often helping the same patient with multiple pregnancies.  I aim to get to know each patient, and take pride in providing personalized, direct care.  If my patients have an urgent need, for example, they can reach me directly on my cell phone; I do not use an after-hours answering service.  Likewise, I personally perform all of my patients' deliveries so long as I am not traveling.

15.     In this relatively small private practice, my patients almost always have some health insurance that aids them in accessing health care; there are many others in Arizona, however, that unfortunately lack any insurance coverage at all.  Even with some insurance coverage, however, many patients must pay significant out-of-pocket costs, including for abortion care.  I know that many of my patients struggle financially, are physically and emotionally stressed caring for their current children or elderly parents, and/or face other significant challenges in their lives.  Some of my patients are single parents.  Some have recently lost their jobs—a phenomenon exacerbated by the COVID pandemic.  Some of my patients have cancer or other serious illness.

16.     My practice recognizes—consistent with all physicians' ethical obligations—that each patient is a unique individual with different preferences about patient care.  I allow time with each patient, both in my office and in the exam/treatment room, to address any concerns or questions they might have.  I emphasize to my patients that they should feel free to bring with them any information that they have read or received from others that they would like to discuss with me.  The doctor-patient relationship is an active partnership that is dependent on trust and open communication.  Only by my fully answering all questions and discussing all relevant

4

alternatives with patients can each patient make their own informed choices regarding healthcare.

### Screening for and Diagnosis of Fetal Anomalies During Prenatal Care

17.     I discuss genetic testing options with every patient for whom I am providing prenatal care.  We discuss the genetic screening and diagnostic options that are available and that may or may not make sense for a particular patient during their pregnancy, and then proceed based on the patient's wishes.

18.     Most of my patients opt to screen for common chromosomal conditions between 10 and 12 weeks, which is the earliest time in pregnancy when genetic screening tests can effectively occur.    Additional or initial testing for fetal genetic conditions can also arise after an anatomy ultrasound, which is routinely performed between 18 and 20 weeks.  As described below, a screening test or ultrasound is only the beginning of what is typically a multi-dimensional medical assessment that requires considerable time, and it is only the beginning of the patient's often-complex decision-making.

19.     Offering genetic testing to each pregnant patient is standard medical practice.  Likewise, an anatomy ultrasound screening for structural development issues in the fetus is standard pregnancy care.

20.     ACOG is the preeminent national professional organization for OB/GYNs.  Its practice bulletins spell out principles of current OB/GYN care to aid physicians in meeting professional standards and providing quality care.  Similarly, the Society of Maternal-Fetal Medicine ("SMFM") is the leading professional organization for physicians and scientists focused on high risk maternal and/or fetal issues.  As a recent joint ACOG and SMFM practice bulletin summarizes,

Each pregnant patient should be counseled in each pregnancy about options for testing for fetal chromosomal abnormalities.  It is important that obstetric care professionals be prepared to discuss not only the risk of fetal chromosomal abnormalities but also the relative benefits and limitations of the available screening and diagnostic tests.  Testing for chromosomal abnormalities should be an informed patient choice based on provision of adequate and accurate information, the patient's clinical context, accessible health care resources, values, interests, and goals.  All patients should be offered both screening and diagnostic tests, and all patients have the right to accept or decline testing after counseling.

ACOG and SMFM, Practice Bulletin No. 226, *Screening for Fetal Chromosomal Abnormalities*, available at https://www.smfm.org/publications/328-practice-bulletin-226-screening-for-chromosomal-abnormalities ("Screening Bulletin"); *see also* ACOG and SMFM, Practice Bulletin No. 162, *Prenatal Diagnostic Testing for Genetic Disorders*, available at https://www.smfm.org/publications/223-practice-bulletin-162-prenatal-diagnostic-testing-for-genetic-disorders ("Diagnostic Bulletin").  In medicine, the terms "abnormality" or "anomaly" are used to describe unusual or unexpected results or conditions; they are descriptive and embody no value judgment.  I use the terms in that way, consistent with professional practice.

21.     As these practice guidelines reflect, screening tests and diagnostic tests for fetal genetic abnormalities are distinct steps.  Screening tests provide information about the likelihood or risk that an anomaly or anomalies may be present.  Diagnostic tests—if available and pursued—aim to determine, with as much certainty as possible, whether a specific genetic anomaly or condition is present in the fetus.  Each type of screening or diagnostic testing has limits and uncertainties.

22.     In addition, testing capabilities continue to evolve.  Cell-free DNA testing has recently come into expanded use, for example, and that evolution contributed to the 2020 update of the ACOG/SMFM genetic screening guidance.  I discuss my patients' use of cell-free DNA testing below.

6

23.     Today, there are testing options to attempt to detect a wide range of clinically significant fetal conditions.  Testing commonly occurs for (a) chromosomal anomalies, (b) single-gene disorders, and (c) isolated structural anomalies.

24.     Chromosomal anomaly testing can occur for aneuploidy (extra or missing whole chromosomes), as well as for "copy number variants," which involve microdeletions and duplications of portions of a chromosome.  Examples of aneuploidy include Trisomy 21 (Down syndrome), Trisomy 18 (Edward syndrome), Trisomy 13 (Patau syndrome), and the sex chromosome condition 47, XXY (Klinefelter syndrome).  With copy number variants, because each chromosome consists of hundreds of functional genes, significant disruptions in a chromosome's genetic material can cause a wide range of potential outcomes, including a newborn with a life-limiting condition, failure to thrive, and structural and intellectual impacts.

25.     Single-gene disorders include sickle cell anemia, cystic fibrosis, hemophilia, and Tay-Sachs Disease.

26.     Isolated structural anomalies—such as congenital heart defects and neural tube defects, which include spina bifida—are as a category more common than the conditions describe in paragraphs 24 and 25.  "Isolated" means that these structural differences usually are not associated with a known genetic syndrome or diagnosis.  These structural traits, however, may be determined by multiple genes, infectious diseases, environmental factors, and/or other causes.  As ACOG and SMFM noted in 2016, "[i]ncreasingly, it is recognized that" the distinctions between genetic causes and environmental or other disruptive factors "are not always clear."  Diagnostic Bulletin.  Because of their complex and uncertain origins, identification of isolated structural anomalies typically occurs through ultrasound and other imaging techniques, and specific DNA or chromosomal testing to confirm a particular diagnosis may not be available.

7

27.     All prenatal imaging, screening, and diagnostic testing for fetal anomalies aims to provide additional information to physicians and their patients to guide pregnancy management: These components of prenatal care can indicate the presence of disorders for which prenatal treatment may provide benefit; help optimize maternal and neonatal outcomes by ensuring the appropriate location and personnel for delivery; and inform the patients' consideration of future steps, including termination (if that is something the patient is considering) or how best to manage the birth and continued care of a child with needs that may be significant and unexpected.. *See* ACOG and SMFM, Diagnostic Bulletin.

28.     When any testing occurs, "[p]retest and posttest counseling is essential."  AGOG and SMFM, Screening Bulletin.  This counseling informs patient decision-making—including by answering their questions and discussing their concerns—but does not direct or otherwise attempt to determine those decisions.  *See* ACOG and SMFM Screening Bulletin ("Counseling should be performed in a clear, objective, and nondirective fashion, allowing patients sufficient time to understand and make informed decisions regarding testing" and their pregnancy.); *see also* Diagnostic Bulletin.  The nondirective approach to counseling is central to and used in many aspects of OB/GYN care and is one in which practitioners—including myself and the MFM specialists with whom I work—are well versed.

29.     Pregnant patients may have misconceptions about fetal conditions or little information about them before considering and undergoing testing.  Pre- and post-test counseling enables patients to base any decisions on available medical facts and case histories.  Without that counseling, they may exaggerate the significance or likely consequences of a given condition, or confuse it with other genetic and/or structural manifestations.  This counseling ensures that "patients realize there is a broad range of clinical presentations, or phenotypes, for many genetic

8

disorders and that the results of genetic testing cannot predict all outcomes." ACOG and SMFM, Diagnostic Bulletin.

30.     Depending on the condition, patients may also participate in counseling regarding risk to future pregnancies or testing of potentially affected family members. Counseling also includes information about potential care resources in the community for the patient, for other family members, and for the child.

31.     The prognosis for fetal conditions that are or might be present is extremely varied, both among different conditions and within any one. Medical advances are making some fetal structural issues treatable in the fetal and neonatal periods, but there is a wide range of outcomes even with attempted treatment. Genetic conditions (and other structural issues that may be related to genetics) have a spectrum of expressivity; the term expressivity refers the degree or intensity that the condition manifests. Some fetal anomalies lead to the need for ongoing medical or other support interventions throughout life, and may manifest with serious and multiple physical as well as intellectual consequences. Some are less serious and may have more limited consequences. Some are invariably incompatible with sustained life, but even for those, there may be considerable uncertainty as to how long a child born with the anomaly may live.

32.     For those patients whom I see for prenatal care during the first trimester, most decide after pre-test counseling to proceed with genetic screening and, in my practice today, that is most commonly cell-free DNA testing. This test screens fetal/placental DNA fragments that are present in maternal blood circulation. Because those fragments increase as gestation increases, cell-free DNA screening is most effective at 10 weeks and beyond. There are a number of other modalities for an initial genetic screen; all become available around this same point during pregnancy.

9

33.     Cell-free DNA testing screens for all of the examples of aneuploidies described in paragraph 24 above.  It can also screen for certain microdeletions, disorders that arise when small fragments of certain chromosomes are missing.  While it is quite sensitive and specific in identifying the likelihood of the relatively more common aneuploidies, it nonetheless can produce false-positives and false-negatives and testing failures (that is, no or uninterpretable results).

34.     Cell-free DNA is not the equivalent of diagnostic testing.  Thus, especially when patients receive positive or uninterpretable screening results, I offer detailed information about the options for prenatal genetic diagnosis.

35.     Diagnostic genetic testing requires the direct collection of placental or fetal cells through either Chorionic Villus Sampling ("CVS") or amniocentesis.  I discuss with my patients the risks of these procedures, which include some small risk of pregnancy loss, and the diagnostic information they can potentially provide.  Then patients may or may not decide to proceed with CVS or amniocentesis and diagnostic testing.

36.     CVS is generally performed between 10 and 13 weeks; amniocentesis can be performed from 15 weeks gestation. After  cells are collected through CVS or amniocentesis, they must be cultivated and analyzed in the laboratory and usually it at least a week before any diagnostic results might be available.

37.     If my patients decide on CVS or amniocentesis, I refer them to an MFM for the procedure and the initial interpretation of the genetic testing results.  The MFM sends me the results as well, though I often hear about the test results first from my patients by phone right after they have discussed those results with the MFM.  My patients rely on me as a resource and

10

support throughout their pregnancies and stay in close contact with me. In every case, I would discuss the CVS or amniocentesis test results with the patient and provide post-test counseling.

38.     In addition, it is standard practice to perform an ultrasound at approximately 18-20 weeks for all prenatal patients. At that time, the ultrasound may identify issues with fetal development, including structural abnormalities that have not been previously detected. I refer my patients to specialist practices (most often, MFM practices) for the ultrasound imaging, receive the results, and then talk with the patient about them.

39.     When I discuss the results of the ultrasound exam with the patient, it may be appropriate for me to again offer information about testing for genetic anomalies. The ultrasound may indicate isolated structural anomalies and/or other conditions.

40.     The specifics of the possible next screening and/or diagnostic steps depend on the findings of the ultrasound and whether there has been any earlier genetic screening: Certain structural anomalies or markers seen by ultrasound point to specific kinds of laboratory genetic testing. If that diagnostic testing follows the 18- to 20-week ultrasound, it will occur on cells obtained through amniocentesis.

41.     MFM practices typically include perinatologists and genetic counselors. The doctors and genetic counselors at the MFM practice may be involved only in specific testing, assessment, and counseling, or may be a partner in the patient's care throughout their pregnancy.

42.     In addition to the discussion of test results and counseling that I provide, there is often sophisticated test interpretation and other specialized counseling that these specialists can offer. For example, as the ACOG and SMFM guidelines describe, "[f]or many copy number variants identified by chromosomal microarray, interpretation requires consultation with a genetic counselor or specialist in prenatal genetic diagnosis." Diagnostic Bulletin.

11

43.     Whenever diagnosis of a specific condition is made, or there is a likelihood of that condition, the patient receives detailed information, to the extent that information is available, about the condition, its expressive range, and potential support resources in the community.  As described above, the patient receives non-directive counseling—either by me alone, or by both me and an MFM practice—that aims to address all of their concerns and answer all of the questions in a balanced way and that discusses any further options in which they are interested, including abortion.

44.     When patients decide on an abortion after anomaly screening and counseling, I learn of that decision in a variety of ways.  For some patients, a consulting MFM practice may report directly to me that the patient has expressed a decision to terminate.  In other instances, the patient calls me or my office and directly indicates that they plan to proceed with an abortion after anomaly test results.  Most patients see me in person after their MFM visit to discuss the findings with me and then, if abortion is their decision, move ahead to schedule it with me after our post-test counseling conversation.  In other instances, as I describe further below, the patient's abortion decision emerges during a number of conversations that touch on a variety of considerations.

## Patients' Abortion Decision-Making

45.     Since establishing my practice in 2001, I have always offered abortions as an option for my patients who become pregnant and decide on that care.  Throughout my internship, residency, and private practice, I have seen how vitally important access to abortion can be for myriad patients.  I have also witnessed that the practical circumstances of pregnant patients' lives can be challenging in so many different ways, often in many ways at once.

12

46.     When a pregnancy test comes back positive, my patients often quickly volunteer to me and my staff a reaction:  Common reactions are joy; ambivalence and concern; or a desire for abortion.  At that time, we meet our patients wherever they are in initially reacting to the pregnancy, listen to their perspective, and offer nondirective information and discussion that may assist them in deciding or confirming how to proceed.  Patients may reference their own values, culture or religion, health history or concerns, and other personal information in reacting to and addressing news of a pregnancy.

47.     In my experience, patients seek abortion for a wide range of personal reasons, including familial, medical, and financial, and often do not specifically delineate each one. Some patients have abortions because they conclude it is not the right time in their lives to have a child or to add to a family that already includes children.  Or they may not want children at all. Some decide they need to prioritize education or greater economic or family stability.

48.     Other patients seek abortions because continuing the pregnancy could pose a significant risk to their physical health, and still others struggle with addiction and do not wish to carry a pregnancy to term under those circumstances.  Some decide on abortion in the context of intimate partner violence or after suffering a rape.  Some decide that, at present, they do not have the emotional resources or mental health to carry a pregnancy to term and raise a child.

49.     And some pregnant patients decide to have an abortion after an indication or diagnosis of a fetal medical condition, as touched on above.  After screening and/or diagnosis, the patient may decide that they are not able to continue with the pregnancy.  It may be the test results, the uncertainty even after testing, the likely or possible prognosis for the anomaly, and/or much else that contributes to that decision.  Patients may take into account—for example—their familial situation; their physical or mental health; their economic security or insecurity; and their

13

capacity to care for a child with unique and potentially challenging needs (and simultaneously to provide for any children and other dependents they already have) given the other circumstances of their lives.

50.    Some patients experience both a high-risk pregnancy, with elevated risks to their own health, and a fetal diagnosis or potential fetal condition.  In my practice, these patients would likely be under the care of an MFM for their own health conditions as well as for the fetal indication.  As described above, however, they would typically engage in ongoing consultation with me and return to me for the abortion procedure if they decide on that course.

51.    As this summary reflects, patients' decision-making about abortion is always deeply personal, and sometimes occurs after extremely complex screening, diagnosis, and counseling related to fetal and maternal health conditions.  In my experience, patients make these decisions through self-reflection; discussion with their health care providers, who offer nondirective information and counseling; and also, in many instances, discussion with a trusted family member, friend, therapist, or religious counselor.

52.    After complying with all the pre-abortion steps now required under Arizona law, I provide pre-viability abortion care for my patients when they request it, including in instances where they have done screening or diagnostic steps for fetal genetic anomalies.

53.    Neither my staff nor I provide any coercive counseling or any directive approach toward our patients who are making decisions about whether to undertake any genetic testing or whether to continue their pregnancy.

54.    I respect my patient's autonomy and care greatly about their well-being.  I put my patients' interests and health first, as I am required to do as a physician.  I am participating in this suit to ensure that I am able to continue providing my patients with quality health care, that we

14

are able to communicate opening and freely within the physician-patient relationship, and that my patients retain their ability to access pre-viability abortion if they decide that is the right decision for them.

### The Reason Ban Scheme and Its Threatened Harms

55. Section 2 of SB 1457, in its part A(2), amends Arizona law to provide that a person who "[p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" is guilty of a class 6 felony.

56. In Section 2's part B(2), it provides that a person who knowingly "[s]olicits or accept monies to finance . . . an abortion because of a genetic abnormality of the child" is guilty of a class 3 felony, which I understand is an even more serious criminal offense than a class 6 felony.

57. The medical care that I provide my patients is, of course, paid for; I accept money from their insurance companies and the patients themselves to enable me to provide care, pay my employees, and otherwise operate my practice.

58. Section 2's part A(2) is the only provision of the new law where the "solely because of" phrasing appears.  In all of the other related provisions of SB 1457, the new law references "abortion because of a genetic abnormality."

59. For example, there is another prohibition in SB 1457, Section 10, that forbids any abortion unless and until the physician performing it swears in an affidavit that the physician "has no knowledge that the child to be aborted is being aborted … because of a genetic abnormality of the child."  That provision requires that the physician "shall not" "perform or induce" any abortion before swearing to that affidavit.

15

60.     Section 2 and Section 10 spell out the strict, onerous terms of SB 1457's "Reason Ban."  Those terms include that "any "physician, physician's assistant, nurse, counsellor or other medical or mental health professional" must report "known violations" of the Reason Ban to Arizona law enforcement authorities or be subject to a civil fine of up to $10,000.

61.     I understand that "knowledge" under Arizona law may be established by circumstances and need not be proven directly.

62.     This new law defines "genetic abnormality" as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression," but excludes a "lethal fetal condition."

63.     "Lethal fetal condition" is defined as "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth."

64.     In addition, SB 1457 requires that the reporting that either I or the hospital where I practice must provide with respect to each abortion requires reporting of "[w]hether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing, such as maternal serum tests, or by ultrasound, such as nuchal translucency screening, or by other forms of testing."

65.     Under this Reason Ban scheme, I would risk felony criminal prosecution if I continued to provide pre-viability abortions at the request of my pregnant patients when I am aware of any testing the patient has received that indicates a possible fetal genetic anomaly, or I am otherwise aware in any way that a patient may be seeking an abortion "because of" such an anomaly.

16

66.     In order to protect my ability to care for all of my OB/GYN patients and maintain my practice, I would have to avoid any, even circumstantial indication that I may be violating the Reason Ban.  I would thus have to stop offering pre-viability abortions whenever a possible fetal anomaly may factor into the patient's decision.

67.     If allowed to take effect, the Reason Ban scheme will severely distort, limit, and damage the physician-patient relationship in addition to erecting an explicit ban on many abortions.  It will force me to depart from full, standard non-directive counseling with my patients because I must deprive my patients of an option for their pregnancies that many have found critical in the past.

68.     The Reason Ban's harmful impact is further exacerbated by its indeterminate, inconsistent, and subjective nature.  As described above, this new scheme variously refers to any detection of a fetal anomaly, abortion "because of" an anomaly, and—in one provision alone— abortion "solely because of" an anomaly.  All of those phrases introduce confusion and uncertainty in this context:  Does detection mean any positive screening test, a high likelihood assessment, a formal diagnosis, or something else?  Is an abortion "because of" an anomaly or "solely because of" an anomaly if the practical challenges associated with the anomaly are part of the patients' thinking?  These are just some of the questions that will leave me and other physicians subject to the Reason Ban unable to understand its rules.

69.     The exception for lethal fetal anomalies does not create any objective safe harbor. Who decides whether there is a "reasonable certainty" that the child would die within three months?  How much certainty is reasonable?  Is that considered with or without every conceivable medical intervention?

17

70.     The Reason Ban scheme does not account for the fact that its interlocking set of required but unclear determinations would have to be made on a patient-by-patient basis—with many factors and unknowns potentially influencing, e.g., outcome after birth—under considerable time pressure because of the gestational age limit for abortion.  Assessments of "because of" and "lethal fetal condition" would have to occur in a context that would make it very easy to be later second-guessed and targeted by enforcement authorities. Similarly, what is the standard for a "morphological malformation occurring as the result of abnormal gene expression"?  If a structural anomaly *may* be caused by abnormal gene expression, does that fit within the ban?  Or can I provide the abortion unless I have some basis for concluding that it is "the result of abnormal gene expression" and not environment or other factors?  What basis does the law contemplate for determining a genetic origin?

71.     Under this Reason Ban scheme, how would I need to satisfy myself and later enforcement authorities that I have "no knowledge" that an abortion is occurring because of the "presence or presumed presence of an abnormal gene expression"?  Because SB 1457 newly requires my reporting of any detection of an anomaly through any type of testing, would I need to probe my patient's reasoning in every instance when even a small likelihood of anomaly risk was detected through screening or ultrasound before abortion?  That would be contrary to medical ethics and, like many other parts of this scheme, would harm the physician-patient relationship and inappropriately prevent medical care.

72.     The Reason Ban scheme upends the highly personal but standard medical care it intrudes upon.  The care that I and other OB/GYNs provide to our patients—when they are experiencing pregnancy, possible fetal anomalies, and/or considering abortion—generates and requires frank physician-patient conversations.

18

73.     Thus, I know whether a given patient is excited about a pregnancy and preparing for welcoming a new child into their family.  They may have struggled with infertility or other conditions that interfere with pregnancy under my care.  If a patient who previously expressed joy at pregnancy desires an abortion right after receiving genetic testing indications, it will be apparent those played some role.  The Reason Ban scheme is riddled with lack of clarity, but its harsh terms would harmfully force me to deny my patient that care in order to preserve my ability to continue my medical practice for all patients and to avoid criminal consequences.

### The Unclear "Rights, Privileges and Immunities" Beginning at Conception

74.     There is another very troubling part of this new legislation.  Section 1 of SB 1457 directs a new interpretation and construction of all of the laws of Arizona "to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons" subject "only to the Constitution of the United States" and the U.S. Supreme Court's interpretation of that constitution.

75.     As stated, Section 1 applies to the construction of all Arizona laws, whether criminal or civil.

76.     "Unborn child" is defined as "the offspring of human beings from conception until birth."  Under Arizona law's existing definition of "conception," that term means "the fusion of a human spermatozoon with a human ovum."

77.     Section 1 carves out just two exceptions:  It states that it does not create a cause of action against "a person who performs in vitro fertilization procedures as authorized under the laws of this state" or against "a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care."

19

78.     The inclusive stated scope of Section 1 and these very narrow exceptions together indicate that medical care and maternal decisions would—beyond the narrow exceptions— trigger rights and protections in the "unborn child."  As a physician who cares for pregnant patients, I am left with serious questions and fears about what Section 1 might mean, and how the "unborn child" rights will affect medical practice and my patients.

79.     For example, does Section 1 create new liability for physicians who provide maternal medical care that, when undertaken by the patient, might negatively affect fertilized eggs, embryos, or fetuses?  I think of examples such as prescription drugs for a wide variety of illnesses and conditions,  cancer care, and other interventions to treat the often-serious medical issues of pregnant patients where those interventions may create risks for the developing pregnancy.  The pregnancy itself may cause or exacerbate maternal medical issues for which I prescribe drugs or other treatment.

80.     Currently, when a patient is taking or considering medication to treat a serious condition (such as epilepsy or a cardiac condition) that may have effects on their pregnancy, we have a conversation about the potential risks to the developing pregnancy and assess those against the patient's health needs.  But now, Section 1 adds new embryo and fetal rights and immunities to Arizona law that may create liability for these types of decisions.  Section 1 seems to create potential new criminal and civil liability issues for both me and my patients.

81.     Section 1's narrow carve-out for certain indirect harms begs the question of what might be considered direct harms or what other indirect harms could trigger a cause of action against a patient.   Might a patient be subject to liability for, in consultation with me or another physician, continuing prescription medications to treat her own health conditions?

20

82.     Section 1's language purports to alter all Arizona law.  Its narrow exceptions highlight that it somehow covers medical care.  But I am left wholly unclear as to its meaning, its effects, and how I must act to conform my medical practice to it and avoid legal liability for me and/or my patients.

## Conclusion

83.     If SB 1457 were allowed to take effect, the Reason Ban scheme would immediately harm my patients, deprive them of medically-appropriate counseling, restrict physician-patient communication, and ban pre-viability abortions after emergence of fetal anomaly indications.  The Reason Ban and Section 1 would subject me and other physicians to criminal liability and other serious penalties without discernible standards for our conduct and without protection against arbitrary enforcement.  I ask the Court to protect both my patients' and my own constitutional rights by issuing a preliminary injunction to prevent grave medical care disruptions from occurring while this case proceeds.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 14, 2021.

_____

Eric M. Reuss, M.D. M.P.H.

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | Case No. |
| Plaintiffs, | |
| v. | **DECLARATION OF KATHERINE B. GLASER, M.D., M.P.H. IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; et al. | |
| Defendants. | |

I, Katherine B. Glaser, M.D., M.P.H., declare as follows:

1.      I am a board-certified obstetrician-gynecologist ("OB/GYN") licensed to practice in Arizona.  As described further below, I currently provide a wide range of OB/GYN care to patients in Arizona, including pregnant patients.

2.      I provide this declaration as a member of the Arizona Medical Association ("ArMA"), one of the plaintiffs in this action.

3.      I earned my medical degree at the University of Arizona College of Medicine in 2008, and completed my residency training at the University of Arizona Department of Obstetrics and Gynecology from 2008 to 2012. I also hold a master's degree in Public Health, which I earned from the University of Arizona in 2005.

4.      I am board certified as an OB/GYN and a fellow of the American College of Obstetricians and Gynecologists ("ACOG").

5.      Since 2012, I have practiced primarily in Tuba City, Arizona.  My patients often have very few financial or medical resources, and most come from the Navajo Nation.  Tuba City is in

1

a relatively isolated part of the state.  I work within a practice there that sees a large volume of pregnant patients and delivers about 400 babies per year.

6.      I also am a back-up OB/GYN provider on contract at a reproductive health clinic in Flagstaff and with privileges at a hospital in Flagstaff.

7.      My OB/GYN services address pregnant patients' range of needs from pregnancy testing onward, up to and including delivery, and assist patients in making their own decisions about their pregnancy and pregnancy care.  Given the number of patients I treat, I see a variety of fetal anomalies with some regularity.

8.      As part of my day-to-day practice, I offer genetic and other routine testing to my pregnant patients; counsel them about genetic testing and ultrasound results; help them maintain maternal and fetal health; provide them with nondirective information about options for their pregnancy and other care; and discuss any concerns and questions they may have during the pregnancy.

9.      After I discuss genetic testing options with them, my patients often choose to undergo "quad screening," for example, which is a maternal blood test that measures the levels of four different hormones in the patient's blood.  The test, which can be performed starting at approximately 15 weeks, screens for and measures the likelihood of various fetal genetic conditions.  Its results are reported as a risk estimate.  This is one of several screening tests that can be performed using maternal blood samples.

10.     All pregnant patients in my care also receive an ultrasound at 18-22 weeks, which may identify structural malformations and/or markers that indicate a genetic anomaly.

11.     If my patients need more specialized testing, consultation, or care than my general OB/GYN services, I refer them to and work with other medical providers, including maternal-fetal medicine physicians and specialists in genetic counseling.  This consultative care can

2

include follow-up testing after their quad screening, other initial genetic screening, or ultrasound exam during their routine prenatal care with me.

12.     Through my various professional roles, and in addition to my ongoing prenatal care for many patients, I perform one or two procedural abortions per year and have also provided medication abortion care.  I also routinely provide information about abortion, as well as about other pregnancy options, during counseling after a positive pregnancy test or in connection with the counseling that accompanies fetal testing.  I provide information about and referrals to abortion providers when and if my patients decide on an abortion, including when those patients have chosen to have an abortion after fetal testing indicated a genetic anomaly.

13.     At ArMA, I serve on the Board of Directors as a Rural Director, a role that highlights that ArMA includes physician members from all parts of the state and aims to address the concerns of all types of medical practitioners.  I am a member of the ArMA board's Committee on Public Health and Committee on Legislative and Government Affairs.

14.     I have reviewed the final text of S.B. 1457, which I understand will take effect on September 29, 2021, absent relief from this Court.  I am very concerned with its new intrusions into medical practice, with its severe penalties, and with the ways in which it will deprive my patients (and many other Arizona patients) of information, counseling, and care that they need.  I am also concerned about the personhood rights it attempts to add to all of Arizona law, and am left without any guide as to how that might newly limit or punish my care for pregnant people or otherwise impact my patients.

15.     I see that S.B. 1457, through a number of convoluted and unclear provisions (the "Reason Ban"), forbids any abortion unless the provider swears that they have no knowledge that the abortion is being sought because of a "genetic abnormality," and creates various felonies that

criminalize physicians who provide abortions when those are sought "solely because of" or "because of" any of the myriad fetal anomalies that may be covered by the law.

16.     It is unclear to me whether I might get caught up in a criminal prosecution, including potentially as an accomplice or aider of criminalized care, if I refer a patient to an abortion provider or simply provide factual information about where in Arizona abortion care is offered, after the patient receives any positive results from anomaly screening or diagnostic tests.  And of course, when I myself perform abortions, if there is any indication of an anomaly, I would be at risk of direct felony prosecution.

17.     If I became aware that another physician had (with some knowledge) provided my patient with an abortion that the patient had decided upon as a result of an anomaly, I would have to breach physician-patient confidentiality and report that abortion to law enforcement.  If I failed to report any such abortion, I would be subject to a fine of up to $10,000.  This scheme is antithetical to my patients' rights and interests, and conflicts with my ethical obligations to them as their physician.

18.     These provisions and ramifications of the banned abortion care in S.B. 1457 would seriously affect my ability to provide full, standard counseling and information to my pregnant patients after any genetic screening, ultrasound, or diagnostic tests.  I would be forced to constrain the non-directive options counseling, referrals, and open discussion with patients that are now essential parts of the care I provide.

19.     Fundamentally, my relationship with my patients depends on earning and building their trust.  I must put their interests first and understand their values, needs, and priorities.  I cannot do any of that if I am required to withhold critical medical information from my patients, deprive

4

them of access to vital medical care options, and disclose their private healthcare decisions to law enforcement.

20.     When a patient is faced with an unanticipated screening result or diagnosis, my purpose is to provide them with comprehensive, objective, and individualized counseling to ensure that each patient can make a well-informed and autonomous decision that is best for the patient and the patient's family.

21.     In these challenging situations, I provide objective, compassionate, and non-directive counseling about options, including both pregnancy continuation and termination, and I help patients and their families navigate an unexpected and sometimes profoundly difficult situation. Because I allow the patient's values, desires, and questions to guide our conversations, it is particularly important that patients feel they can speak openly with me, ask any questions they may have, and receive help from me in finding and receiving the care they need. S.B. 1457's Reason Ban scheme would bar that.

22.     The Reason Ban's harms will be particularly harsh for the patients that I serve in Tuba City. Many of my pregnant patients there simultaneously experience an array of significant challenges, ranging, for example, from financial insecurity, to family insecurity, to caregiving challenges and serious health issues that preceded the pregnancy, to lack of access to any other reliable health information sources. These are patients who need a full physician-patient relationship with me and who need my support in openly considering their pregnancy options after anomaly screening or other testing. The Reason Ban will tie my hands and their options.

23.     In addition, as another major example of S.B. 1457's interference with essential health care, Section 1 of the law appears to newly restrict treatments provided for a pregnant person's own medical issues during pregnancy. When I care for pregnant patients, I may prescribe drugs

5

or order testing to address the patient's health needs that unavoidably pose some risk to a developing embryo or fetus. I also often work together with other Tuba City medical colleagues to address maternal health issues that require chemotherapy, prescription drugs, or other interventions that pose such risks to an embryo or fetus. And I may be helping patients who are in treatment for opioid addiction or struggling with addictions in ways that could harm a fertilized egg, embryo, or fetus.

24.     The new personhood "rights" and "immunities" in Section 1 of S.B. 1457 appear to create potential liability for both physicians and patients, but their sweep and specifics are exceedingly unclear. I do not understand how Section 1 changes the interpretation of all Arizona laws, how I must adjust my behavior to recognize such rights, or the specifics of the criminal or civil liability that I or my patients will face if it is allowed to take effect.

25.     As an ArMA member and board member—appearing here for myself, my patients, my fellow ArMA members who provide pregnant patients with care, and their patients throughout the state—I urge this Court to examine S.B. 1457 closely.

26.     I do not by any means attempt here to identify all of the many harms and confusions that S.B. 1457's Reason Ban and its new Section 1 rights and immunities impose.

27.     But it is clear from its terms that S.B. 1457 will upend standard medical practices and interfere with physicians' open communication with their patients, including my own. S.B. 1457 will deprive patients of medical care they need; open up private, complex patient decision-making to law enforcement; establish felonies and other serious penalties for physicians; and create unbounded and unexplained rights in fertilized eggs, embryos and fetuses.

28.     For all the legal reasons and based on all of the facts presented by ArMA's lawyers, I urge the Court to prevent S.B. 1457 from taking effect and to rule it unconstitutional.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

August 16, 2021.


_____

Katherine B. Glaser, M.D., M.P.H.

7

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | |
| Plaintiffs, | Case No. |
| v. | |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; et al. | |
| Defendants. | |

## DECLARATION OF PAUL A. ISAACSON, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, PAUL A. ISAACSON, M.D., pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a Plaintiff in this lawsuit. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction against enforcement of provisions of Arizona Senate Bill 1457 of 2021 ("the Act").

2.     I am a physician licensed to practice medicine in Arizona and Nevada. I graduated from Tufts University School of Medicine in 1991. I am a board-certified obstetrician and gynecologist. I have provided reproductive health care, including performing abortions and delivering babies, to thousands of women in Arizona over more than 25 years.

3.     I offer this declaration as a Plaintiff in this case. My statements herein are based on my personal knowledge as well as my experience providing obstetrical and gynecological care, including abortion care, to patients in Arizona.

### I.     Background

4.     I am currently a physician at Reproductive Choice Arizona, PLC, doing business

1

as Family Planning Associates Medical Group ("FPA"). FPA is a private medical practice located in Phoenix, which I co-own along with another physician. It is licensed as an abortion clinic by the Arizona Department of Health Services.

5. At FPA, we provide a variety of services, including medication abortion to patients up to 10 weeks since their last menstrual period ("LMP") and surgical abortion prior to viability. FPA is one of only three medical practices in Arizona that regularly provides previability abortion care up to 23 weeks, 6 days LMP.

6. In my role as a physician at FPA, I provide the full range of services offered at the clinic, including performing medication abortions and pre-viability surgical abortions. I also oversee FPA's medical staff and ensure the clinic's policies, procedures, and protocols are in compliance with state law. Additionally, I lead one of the only two abortion-training programs available to Arizona's OB/GYN medical residents.

7. In order for FPA to remain in operation, the clinic charges a monetary fee for the medical services I provide to my patients, including patients for whom I provide abortion care after a fetal diagnosis.

## II.  Access to Abortion Care for Patients in Arizona with Fetal Diagnoses

8. I am familiar with other abortion providers in Arizona and the general availability of abortion care in Arizona.

9. FPA is the foremost medical practice in Arizona providing care to patients referred by other physicians and who are seeking abortion care because of medical indications, including following a diagnosis of a fetal condition. Some of my abortion patients are referred to FPA by other medical providers after receiving a fetal diagnosis from their obstetrician or a specialist in maternal-fetal medicine ("MFM") or high-risk pregnancies. They may also be referred by a genetic counselor or other therapist with whom they discussed the fetal diagnosis.

2

10.     My patients who are referred to FPA after receiving a fetal diagnosis are more frequently among my patients who are further along in pregnancy. For example, many of the patients I have seen for an abortion who also had a fetal diagnosis were referred to me by another medical provider after an issue was detected during a full obstetric ultrasound, which usually occurs after a pregnancy is at or beyond 18 weeks LMP.

11.     Very few Arizona providers offer abortion at the later stages of pregnancy when certain fetal conditions are likely to be detected. FPA's other physician owner and I are two of only a handful physicians in Arizona who provide abortion care beyond 16 weeks LMP. Medical providers accordingly refer patients with fetal diagnoses to us from across Arizona, as well as from other states.

12.     Among my patients at FPA, some of the more common examples of fetal diagnoses are neural tube defects, including anencephaly (which causes lack of brain development), meinigomyeloceles (a condition in which the spinal canal and the backbone do not close before birth), and holoprosencephaly (a condition in which the brain does not properly divide into two hemispheres); chromosomal abnormalities such as trisomy 21, 18 and 13; diaphragmatic hernia (which impedes organ development); and fetal cardiac conditions. There is also a variety of referrals for other fetal diagnoses.

13.     And as a physician who has provided abortion care to patients with fetal diagnoses for over two decades, I am familiar with patients' decision-making around abortion. Patients decide to have an abortion for many reasons, and often more than one reason at a time. But only the patient can ultimately know all of the reasons why they decided to have an abortion, or where there was a "sole" reason as opposed to several concurrent reasons. It is my practice to be supportive of patients' decision-making and personal autonomy; I do not attempt to steer a patient's decision toward or against abortion, and I do not press patients to elaborate on the basis

3

for their decisions.

14.     I am aware based on my experience providing care to patients with diagnosed fetal conditions that they come to FPA from across Arizona, and often rely on referrals and counselors to guide them toward an abortion provider who can meet their needs later in pregnancy.

**III.    My Abortion Practice and Patients**

15.     As a physician and co-owner of FPA, I am familiar with the manner in which my patients' appointments for abortion care are scheduled and conducted, and the process of obtaining informed consent, including pre-abortion consultation and counseling sessions.

16.     FPA typically receives patients who either: (1) call the clinic and make appointments independently; or (2) are referred by other medical practices based on their existing medical circumstances.

17.     Patients seeking abortion care at FPA without going through a referring physician typically first contact FPA over the phone and speak with a receptionist to schedule an appointment. These patients must visit FPA for at least two in-person appointments. The first appointment, which we refer to as the "consultation" appointment, must take place at least 24 hours before the second appointment, which is when the patient can receive the abortion (the "Day 2" appointment).

18.     For patients who are referred to me by a genetic counselor, MFM, obstetrician, or other specialist, the referring provider will usually contact me or another FPA physician directly, speak with one of us about the patient and/or the fetal diagnosis at issue, and then usually send the patient's medical records to FPA so that I or one of FPA's other physicians can review the patient's medical history and any information regarding the fetal diagnosis before the patient's appointment.

19.     While the vast majority of my patients with a fetal diagnosis are referred to FPA by specialists or other providers, patients who have received a fetal diagnosis will on occasion make

4

an appointment for themselves, without a referral and sometimes without directly disclosing the diagnosed fetal condition.

20.     During the Day 1 consultation appointment, all patients seeking abortion care currently check in at the reception desk, where they are screened for COVID-19 and provided with paperwork to fill out. This paperwork includes a medical history form and other initial paperwork. After the patient completes the paperwork, a member of FPA's medical staff will take the patient for lab work and vitals, and then the same or another member of the medical staff will perform an ultrasound examination. The patient next schedules their second ("Day 2") appointment for the abortion procedure and then meets with me or one of FPA's other physicians for a pre-abortion consultation.

21.     During the pre-abortion consultation, I go over the patient's medical history, other initial paperwork, and test results; tell the patient the name of the physician who will be providing the abortion (which would be me or another FPA physician); and provide all of the information patients are required by state law to receive at least 24 hours before an abortion (which I refer to as "State Mandated Information" or "SMI"). After the pre-abortion consultation concludes, the patient leaves the clinic.

22.     My patients will usually next visit FPA at least 24 hours after their "consultation" appointment to receive their abortion (the "Day 2" appointment). During this appointment, my patients check in with an FPA receptionist who provides them with paperwork to complete, including consent forms for the abortion procedure or medication abortion, and forms seeking information about the patient and their pregnancy that I am legally required to report to the state.

23.     Patients will then have a pre-abortion counseling session with a member of my medical staff who will review the patients' paperwork with them, including all consent forms and State-Mandated Information (which includes a form requesting the patient's reasons for having an

5

abortion). The medical staff member will also go over in detail the abortion procedure the patient has chosen and assess whether the patient is firm in their decision to have an abortion. The patient is given multiple opportunities to ask questions throughout this process.

24.     The Day 2 appointment will then move forward based on the method of abortion the patient selected.

25.     Once a patient receiving a medication abortion has confirmed they are certain in their decision to terminate their pregnancy, I will be brought into the counseling session. I will then give the patient an opportunity to ask me any additional questions, administer mifepristone to the patient (the first medication in the two-drug medication abortion regimen), and then either dispense or prescribe to the patient misoprostol (the second medication in the two-drug regimen, which the patient takes at home or another location). The patient then leaves the clinic with instructions for how to complete the medication abortion regimen.

26.     Once a patient having a surgical abortion confirms they are certain in their decision to terminate their pregnancy, a member of my medical staff will administer pre-procedure medications to the patient. The patient then waits for about 30 minutes before they are taken to the procedure room, where they will have another opportunity to meet with the physician and ask any final questions before the procedure begins.

27.     Some patients who are further in pregnancy, starting at 16 weeks LMP, will have a surgical abortion procedure that takes place over two, three, or four days. However, all patients complete their pre-abortion counseling on Day 2. For example, a patient at 18 weeks LMP may need a two-day procedure where their Day 2 appointment would involve a procedure to prepare the cervix, and then the patient would return to the clinic the following day for the abortion procedure (which I refer to as a "Day 3" appointment). Altogether, that patient would visit the

6

clinic three times, but would nevertheless have the pre-abortion counseling session during the Day 2 appointment.

## IV. If the Reason Ban Scheme Goes into Effect, I Will Be Forced to Turn Away Patients When There Is Any Inference of a Fetal Diagnosis

28.  I have read the Act and am very concerned about its impact on my medical practice and my patients. In particular, I am concerned that if the "Reason Ban"[1] and its related reporting requirements,[2] which I will refer to together as the "Reason Ban Scheme," are permitted to go into effect, many pregnant people will be deprived of quality and compassionate medical care and either severely inhibited or fully deprived of their ability to access previability abortion care in Arizona.

29.  I understand that violating the Reason Ban Scheme could result in me being subject to criminal prosecution, civil liability, and potentially losing my license to practice medicine.

30.  For the reasons detailed below, coupled with these severe penalties, the Reason Ban Scheme would force me to turn away patients when there is any inference of a fetal diagnosis.

### a. The Reason Ban does not make clear what previability abortion care it prohibits.

31.  While I understand that the Reason Ban prohibits some previability abortions, it is not clear which actions it prohibits.

32.  For example, I understand that if the Reason Ban goes into effect, a person who "[p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" would be guilty of a felony punishable by up to two years in prison.[3] A person would commit another felony punishably by up to 8.75 years in prison if they accepted

---

[1] Act § 2, A.R.S. § 13-3603.2 (as amended); Act § 10, A.R.S. § 36-2157 (as amended).
[2] Act § 11, A.R.S. § 36-2158(A)(2)(d) (as amended); Act § 13, A.R.S. § 36-2161(A)(25) (as amended).
[3] Act § 2, A.R.S. § 13-3603.02(A)(2) (as amended).

7

money "to finance" an abortion that they know is sought "because of a genetic abnormality of the child."[4] And the Reason Ban similarly prohibits a person from performing an abortion unless they first sign an affidavit stating that they have "no knowledge" that the abortion is sought "because of a genetic abnormality of the child."[5] Because most of the Reason Ban (except for one provision) prohibits abortions when they are sought "*because of* a genetic abnormality of a child," regardless of whether it is the "sole" reason or one of several, the law appears to require that I abide by that arguably broader prohibition. In practice, however, and as discussed further below at paragraph 51, even if the qualifier of "solely" were taken into account, its application is so unclear in this context that it would make no practical difference.

33.     I also understand that the term "genetic abnormality" is defined as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression."[6] But there are many fetal diagnoses that may inform a specialist's decision to refer a patient to FPA that are not clearly within or outside of this definition. For example, a fetal condition such as a malformation could be the result of both a chromosomal condition and environmental factors, or the result of physical trauma to the fetus *in utero*.

34.     I also understand that I will be required to report to the state "whether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing . . . or by ultrasound, such as nuchal translucency screening, or by other forms of testing."[7] It is unclear to me what the term "detect" means in this context, or whether an abortion provider could

---

[4] Act § 2, A.R.S. § 13-3603.02(B)(2) (as amended).
[5] Act § 10, A.R.S. § 36-2157 (as amended).
[6] Act § 2, A.R.S. § 13-3603.02(G)(2) (as amended).
[7] Act § 13, at A.R.S. § 36-2161(A)(25) (as amended).

comply with the Reason Ban Scheme without determining with reasonably certainty whether an observed fetal condition is due to a "genetic abnormality."

35.     Specifically, FPA's patients seeking abortion care receive an ultrasound examination during their consultation appointment; a physician must estimate the gestational age of the fetus based on this ultrasound.[8] In some cases, a physician can notice or detect a fetal condition on an ultrasound. This type of early detection does not reflect an actual diagnosis of a fetal condition, only a risk or likelihood of there being one. Further specialized testing would be necessary to diagnose a fetal condition observed on an ultrasound and determine whether it is due to an abnormal gene expression. FPA does not provide such testing and would have to refer a patient out to a specialist in order to know, with reasonable certainty, whether the fetal condition is due to a "genetic abnormality," as that term is defined in the Reason Ban Scheme.

36.     I am concerned that if I observe a fetal condition on a pre-abortion ultrasound and the patient declines to undergo specialized testing to diagnose that fetal condition, and instead wishes to proceed with the abortion, I could be perceived as violating the Reason Ban by providing an abortion "with knowledge" it was being sought "because of" a genetic abnormality.

37.     Further, I understand that the Reason Ban Scheme's definition of "genetic abnormality" excludes "lethal fetal conditions," which are defined as conditions that are "diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth."[9] This exclusion makes it difficult, if not impossible, for me to determine what actions could expose me to serious penalties for violating the Act.

38.     Based on my experience treating pregnant patients with fetal diagnoses, medical

---

[8] A.R.S. § 36-449.03(D)(5).
[9] Act §§ 2, 11, at A.R.S. §13-3603.02(G)(2)(b) (as amended) (incorporating A.R.S. § 36-2158(G)(1)).

9

providers often disagree on the "reasonable certainty" of a fetal condition resulting in fetal death or a live birth, much less the likelihood of death occurring within three months after birth. The likelihood of survival can vary for a fetus with any fetal condition; such determinations are made on a case-by-case basis because each pregnancy is unique, and different physicians will inevitably reach varied conclusions.

39.     In the case of a few types of fetal conditions, death is more certain. Fetuses with serious conditions—such as anencephaly, when the fetus has not developed a brain, and Potter Syndrome, when the fetus has not developed lungs—cannot survive outside of the womb. In other cases, it is important to consider potential medical interventions that are available, and whether such interventions will increase the likelihood of survivability. For example, a fetus with a severe cardiac condition may survive only a few hours or days after birth without medical intervention. On the other hand, while most fetuses with Trisomy 13 or 18 die *in utero* or within a few days or weeks after birth, some may survive beyond three months without medical intervention. For fetuses with Trisomy 13, providers are unlikely to pursue medical intervention after birth because newborns with Trisomy 13 often have complicating cardiac conditions that make medical intervention difficult and unlikely to succeed. However, in recent years, some physicians have become more willing to try medical interventions to increase the likelihood of survival for newborns with Trisomy 13.

40.     But, medical interventions are not always possible and/or consistent with the standard of care. In general, the availability of medical interventions greatly depends on a number of factors such as the person's financial circumstances and the availability of physicians who specialize in these procedures in the state. And even if medical intervention is possible and accessible, its success is never guaranteed. For example, fetuses with cardiac anomalies present complications that continue to incite live discussions and disputes among physicians and

10

specialists about the success of medical interventions.

41.      In my daily medical practice at FPA, I do not, and would not be able to, make approximations on a case-by-case basis as to whether and how long a fetus with a particular genetic condition or other severe diagnosis may survive after birth with or without medical interventions. Even given my long career as an OB/GYN and my expertise in providing abortion care to patients with fetal diagnoses, when faced with the need for making any such approximations I would refer the patient to a MFM or genetic specialist and it would largely be their opinion that I would rely upon if the patient were to return to FPA seeking abortion care.

42.      And even if I could make that determination, the diagnosis of fetal conditions is complex and subject to disagreement among medical professionals. I would fear that another physician looking at the same evidence and weighing the same factors could very easily disagree with my determination after the fact, and that could be used as a basis to prosecute me for violating the Reason Ban. This fear is particularly significant in Arizona because many members of the medical profession oppose abortion care in general.

43.      I worry that because the penalties for violating the Reason Ban are so severe, and it is unclear which previability abortions are banned and which are allowed, I will be forced to err on the side of caution and deny abortion care to any of my patients whom I know have a fetal diagnosis, even if that diagnosis could arguably fall within one of the exceptions. Being prosecuted or losing my medical license would be too great a risk if I provided an abortion in such cases.

> **b.      If the Reason Ban goes into effect, it will not be possible for me to avoid the inference that some of my patients are seeking abortions for the prohibited reason—*i.e.*, because it is apparent based on the patient's circumstances or medical chart.**

44.      I believe many pregnant people with fetal diagnoses who seek abortion care at FPA will ultimately disclose—either intentionally or unintentionally—their fetal diagnosis to me or to

a member of my staff. I believe this outcome is likely, both in cases that come to FPA through referrals and for patients who find FPA on their own. And I believe that it would be difficult, if not impossible, for me to avoid inferring that such patients are seeking abortion care because of the fetal diagnosis.

45.     For example, medical professionals throughout Arizona's health care network currently work together to provide patients with fetal diagnoses with comprehensive medical care, information about their options, nondirective counseling, and abortion care for those who decide to end their pregnancies.

46.     If the Reason Ban goes into effect, I would be concerned that officials enforcing it would interpret a patient's referral to FPA by an MFM or a genetic counselor as evidence that I knew the patient was seeking abortion care because of a fetal diagnosis they received from the referring provider. For this reason, along with the significant penalties for violating the Reason Ban, I would be afraid to provide abortion care to patients referred to me or to FPA by an MFM or genetic counselor, and would likely stop accepting such referrals.

47.     If the Reason Ban goes into effect, it will not be possible for me to continue working with these providers to collaboratively and compassionately care for patients with fetal diagnoses, and to ensure they receive the medical care and information that enables them to make the best decision for their unique circumstances. This would undoubtedly result in some patients with fetal diagnoses being denied previability abortion care in Arizona altogether, and other patients being delayed in receiving that care or otherwise receiving less complete care than would have been available before the Reason Ban went into effect.

48.     Even if I and FPA's other physicians stopped speaking directly with the network of medical providers we currently work with to provide care to patients with fetal diagnoses, patients who have been referred to FPA by another medical provider after a fetal diagnosis will often bring

12

up the referral and/or the fetal diagnosis during the pre-procedure consultation session or will include such information on the medical history form. When this occurs, it would typically be mentioned in the patient's FPA medical chart that the providing physician reviews prior to performing the abortion procedure or administering the drugs for a medication abortion. Most of the patients who are referred to me by MFMs, genetic counselors, or other specialists openly discuss their fetal diagnosis and decision to seek abortion care with me and my staff. Many of those patients clearly express that they very much wanted the pregnancy, are devastated by the fetal diagnosis, and are making a difficult decision to end the pregnancy.

49. Even less forthright patients will frequently talk about their fetal diagnosis with me and my staff in a manner that indicates they would have continued the pregnancy had they not received a fetal diagnosis. For example, patients with fetal diagnoses often ask me questions that are not relevant to the abortion procedure but are instead focused on how quickly the patient can try to get pregnant again after the abortion or the likelihood of getting a similar fetal diagnosis if they get pregnant again.

50. Even when a patient was not referred to FPA by an outside specialist or counselor, I or a member of my staff usually learn about the fetal diagnosis when the patient includes it on their medical history form or brings it up during the pre-abortion consultation. For example, I am required by law to determine at least 24 hours before providing an abortion whether a patient is seeking an abortion for a "lethal" or "nonlethal" fetal condition and, if so, to provide them with state-mandated information about, *e.g.*, the availability of perinatal hospice services if the fetus survives the birthing process.[10] FPA complies with this requirement by providing all patients with this state-mandated information during the Day 1 pre-abortion consultation appointment. My staff

---

[10] A.R.S. § 36-2158(A).

13

and I are also required under existing law to ask our patients why they are seeking an abortion and to report their response(s) to the Department of Health Services. FPA complies with this law by providing patients with a pre-printed form to fill out during their Day 2 appointment that includes a list of reasons the state requires us to report, if given by the patient. That list of reasons currently includes, among other things, whether the abortion is "elective," and whether the abortion is due to "fetal health considerations," including a fetal diagnosis of a lethal condition, a central nervous system condition, Trisomy 18 or 21, Triploidy, or "other" condition.[11]

51.     Even if patients with a fetal diagnosis note other or additional reasons for seeking an abortion, that would often not be sufficient for me to determine that they are not seeking an abortion "because of" or "solely because of" the fetal diagnosis. At times, patients for whom I have provided an abortion after a fetal diagnosis have expressed other reasons for seeking abortion care, in addition to learning of a fetal diagnosis, which appear to be inextricably intertwined with the diagnosis itself. For example, some patients have told me that they lack sufficient financial, emotional, family, or community support to raise a child with special needs. For those patients, it is not clear how I would determine whether the fetal diagnosis is the reason for the patient's decision to terminate the pregnancy or not.

52.     If the Reason Ban Scheme goes into effect, I expect pregnant people will continue to seek abortion care at FPA after receiving a fetal diagnosis, even if we stop accepting referrals.

53.     Due to the nature of existing reporting requirements, my medical practice, and the reality of patients' circumstances, it would be highly unlikely, if not impossible, for me to avoid inferring that a patient is seeking abortion care due to a fetal diagnosis. Under the Reason Ban Scheme, I would likely be forced to turn those patients away.

---

[11] A.R.S. § 36-2161(A)(12)(c)(i)-(vi).

14

**c.    If the Reason Ban Scheme goes into effect, patients are unlikely to conceal a fetal diagnosis to the extent necessary to secure an abortion.**

54.    If the Reason Ban Scheme goes into effect, I expect that pregnant people in Arizona will continue to seek abortion care at FPA after receiving a fetal diagnosis, but some will be discouraged from engaging in open and honest communications with me and my staff about their medical diagnoses and options, lest by doing so they are unable to receive an abortion.

55.    However, I believe it would be extremely difficult for me or my medical staff to avoid discovering that some patients have fetal diagnoses and inferring that those patients are seeking an abortion due to a fetal diagnosis.

56.    For example, as I explained above, I am required by law to determine the gestational age of each patient for whom I provide an abortion based on that patient's ultrasound examination.[12] In some cases, I am able to notice or detect a fetal condition on an ultrasound. If I am able to see a fetal condition on a patient's ultrasound, and that patient has not disclosed a fetal diagnosis to me, I would fear proceeding with providing abortion care to that patient for fear such an action could be interpreted as violating the Reason Ban.

57.    Similarly, the Reason Ban Scheme will require me to report to the state "whether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing . . . or by ultrasound . . . ."[13] It is unclear to me what the term "detect" means in this context, or whether I would be punished for violating the Reason Ban Scheme if I did not report a fetal condition that I observed on an ultrasound and suspected to be caused by a "genetic abnormality," but could not confirm a diagnosis through testing.

---

[12] A.R.S. § 36-449.03(D)(5).
[13] Act § 13, at A.R.S. § 36-2161(A)(25) (as amended).

15

58. Further, under current protocols due to COVID-19, most patients are not permitted to have a spouse, partner, friend, or other person accompany them during the consultation appointment. But prior to the pandemic patients were permitted to bring a trusted support person, such as a spouse, partner, or other family member—into their abortion consultation after all State Mandated Information had been provided to the patient and the patient had an opportunity to have a private discussion with the physician. While we would grant any patient seeking abortion care this courtesy, in my experience patients who have had a fetal diagnosis most frequently request to have a spouse, partner, or other trusted person join the pre-abortion consultation. I expect FPA to resume that policy once the pandemic has subsided. Even if a patient was trying to conceal a fetal diagnosis, a support person accompanying the patient may inadvertently bring it up to me or my medical staff.

59. It is my understanding that under the Reason Ban Scheme, I would also be required to sign an affidavit certifying that I am not providing the abortion "because of" a fetus's "genetic abnormality" and have "no knowledge" that the pregnant person decided to receive an abortion "because of" a "genetic abnormality" of the fetus.[14] I will also have to report "whether any genetic abnormality of the [fetus] was detected at or before the time of the abortion."[15] Because sometimes only my patients know this information, it is not clear what I am obligated to do to meet these requirements. Can I proceed with providing an abortion without first asking the patient these questions? If that is not the case, I believe patients would feel obligated to provide honest answers in response.

60. Additionally, before providing any medical information to a patient, I must first get their informed consent to the procedure. While Arizona has many laws titled or referred to as

---

[14] A.R.S. § 36-2157(A)(1).
[15] A.R.S. § 36-2161(A)(25).

"informed consent," very few of those laws reflect the informed consent process recognized by the medical profession and required by physicians' medical ethics. That is an ongoing process during which a physician must ensure that the patient understands what will happen during a medical procedure; the risks associated with the procedure; and the available alternatives. I am ethically bound to use my best medical judgment to deliver this information in a manner that recognizes each patient as an autonomous and capable decision-maker, and to act with the intent of benefiting the patient and to *avoid harming the patient*.

61.     Another important aspect of obtaining informed consent from each of my abortion patients is to ensure that each one wants to have an abortion. If a patient expresses doubts, or appears uncertain, I advise them not to go ahead with the abortion. I tell such patients that they can always come back if and when they are certain of their decision. My staff and I begin the process of obtaining the patient's informed consent, as recognized by the medical profession and required by medical ethics, during the pre-abortion consultation. Members of the FPA staff also meet with the patient as part of the informed consent process, which continues during the Day 2 counseling session and includes an assessment of the patient's decisional certainty. Occasionally, a patient may also have questions about the consent form or another matter which the physician may address prior to initiating the abortion procedure.

62.     Based on the realities of my medical practice and treating pregnant patients who have received fetal diagnoses, I believe it would be difficult for many of those patients to go through the informed consent process at FPA over the course of at least two, if not more, appointments without either revealing information that would cause me to infer they were seeking an abortion due to their fetal diagnosis or causing me to question whether they were certain in their decision to end their pregnancy.

17

63.     For example, it is currently my practice to always speak with patients who were referred to FPA by MFM or other specialists about their fetal diagnosis during the pre-abortion consultation and/or the Day 2 counseling session. Many of these patients express difficult and complex emotions about terminating a pregnancy that was wanted, even though they are firm in their decision to have an abortion. Patients with fetal diagnoses often want to distinguish themselves from patients seeking abortion care for reasons that, *e.g*., do not reflect the patient's personal beliefs or values. They also often ask me questions that are not relevant to the abortion procedure but are instead focused on future pregnancies, such as asking how quickly they can try to get pregnant again after the abortion or the likelihood of getting a similar fetal diagnosis if they get pregnant again. If the Reason Ban goes into effect and I observed a patient expressing similar emotions or asking similar questions, it would be difficult, if not impossible, for me to avoid inferring that the patient was seeking an abortion because of a fetal diagnosis.

Pursuant to 28 U.S.C. § 1746, I hereby declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

18

Dated this 13th day of August, 2021.

_____

Paul A. Isaacson, M.D.

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | |
| Plaintiffs, | Case No. |
| v. | |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; et al. | |
| Defendants. | |

### DECLARATION OF DIANNE POST, STATE COORDINATOR FOR POLITICAL ACTION, ARIZONA NATIONAL ORGANIZATION FOR WOMEN

I, Dianne Post, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the State Coordinator for Political Action for Arizona National Organization for Women ("AZ NOW"), a unit of the National Organization for Women ("NOW"). NOW is a nonprofit 501(c)(4) corporation incorporated and headquartered in Washington, D.C. and is the largest organization of feminist grassroots activists in the United States.

2.      Since its founding in 1966, NOW's purpose has been to take action through intersectional grassroots activism to promote feminist ideals, lead societal change, eliminate discrimination, and achieve and protect the equal rights of all women and girls in all aspects of social, political, and economic life. AZ NOW uses a variety of strategies, including public education and legislative advocacy, to advance women's rights and address NOW's six core issues important to our members and women in general: (1) reproductive rights and justice; (2) economic justice; (3) ending violence against women; (4) racial justice; (5) LGBTQIA+ rights; and (6) constitutional equality.

3.      As part of its mission, AZ NOW fully supports and actively takes action to ensure access to safe and legal abortion, to effective birth control and emergency contraception, and to reproductive health services and education for all.  We oppose attempts to restrict these rights through legislation, regulation or Constitutional amendment.

4.      As of June 2021, I became the State Coordinator for Political Action.  In that position I am in charge of the state Political Action Committee.  From 2017-2021, I served as the State Coordinator for Legislative Action.  In that position I oversaw AZ NOW's lobbying activities and coordinated AZ NOW's response to Arizona legislation impacting its members.  Prior to that time, I held various positions in a local chapter.  I have been a member of AZ NOW since the 1970s.

5.      I am over the age of 18 and I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I would testify competently and truthfully to these matters.

**AZ NOW's Organizational Structure**

6.      AZ NOW has more than 1,500 members across the state of Arizona.  Its membership is made up of four local chapters—East Valley Chapter, Central Phoenix-Inez Casiano Chapter, Tucson Chapter and Sun Cities/West Valley Chapter—as well as all NOW members at large living in Arizona.  Approximately 365 of AZ NOW's members are also members of at least one local Arizona chapter.  AZ NOW's approximately 1,200 other members live throughout the state.

7.      AZ NOW is run by a board of State Coordinators, consisting of: State Coordinator for NOW Policy/Spokesperson; State Coordinator for Chapter Development; State Coordinator for Leadership Training; State Coordinator for Records and Meetings; State Coordinator for Finance; State Coordinator for Legislative Action; State Coordinator for Political Action; State

Coordinator for Membership and Newsletters and State Coordinator for Technology and Electronic Media. At least one of these positions has to be filled by a member-at-large.

8. AZ NOW's budget is comprised mainly of membership fees. AZ NOW may also generate fees from an event such as the State Conference.

## AZ NOW's Activities

9. As part of its mission to support access to abortion care in Arizona and in order to educate the people of Arizona about the state of abortion access in Arizona, AZ NOW hosts speakers on the subject of reproductive rights, including what actions they can take to maintain and ensure access throughout the state. For example, in May 2021, the Sun Cities/West Valley Chapter hosted Whitney Walker, Vice President of Public Policy, Advocacy, and Organizing for Planned Parenthood. Ms. Walker spoke on present threats to women's rights in today's society, including threats to reproductive rights, and the services offered by Planned Parenthood.

10. Additionally, in June 2021, as part of AZ NOW's annual state conference, the organization presented Katherine Stewart on the topic of Christian nationalism and the relation to women's reproductive rights. One of the main tenets of Christian nationalism is to control women and their reproductive decisions. The Christian nationalism movement's Project Blitz seeks to introduce and pass many pieces of legislation against reproductive rights across the nation, including in Arizona. Because Ms. Stewart has researched the movement for years and written two books on it, she was asked to speak to AZ NOW and its members in order to educate women in Arizona about steps they can take to address the growing reproductive inequality chasm in the State.

11. AZ NOW also frequently lobbies against legislation seeking to impose restrictions on women's access to reproductive care. For example, in 2017, AZ NOW filed comments on two

3

executive orders denying people access to birth control through employers or insurance. In 2018, the organization lobbied against S.B. 1394, proposed legislation that mandated that the patient give a reason for the abortion, that doctors report any complications in great detail, that the doctors identify their specialty, that detailed reports be given about "informed consent" and that statistical data be reported annually. The bill passed and was signed into law April 12, 2018. That same year, AZ NOW sent a letter to the state health department against a "crisis pregnancy center" resolution that would legitimize these "centers" that are not licensed, are not regulated, do not have trained medical staff, and whose main purpose is to counsel pregnant people not to have an abortion. AZ NOW also lobbied against the bill at issue in this legislation, S.B. 1457, by providing extensive legal research and education about the impact of the bill to our members, providing statewide grassroots alerts to encourage our members to contact their legislators against the bill, and participating in phone banking.

12. Aside from the organization's lobbying activities, members of the Central Phoenix-Inez Casiano Chapter of AZ NOW recently participated in a protest at the Arizona State Capitol building to support the right to abortion.

13. Historically, the Tucson Chapter also has a Reproductive Justice Committee that researches and provides education on pregnancy crisis centers and organizes fundraisers to raise funds for the Arizona Abortion Fund.

14. AZ NOW has also partnered with three high school groups to assist them in establishing high school chapters, to connect them with prominent women speakers on topics of their choice, and to work with them on projects such as a letter writing campaign. AZ NOW also provides pregnancy prevention information to the students.

4

**The Threat to AZ NOW's Mission and Members**

15.     SB 1457 will significantly harm AZ NOW as an organization, seriously frustrate AZ NOW's mission, and divert organizational resources.  As a result of the legislation, AZ NOW will have to spend significant resources to educate its members and Arizona people on the impacts of the new law.  This would include devoting volunteers' and officers' time and organizational resources to understanding the law, its impact on the communities we serve, and subsequently educating and advising our members and women in Arizona accordingly.  Educating the women we serve about the law would take significant resources and take away from our current lobbying and educational efforts, including in areas that are separate from our existing reproductive justice work, such as gun violence, inter-personal violence, sexual assault, immigration and border issues, Equal Rights Amendment, racism, and discrimination against LGBTQIA+ communities, among others.

16.     This public education campaign would be necessary in order to fulfill AZ NOW's mission of ensuring abortion access and advancing the goals of reproductive justice throughout Arizona.  This is because, in order to continue accessing abortion in Arizona, people must understand the limitations on that right, the circumstances in which they can exercise that right and the conditions they must abide by to obtain an abortion, including the types of information they will be forced to hide from their providers.  Accordingly, we would need to educate our members about the risks imposed by the new law, as well as pregnant person's remaining available options under S.B. 1457 and how to access them.

17.     In addition, given the potential liability that S.B. 1457 imposes for medical professionals who provide abortion referrals, AZ NOW would need to educate our members about where abortion is available throughout the state and regarding at what point in a patient's pregnancy abortion is an option in the state.  Given the chilling effect that S.B. 1457 will have on

physicians' ability to give this information to their patients, including but not limited to in the form of providing abortion referrals, AZ NOW's work to educate the public about the state of access in Arizona would become more important than ever, and thus we would need to substantially expand our work on that front.

18.    In order to be effective and to meet the needs of AZ NOW's members and mission, any response to S.B. 1457 would need to be multi-faceted and intersectional.  For example, AZ NOW would need to create both hard copy and electronic informational resources about the impact of the legislation.  These materials will be distributed via mail to AZ NOW's 1,500 members and on its website and social media pages.  Because AZ NOW does not have email addresses for a large percentage of its members, the materials would need to be distributed via hard copy mail. The cost of printing and mailing alone would significantly impact AZ NOW's limited finances. Such materials also must be translated into languages other than English such as Spanish, Russian, Navajo, and Arabic because not only does Arizona have a large percentage of Spanish speakers, but we also have large sections of Native Nations and pockets of refugees.  Such translation is very costly.

19.    AZ NOW would also need to host informational presentations to churches, clubs, women's groups, civic groups, youth groups and other relevant audiences about the legislation. Further, in order to reach more remote populations in Arizona, AZ NOW would buy radio ads on local stations.

20.    AZ NOW will also be forced to divert resources to provide support to people seeking abortions who face hardships in accessing abortion care as a result of the legislation.  AZ NOW has previously raised funds for groups, such as the Abortion Fund, that provide these types

2-ER-275

of services.  Given the widespread impact of the impact of the legislation, AZ NOW will begin providing these services in addition to raising funds.

21.     In the wake of this new legislation, which would force more people to travel to access abortion care, AZ NOW is coordinating its members to organize support.  Specifically, because the Act bans abortion for patients who have received a fetal diagnosis, more people may need to travel longer distances to obtain an abortion.  This would likely require AZ NOW to organize and recruit teams of volunteers from its membership that would provide or assist affected pregnant people with the provision of travel, lodging, child care, and other assistance necessary to obtain abortion care in Arizona, and/or coordinating with NOW chapters in neighboring states to assist such people with locating an abortion provider in, and traveling to, another state.

22.     In connection with the logistical support AZ NOW intends to provide, the organization is developing a form for its website that people can use to request assistance in finding an abortion provider or obtaining resources to offset the increased cost of abortion.

23.     In order to provide this type of support to people seeking abortions, AZ NOW will need to raise funds.  AZ NOW will raise money by sending direct requests to its members, posting fundraising campaigns on its social media and hosting events such as concerts and trivia nights.  By soliciting funds to help people obtain an abortion, AZ NOW opens itself up to criminal liability if it knows that the person is seeking an abortion for the banned reason.  The Act makes it a class 3 felony to "solicit[ ] or accept[ ] monies to finance . . . an abortion because of a genetic abnormality of the child."  A.R.S. § 13-3603.02(B)(2).

24.     These anticipated new activities would result in a diversion of resources from AZ NOW's current activities.  AZ NOW anticipates that it would need to reduce its current lobbying

7

and educational activities, as detailed above in order to support the new education and member outreach activities caused by the legislation.

    25    The new legislation also directly frustrates AZ NOW's mission of seeking safe and legal abortion for all and ensuring reproductive justice.

Pursuant to 28 U.S.C. § 1746, I hereby declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed August ___, 2021

Dianne Post

8

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Paul A. Isaacson, M.D., on behalf of himself and
his patients, et al.,

            Plaintiffs,

     v.

Mark Brnovich, Attorney General of Arizona, in
his official capacity; et al.

            Defendants.

Case No.

**DECLARATION OF CIVIA TAMARKIN, PRESIDENT OF THE NATIONAL
COUNCIL OF JEWISH WOMEN (ARIZONA SECTION), INC.**

I, CIVIA TAMARKIN, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the President of the National Council of Jewish Women (Arizona Section),

Inc. ("NCJW AZ"), which is a nonprofit 501(c)(3) corporation incorporated and headquartered in

Scottsdale, Arizona. NCJW AZ is a Section of the National Council of Jewish Women ("NCJW"),

a national nonprofit 501(c)(3) corporation incorporated in New York and headquartered in

Washington, D.C.

2.      Founded in 1893, NCJW is a grassroots organization of volunteers and advocates

who turn progressive ideals into action. Inspired by Jewish values, NCWJ and NCJW AZ have a

shared mission to strive for social justice by improving the quality of life for women, children, and

families and by safeguarding individual rights and freedoms. NCJW AZ advances this mission by

working across varied platforms and in cooperation with other organizations to promote social

justice through advocacy, activism, public education, and community service. NCJW's priorities

1

include, among others: protecting and advancing reproductive health, rights and justice; civil rights; immigration and refugees; and gender-based and sexual violence.

3.     An integral component of NCJW AZ's mission is advancing the goals of reproductive justice so every person can make their own moral and informed decisions about their body, regardless of race, income, sexual orientation, gender, immigration status, ability, or geography. This includes supporting and advocating for health equity and universal access to health coverage, services, and information, specifically including abortion and contraceptive care; comprehensive sex education; and comprehensive family planning information and services.

4.     As President of NCJW AZ, my responsibilities include: (i) serving as the official spokeswoman for and representative of NCJW AZ; (ii) presiding at meetings of NCJW AZ and of the NCJW AZ Board of Directors; (iii) signing all contracts, agreements and legal documents on behalf of NCJW AZ; (iv) serving as a member of all NCJW AZ committees, with the exception of the nominating committee; and (v) setting NCJW AZ's strategic direction and organizational agenda, priorities, and focus in carrying out NCJW AZ's mission.

5.     I have held the position of NCJW AZ President since April 2019. Prior to that, I served as Vice President of Social Justice. I have been a member of NCJW AZ since 2017, when I was specifically invited to both become a member of NCJW AZ and participate on the Board of Directors based on my significant experience with reproductive rights and justice during my career as an investigative journalist, as well as my work as the co-writer, director, and producer of "Birthright: A War Story," a critically acclaimed feature-length documentary that was theatrically released in more than 45 cities in 2017 and focuses on the effects of policies that criminalize pregnancy or otherwise punish pregnant people for exercising their right to procreative and bodily autonomy.

2

6.      I have reviewed and am familiar with S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) ( "S.B. 1457" or the "Act"), including its provisions banning abortions sought because of a fetal diagnosis, Act §§ 2, 10, A.R.S. §§ 13-3603.02, 36-2157 (as amended) (the "Reason Ban") and imposing related reporting requirements, Act §§ 11, 13, A.R.S. §§ 36-2158(A)(2)(d)), -2161(A)(25) (as amended) (collectively, the "Reason Ban Reporting Requirements") (collectively, the "Reason Ban Scheme"), as well its provision altering the entire Arizona Code to require its laws be "interpreted and construed" in a manner that gives all fertilized eggs, embryos, and fetuses the same "rights, privileges and immunities available to other persons," Act § 1, A.R.S. § 1-219 (as amended) (the "Personhood Provision").

7.      I am over the age of 18 and I make this declaration based on my personal knowledge, unless I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

**The Organizational Structure of NCJW AZ**

8.      NCJW AZ has over 480 members, who live throughout the state of Arizona and include people with capacity to become pregnant.

9.      NCJW AZ is an all-volunteer organization governed by a Board of Directors, which consists of: President; Senior Vice President Policy and Advocacy; Senior Vice President Membership; Vice President Communications; Vice President Development; Vice President Legal Affairs; Vice President Marketing; Vice President Strategic Planning; Recording Secretary; Treasurer; Events Director; and seven Directors at Large.

10.     NCJW's budget is comprised mainly of membership fees and funds generated from donations and fundraising events.

**NCJW AZ's Reproductive Justice Initiative**

3

11.     NCJW AZ advocates for social justice within a reproductive justice framework. This means that NCJW AZ aims to create a world where everyone, regardless of race, class, gender, sexuality, ability, or immigration status, is able to control their body, sexuality, and future.

12.     The formal reproductive justice framework was created in the mid-1990s by women of color. Inspired by universal human rights concepts, it grew out of a discussion of how U.S. health care reform proposals would impact Black women's lives and communities. From there, the reproductive justice movement was born, committed to achieving human rights for all. Specifically, these rights include: (i) the right to have full autonomy over our bodies; (ii) the right to have or not have children; (iii) the right to birth and/or parent our children with dignity; and (iv) the right to live and/or raise a family in a safe, healthy environment.

13.     The reproductive justice framework goes beyond the basic legal right to access key reproductive health services. Using a broader social justice and human rights lens, it seeks to advance moral and bodily autonomy, health equity, and unfettered access to comprehensive reproductive health care for all individuals and communities. It also emphasizes how multiple systems of discrimination intersect and influence these rights among marginalized communities. As a movement, it works to place the voices of those who have been marginalized at the center to lead the conversation for social change.

**NCJW AZ's Activities**

14.     As an ally to the reproductive justice movement, NCJW AZ seeks to promote legislative measures and public policies that advance justice, combat regressive policies, and dismantle the deep-rooted systems of discrimination and inequality from which harmful policies arise. Building on our legacy of raising our Jewish voice for progress, NCJW AZ engages in

4

grassroots organizing, legislative advocacy, and community awareness to advocate for health equity, procreative liberty, and true moral and bodily autonomy for all.

15.     For example, NCJW AZ is a member of the Arizona Reproductive Rights Coalition, which engages in legislative advocacy, grassroots organizing, and community awareness actions with the goal of advancing reproductive rights and blocking legislation that would limit access to full spectrum reproductive healthcare or criminalize pregnancy.

16.     NCJW AZ, in particular, has publicly opposed and actively lobbied against proposed legislation that would ban previability abortion as well as bills classifying fertilized eggs, zygotes, embryos, and fetuses as people with full legal rights and protections.  For example, NCJW AZ publicly opposed S.B. 1457 in 2021 and, in partnership with the Arizona Reproductive Rights Coalition and other Arizona reproductive rights and justice advocacy organizations, worked to prevent its passage by enlisting and guiding witness testimony, directly engaging with legislators, encouraging NCJW AZ members and the general public to take action against the bill and providing them with resources for doing so, writing op eds, taking out print and digital newspaper ads, and participating in press conferences. NCJW AZ similarly engaged in legislative advocacy in 2021 to defeat H.B. 2650, which would have included fetuses within the legal definition of "person," and allowed both doctors who provide abortion care and people who receive abortions to be prosecuted for first degree murder.

17.     NCJW AZ also provides its membership with access to trainings and tools to assist them in effectively advocating against legislation that threatens to take away people's rights to control their bodies, sexuality, and future. We host several presentations annually and small group weekly training sessions that are intended to encourage NCJW AZ members to become engaged

5

in legislative advocacy. These presentations almost always discuss legislative advocacy to protect and advance reproductive rights and justice.

18. NCJW AZ has also engaged in efforts to educate our membership and the public about the dangers of abortion bans and fetal-centric personhood laws and policies, including by holding multiple public events since 2017 to raise awareness of the ways in which procreative liberty and bodily autonomy are being threatened in the United States. For example, in 2017, 2019, and 2021 NCJW AZ hosted screenings of the critically acclaimed documentary, "Birthright: A War Story," which exposes the ways pregnant people in the United States are being jailed, physically violated, and even put at risk of dying due to states' attempts to control whether, when, and how people bear children. In 2021, NCJW AZ also joined an amicus brief filed in the Arizona Court of Appeals on behalf of 45 organizations, experts, and advocates in support of an Arizona mother found to have committed child neglect for using medical marijuana (for which she had a medical authorization) to treat hyperemesis gravidarum, a severe health condition that only occurs during pregnancy. NCJW AZ also conducted a public webinar in July 2021 featuring nationally recognized experts on the criminalization of pregnancy who discussed the ways in which prosecutors and other state officials have used ambiguous, fetal-centric laws like S.B. 1457 to penalize pregnant patients, harm public health, separate families, and ruin lives.

19. NCJW AZ also frequently hosts and supports events and campaigns to educate our members and the general public about laws and public policies that threaten reproductive rights and the goals of reproductive justice. For example, during the summer of 2018, the NCJW AZ Board of Directors voted to focus all of NCJW AZ's organizational events for the following year around reproductive health and justice. NCJW AZ then organized and hosted several events to specifically educate our membership on threats to reproductive health and the goals of reproductive

justice in both Arizona and in the United States. These events included a public presentation in October 2018 during which panelists engaged in reproductive rights, health, and justice advocacy in Arizona discussed their work and ways attendees could become involved in and/or support similar advocacy; and an event in February 2019 in which Robin Marty, author of the book "Handbook for a Post-Roe America," educated attendees about the various worst-case scenarios that could occur if *Roe v. Wade* is overturned, and offered guidance on how to use existing networks and create new ones to ensure all people can access the abortion care they need. Additionally, in February 2019, NCJW AZ's annual awareness luncheon included a panel discussion focused on educating attendees about how people can access reproductive health care in Arizona, the rising maternal mortality rate in the U.S. and its causes, what will happen if *Roe v. Wade* is overturned, and actions individuals can take to protect and advance procreative liberty and health equity in Arizona. The panelists for this event included myself (in my role as an investigative journalist and filmmaker); abortion and family planning providers; public health experts; and a maternal fetal medicine specialist. At the event, NCJW AZ presented its Impact Award to the leader of the Planned Parenthood Clinic Escorts.

20. In April 2021, NCJW AZ also conducted a virtual meeting and mock trial called "You Be The Judge" in which members debated various state reproduction and abortion laws, reached a "judicial decision" on the laws, and then evaluated the actual decisions made by federal courts when those laws were challenged.

21. While NCJW AZ's reproductive justice initiative is focused on achieving health equity and universal access to health coverage, services, and information, specifically abortion and contraception, our activities also address a range of issues that fall within the four basic reproductive justice human rights concerns.

7

22.     For example, the right to have full autonomy over our bodies includes the ability to live free from sexual assault, harassment, and violence. In furtherance of this principle, NCJW AZ is currently dedicating a significant amount of our organizational resources to creating Ruth Place, a comprehensive trauma recovery treatment program and social support network to empower survivors of sexual assault and exploitation to take control over their lives and futures. Ruth Place will address the social, emotional, and psychological needs of a diverse population of survivors, their families, and allies, at all stages of the recovery process by providing no-cost or low-cost individual counseling, group therapy, emergency intervention, mentorships, and social support networks to enable long-term.

23.     As an additional example, NCJW AZ has sought to further the right to live and/or raise a family in a safe, healthy environment by advocating for just, humane immigration policies and taking actions to assist asylum seekers who enter Arizona through its shared border with Mexico. NCJW AZ has provided its members with information and opportunities to assist local and international rescue organizations in opposing inhumane treatment of asylum seekers in Arizona, and to support asylum seekers released in Arizona with obtaining necessary supplies and services, such as shelter, clothing, toiletries, and health care. We have also conducted events to raise community awareness of the conditions women and girls face when seeking asylum in the United States, including procreative coercion and denial of health care services.

**S.B. 1457 Will Irreparably Harm NCJW AZ's Mission and Members**

24.     If the Reason Ban Scheme or Personhood Provision go into effect, NCJW AZ will be significantly harmed as an organization; addressing either or both laws would cause us to divert resources and would seriously frustrate our mission.

8

25.     If the Reason Ban Scheme and Personhood Provision go into effect, NCJW AZ would have to devote significant resources to educating our membership and the communities we serve about the new laws and their likely impacts. To do this, NCJW AZ would first have to allocate volunteer time and organizational resources to developing a deeper understanding of the laws and their potential impacts on our membership and the public. NCJW AZ's all-volunteer Board of Directors would accordingly have to form a task force and then recruit among our membership volunteers that would, at minimum, have to locate volunteer attorneys to assist with legal analysis, and also consult with the NCJW's national office, NCJW Sections in other states, and other Arizona reproductive rights and justice organizations.

26.     NCJW AZ would thereafter divert additional organizational resources and volunteer time to developing programming and initiatives to educate our membership and the public about the Reason Ban Scheme and Personhood Provision, and provide assistance to members of our communities who are impacted by the laws. Given the significant breadth of these new laws, this would require us to expend considerable organizational and financial resources, as well as volunteer time.

27.     For example, if the Reason Ban Scheme or Personhood Provision go into effect, NCJW AZ would have to develop and execute a significant public education or "Know Your Rights" campaign, likely in partnership with one or more other reproductive rights or justice organizations in Arizona. To be consistent with NCJW AZ's mission of seeking social justice through a reproductive justice lens, this campaign would have to be intersectional and meet the needs of NCJW AZ's membership *and* the marginalized communities in Arizona that are most likely to be negatively impacted by the new laws. This would be challenging, given that those communities are located in remote areas, such as the Navajo Nation in northeast Arizona, or are

9

otherwise difficult to access, such as pregnant people who are incarcerated or asylum seekers being held in detention centers. Arizona also has a significant Spanish-speaking population, as well as refugee communities who primarily speak Russian or Arabic, and indigenous communities who speak Navajo. NCJW AZ would accordingly have to structure the campaign to include multiple types of communications translated into multiple languages, such as a multi-platform social media campaign; print leaflets and brochures for tabling events; postcards and other mailings to NCJW AZ members and impacted communities; advertisements in newspaper and other media outlets; writing op eds; and potentially purchasing billboard space in strategic locations.

28.    If the Reason Ban goes into effect, NCJW AZ would also have to educate our membership and the communities we serve about the potential liability imposed on medical professionals who provide abortion referrals as well as physicians who provide abortion care. We would accordingly need to partner with other reproductive rights and justice organizations in Arizona to develop resources and programming to assist the public with navigating these restrictions and locating abortion providers in Arizona or elsewhere.

29.    If the Reason Ban Scheme goes into effect, people with fetal diagnoses may have to travel long distances to obtain abortion care. In response, NCJW AZ would seek to collaborate with partner organizations to develop programming and initiatives to assist such people with obtaining abortion care. This would likely require NCJW AZ Board members to organize and recruit teams of volunteers from NCJW AZ's membership that would provide or assist affected pregnant people with the provision of travel, lodging, child care, and other assistance necessary to obtain abortion care in Arizona, and/or coordinating with NCJW Sections in neighboring states to assist such people with locating an abortion provider in, and traveling to, another state.

10

2-ER-288

30.     Finally, if the Personhood Provision goes into effect, people in Arizona may be criminally prosecuted or subject to other legal penalties based on allegations that their actions during pregnancy harmed their fertilized egg, embryo, or fetus. In addition to the public education campaign described above, NCJW AZ would take further action in response to pregnancy prosecutions facilitated by the Personhood Provision. For example, NCJW AZ has in the past assisted people punished for actions alleged to have harmed their developing fetus with locating legal experts to assist with their legal cases and providing support through amicus briefs. We would be compelled to provide such support on a larger scale if the Personhood Provision goes into effect, which would in turn require us to divert time and organizational resources from other projects.

31.     If the Reason Ban Scheme or Personhood Provision go into effect, the campaigns, programming, and initiatives described above would be necessary for NCJW AZ to carry out its mission of protecting reproductive rights and advancing the goals of reproductive justice. Specifically, the Reason Ban Scheme would prohibit some people from receiving previability abortion care in Arizona, and the Personhood Provision may put pregnant people at risk of criminal prosecution or other serious penalties for actions that would be legal if they were not pregnant. Both laws are direct attacks to procreative liberty and bodily autonomy. Pregnant people seeking abortion care because of a fetal diagnosis will lose their right to previability abortion unless they receive information about the Reason Ban Scheme and resources to obtain an abortion outside Arizona. Others may lose their right to previability abortion care unless they understand the conditions imposed by the Reason Ban Scheme and have the resources to navigate those conditions. And if pregnant people in Arizona are to avoid being prosecuted for actions that would be legal if they were not pregnant, such as undergoing methadone treatment for a substance use disorder or remaining in an abusive relationship, they will need to be made aware of the

11

Personhood Provision and informed of actions taken during pregnancy that could put pregnant people at risk of criminal prosecution or other penalties.

32.     If either the Reason Ban Scheme or Personhood Provision, or both, go into effect, NCJW AZ would have to divert resources away from its existing programs, initiatives, and activities. Significantly, NCJW AZ is an all-volunteer organization. We rely on volunteers from within our membership to execute any program, initiative, or event. Our budget is also derived only from membership dues, donations, and fundraising (which typically requires an upfront financial investment to be successful). Our resources are, therefore, necessarily limited. The campaigns, initiatives, actions, and programs described above that would be necessary to both serve the needs of NCJW AZ's membership and carry out our mission would require NCJW AZ to launch a significant fundraising campaign and divert our most precious resource—our volunteers' time—away from existing programming and initiatives.

33.     Specifically, to carry out an effective public education campaign, NCJW AZ would have to increase the workload of its paid social media consultant, who works on contract, to develop and execute a multi-platform social media strategy that would reach NCJW AZ's membership as well as members of the communities most in need of information about the new laws. NCJW AZ would also need to pay for printed fliers, booklets, postcards, and other informational materials, as well as postage for mailings to its membership and other contacts. To reach all of the communities impacted by the new laws, NCJW AZ would have to pay for these resources to be translated into languages other than English, such as Spanish, Navajo, Russian, and Arabic. It may also be necessary for NCJW AZ to engage the services of a consultant to develop a marketing strategy campaign and other resources to assist with public outreach and community awareness. This may include paying for advertisements on billboards, in newspapers,

12

or in other media outlets. All of these activities would require substantial volunteer time and effort to be diverted from NCJW AZ's other programs and initiatives.

34.     To cover these expenses, NCJW AZ would need to engage in significant fundraising efforts. A fundraising campaign of the magnitude necessary to pay for the programming, actions, and initiatives described above—include raising funds to directly aid people in obtaining abortion care—would require NCJW AZ to divert funds from its existing budget—especially to the extent fundraising activities require upfront payments, such as securing a facility rental or hiring a production studio to conduct a virtual fundraiser. Such fundraising activities would also require the NCJW AZ Board to recruit volunteers to participate in several task forces or initiatives to carry out the various tasks involved in planning, developing, and executing a fundraising campaign. Given NCJW AZ's current resources, launching any new fundraising campaign would necessarily divert additional time and organizational resources away from NCJW AZ's other programming—including our current campaign to raise money to purchase and renovate the building that will house the Ruth Place.

35.     The anticipated new actions, programming, campaigns, and initiatives described in this Declaration would result in a diversion of resources from NCJW AZ's current activities, including our ongoing legislative advocacy activities, community service programs, and community awareness and education events. Most significantly, responding to the Reason Ban Scheme and Personhood Provision would require NCJW AZ to shift resources from our volunteers' ongoing efforts to launch the Ruth Place program and our capital campaign to raise funds for the building that will house the program. Responding to the new laws would also require NCJW to divert resources from its ongoing social justice initiatives, such as our work assisting

13

asylum seekers and sex trafficking survivors, as well as our social justice actions, such as supporting voting rights and just immigration policies.

36. The Reason Ban Scheme and the Personhood Provision directly frustrate NCJW AZ's mission of advancing the goals of reproductive justice so every person can make their own moral and informed decisions about their body. In particular, the new laws would directly obstruct NCJW AZ's reproductive justice initiative by, among other things, threatening or taking away pregnant peoples' moral and bodily autonomy to make decisions about their health care and whether or not to have children; exacerbating inequitable access to health care by banning previability abortion for people with fetal diagnoses and restricting pregnant people's access to health care that may harm a fertilized egg, embryo, or fetus; and restricting access to comprehensive reproductive health care for all individuals and communities by imposing significant restrictions on medical providers' ability to have open and honest communications with patients and make appropriate referrals.

37. Finally, by soliciting funds to assist people in obtaining an abortion, I understand that NCJW AZ would open itself up to criminal liability if we know that a pregnant person is seeking an abortion for a fetal condition prohibited by the Reason Ban Scheme.[1]

Pursuant to 28 U.S.C. § 1746, I hereby declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

---

[1] A.R.S. § 13-3603.02(B)(2).

14

Dated this 13th day of August, 2021.

Civia Tamarkin
President, National Council of Jewish
Women (Arizona Section), Inc.

15

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | |
| Plaintiffs, | |
| v. | Case No. |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; et al. | |
| Defendants. | |

**DECLARATION OF DR. MIRIAM ANAND IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

1.      The Arizona Medical Association ("ArMA") is one of the plaintiffs in this action. I am the current President of ArMA.  In that role, I am the chief elected officer, Chair of the Board, and exercise general supervision of the membership and affairs of the organization. Through my responsibilities at ArMA and my interactions with its board leadership, staff, and members, I am personally familiar with its purposes, constituents, and activities.  I submit this declaration on behalf of ArMA.

2.      ArMA is a membership organization with nearly 4000 members.  The majority of members in ArMA are physicians; our membership also consists of physicians in training and medical students.

3.      ArMA promotes the art and science of medicine "on behalf of member physicians".  ArMA's mission statement specifically includes advocacy for "the freedom to deliver care in the best interests of patients" and for the "health of all Arizonans."

1

4.    ArMA's advocacy efforts include representing its members and the medical profession before the legislative, executive, and judicial branches of government.  In doing so, its goals include promoting optimal health and medical services for Arizonans; promoting the standards for medical ethics; and aiding members in their professional pursuits.

5.    During the most recent Arizona legislative session, ArMA actively opposed passage of SB 1457 and urged legislators to vote against it.  ArMA also urged Governor Ducey to veto it after it passed through the legislature.  In ArMA's strong opposition to SB 1457 and our request for a veto, we were joined by a number of other physician groups in the state, including the Arizona Section of the American College of Obstetricians and Gynecologists, the Arizona Academy of Family Physicians, the Arizona Chapter of the American Academy of Pediatrics, and the Arizona Osteopathic Medical Association.

6.    In opposing SB 1457, ArMA emphasized that the bill would cause significant harms to the physician-patient relationship, to medical care, and to physicians' legitimate medical practice in Arizona.  ArMA made clear that government should not be defining appropriate medical care and jeopardizing patients' interests in the process.  We urged the legislature and the governor not to "criminalize[] the termination of pregnancy based upon a genetic abnormality."

7.    As ArMA also explained, the "physician-patient relationship is founded on trusted, open and honest communication, which best serves the health and safety of the patient." But "SB 1457 undermines the foundation of the physician-patient relationship by threatening criminal consequences" for physicians.  ArMA urged the legislature and the governor to reject SB 1457 "as an unacceptable, unwise, and dangerous intrusion into" physician-patient interactions and medical care.

2

8.      In our advocacy against SB 1457, ArMA also highlighted that SB 1457 is extremely broad and vague, and seems to impact many aspects of reproductive health care.

9.      ArMA collects basic demographic information about its membership and asks each member to provide their medical credentials, medical practice type, medical specialty, and geographic location.

10.     ArMA's thousands of members provide medical care for Arizonans in all areas of the state, including rural areas.  ArMA members' work spans the full gamut of medicine, medical research, and medical education.

11.     ArMA-member physicians serve their communities as primary care physicians and as practitioners in all major medical specialties, including members who are obstetricians and gynecologists (OB/GYNs), maternal-fetal medicine specialists (MFMs, who are also known as perinatologists or colloquially as high-risk OB/GYNs), and reproductive endocrinologists.  At least 75 OB/GYNs are ArMA members today.

12.     Some of ArMA's members provide abortion care to Arizona patients, including pre-viability abortion care that SB 1457 would ban.  For example, Plaintiffs Dr. Paul Isaacson and Dr. Eric Reuss are ArMA members and will, I understand, be submitting their own declarations that describe their practices in detail.  Those physicians and other ArMA members like them include pregnancy counseling and abortion care, among much other reproductive health care, in their practices.

13.     Many ArMA members, including obstetricians, MFMs, and others who care for pregnant patients, include information and counseling about genetic testing and fetal anomalies in their practice.  As I understand from our members, offering genetic testing as a possibility for pregnant patients; conducting a detailed ultrasound exam; and discussing possible anomalies are

3

routine components of prenatal care. SB 1457, however, would invade those types of physician-patient communications, limit patient counseling, and restrict consultation among physicians treating a particular patient. Dr. Katherine Glaser, for example, is an ArMA member who routinely provides prenatal care and discusses these issues with her patients and other physicians. I understand that she will also submit a declaration.

14. ArMA members also treat pregnant patients for serious medical conditions (such as cancer and heart disease) and for pregnancy complications—including treatment with drugs or other interventions that may have risks and side effects for an embryo or fetus. In SB 1457's Section 1, however, this new law appears to create the possibility of legal liability for physicians' provision of such medical care. SB 1457 leaves ArMA and its member physicians highly uncertain of how Section 1's sweeping reinterpretation of Arizona law affects medical practice.

15. In sum, SB 1457 establishes new felonies that criminalize health care. It requires physician reporting of private patient information to law enforcement authorities. It punishes communication between patients and their doctors, and among medical professionals. It leaves physicians unclear about the legal standards that govern their provision of important care, including for pregnant patients with serious maternal conditions. Contrary to legislators' assertions, SB 1457 interferes with "the integrity and ethics of the medical profession" and does not advance the medical profession and provision of health care in our state.

16. ArMA appears here on behalf of its members and their patients to contest and prevent these extremely harmful intrusions into health care. For all the reasons that Plaintiffs' attorneys argue in moving for a preliminary injunction, SB 1457 should not be allowed to take effect and should be struck down as an unconstitutional invasion of physicians' and their patients' rights.

4

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

August 13, 2021.

_____

Miriam Anand, MD